CAUSE NO. 2012-CI-8758


2012CI08758 -P00034

| | | |
|---|---|---|
| CARMELLA GUERRERO, | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| VS. | § | 225TH JUDICIAL DISTRICT |
| | § | |
| BEXAR COUNTY CIVIL SERVICE | § | |
| COMMISSION, | § | |
| Defendant. | § | OF BEXAR COUNTY, TEXAS |

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
11/17/2015 7:02:43 PM
KEITH E. HOTTLE
Clerk

## NOTICE OF FILING OF ORIGINAL RECORD AND HEARING TRANSCRIPT

Defendant, Bexar County Civil Service Commission files the attached reporter's record

and clerk's original record per Texas Local Government Code 158.0122(a)

Respectfully submitted,

Clarkson F. Brown
State Bar No. 00798082
Assistant Criminal District Attorney
- Civil Section
300 Dolorosa, Suite 5049
San Antonio, Texas 78205-3030
Telephone: (210) 335-3918
Telecopier: (210) 335-2151
cbrown@bexar.org
ATTORNEY FOR DEFENDANT

BY: _____

DEPUTY

2014 JAN 10 P 1:53

BEXAR COUNTY
DISTRICT CLERK
DONNA KAY McKINNEY
FILED

TR-0001

Document
scanned as filed.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been served by email, on this the 10th day of January, 2014, to the following:

Orlando R. Lopez
The Lopez Law Firm
719 S. Flores, Suite 100
San Antonio, TX 78215
210-472-2100
210-472-2101 fax
Olopez@Lopez-Law.com
*Attorney for Plaintiff*

Clarkson F. Brown

2

TR-0002

NO. 10-BCCS-002

| | | |
|---|---|---|
| CARMELLA GUERRERO,<br>      Employee | ) | |
| | ) | |
| | ) | BEXAR COUNTY |
| | ) | CIVIL SERVICE COMMISSION |
| vs. | ) | |
| | ) | BEXAR COUNTY, TEXAS |
| INFORMATION TECHNOLOGY<br>DEPARTMENT,<br>BEXAR COUNTY, TEXAS,<br>      Department. | ) | |
| | ) | |
| | ) | |
| | ) | |

TRANSCRIPT OF AUDIO RECORDED PROCEEDINGS

APPEAL HEARING OF CARMELLA GUERRERO

APRIL 26, 2012

HELD BEFORE

THE BEXAR COUNTY CIVIL SERVICE COMMISSION
CHAIRMAN GINA M. ELLIOTT, PRESIDING

HR Training Room
211 S. Flores Street
San Antonio, Texas 78204

DAWN FLIPPIN, CSR
200 Alcalde Moreno
San Antonio, Texas 78232

Dawn Flippin, CSR                          210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)                5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0003

APPEARANCES

FOR THE EMPLOYEE:

    Mr. Orlando R. Lopez
    The Lopez Law Firm
    719 S. Flores, Suite 100
    San Antonio, TX   78215
    210-472-2100

FOR THE COUNTY:

    Mr. Clark Brown
    Bexar County District Attorney's Office - Civil Division
    300 Dolorosa Street, Suite 5049
    San Antonio, Texas 78205
    (210) 335-3918

ALSO PRESENT:

Commissioner Elliott
Commissioner Gimblet
Commissioner Cortez
Ms. Andrea San Miguel
Ms. Carmella Guerrero, Employee

Electronically signed by Dawn Flippin (401-013-461-8760)    5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0004

INDEX

|                                              | Page |
|----------------------------------------------|------|
| County Opening Statement                     | 12   |
| Employee Opening Statement                   | 16   |

\* \* \* \* \* \* \* \* \* \* \* \* \*

COUNTY WITNESS: CARMELLA GUERRERO

|                                              |     |
|----------------------------------------------|-----|
| Direct Examination By Mr. Brown              | 18  |
| Cross Examination By Mr. Lopez               | 65  |
| Redirect Examination by Mr. Brown            | 91  |

COUNTY WITNESS: TINA SINGH

|                                              |     |
|----------------------------------------------|-----|
| Direct Examination By Mr. Brown              | 95  |
| Cross Examination By Mr. Lopez               | 106 |
| Redirect Examination by Mr. Brown            | 112 |
| Recross Examination by Mr. Lopez             | 116 |
| Further Redirect Examination by Mr. Brown    | 120 |

COUNTY WITNESS: GILBERT SANCHEZ

|                                              |     |
|----------------------------------------------|-----|
| Direct Examination By Brown                  | 122 |
| Cross Examination By Mr. Lopez               | 133 |
| Redirect Examination by Mr. Brown            | 138 |
| Recross Examination by Mr. Lopez             | 141 |

COUNTY WITNESS: CATHERINE MARAS

|                                              |     |
|----------------------------------------------|-----|
| Direct Examination By Mr. Brown              | 143 |
| Cross Examination By Mr. Lopez               | 197 |
| Redirect Examination by Mr. Brown            | 235 |
| Recross Examination by Mr. Lopez             | 242 |

COUNTY WITNESS:  ROBERT HAMPEL

Direct Examination By Mr. Brown                    247

Cross Examination by Mr. Lopez                     256

EMPLOYEE WITNESS:  DAVID MANDUJANO

Direct Examination By Mr. Lopez                    261

Cross Examination By Mr. Brown                     265

EMPLOYEE WITNESS:  CHAUNCEY SPENCER

Direct Examination By Mr. Lopez                    266

Cross Examination by Mr. Brown                     269

EMPLOYEE REBUTTAL WITNESS:  CARMELLA GUERRERO

Direct Examination By Mr. Lopez                    272

* * * * * * * * * * * * *

County Closing Statement                           281

Employee Closing Statement                         287

Commission's Decision                              291

COUNTY EXHIBITS

| | | Page |
|---|---|---|
| 1. | E-mail to Ms. Singh | 65 |
| 2. | Letter requesting apology | 65 |

EMPLOYEE EXHIBITS

| 1. | Binder of work history | 65 |
| 2. | Bexar County Parking Policy | 133 |
| 3. | E-mail | 275 |

Dawn Flippin, CSR      210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)      5245eeb5-f8db-45f5-aa87-28085203e4ee

TR-0007

PROCEEDINGS:

CHAIRMAN ELLIOTT: Good morning. It is Thursday, April 26th of 2012. Time now of 9:05. We're here to call to order the Bexar County Civil Service Commission meeting. And present are all three commissioners, myself Gina Elliott, Commissioner Gimblet and Commissioner Cortez.

(Off-the-record Commission business).

MS. SAN MIGUEL: Item number 4 is Bexar County Civil Service Commission Appeal Hearing, Case Number 10-BCCS-002, Carmella Guerrero versus Information Technology Department. The action being appealed is a demotion. The date of the incident was October 4th, 2010. The place of the incident was the office of Catherine Maras, CIO BCIT.

And the specific rule or policy violated was Bexar County Civil Service Rules and Regulation policy number 7.6.09 (b), (c) and (j). And all parties are present, and this is an open hearing.

CHAIRMAN ELLIOTT: Okay. We'll go forward. Opening statement from the County.

MR. BROWN: Clark Brown on behalf of Bexar County. Before we start, the County would like to invoke the rule.

CHAIRMAN ELLIOTT: Okay. Based on that invocation, we will ask that -- this is under Texas Rule of Evidence 613. And what that means for those of you not

familiar with that, all witnesses excluding the office or department representative and the employee will be asked to leave this hearing at this time and wait until you are called. The rule also provides that there is no discussion. We ask that while are you waiting. So at this time -- okay.

MS. SAN MIGUEL: Only the ones that are witnesses, okay.

CHAIRMAN ELLIOTT: Okay. We're ready to proceed.

MR. BROWN: Clark Brown on behalf of Bexar County. I don't know if -- can I just talk about a bookkeeping or kind of the way this is going to proceed today matter to try to set up ...

CHAIRMAN ELLIOTT: Sure.

MR. BROWN: It seems a lot of the witnesses weren't here at the time of this incident. So I don't know how much character witnesses we're going to go into, which could take all day. And I don't know at this point if the Commission is going to allow as to how much background we're going to go to. I know some of the witnesses are in that department had nothing to do with that department. Certainly opposing counsel can argue as to why we need to go back in history some of these before -- I mean a long time ago.

CHAIRMAN ELLIOTT: Okay.

MR. BROWN: Our position is we should focus on

the time period that this occurred, which was when Ms. Maras began. It's about a year's time period. So as just to set up the day, which I'd rather not set up the whole day for this, but if we need to, can we at least discuss or have a ruling on how far back we're going to go? Because that will also affect the case we put on as to whether we need to call witnesses if we're going to go into a whole character set up, which is what most of these are for.

If we need to do that, I think we need to be allowed to then arrange for witnesses to come over. They're currently working right now being productive. Have them come over, wait, and then be called to do all this character discussion. It would only be fair if one side is going to do it.

CHAIRMAN ELLIOTT: Okay. And let me just clarify, this -- this list of witnesses, Exhibit A, I see five individuals identified. That is your list?

MR. LOPEZ: Yes, ma'am.

Madam Commissioner, this is a case about character. In fact, Ms. Guerrero, the employee in this case was demoted for basically what Ms. Maras is calling her a liar. And so we believe character is at issue. We've limited our -- our witness list to five people. In fact, we only intend to call one character witness, and that is Chauncey Spencer, who is Ms. Carmella's former supervisor in the jail

department. And I don't expect to have him on the stand more than five to ten minutes.

CHAIRMAN ELLIOTT: Okay. So the other four that are identified, we're saying we -- you don't need their testimony?

MR. LOPEZ: Mr. Mandujano is a former BCIT employee, Madam Commissioner.

CHAIRMAN ELLIOTT: Okay.

MR. LOPEZ: And he's going to be testifying regarding some substantive facts unrelated to character.

CHAIRMAN ELLIOTT: And if I read the record correctly, Mr. Mandujano, he did retire or resign prior to the matter?

MR. LOPEZ: At some point before October the 4th he left the County, yes, ma'am.

CHAIRMAN ELLIOTT: Okay. So can you just give us a summary of what information he will have?

MR. LOPEZ: Certainly. One of the issues that we have in the case is what responsibility the employee, Ms. Guerrero had for parking matters. And Mr. Mandujano was actually referenced I believe in some respects in the disciplinary demotion letter that Ms. Maras gave Ms. Guerrero. And to the extent he was identified in that letter and he has information concerning what the policies were, what the practices were, and what he understood that Ms. Guerrero's

6 (Pages 6 to 9)

responsibilities were, that's going to be the substance of his testimony.

I also believe his testimony, Madam Commissioner, won't be more than ten minutes as well.

CHAIRMAN ELLIOTT: Okay. And you have these other witnesses that are listed.

MR. LOPEZ: They won't be called, ma'am.

CHAIRMAN ELLIOTT: Okay. And, Mr. Brown, you have no need to speak with those other witnesses identified here?

MR. BROWN: No.

CHAIRMAN ELLIOTT: Okay.

MR. BROWN: No, they have nothing to do with it.

CHAIRMAN ELLIOTT: All right. We're in agreement we limit it to the two.

MR. LOPEZ: Yes, ma'am.

CHAIRMAN ELLIOTT: Ms. San Miguel, can we dismiss the others? I hate to have them here waiting, these individuals that are listed here, if we're not going to call them.

MR. LOPEZ: Madam Commissioner, I am -- I'm not positive -- I'm not completely positive, but I suspect the only two people at least from the employee side that have been excused and are waiting to testify are Mr. Spencer and

Mr. Mandujano. The others I did not see them in the lobby and I don't see them here.

CHAIRMAN ELLIOTT: Okay. All right. Mr. Brown?

MR. BROWN: I don't know who all the people were that left. I mean I'll just have to take his word.

CHAIRMAN ELLIOTT: I'm sorry?

MR. BROWN: I mean I'll just have to take his word that there's only two of them. And Chauncey Spencer was the one that was really out there, because Chauncey Spencer has not been with the County for 13 years or something. But if we're going to have that as a character witness and ten minutes, then we'll allow -- I don't have any objection to that. It just seemed that we were going to be here all day on character and not really substance.

CHAIRMAN ELLIOTT: Right. No. And our goal is not to be here all day. I think we're all in agreement of that.

Okay. All right. Well, then we will -- the two, Mr. Brown -- I'm sorry -- Chauncey Spencer and Mr. Mandujano, those are the only two then.

Okay, Mr. Brown.

MR. BROWN: Okay. Thank for allowing me to --

CHAIRMAN ELLIOTT: Sure. Thank you for clarifying.

MR. BROWN: Okay. My name is Clark Brown with the Bexar County District Attorney's Office representing Bexar County Information Technology and the role of Bexar County in this matter.

As you've probably seen from the documents that are in the record, the discussion is going to be about a parking issue. It's a bigger issue than that from the department's side. What it is is about whether a high ranking employee who had just been promoted to one of the highest positions in the department, a position she herself called second in command, can be trusted. She had responsibility over money, over other employees, over budget, over purchasing, over approving things. She essentially had the control of the purse strings of this department subject to what she shared with her boss, which is one person above her, and that's Ms. Maras. So this isn't so much a discussion over a parking space as it is over a trust issue.

Does Bexar County require and allow that the head of a department have faith in the person that is now second in command? And if she doesn't, is it not a reasonable personnel decision when that person lies in what the department believed was -- what Ms. Maras believed was to her face, a blatant lie to her face, does she then need to under Civil Service Rules keep that person in a position of ultimate trust? And isn't it important for the County,

taxpayers and everything else involved in County business that Ms. Maras have full trust in the person that is now second in command?

And when that person lies, whether it be over something minor, which they're going to I imagine say is this parking space, or something major isn't the point. The point is if the person you've now entrusted with second in command will lie to your face over something very small, are you now required under Civil Service Rules to take something less than a demotion or even a termination -- in this case a demotion -- and move that person out of that position because you no longer have any faith in them?

That's what we're really faced with here. It all arose over a parking space and a parking issue. And that's the way to minimize this and say well, this is a big misunderstanding over a parking space, and are you kidding me, we're going to demote someone over a parking space? That's not the issue. The issue is are we going to leave someone in place that the head of the department no longer has any confidence in. And would any manager, business owner, person that has responsibility over the budget, a huge budget mind you, of Bexar County Information Technologies -- which I'm going to refer to as BCIT today to stop being tongue tied -- when you have a huge budget and a huge responsibility as anyone knows computers are in this day and age, if you do not

Dawn Flippin, CSR                210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0009

## Page 14

trust your second in command, can you not remove that person and put them in a position -- rather than terminate them, do them actually a favor -- put them in a position where you don't have to trust them, where they're not in charge of a budget, where they're not in charge of other individuals, where they don't have the right to sign off on purchase orders, where essentially they do not have the right to control the purse strings of the department or subject to Ms. Maras reviewing what is brought to her?

If that person has a right essentially to stop the things that Ms. Maras finds out if she wants, because as the chain goes up, anybody could stop something in the chain, if she no longer has faith that these things will get to her because someone has lied to her about a minor issue, are we now expected under Bexar County Civil Service Rules to require that person to retain that position and to be put in that position of trust when Ms. Maras no longer has any full faith and confidence in her, and instead decides the best position for this person is one where she doesn't have any of those responsibilities, where I, as the head of this department, don't have to worry that she is going to destroy my department because she's not trustworthy?

And in the end it's going to cost Ms. Maras her job, because when the Commissioners review it, they're going to say how did all this happen? And if she goes back to them

## Page 15

and says well, yeah, she lied to me, but I left her as my second in command, the Civil Service Rules, they didn't seem to allow me to do this. But we'll argue they did. So the Commissioners are going to say thank you, Ms. Maras, head back to Chicago. And that's where we are.

So it can be reduced to a parking space, but what I'd ask you to consider as the whole discussion goes on, however long this takes, is the much larger issue of trust. And does not Bexar County allow under Civil Service Ms. Maras to determine who her second in command should be, and remove that person if that trust has been breached? Not only for her sake but for the entire sake of Bexar County, which is what this comes down to.

And what we will show by the end of the day or the end of the morning is why this demotion occurred. Not a parking space, an issue of major trust violation. And we will show that through witnesses and documentation. And at the end of the day we'll ask that you uphold this demotion and allow the BCIT to proceed as it has been, which is very well, since all of this occurred. May we proceed onward, allow Ms. Guerrero to stay in her position, allow the department to proceed as they have been, and for the betterment of Bexar County allow this demotion to stand. Thank you.

CHAIRMAN ELLIOTT: Thank you.

Mr. Lopez, opening statement.

## Page 16

MR. LOPEZ: Yes, ma'am. I'm Orlando Lopez for the employee. I'd like to introduce Carmella Guerrero. Ms. Guerrero is an almost 20-year veteran of Bexar County. She moved to San Antonio from New Mexico back in the early 90s and almost immediately started working for the County. She started at one of the lower level positions and worked her way over 18 years through several departments. And eventually she came to work for the BCIT department.

While at the IT department she rose phenomenally through the ranks, much like she had done throughout her County service. She rose as Mr. Brown has indicated to basically the top level non-technology person. And by non-technology person, I mean we probably have some hackers that work in the IT department or techies as sometimes they're called, but Ms. Guerrero was not a technology person. Instead she was in charge of nontechnical issues at the County.

And we believe the evidence is going to be perfectly clear that's going to paint Ms. Guerrero as a model employee. That you don't rank -- or you don't get to her rank at Bexar County by being insubordinate, by being derelict in your duties, by doing the things that Ms. Maras has alleged that she has done in her demotion. You just don't -- in any business. I'm not even talking about County, I'm talking about wherever you work, if you're dishonest, if you're

## Page 17

deceitful, if you are insubordinate, if you don't do the things your job tells you to do, you're not going to rank or get to where you're at this high on the totem pole. It just doesn't happen.

At worst it's a witch hunt. We have a situation where Ms. Maras became upset about somebody having a plum parking spot on the day in question and that she went out of her mind and began a witch hunt to get rid of one of the most respected and most tenured persons in the whole IT department.

Before I finish, I want to make sure that the Commissioners understand whose burden it is in this case. In today's hearing it is Ms. Maras' burden. As the person who demoted Ms. Guerrero, it is Ms. Maras who must demonstrate to you with credible evidence that this demotion was reasonable and that it was following the Bexar County policies. And so I'm going to ask that you pay close attention to Ms. Maras' testimony. We learned, our kids learn that one of the worst things that you can do is lie. Whether it's a small lie or a white lie or a big lie, it's huge. It's one of the most fundamental things that we teach that all humanity must understand is to be truthful and not lie. The second worst thing is to call somebody a liar when they're not.

This is a case about Mrs. Guerrero's career. At the time that she was demoted she had risen to the level of

8 (Pages 14 to 17)

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0010

E -- A10 -- I'm sorry -- E11, which was the second ranking person at the IT department. After the demotion, she got downgraded to an E5, six ranks, six grades in the stroke of a pen because she called her a liar. And what I'm going to ask you to do is put her to her test today.

This is a simple misunderstanding about some parking spot. I'm offended, Ms. Guerrero's offended that we would have to come to this process because Ms. Maras decided to call her a liar. That's not the case. We're going to prove it. And at the end the day we hope that you reinstate Ms. Guerrero to her former rank position and award her back pay to the time of the demotion.

CHAIRMAN ELLIOTT: Thank you, Mr. Lopez.

Mr. Brown.

MR. BROWN: At this time we call Ms. Guerrero.

(Witness sworn).

CARMELLA GUERRERO, having been sworn to tell the truth, testified as follows:

DIRECT EXAMINATION BY COUNTY

BY MR. BROWN:

Q Morning.

A Good morning.

Q Ms. Guerrero, just jumping ahead to the time of this incident or the time Ms. Maras came into the job which was when; do you remember?

A September of 2009.

Q Okay. And what was your position at that time?

A I was the interim CIO while they went through the process of hiring a new CIO.

Q Okay. So at the time you were -- does that mean you were in charge of BCIT?

A Administratively, yes. I was also answering to another executive director that was kind of overseeing my work to make sure that everything was flowing smoothly.

Q And so at the time that Ms. Maras came in, what was your role in terms of orientating or did you have any role in --

A Yes, I did.

Q Okay.

A I spent probably the first year working with Ms. Maras and orientating her to what we do at BCIT, how the County works, set up meetings with all the executive directors and elected officials for Ms. Maras to meet them. And then, you know, worked with her closely on all BCIT issues that first year.

Q And what were your responsibilities that first year that she was here? Once you were no longer interim CIO, what were your responsibilities?

A I had a division, the planning and technical services division. And I had about 19 people reporting to me.

I had the video conferencing section, the communications division, the technical training division. I was responsible for all budget related matters and H.R. related matters in the department. And then I oversaw the administrative staff.

Q Okay.

A And the technology business analysts. I'm sorry, I forgot that.

Q And what about purchasing; were you in charge of purchasing or involved with purchasing?

A Yes, I was pretty much included in the administrative duties of purchasing, of procurement.

Q Okay. And would that include approving payments or bids or ...

A Yes, sir.

Q All of those things?

A Yes, sir.

Q And what would you say the budget of BCIT was in a year for purchasing -- other than salary, what monies did BCIT have to spend?

A We had a couple of budgets actually. One of them was a technology budget over $1 million. About $2.5 million I believe -- now, you're asking me to think back 18 months. So I apologize if I'm not exactly sure of the --

Q That's all right. Just if you can round figure me, that's fine.

A Yeah.

Q It was a substantial --

A A lot of money.

Q -- amount of money?

A Yes, sir.

Q And in your position did you have control over some of that money as to whether bills got paid, who got paid, what got bought?

A As far as approving the purchase orders, yes, I did. However, all of that went through the CIO, my previous CIO, Dr. David Morgan.

Q Uh-huh.

A And then Cathy Maras. In the interim was David Marquez who's an executive director of Economic Development. So if I was spending over a certain amount of money, I always went through him.

Q Okay. Would it be fair to say that if something came to you that you approved, it would get paid?

A Yes, sir.

Q Okay. In terms of your H.R. role that you -- after Ms. Maras got here, what was your role in terms of H.R.? I think you said you had an H.R. --

A I had an H.R. role the whole time I was -- most of the time that I was in BCIT. Changing directors, changing CIOs, obviously things changed. So under David Morgan pretty

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0011

## Page 22

much I -- all personnel related matters went through me. If another manager wanted to take disciplinary action or promotion or reclassification of a position, they went through me to research the rules, to talk to the D.A.'s office, to talk to the Civil Service department and make a recommendation.

Q So you're familiar with Civil Service?

A Oh, absolutely. Yes, sir.

Q And familiar with the rules of Civil Service?

A Yes, sir.

Q And familiar with the bases on what you could -- the degrees of discipline you could issue?

A Yes, sir.

Q Are you aware of the rule that if something was severe enough, you didn't have to go through each small step of progressive discipline; you could jump to something more severe?

A I understand that it's written in the rules. It's not -- it was not the practice that I employed.

Q Okay. So on the disciplines you reviewed and you said contacted the D.A.'s office and consulted perhaps with Andrea in H.R.

A Uh-huh, yes.

Q You didn't have a situation where you felt it was severe enough to go to a demotion or a termination rather than

## Page 23

maybe a counseling, a written reprimand?

A In my history with the County?

Q Yes.

A Yes, we have had that in the past.

Q Okay. So you are aware and you have experienced that sometimes an infraction, in the person issuing the discipline's opinion, is severe enough to skip all the first initial smaller steps and go to something larger?

A Yes.

Q All right. Let's jump ahead to why we're here regarding Ms. Singh. Tell me who Ms. Singh is.

A Tina Singh is a contract employee who was hired -- a contract manager who was hired to do project management for one of our large implementations.

Q Okay. And when you say hired, she wasn't a County employee, correct?

A No.

Q Okay. So she's an outside vendor's employee?

A Yes.

Q Okay. And as an outside vendor's employee, what control do you have over her daily activities as the head of H.R.?

A I was really just making sure that her -- we have a contract with the vendor that hired her, so I was the one that went through purchasing to get that approved. And that -- I

## Page 24

wasn't signing off on her time sheets or anything, so I believe making sure that her payments went through. Coordination with the vendor basically.

Q What about on a day-to-day basis what would Ms. -- would Ms. Singh rely on you for anything in terms of personnel issues?

A Not that I can remember.

Q If Ms. Singh had a question about how things operated in the County since she wasn't a County employee and was --

A Uh-huh.

Q -- new to the County, correct?

A Yes.

Q Who would she go to?

A She would go to me.

Q Okay. So things like as minor as where to park or on a daily basis how to come into the building, access cards, all those things would she go to you to find out how that happens?

A Yes, typically we do an orientation with any new employee whether they're contract or not. And those things are usually covered during that time period.

Q So at the end of the day, so to speak, was she treated as a Bexar County employee?

A I would say yes.

## Page 25

Q Okay. But not subject to -- termination or discipline issues were not -- that would be up to her employer, correct?

A Yes.

Q And if there was a recommendation for something to happen to Ms. Singh, that would come through the department but have to go to her employer?

A I don't understand the question. I'm sorry.

Q The ultimate decision -- say, Ms. Singh was going to be moved out of Bexar County, that would be up to her vendor that she worked for?

A No, I think the recommendation would come from Bexar County. She needed to be performing at a certain level. There was a contract with the vendor. If she wasn't performing at a certain level, Ms. Maras could have recommended either a new, you know, a new employee -- new contractor or.

Q And as far as you know Ms. Singh, did she do her job?

A As far as I know. I wasn't supervising her, so.

Q Well, as the head of the H.R. area would people have come to you had they decided Ms. Singh is not working out?

A No, I think that Ms. Singh reported directly to Cathy. A manager at the same level as myself except for contract workers, so those decisions would have been made by

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0012

Ms. Maras.

Q Okay. So you had no supervisory --

A No.

Q -- role over Ms. Singh?

A No, I did not.

Q Okay. In your time at the BCIT as far as you know did Ms. Singh perform to her standard?

A As far as I know, yes.

Q And as far as expected, she performed?

A As far as I know, yes.

Q And in your interactions with her was she an honest person?

A Yes.

Q Okay. So as far as you know if she says something at this hearing or put something in writing or had said anything to you or Ms. Maras or anybody else, you'd say she's an honest person?

A As far as I know she's an honest person. I have no reason to believe she is not.

Q And did you have interactions with her on a weekly basis, daily basis, monthly, yearly?

A At the beginning I did when she was first brought on.

Q So you know her more than a face in the hallway?

A Yes.

Q You know her on a conversational basis?

A Yes.

Q Okay. At some point did Ms. Singh come to you and ask how parking works at Bexar County?

A Yes.

Q Okay. And do you remember -- I don't need a specific date unless you know it -- about when that was?

A No, I do not. I'm sorry.

Q Do you know if it was early on when she got to Bexar County or later? When did she come to Bexar County? I'm sorry.

A I don't have that date, sir. I don't -- I don't remember.

Q Prior to Ms. Maras?

A No.

Q Okay. So sometime after September '09?

A Yes.

Q And you said you approved her hiring?

A No, Ms. Maras interviewed her. Ms. Maras and I discussed it. I believe Ms. Maras and I agreed that she would be a good fit for the position. Ms. Maras hired her.

Q Okay. But you said you approved something in relation to her coming here?

A We had a contract with the vendor.

Q Okay.

A And since all contracts went through me for any kind of procurement and I did the coordination with our purchasing department to make sure that the contract was in order and that the budgeted funds were there, I coordinated the contract going to Commissioners Court for approval. But the hiring of Ms. Singh was Ms. Maras'.

Q Okay. The actual whether we're going to hire her position --

A Uh-huh.

Q I mean hire her was Ms. Maras?

A Uh-huh.

Q You did the contract end of it?

A Uh-huh.

Q And you -- do you think it was September, October, November?

A I do not remember what date it was, sir.

Q Do you remember if it was within six months, within three months, within two months of Ms. Maras starting?

A No, I do not. I'm sorry.

Q That's okay. So suffice to say at some point after Ms. Singh came here, she came to you and asked about parking, correct?

A Yes, she did.

Q Okay. And what was the general discussion if there was a discussion?

A The question Ms. Singh asked me was whether or not that she qualified to get in the County parking garage. And I basically told her not as an employee, but, you know, you can contact -- I know they have parking spaces in the garage. You can contact infrastructure services. And I gave her Raul Talamantes' name. I'm not sure if she did that or not.

At a later date she did come to me and ask me if there was any way that she could park closer because she had these seven o'clock meetings in the morning and she was parking three or four blocks away. And so we had that discussion as well.

Q Okay. So the first discussion she asked you if she could get in the parking garage, correct?

A Yes.

Q That's the building we're in?

A Yes.

Q And your answer was to refer her to IS -- to Raul Talamantes?

A Yes.

Q Who is who?

A Raul Talamantes works for the infrastructure services department. And I believe he's the supervisor over parking facilities, parking facilities.

Q Okay. And did you take any steps other than referring her to Raul to get her in the garage?

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

A No.

Q And were you aware of whether there was a waiting list to get in the garage?

A I know there was a waiting list for County employees, because this building had not been built yet. But they -- I know they have contract parking in there for people like City of San Antonio or attorneys. I didn't have any information about that.

Q And did you know what the wait list was?

A At the time for employees I believe they were saying somewhere around two years.

Q Did you contact Raul to see if she could get in the garage or did you just refer her to Raul?

A I think I referred her to Raul. I'm not positive if I made that contact for her. I may have.

Q Okay. You may have taken more steps than just refer her to Raul?

A I may have contacted Raul. I'm not positive.

Q And at some point did you recommend that she park elsewhere within County parking other than the garage?

A Ms. Singh had an issue with walking in the dark at seven a.m. to a meeting that was several blocks away. And so yes, I did see if she could park behind our building for those early morning meetings.

Q And your building is?

A Our building is the County annex caddy corner to the parking garage.

Q Okay. So essentially you're across the street?

A Yes.

Q From the old parking garage?

A Yes.

Q Okay. And what about Heritage Plaza parking; are you -- did you take any steps to try to get her into Heritage Plaza parking?

A There were several -- we have a contract -- the contract that she was actually working for was the loss and implementation which was our financial system. And the auditor's office basically was taking over the third floor of the Heritage Plaza for that project.

Our criminal justice division was in there previous to that, and when they moved out, the auditor's office was expanding into that area. Because I oversaw the contract with Heritage Plaza for our criminal justice division, then I knew that it also came with eight to ten parking spaces, that leased area did. The County auditor, Ms. Yates just had taken over that contract, so she was not aware of those parking spaces. So I did notify Ms. Yates that there was parking spaces for that building allotted for that third floor. And so I did take that step.

Q And did you try to get Ms. Singh parking in Heritage

Plaza?

A I -- I did ask Ms. Singh to talk with Ms. Yates about whether or not they would have parking not just for Ms. Singh but for another one of our employees that was going over there all the time because he was also on the project. So I believe Ms. Yates reserved two parking spaces for employees that were coming from our department or parking elsewhere to use those spaces when they went to meetings at Heritage.

Q So you did secure parking at Heritage for her?

A It was not specifically for her, but I believe that Ms. Yates gave Ms. Singh parking at Heritage Plaza.

Q Okay. And at some point in all of this -- Ms. Maras was already here? Ms. Maras was already here?

A Yes.

Q Did you speak with Ms. Maras about Tina Singh and parking?

A Yes, I did.

Q On how many occasions?

A I believe one.

Q And on that occasion what was -- where was the parking supposed to be that you were asking about?

A It was a space that was behind our building.

Q Okay.

A Behind the annex building there was some BCIT, which

is our department, designated spots. And I asked Ms. Maras if she could park there when she had those early morning meetings for those meetings.

Q And what was her response?

A Yes.

Q Ms. Maras approved her parking there?

A Yes.

Q Okay. At any point did Ms. Maras tell you -- at any point did you ask her about other parking for Ms. Singh?

A No, I do not believe I asked her for other parking for Ms. Singh.

Q So your recollection is Ms. Maras never told you that Ms. Singh could not have free parking in any County Spaces since you never had a discussion with her about other parking?

A That's my recollection for the exception of October 4th.

Q Right. Okay. At any point during that -- or is it your testimony that you had nothing to do with parking in terms of BCIT?

A That is not my testimony.

Q What is your testimony regarding your role in parking -- and all employees, not just Ms. Singh -- at BCIT?

A I was the liaison between our department and the infrastructure services department for all parking issues.

12 (Pages 30 to 33)

Similar to the same responsibilities I had for H.R.-related matters or budget-related matters. If there was a parking issue, I was the person that the employees would go to or the managers would go to to either get approved parking in the parking garage for like for instance technical people who are using their vehicles for work-related issues.

I also know that parking is a commodity downtown. And then we had a lot of other issues with employees who were having to park at the K-Mart parking lot at the time, which is now the new City Police Department. But that lot got closed down, so you had a lot of employees that were moved from there. So I handled a lot of parking issues within our department.

Q And as liaison, what did -- what does liaison mean in your mind as to how you did this?

A The -- the internal -- and I can't say it's a written policy -- but our internal BCIT procedure basically was if a manager or a supervisor believed that their employee or a position for an employee required them -- or not required them -- but that they qualified for in and out parking, then they would come to me. I would look at the job description, find out how often the employee was going in and out leaving the building or, you know, and then I would get that information and send it to Raul Talamantes for approval.

Q Okay. At some point did you ask Mr. Talamantes who

was parking in certain designated spaces?

A Yes, several times.

Q Okay. And why would you need that information?

A Because I didn't assign parking spaces. Basically a manager, for instance Mr. Mandujano, the technical support manager, would come to me and say okay, this person, this person and this person need in and out parking. So I got them the in and out parking.

There were designated spots, but I didn't assign who was in those designated spots. We had employees -- one of my employees, as a matter of fact, who was the video conference manager, he had in and out parking. He did not have a designated spot. So he had free parking. He had a card to get in and he came and went as he pleased, but he didn't have a designated assigned spot. I did not assign spots. And so I did not have information as to who was parking in what assigned spot.

Q And who would -- did you have information as to who was parking in free parking?

A Yes, but it changed frequently. So I would get an update from Mr. Talamantes frequently.

Q And how would that change come about?

A An employee would leave and a new employee would come in or -- I wasn't keeping a, you know, a concrete list all the time. So I would make sure that I had a good list of

who had in and out parking.

Q And who would decide who got free parking?

A Mr. Talamantes.

Q Mr. Talamantes would decide who got free parking?

A Yes.

Q How would he know what an employee's rank was or what level they were?

A No, I -- I would -- that's why I meant when I was the -- when I said I was the liaison, I would provide information to Mr. Talamantes about what the employee's role was. I would sometimes even send him a job description so he could see that that person in my opinion -- and I would recommend in and out parking or free parking I should say.

So the policy for Bexar County spells out exactly who is eligible for parking. And so by those standards, I would make a recommendation based on my knowledge of what that employee's job was to Mr. Talamantes.

Q Okay. And as you said, parking is a commodity downtown?

A Yes.

Q A valuable commodity to some people?

A Yes.

Q Would you take this information as to who was going to get free parking and go to your superior?

A With David Morgan, no, I did not.

Q So it was all -- you were the end?

A I was the person that made the recommendation to Raul Talamantes, yes.

Q And prior to October 4th with Ms. Maras, did you run these decisions by her?

A I'm not sure that there were any of these big decisions to make during that time period under Ms. Maras for the exception of manager parking. If you're a manager, you have free first level parking. And we had three managers leave in the first year that Ms. Maras was here, so there was turnover. And people were interim managers. So yes, I discussed with Ms. Maras whether those interim managers should have manager parking in the parking garage.

Q And would she approve it or deny it or would she leave it up to you or how would that go?

A No, she would approve it or deny it.

Q And then as liaison, you would relate that to Mr. Talamantes?

A Yes.

Q And would Mr. Talamantes do as you told him generally?

A Sometimes. A lot of times he would have questions about -- and they also have a system in the parking garage that monitors how much somebody is going in and out. The policy says you have to go in and out between three and five

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0015

times a week. So he would contact me and say these people haven't been going in and out. We have to pull their card or whatever. So he did have the final say-so.

Q  Okay. He's got the power?

A  Parking power.

Q  Which for an employee like myself or you is a $600 benefit a year, correct?

A  Uh-huh, yes, sir.

Q  Because parking in the garage is $50 a month, correct?

A  $55 now I believe.

Q  $55, oh.

A  That's what I'm paying.

Q  Better check my paycheck.
So we're not talking -- to an average employee we're not talking chump change. That's a serious --

A  Uh-huh, it is.

Q  -- benefit each year?

A  Yes, it is.

Q  Let's go back to Ms. Singh. Did you ever tell Ms. Singh she could park permanently in back of the building, your work building?

A  No, I did not.

Q  Okay. So if Ms. Singh began parking there permanently, why -- what's your understanding of how that

happened if you have one?

A  It would be my opinion that Ms. Singh knew that she could park there for early morning meetings. And then I think that she just took advantage of that and continued parking there. And I had no idea she was doing that.

Q  Did you ever tell her she can't park there permanently or all day or?

A  There was no question as to whether or not she could park there permanently. The question was could she park there for those early morning meetings because it was still dark outside and she was walking from three blocks away.

Q  What were your instructions to her regarding parking there?

A  It was my understanding that she -- or it was -- what I understand I told her is that she could park there for those early morning meetings and then she needed to move her car after the meetings.

Q  So if she had an early morning meeting, she couldn't leave the car there all day; she had to get back in it and move it after the meeting was over?

A  Yes. The issue at the time was whether, you know, she was parking walking three or four blocks in the dark. That was the issue.

Q  Okay. And did other employees have early morning meetings?

A  I don't know.

Q  So --

A  I was not approached by any other employee with that.

Q  Well, as second in command or as a high up person --

A  Uh-huh.

Q  -- of the department, were you there in the mornings?

A  Yes.

Q  Early mornings?

A  Sometimes.

Q  Were you aware of other employees that had meetings in the morning?

A  Well, of course I'm sure there were employees who had meetings in the morning.

Q  Ms. Singh wasn't unique in that she had meetings in the morning?

A  No, I do not believe so.

Q  All right. And where did you tell her to park or did you tell her to park after the meetings were over and the sun was out?

A  No, I did not tell her where to park.

Q  Did you just tell her she needed to move that car as soon as the meetings were over?

A  She was already parking in the lot down the street

under the bridge. I mean, so she was already parking there.

Q  Okay. But in the discussion of you need to move your car as soon as the meeting is over, how did that discussion come about? Is that when you told her where she could park just for meetings and then leave?

A  What I told Ms. Singh was that I talked to Cathy Maras and it was -- it's okay to park there when you have those early morning meetings, and then you need to move your car.

Q  Okay. So you had run all this by Ms. Maras?

A  Yes, I did.

Q  And Ms. Maras' instructions to you were what?

A  Ms. Maras said it was okay for her to park there when she had an early meeting.

Q  And that then she then had to move her car?

A  I don't believe she went into that much detail to tell me then she has to move her car. And I ...

Q  That was your understanding though?

A  Yes, that was my understanding.

Q  And that's what you related to Ms. Singh?

A  Yes.

Q  And on the day of October 4th when all this seemed to come to a head what's your recollection of what occurred that day?

A  Ms. Maras was coming back from a meeting. She

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0016

approached me on the porch. She asked me who has a black Mercedes something something, some kind of vehicle. I'm not really good at vehicles. And my answer was I don't know who has a black Mercedes. I didn't know why she was asking me who had a black Mercedes. She said well, there's a black Mercedes parked in the BCIT spot in the back. And I said oh, I don't know whose it is.

Ms. Maras walked in the building, walked right back out. She said I bet you that's Tina Singh's car. And I said oh, maybe -- maybe it is. And so she told me to go up and tell Ms. Singh that she needed to move her car and that it would look very bad on her if a contract employee was parking in a BCIT spot with a Mercedes. And I said okay. Ms. Maras went into the building before I did and was already in Ms. Singh's office talking with her when I walked up. So Ms. Maras asked Ms. Singh to move the car.

Do you ...

Q Okay.

A You want the whole story or just that part or all of the incidents?

Q That's okay. So at that point Ms. Maras was up in Ms. Singh's office?

A Yes.

Q And had you gone in with her?

A I was kind of behind her.

Q Okay. And what did Ms. Maras say to Ms. Singh?

A I didn't hear the whole thing other than she told Ms. Singh to move her car I believe.

Q Okay. And --

A I stopped at the door because she was already telling Ms. Singh, so I didn't have to tell Ms. Singh anything.

Q And did Ms. Singh respond that you heard?

A I did not hear a response from Ms. Singh.

Q And did you -- were you part of any of the conversation between Ms. Singh Ms. Maras yourself? Were you in there?

A No, I was not. I stopped at the door of Ms. Singh's office.

Q Did Ms. Maras come out after she said you need to move your car?

A I believe so.

Q Okay. And did you continue the conversation with Ms. Maras after that?

A Throughout the day we had several conversations about the parking issues.

Q Right after -- I'm sorry. I didn't mean to interrupt you.

Right after Ms. Singh's office, what was the next thing that happened between -- with you, Ms. Maras and

parking and the timing of it?

A I can't remember exactly what happened next.

Q Okay. Did you know -- do you know if you went back to your office, you went to Ms. Maras' office, you went outside; do you remember?

A I didn't go outside. I'm really trying to think of exactly what happened in what order it happened. I did have a conversation with Ms. Maras in regards to -- it's my understanding that Ms. Maras did not have knowledge that there were designated parking spaces behind the building, because I don't -- I believe she told me she had not been back there. So we had that discussion. And she wanted to know who was parking in those spaces.

I also explained to her that we also had designated spaces in the garage. And she wanted to know who was parking in those spaces. And I didn't have that knowledge either at the time. So throughout the day there were several meetings and several discussions and several e-mails going back and forth regarding who was parking where and how many spaces did we have and who had free parking.

Q Okay. And throughout the day did Ms. Maras question whether you had been honest with her about parking?

A At the end of the day Ms. Maras was very upset and raising her voice. And at that point yes, expressed that I had not been honest with her about parking.

Q And what was your understanding of what she believed you had not been honest about?

A My understanding is that she had the impression that I knew who was parking in those spaces and that I was refusing to give her that information. And she also was very upset that she felt that I had been dishonest in some way about Ms. Singh's parking.

Q Did she express to you what the dishonesty in her opinion was?

A She said that she did not know that Ms. Singh was parking in the back of the building. And I told her I did not know Ms. Singh was parking in the back of the building either, and so I did not know that was her Mercedes in the back. I do not believe Ms. Maras believed me that I did not know that was Ms. Singh's Mercedes in the back.

Q So you had no knowledge that Ms. Singh had been parking in back; is that true?

A I had knowledge that Ms. Singh was going to park there for early morning meetings, and then I never heard anything else about it.

Q Okay. Do you know how long she had been parking there for early morning meetings?

A No, I do not.

Q Had you informed Ms. Singh by e-mail that she could only park there in the morning?

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

A   I do not believe so. I believe that was a verbal conversation.

Q   Had you informed her by e-mail that she needed to coordinate with ISD regarding parking?

A   I'm not really sure if that was an e-mail or verbal either.

Q   Did you inform her that she needed to pay for parking at some point?

A   She wanted to pay for parking. There was never an issue with whether she should have free parking or not. She came to me asking if she could get on a contract to park in the garage. And she was very willing to pay for her parking. She just wanted to park closer. That was closer than where she was parking.

Q   So she volunteered that she needed to pay her parking. Had you told her that she needed to pay for parking?

A   Well, yes, that's -- everybody pays for parking, so yes, I told her she needed -- told her what the options for parking were and where most employees park.

Q   Do people pay for parking behind your building?

A   No.

Q   Do people pay for parking on the second floor?

A   Some -- you mean in those designated spots?

Q   Yes.

A   No.

Q   Do people pay for parking at Heritage?

A   The Heritage Plaza -- well, I don't -- I don't know. I couldn't tell you about everybody at Heritage. But when our (inaudible) department had parking behind Heritage, it was seven to ten spaces I believe that came with that lease. So those people did not pay.

Q   Okay. So there was free parking available?

A   Yes.

Q   To BCIT employees?

A   Yes.

Q   Okay. So in the realm of possibilities, Ms. Singh could have received free parking had it been approved?

A   No, Ms. Singh didn't qualify for free parking.

Q   If someone had -- say, Raul, the ultimate parking God, had said she's getting free parking, it could have happened?

A   It could have happened I suppose if she went to Raul. But she didn't qualify, so I would not recommend it to Raul for her to have free parking.

Q   Okay. My point really is there was -- you said there's no free parking. There is free parking?

A   I didn't know I said that. I apologize. There was free parking.

Q   Okay. In your response to this discipline, admittedly drafted by your attorney, but most likely with your

assistance because Mr. Lopez wouldn't know all the details of Bexar County parking infrastructure services --

A   Uh-huh.

Q   -- and BCIT, correct?

A   Uh-huh, yes, sir.

Q   Did you assist him with this response?

A   Yes, sir.

Q   Okay. So in the response when it says Ms. Guerrero informed Ms. Singh by e-mail that she could only park in a designated space in the early mornings, you said there was not an e-mail; it was a verbal conversation. Was that an incorrect statement?

A   What I said is I don't remember if there was an e-mail. I do remember a conversation. I'm not sure if I followed that up with an e-mail. And I apologize. It has been 18 months. So I apologize that I don't remember every detail, but.

Q   So if there is no question in your response that it was by e-mail, would your response be more accurate or your memory today?

A   Probably my response would be more accurate.

Q   Okay. And if it was by e-mail, do you have the e-mail?

A   No. After I was demoted, Ms. Maras took away my e-mail and any form of electronic, you know, in the whole time

I was at BCIT, I was not able to access anything.

Q   And did you ask for the e-mail?

A   I asked for my e-mail back several times. And I was told that it didn't exist anymore, so.

Q   Okay.

A   You're talking about my e-mails, all of my e-mails. I haven't -- I had nothing --

Q   Specifically the e-mail you cite in your response.

A   I asked for all of my e-mails back.

Q   Okay. And in your response you also cited that you e-mailed Ms. Singh that she would need to coordinate with ISD for permanent parking?

A   I did tell Ms. Singh that, yes.

Q   Okay. Do you have that e-mail?

A   I don't have any e-mails from the date I was placed on administrative leave to the date I -- anything beyond October 4th. I have no e-mails.

Q   These would all be before that date, correct?

A   Yes. I have nothing before that.

Q   Or after?

A   Or after. Well, until I came back reinstated as a business analyst and they gave me a new e-mail account.

Q   Okay.

A   So unless I kept a hard copy of that in the files that were in that office, then I didn't have access to it at

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0018

the time I appealed.

Q And in an e-mail that you wrote to Ms. Singh you stated: How about I -- how about if I ask if you can park at Heritage in one of their spots. I was not successful getting you parking here as you are not a County employee.

MR. LOPEZ: Madam Commissioner, I would ask if he's going to question her about an e-mail that he show her a copy of the e-mail.

CHAIRMAN ELLIOTT: Okay.

MR. BROWN: Okay. I'm going to.

Q (By Mr. Brown) And the waiting list for County employees is three years long. Do you recall that e-mail?

A Sounds very familiar.

MR. BROWN: Sorry, I took the file.

CHAIRMAN ELLIOTT: I don't believe copies of that e-mail were in our packet. So if you would provide for us a copy.

A Yes, I recall this e-mail.

Q (By Mr. Brown) Did you write the e-mail?

A Yes, I did.

Q Okay. So you took steps beyond simply referring Ms. Singh to Raul Talamantes to get parking?

A Yes. I contacted the Heritage Plaza to find out if our two staff that were over there all the time could park at Heritage Plaza and --

Q And beyond --

A -- when they had meetings.

Q Okay. I'm sorry. And beyond referring her to Raul Talamantes, it appears you took steps to get her in County parking where it says I was not successful getting you parking. Does that imply to you that you did more than refer her to ISD to get parking?

A It -- it sounds to me as if I contacted Mr. Talamantes to find out if she could get on that contract parking. That's what my understanding was at the time. She always wanted to pay for parking. She never asked for free parking. So there was an -- an option I know that like city employees and some attorneys have to pay for parking in the parking garage. So I was probably not successful at getting that done or that for her.

Q Okay. But clearly more steps than simply telling her she had to coordinate with Raul Talamantes on her own, correct?

A That -- that sounds familiar. That sounds like what I usually do is try to help employees more than telling them to do things on their own.

Q And at the top an e-mail to her where it says awesome news. Come see me when you have a chance.

A Yes.

Q Do you recall what the awesome news was?

A Yes. Ms. Yates saw that they did have parking there. And she gave direction to her project manager to reserve two spots for BCIT people to use when they go to Heritage Plaza for meetings. Ms. Yates told me that, and that was the awesome news. That she could coordinate with Susan Yates about her and her -- her employees getting --

Q Okay.

A -- to park there during meetings.

Q So you coordinated with Ms. Yates regarding parking for BCIT employees at Heritage Plaza, correct?

A Yes. I really didn't coordinate -- yes, I did. I did.

Q Okay. You spoke with Raul Talamantes about getting Ms. Singh parking in the garage?

A Yes.

Q And you recommended to her -- oh, and you asked her if she should check on Heritage Plaza parking?

A I asked her if she should check?

Q How about if I ask if you can park at Heritage in one of their spots.

A Yeah.

Q Okay. So specifically you direct -- you wrote to Ms. Singh that you would ask if she could park at Heritage Plaza?

A Yes, I wrote that to Ms. Singh in this e-mail.

Q Okay.

A Is that your question?

Q Yeah, the e-mail speaks for itself. You've admitted you wrote it, so.

A Yeah.

Q You were asking about Ms. Singh. Not about all employees, about Ms. Singh?

A Yes, I was.

Q Okay. In your response you also stated that the person responsible for assigning parking spaces for ISD was David Mandujano.

A David Mandujano worked for BCIT, not ISD. And yes, he was responsible -- he's the manager over the technicians who used the in and out parking mostly for going in and -- going to other offices and departments to work on their computers. And so there were a certain amount of assigned spaces for those techs, and David Mandujano assigned those spaces.

Q So someone other than Raul Talamantes did have control over those spaces according to your response?

A The approval of free parking per the parking policy is Raul Talamantes' final decision. The assignment of parking spaces within BCIT would have been whatever manager was responsible for those spaces. So at the time the ones in the parking garage were David Mandujano, and the ones behind the

Dawn Flippin, CSR          210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

building were Gary Rose. Gary Rose, who was a previous manager as well that left after Cathy came in, was responsible for the parking, the ones behind the building as far as -- as far as I know.

Q Okay. So it was Raul for some, David Mandujano for others?

A No, Raul never assigned parking spaces. He approved whether or not by the policy they qualified for free parking. Once they qualified for free parking, then they would go sign a paper at infrastructure. Infrastructure would give them a little card. Now they can go in and out of the garage as many times as they want without paying for parking. And once that -- once that happens, then the manager responsible for whatever the assigned spaces are tells them you get an assigned space or you don't.

I had two employees who did not have an assigned space, but they had parking privileges because they went in and out for their jobs. They didn't have an assigned space, they just went in and out and parked in whatever spot they found open. But I did get them approved through Raul Talamantes to have free parking as per the parking policy.

Q Okay. Let's jump back to October 4th or jump ahead. After you had initially -- on the front steps of the annex is where the initial conversation about Ms. Singh's car came about, correct?

A Yes, about a black Mercedes, yes.

Q Then you moved to Ms. Singh's office?

A Yes. I was trying to talk to her, yes.

Q After that you're not clear where you went, correct?

A I'm not clear as to what the immediate right after --

Q Do you know what --

A -- happened next.

Q -- the next meeting with -- I'm sorry. The next meeting with Ms. Maras was regarding this whole parking issue?

A It could have been right after that. And through pretty much throughout the whole day it was either e-mails or -- we were even in a meeting sometime during that morning with other employees where that issue came up again. Then there was e-mails. And I was in and out of her office the majority of the day discussing parking issues with her.

Q Okay. At some point throughout the day was there a meeting where you felt Ms. Maras was getting angry?

A Yes.

Q And did you on October 6th -- I don't know if this is in the packet -- write a letter demanding an apology from Ms. Maras?

A Yes, I wrote this letter.

Q And familiar with Civil Service and --

MR. LOPEZ: Do you have an extra one?

MR. BROWN: Oh, I'm sorry.

Q (By Mr. Brown) Familiar with Civil Service and how everything works and paper trails that exist in Bexar County, what brought about your need to write a letter to Ms. Maras explaining your discontent and telling her, your supervisor, that she owes you an apology before you go on vacation?

A Throughout the day I was trying to assist Ms. Maras in getting the information she wanted. Throughout the day several times Ms. Maras had outbursts and -- and basically was becoming angrier and more agitated, not just with me but with others in regards to the parking issue.

Towards the end of the day Ms. Maras sent out an e-mail saying she was pulling all the parking cards and she was going to redo the policy. I was not sure if Ms. Maras was aware that there was a County policy, and so I went into her office.

At that time I handed her the policy. And again she raised her voice at me and said that she was, you know, why do I want to see this policy? I don't understand this e-mail. And she started slapping the policy. And I did say to Ms. Maras I don't understand why you have been so ugly to me all day. I tried to walk out of the office. Ms. Maras stopped me. She got up in my face basically and she was screaming and yelling at me. I was scared. I was shaking. She was telling me ordering me to sit down. Not just talking,

she was screaming to sit down. And I was just standing there because I didn't -- I couldn't get past her to go sit down.

And at that point she turned to slam the door in her office. And then I sat in the chair and I got yelled at again for about another 10 or 15 minutes including cuss words.

And I have been in the County for 19 years. I have never been treated that way by a supervisor or manager or any other person. And so I did write this letter hoping that her and I could sit down and talk about it. I felt the need to express to her how humiliated and scared I was, and that I believed that, you know, it was wrong and we should talk. And I was hoping that we could do that before I went on vacation so that I could -- we could put some resolve to it. Because I thought that we had worked together well for the previous year and I wanted to fix whatever happened that day.

Q Okay. You wanted an apology?

A Yes, I did.

Q And it was your opinion apparently if she was going to apologize, that nothing you had done was improper, correct?

A Well, I hoped that we could sit down and talk about it. I'm sure Ms. Maras would have told me what she thought was improper if we had talked about it. And I've, you know, we've always been able to talk before even when she was angry. So I didn't think that this day would be -- this day was

particularly bad. And so I thought that, you know, if I put my feelings in writing, then we could sit down and talk about it.

Q And you said she had expressed to you by the end of the day that she felt you had been dishonest with her, correct?

A When she was yelling at me in the office she said several times that, you know, she was the CIO and that she didn't care -- you know, what she asked me for I had to get it for her. And I was trying to tell her that I had been trying to get her what she asked for all day. Did she ever say you're dishonest, you lied to me? No, she didn't say that to me at all that day.

Q Okay. But you had said earlier that she expressed by the end of the day that she felt you were not being honest with her about Ms. Singh?

A No. The conversation was not about Ms. Singh. The conversation was about she -- she was under the impression that I told her I wasn't in charge of parking. And I never said that I was not in charge of parking. So I think she thought I was dishonest because I wouldn't or didn't produce a list of who was parking in the assigned spots. That's what I thought she was considering for me to be dishonest.

And I spent the majority of the day running around trying to figure out who was parking in those spots,

even to the point where I took license plate numbers and went to the Sheriff's Office to ask for assistance to tell me whose cars those were. So I felt that her thinking me dishonest had to be -- had to do with the fact that I wasn't giving her the information she wanted that day.

Q Okay. Subsequent to that, again, you filed a response to the discipline. And instead of stating that you were the one owed an apology, you acknowledged that perhaps you were instead deserving of a counseling for what was exchanged that day in Ms. Guerrero's -- I'm sorry -- in Ms. Maras' office. Why would there be a change to where you acknowledge perhaps you deserved a discipline which a counseling counts as rather than stating in your response you were absolutely right that day, and if anybody deserves anything, it's you an apology. Not a counseling, but completely opposite, an apology?

A Counseling is not a disciplinary action. It's basically where you sit down with an employee and you try to work things out with them. It does not count as a disciplinary action. I know that I've done hundreds and hundreds of counselings with my employees in the past, and it's not a disciplinary action.

I did believe that the blow up that Ms. Maras had that day in her office -- and I believe that if I had any part of that, then yes, she should counsel with me. As a good

supervisor, as a good manager, she should sit down and counsel with me about that blow up and how it happened and why it happened. That's what I believe, and that's what I'm saying in that letter.

Q That you should receive a counseling?

A That she should --

Q Not counsel with her, but you said such as a counseling. And while counseling may not be as you know very well from knowing Civil Service Rules --

A Uh-huh.

Q -- a counseling is a form of an effort by a manager to correct behavior, correct?

A Yes.

Q Okay. It's not a discussion; it's a -- as you've counseled people as you just stated, you counsel people to correct their behavior, correct?

A Not always, but yes, I have.

Q Okay. So when you said that when this matter escalated if it escalated unnecessarily, is it your opinion that the whole escalation was the result of Ms. Maras' behavior?

A I think it was a misunderstanding of information exchanged between Ms. Maras and myself, at which point a counseling between Ms. Maras and myself would have been in order so that she could explain to me where she was coming

from, I could explain to her where I was coming from. And hopefully we would come to an agreement and not a disciplinary action.

Q And you were, in fact, given the opportunity to state your position in response to the disciplinary action, correct?

A Yes.

Q So you were allowed to respond to the accusation by Ms. Maras?

A Yes.

Q Okay. You said you would like the opportunity to have responded. You were given that opportunity in response to discipline?

A No, sir, I believe you misunderstood me. I was hoping that by writing the letter, Ms. Maras and I could sit down and talk through this issue.

Q We're back to the October 6th letter?

A Yes.

Q Where you demanded an apology?

A Yes.

Q That was --

A Did I -- did I actually put the words I demand an apology?

Q You owe me an apology.

A Okay.

Dawn Flippin, CSR          210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0021

Q   So this isn't a letter where you say I'd like a counseling; this is a letter where you essentially say you were wrong and you owe me an apology, correct?

A   I believe that Ms. Maras was wrong in attacking me and getting up in my face. And for that, yes, I believe she owed me an apology. We're both human beings. Yes, she is my manager, my supervisor, my Chief Information Officer. I don't believe any human being should be treated that way. And for that I believed I was owed an apology. ·

Q   And throughout all of this did you remain perfectly calm?

A   I was shaking, I was scared.

Q   What was your reaction?

A   I never raised my voice. I just stood there shaking. She was up in my face.

Q   You never raised your voice?

A   No, I did not raise my voice.

Q   Okay. So any testimony to the contrary would be a lie?

A   I did not raise my voice.

Q   Since the demotion, what position have you been placed in?

A   Technology business analyst.

Q   And what responsibility do you have over any funds in BCIT?

A   In the current position?

Q   Yes.

A   None.

Q   What responsibilities do you have over other employees?

A   None.

Q   What responsibilities do you have in terms of purchasing or approving purchasing?

A   None.

Q   Okay. And is it your understanding that the position you were moved into, an E11 was abolished the subsequent year?

A   Yes.

Q   So that position doesn't exist?

A   No.

Q   No, it doesn't or no, I'm wrong?

A   No, it does not exist. It was abolished.

Q   Okay. And do you feel, assuming there was the authority to reinstate you to the previous position, that that would be a position that could work between you and Ms. Maras?

A   I can't look into the future. I do know that since I've been in the technology business analyst position that I have been working very hard. I go to work every day with a smile on my face. I would hope that eventually I could be in a position like that and work for Ms. Maras or any other

executive director in the same capacity that I worked up to. So I couldn't tell you that, but -- I couldn't give you that answer right now.

Q   Okay. You would hope it would work out?

A   I would hope that I could be in the position that I earned over the 19 years that I was -- and that could be with Ms. Maras or another executive director.

Q   Okay. And you understand the constraints of the Civil Service Commission that they cannot place you in another department or --

A   Yes, I do.

Q   Correct?

A   Yes, I do.

Q   And you understand that they cannot place you in an abolished position?

A   No, I did not. It was my understanding that the position should not have been abolished while I had a pending Civil Service hearing. So yes, I was very surprised that the position was abolished by Ms. Maras while I was still pending the hearing.

Q   And what rule or basis are you citing that Bexar County Commissioners cannot abolish a position?

A   No, I didn't cite a rule. I just said I was surprised at that.

Q   Okay. So that's not based on a rule?

A   No.

Q   Okay. You understand the Commissioners have a right to control the budget as they see fit?

A   Oh, yes.

Q   And abolishing or creating positions is solely within the gamut of Commissioners power?

A   Yes.

MR. BROWN:   Thank you. That's all I have right now.

THE WITNESS:   Okay. Thank you.

(Department Exhibits 1 and 2 marked).

MS. SAN MIGUEL:   Just for the record, I marked the first exhibit the e-mail as Department's Exhibit 1 and the letter regarding the incident on October 4th as Department's Exhibit 2.

(Employee Exhibit 1 marked).

CHAIRMAN ELLIOTT:   Before you start, Mr. Lopez, we're coming up almost on an hour and a half. I'm okay to continue unless we want to take a short break.

MR. LOPEZ:   I think we're prepared to go forward, Your Honor. May I proceed, Madam Commissioner?

CHAIRMAN ELLIOTT:   Sure.

CROSS EXAMINATION BY EMPLOYEE

BY MR. LOPEZ:

Q   Ms. Guerrero, tell the Commissioners about your

history with the County from the first job you had at the County up until now.

A I started working for Bexar County Sheriff in 1993 after I moved here from New Mexico. Wanted to be in corrections, so I took a job there, very low level position. And it was with the mothers and their children program working with the inmates' children who their parents were incarcerated.

I decided or had set a goal for myself that I would try to move up at least every two years. So I worked in that position for a couple of years. Then I was promoted to jail support coordinator where I coordinated all the programs for the inmates. Subsequently again promoted to jail support services manager where I worked for the jail administrator specifically and had several programs and about 55 employees under me.

I had large contracts, because the jail budget was $33 million. So I was recruited by the Y2K office in the IT department because they had some real large contracts for Y2K. So I accepted a position with BCIT to become a Y2K contract coordinator. And did that until Y2K was over. And then subsequently promoted to a business services manager. Took on more responsibility with budget and H.R. And as time went on Dr. Morgan and Mr. Marquez, David Marquez, both saw that I was willing and able to take on a lot more. And so I

was subsequently promoted to a fiscal administrative services manager. And then to the planning and technical services manager prior to Ms. Maras coming in.

Once Ms. Maras was in, she recommended promotion for me to IT services manager with more responsibilities.

Q Ms. Guerrero, I'm going to show you on Employee's Exhibit Number 1 the last tab. Would you explain what the last tab is to the Commissioners?

A The resume and certificates?

Q Yes, ma'am.

A I've included in this section just my resume to show you how I've moved throughout my career. I also have some certificates that I've received while employment with -- within Bexar County.

Q And those are certificates that you've obtained through your course of employment?

A Yes.

Q That gave you permission and authorization to do certain things?

A Yes.

Q Can you also explain on tab number 2 for the Commissioners what you have included?

A Tab number 2 are character references from high level officials in Bexar County who I've worked with

throughout the years in my employment. They've had dealings with me on County wide issues or specifically because they had an IT need and they would come to me. And so these are letters that were written by those people to show my character and what kind of a work ethic I have.

Q Ms. Guerrero, to save some time, we don't need to go through these character references, but it's your testimony that these were provided to you in support of your work for the County?

A Yes, sir.

Q Back to the -- your work at the IT department. Before you were demoted you were the second in command?

A Yes, sir.

Q For lack of better words were you the highest ranking non-techy?

A Yes, sir.

Q And what were your job responsibilities there?

A I had budget, all H.R.-related matters, video conferencing, the administration. I had communications, technology business analysts and technical trainers.

Q And in that job, Ms. Guerrero, can you explain to the Commissioners how it was that you were elevated to such a high rank within that department?

A I believe it's because of my work ethic and the fact that I give everything my 100 percent. Work very well with my

supervisors and with my employees. I have developed policies and procedures throughout the years, guided Dr. David Morgan, who also was new when I was there as well. So guided Dr. Morgan through some I guess training, for lack of a better term. And was able to show over these years that I could take on more and more responsibility. And as you take on more responsibility, then obviously you -- you get promoted.

Q Ms. Guerrero, in your Exhibit Number 1 under tab 4A can you explain to the Commissioners what you recorded?

A These were letters that I -- or commendations that I received throughout the year in regards to, you know, I guess supervisors or managers telling me wow, what a great job.

Q Ms. Guerrero, I know you're trying to be as humble as you can, but on Exhibit Number 4A of Exhibit Number 1 these are, in fact, letters that you received commending you for your service in what you did at the IT department?

A Yes, sir. And some of those are also from the Sheriff's Office.

Q And so for lack of better words, these are -- these letters are kudos to you for the types of things that you've done?

A Yes, sir.

Q And over the years you've maintained a file for these things?

A Yes, sir.

Q Why -- why are these important? Why should the Commissioners take interest in -- in these commendation letters?

A I believe that my work over the years has been commended and recognized County wide, and I believe that these letters show that. I also believe that in one day on October 4th one incident that exploded through to the end of the day and now after 19 years working for the County and always having been commended, I am now being accused of being a liar and insubordinate, and that, I believe, it's failure to do my job. And I believe that these letters exhibit that I haven't had a failure to do my job in the 19 years I've been here.

Q You also included in Exhibit Number 1 under tab number 3, not only have you received written letters of commendation, you've also received e-mails from your coworkers and other folks outside of the IT department?

A Yes.

Q Explain briefly just why you included these commending e-mails in Exhibit Number 1, Ms. Guerrero.

A I take pride in my work. And whenever I -- it's brought to my attention that I've done a good job, I would print the e-mail and save it, you know, for whatever reason. These e-mails tell me well, Carmella, you are doing a good job. It gives me motivation to do an even better job the next time when somebody tells me thanks, you're doing great.

So I've included these to show that not just internally in the BCIT department, but business partners throughout the County I think really appreciate my work and appreciate what I do.

Q Ms. Guerrero, the IT department, is it safe to say that it's basically in charge of all the computers for the County?

A Yes.

Q In charge of e-mails?

A Yes.

Q In charge of software?

A Uh-huh, yes.

Q Video conferencing?

A Yes, sir.

Q And so if you guys were a football team, the IT department is kind of like the quarterback for computers for the County?

A Yes.

Q And so with these commending e-mails, the Commissioners may notice that they come from different departments, elections?

A Uh-huh, yes, sir.

Q Explain why they would come from different departments.

A We coordinate all the IT services for the entire

County. And I was the BCIT liaison with most of these departments. And for the most part -- now I can toot my horn -- for the most part most County offices and departments would say well, if you go through Carmella, it'll get done. And so that spreads quickly. And so I get -- I was getting about 90 percent I would say of the IT stuff even if it wasn't in my division. The fact that I make sure that division manager knows this needs to get done or this particular person is in need of this.

So I think it was more the coordination with all the offices and departments for their IT needs. I am not the IT person, so I didn't fix anybody's computer, but I was able to coordinate their needs with whatever division within our department needed to get their -- their issue resolved.

Q Ms. Guerrero, I want to fast forward not to the day of October 4th, but I want you to tell the Commissioners from your perspective what -- what the effect of -- of your demotion was, starting with your grade and what your work responsibilities were.

A I was promoted to an E11 on October 1st. This incident happened on October 4th. Therefore, I was not in that position for many days. Previous to that, I was an E10 and had a lot of responsibilities.

On the day that I returned back to work demoted five grades -- six grades I think -- yeah, six grades, I was

moved from an office to a cubby hole. I now report to one of the employees that reported to me. So I was moved way down the chain of command.

And it has been devastating for me and my family, not just financially but it, you know, kind of hurts yours self-esteem as well. I made a commitment to myself that I was going to go to work every single day in that position, smile, say good morning, and work my butt off so that nobody would consider me a disgruntled employee or dishonest or not have the ability to do my job or insubordinate. So I've done that every single day for the last 18 months, just praying for this hearing to come, and ...

Q So, Ms. Guerrero, the effect of the demotion had a financial --

A Yes.

Q -- (inaudible), right?

A Yes, sir.

Q What was your salary before the demotion?

A Approximately $79,000. In that area.

Q And then after the demotion you were reduced to what?

A $58,000.

Q About 21,000 a year?

A Yes, sir.

Q And you also were reduced in your responsibilities?

A  Yes, sir.

Q  And you said that you were humiliated. What do you mean by humiliated?

A  Well, I went from being a manager for many, many years in the IT department, 12, 13 -- 12 years I guess, and, you know, then going back to work and changing offices and having to report to the people who reported to me knowing now from my previous 12 years that I had been there, none of my files were provided to me. I didn't -- I was basically started from scratch after all of that work that I did for the last 18 years.

Q  So you were thrown out of an office and put in a cube? Yes?

A  Yes.

Q  You started having to answer to people that used to answer to you?

A  Yes, sir.

Q  So people to whom you were the boss were now your bosses?

A  Yes.

Q  Reviewing you?

A  Yes.

Q  And there's a financial pay cut that you took?

A  Yes, sir.

Q  You no longer had the responsibility that you had as

a manager at the E11?

A  No, sir.

Q  And despite the fact that you were humiliated, that you were downgraded, that you were thrown out of an office and put into a cube, did you still take your new demoted job seriously?

A  Yes, sir, absolutely.

Q  And, in fact, if you'll turn to tab number one, what does tab number one begin with that we've entitled performance evaluations?

A  My most recent appraisal in my new position.

Q  So this is, for lack of a better word, your demoted job performance?

A  Yes.

Q  And what was the score?

A  Commendable.

Q  Or there's a ...

A  4.39.

Q  And that means that it was almost to the distinguished level, but it was certainly within the commendable --

A  Yes.

Q  -- range? And so all the time that you were humiliated, all the time that you were downgraded, thrown out of your office, restricted, you still did enough at your job,

took it seriously enough and with pride to have a commendable and almost distinguished performance review?

A  Yes, sir.

Q  So the person who did this review, you used to do her reviews?

A  Yes, sir.

Q  And then here recently the shoe has changed, huh?

A  Yes.

Q  What else do we have? There's some other reviews here?

A  These are the evaluations that I've had in the County since -- I think I even have one dated back to the Sheriff's Office. And the work that I've done, in every one of the comment sections of those evaluations it shows by a supervisor -- not every one -- but a supervisor or manager that they believed I was doing my job.

Q  So have you ever had any negative --

A  Never, sir.

Q  -- performance reviews?

A  Never.

Q  Have you ever had any formal, as Mr. Brown asked you, counseling sessions that went into your file?

A  No, sir.

Q  Have you ever been written -- been reprimanded writtenly [sic]?

A  No, sir.

Q  Ever been suspended?

A  No, sir.

Q  Ever even informally. You're saying in the 20 years that you've been with the County, never once has anybody took issue with the way you were doing your job and taken any disciplinary action against you?

A  No, sir.

Q  Not only does your immediate supervisor appreciate your work after the demotion, you've also included under 4B -- what is 4B, Ms. Guerrero?

A  Since I took my new position -- and I am coordinating with several offices and departments documenting their business processes. So I was assigned to the juvenile probation department first. So I was able to document their processes. And since they didn't have anything like this before, they were real excited and happy about the work that I had done. So a lot of these are e-mails from those business partners saying wow, great job, thanks, this is really helping us.

Most recently I was working with our Justice of the Peace Precinct 3 office doing the same type of work. And so these are e-mails from those business partners after seeing the work that I completed saying wow, thanks, these are good, these are great, whatever it is.

Q Does it give you pride that these people would go out and comment about your work?

A Yes, it does.

Q Ms. Guerrero, I want to go back to the time before Ms. Maras came to the County. You worked for Dr. Logan?

A Morgan.

Q Morgan.

A Morgan.

Q I'm sorry.

A Dr. Morgan.

Q Mr. Morgan was the CIO before Ms. Maras?

A Yes.

Q And CIO is Chief Information Officer; is that right?

A Yes, sir.

Q And after he left, you became the interim for a while?

A Uh-huh.

Q And you said you testified that Ms. Maras came on board September of '09; does that sound right?

A Yes, I believe that's right.

Q What was your job immediately when Ms. Maras came to work for the County?

A To take her to all the County offices and departments, the elected officials, introduce her. Get her acquainted with how departments are set up. That was

immediately.

Ms. Maras took some time at the beginning of her being hired to take care of all of her moving. I also assisted Ms. Maras with some personal issues in regards to getting her cars registered and, you know, helping her get, you know, in the right hotel or whatever she needed when she first came on board.

Q At that time you answered directly to Ms. Maras?

A Yes.

Q As the E -- was that what you -- that was your E10 position?

A Yes.

Q And so from September when she came on, you answered directly in your first E10 job, right?

A Yes.

Q At some point she promoted you, right?

A Yes.

Q And, in fact, on tab number five you included the promotion papers, right?

A Yes.

Q Explain to the Commissioners what tab number five is.

A This is the Bexar County form that you use during the budget process to request a reclassification of a position to a higher level or to just change the job description or job

duties of that position. So this request is a budget request to H.R. or to the budget office. We have -- these are the responsibilities for this position right now.

Ms. Maras at the time was requesting an E12 which would have been higher than the other managers. And so I would be going from an E10 to an E12 with job responsibilities of what my new position would be if I got the promotion, and an attached job description that was redlined to show where new -- new --

Q And if we turn four --

A -- responsibilities.

Q If we turn four pages into that's on the right-hand corner, it says section F, is that Ms. Maras' signature?

A Yes, it is.

Q Okay. So this is -- this is not something you did, right?

A No, sir.

Q This was submitted by the CIO, Ms. Maras, right?

A Yes.

Q And that's her signature there?

A Yes.

Q And that was dated on 6-30 of 2010?

A Yes.

Q So you had worked for her for about ten months?

A Uh-huh.

Q And after working alongside her, she saw fit to recommend that they create a new position for you, right?

A Yes.

Q And that would take you all the way to an E12?

A Yes.

Q She wanted to make you not only the highest ranking non-techy, but she wanted to make you the highest ranking IT employee other than herself; is that what I understand?

A Yes.

Q Okay. But eventually because of budgeting you got moved down to an E11?

A E11, yes.

Q Whose idea was it to promote you if you know? Was it Ms. Maras?

A I think that her and I had talked about it, but Mr. Marquez had also talked to her about it. So it was -- it was a mutual decision after all the work that I had been doing and the responsibility that I had incurred.

CHAIRMAN ELLIOTT: Excuse me. Can I ask who is Mr. Marquez?

A I'm sorry. Mr. David Marquez was the executive director that the Commissioners asked to kind of oversee me while I was interim, because that was management level.

Q (By Mr. Lopez) And so with your new promotion, what responsibilities did you have?

24 (Pages 78 to 81)

Dawn Flippin, CSR                    210.383.2290

TR-0026

A   I was going to take over more of a customer service role with the IT department. Cathy Maras was in the middle of kind of doing a reorganization. The Commissioners had told her, you know, get -- get familiar with your department and then you come back and tell us what you need. So we were working through kind of a reorganization. So the new position was going to possibly have some responsibility -- role and responsibility over the help desk and those kind of customer related, plus what I was already doing.

Q   Ms. Guerrero, you testified that in your entire time with the County you have never been disciplined, right?

A   Yes, I did.

Q   I want to talk to you specifically about Ms. Maras and while she was your boss. During that time did she ever discipline you?

A   No.

Q   Did she ever pull you in the office and give you any stern words that you weren't doing what you were supposed to?

A   No.

Q   Did she ever say that you violated any policy?

A   No.

Q   Did she ever tell that you've ever violated any rules?

A   No.

Q   Did she ever tell you you were coming in late?

A   No.

Q   Did she ever tell you that simply you just weren't doing your job?

A   No, she did not.

Q   Did she ever write you up in any form?

A   No.

Q   Did she ever send you an e-mail and say hey, Ms. Guerrero, you know, you're not getting it done?

A   No.

Q   Did -- so there wasn't ever any written reprimand in your file from Ms. -- Ms. Maras?

A   No, nothing.

Q   And, in fact, she'd never even -- she never suspended you as well, right?

A   Right.

Q   In terms of parking -- and I want to make sure that you're clear for the Commissioners here -- it's your testimony that -- that you were the liaison for parking?

A   Yes, sir.

Q   It's not your testimony that you had nothing to do with parking, right?

A   No, of course not.

Q   In fact, as the non-techy, it was probably natural that you would handle some of these responsibilities?

A   Yes, sir.

Q   But who assigned actual parking that you were able to coordinate with infrastructure with Mr. Talamantes?

A   Who assigned the parking spaces in question?

Q   Yes.

A   David Mandujano and Gary Rose.

Q   You testified that you thought one of the things that -- that Ms. Maras thought you were being untruthful with her was whether or not you knew that Ms. Singh drove a Mercedes?

A   Yes.

Q   On the day of the incident was the idea of a Mercedes in this parking spot was -- was angriness in Ms. Maras, right?

A   Yes, it did.

Q   She was upset that somebody with, you know, a Mercedes would be -- would be marking there, right?

A   Yes.

Q   And tell the Commissioners we're talking about a pretty plum spot, right?

A   Yes, sir.

Q   And do you believe that the reason Ms. Maras was upset was that somebody had a great spot and that that person had a Mercedes?

A   Yes.

Q   You didn't know it was Ms. Singh's Mercedes, right?

A   No, I did not.

Q   Do you drive a luxury car?

A   No.

Q   A BMW or Mercedes?

A   No.

Q   You testified that she asked, you know, who drives the Mercedes and then some words. I don't drive a Mercedes, so I don't know, but --

A   Yes.

Q   And so it was unfamiliar to you, right?

A   Yes.

Q   Before that had you ever ridden -- ridden in the vehicle -- in a vehicle with Ms. Singh?

A   No.

Q   You ever take down her license plate?

A   No.

Q   Did you know that she drove a Mercedes?

A   No.

Q   So you -- you couldn't have been untruthful with Ms. Maras about the knowledge of this Mercedes, right?

A   Right.

Q   Okay. Mr. Brown asked you some questions, Ms. Guerrero, about the letter you wrote on October the 6th.

A   Uh-huh.

Q   At the time you wrote the letter on October the 6th,

25 (Pages 82 to 85)

did you know you were going to be disciplined?

A No, sir.

Q Did you think that it was -- on October 6th did you just simply believe that you had a misunderstanding with Ms. Maras?

A Yes.

Q And that you thought that she was rude to you, right?

A Yes.

Q And that you wanted an apology to clear the air with her; is that right?

A Yes.

Q But when you write in your October 6th letter you weren't saying that all you wanted was an apology. You were -- you were basically just trying to figure out, you know, why she had gotten upset. And you -- and since you had a close relationship with her, you wanted to be able to work with her going forward, right?

A Yes.

Q In your -- in the response that we filed we indicated that you weren't even counseled about the discipline, okay? Do you remember that?

A Yes.

Q Okay. Now, do you believe that you did anything that rises to the level that Ms. Maras has cited in her

discipline?

A No, sir.

Q Do you believe that you were deceitful with Ms. Maras?

A No, I do not believe I was deceitful.

Q Do you think that you lied to Ms. Maras?

A No, I did not lie to Ms. Maras.

Q Did you try to mislead her?

A No, I did not.

Q In no way were you trying to -- to hide something from Ms. Maras?

A No.

Q And would you have any reason why you would want to hide --

A No.

Q The -- we've talked about how parking is virtually insignificant in the hierarchy of the IT, right?

A Yes.

Q You've got a $2.5 million budget, right?

A Yes.

Q That deals with all of the computer brains for the entire County, right?

A It's more like $10 million. I was answering a different question, but yes, okay.

Q So in terms of -- in terms of the IT --

A Uh-huh.

Q -- the IT's importance --

A Yes.

Q -- the computer stuff is up here, right?

A Yes.

Q Where the employees park is way down here, right?

A Yes.

Q Maybe even below the table, right?

A Right.

Q And so you'd have no reason to lie to her, right?

A No.

Q Okay. In terms of being insubordinate, and Ms. Maras hasn't been clear in her letter, what is it that you understood that she told you to do that you didn't?

A I didn't understand at all where the insubordination came from for the exception of -- and I'm being honest -- when I went in her office to give her the policy I said -- she yelled at me again and slammed the policy in her hand -- and I said I don't understand why you're being so ugly to me today about this issue. And I walked out. I started to walk out.

That was my understanding of where she -- how she came to insubordination from that event. Because all day long I spent trying to find out who parked in those parking spaces so that I could give her a list. And at 5:03 I did e-mail her a list of everybody that was parking in the

assigned spots.

Q And so that's the only thing that you can understand that she said for you to do that you didn't?

A Yes.

Q But the exact opposite is true, right? You didn't fail to do something she told you, right?

A Right.

Q Do you take the chain of commands at your job serious?

A Absolutely.

Q And so when -- when you're overseeing an employee, it's important that they do what you tell them?

A Yes.

Q Likewise, when you're told to do something, do you take it equally as important?

A Yes, I do.

Q And you just can't have an organization that runs smoothly without it?

A Yes.

Q Ms. Guerrero, I want you to tell the Commissioners what -- what exactly you want them to do today, and why you deserve to be reinstated to your position and to get your back pay.

A Well, I know you've heard all about how hard I've worked over the last 19 years. I take my job really

Dawn Flippin, CSR                210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

seriously. I'm a sincere employee. I don't believe you could find many people that would say that I'm not. I work really well with others. I work really well with my coworkers and County employees. I love my job. I love working for the County. And even though I'm eligible to retire in a year, I have no intentions of retiring in a year. I love my job. And I believe that's why I worked up to where I was in the County.

I do believe that what happened on one day on October 4th was a misunderstanding between Ms. Maras and myself that escalated to a very -- to a bad ending. And I believe that whether regardless of them demolishing my position, that I would like the Commissioners to consider overturning Ms. Maras' decision to demote me six grades. I have never heard of anybody in Bexar County getting demoted six grades ever. I believe that was a very harsh -- harsh disciplinary action for an event that happened one day after 19 years of, you know, really working hard for this County.

So I'm asking that Ms. Maras' decision be overturned and that I be awarded back pay.

MR. LOPEZ: Thank you. I pass the witness, Madam Commissioner.

CHAIRMAN ELLIOTT: At this time let's go ahead and recess and let's come back at 10 o'clock.

MR. BROWN: 10? 11.

CHAIRMAN ELLIOTT: Oh. Time moves. At 11

please. Time now is 10:50. We will reconvene at 11 o'clock.

(Brief recess).

CHAIRMAN ELLIOTT: We will go ahead and reconvene. Time now is 11:04.

And Mr. Brown, you wish to proceed?

REDIRECT EXAMINATION BY COUNTY

BY MR. BROWN:

Q In the whole time you worked with Ms. Maras she never counseled you, disciplined you, issued any kind of recommendations on changing your behavior; is that your testimony?

A She never counseled me or disciplined me. Ms. Maras and I have had one conversation in regards to my -- I guess my demeanor, my -- the way that I speak to her.

Q Okay. Speak to her?

A Uh-huh.

Q And to you that wasn't a counseling, that was what, a corrective --

A Yes.

Q -- behavior conversation?

A Yes. I believe that Ms. Maras and I were getting to know each other. And I had to make adjustments for a new boss after 13 years. And I believe that she needed to also make the same kind of adjustment with me. We both have kind of the same type of personality in regards to the way that we handle

things. So there was a conversation between her and I in her office. And everything worked out I believe. I worked on what she asked me to work on, and we continued our relationship.

Q Okay. And in terms of a promotion, she supported it, correct?

A Yes.

Q Okay. And this incident occurred -- the promotion actually probably was approved by Commissioners mid September your -- from your experience with the budget?

A Yes, I believe so.

Q Okay. And goes into effect October 1?

A Yes, sir.

Q The County is on a budget year October 1 to October 1, correct?

A (No audible response).

Q That's your ...

A Yes. Yes, sir.

Q I'm sorry.

A I'm sorry. Yes.

Q I'm not supposed to testify.

A Yes. Yes, sir.

Q So why do you think she would promote you and then almost immediately turn around and demote you if it wasn't an incident -- one incident that caused her to think something

very serious was going on?

A To be honest with you, I think that she was reacting to the letter that I wrote on October 6th. She placed me on administrative leave shortly after she read that letter pending an investigation, which from my understanding from H.R. there was never an investigation. And I was never provided any -- any information. I wasn't allowed to speak to anybody during that six weeks I was on leave, so I really did not know what was going on other than H.R. telling me there was no investigation.

So it's my understanding that Ms. Maras demoted me six grades in response to the letter that I wrote her after the incident that happened on October 4th.

Q That's your -- that's just your opinion, correct?

A Yes, sir.

Q That's not something she's told you?

A No, sir.

Q Okay. And what specifics can you provide to support the witch hunt that your attorney said was happening at this time? Since she had promoted you, correct?

A Yes.

Q Less than a couple weeks prior to this incident --

A Yes.

Q -- what would cause her, other than your letter demanding an apology, go on a witch hunt? Or had the witch

Dawn Flippin, CSR          210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0029

hunt been going on the whole time she had been there?

A  Not as far as I know. I knew nothing about a witch hunt going on prior to the day in question and me writing the letter asking for a meeting with her so that we could resolve the issues of what happened that day. That's what my -- my understanding of a six grade demotion from Ms. Maras is.

Q  Okay. So it was basically a two week witch hunt?

A  I don't know about a witch hunt, sir.

Q  Okay. I'm not making the words up.

A  Oh, I know you're not, but I'm not -- I don't know anything about witch hunt.

Q  Okay.

MR. BROWN: That's all I have. Thanks.

MS. GUERRERO: Thank you.

MR. LOPEZ: Madam Commissioner, nothing further.

CHAIRMAN ELLIOTT: Okay. Mr. Brown?

MR. BROWN: We would call Tina Singh in the next room.

CHAIRMAN ELLIOTT: Good morning, Ms. Singh.

(Witness sworn).

Tina Singh,
having been sworn to tell the truth, testified as follows:

DIRECT EXAMINATION BY COUNTY

BY MR. BROWN:

Q  Ms. Singh, you know why we're here?

A  Yes.

Q  I met with you yesterday to talk about this, correct?

A  Uh-huh.

Q  And I told you that records, doesn't amplify?

A  Uh-huh.

Q  So can you speak up so everybody can hear you?

A  Uh-huh.

Q  Can you state your name again. I'm sorry.

A  My name is Tina Singh.

Q  Okay. And who do you work for?

A  I work for the CIO of BCIT.

Q  Okay. And who is that?

A  Cathy Maras.

Q  Okay. And who are you an employee of?

A  I'm self-employed.

Q  You're self-employed. Okay. You're not a County employee?

A  No, I'm not.

Q  Okay. Ms. Guerrero discussed what your job is, how

you got here. Nobody is going to contest that. So I'll just tell you we know who you are, why you're here, your job. I'm going to skip over all the background.

A  Okay.

Q  I'm going to jump to parking at Bexar County.

A  Okay.

Q  Okay. When you came to Bexar County what was your understanding of parking, where you should park?

A  When I came at Bexar County I didn't know that parking is such a, you know, big deal here. And I came -- when I initially started I came to Sapphire. And when I came here my -- the -- my contact at Sapphire told me that parking is an issue, but I really I didn't pay attention to it because I was more -- more concerned about getting the job. So I didn't pay attention at that time.

Q  Okay. And who is Sapphire? That I didn't hear.

A  The Sapphire is second largest employer, you know, third-party employer, so.

Q  Okay.

A  So but when I was hired with Bexar County I was hired through Sapphire.

Q  Okay. So when you came and first started where did you park?

A  I parked in K-Mart parking lot.

Q  Okay. And K-Mart parking lot is now the new police

station, correct?

A  Yes, exactly.

Q  Do you pay for parking there?

A  Yes.

Q  At some point did you inquire about getting parking somewhere within the County?

A  Yes, I did.

Q  And who did you ask about it?

A  I -- I'll be honest here. I don't recall exactly, but, you know, I think I might have asked around like secretary like who do I talk to park. You know, who do I talk to get parking here, because I'm going to be a long time employee, my project was 15 months long. And since I'll be working over a year with the -- with the project, I might have asked around like who do I -- who do I inquire about park -- who do I talk to to get parking.

Q  And was there a consensus or did you come to understand who you should talk to?

A  Well, yes, I was told I can talk to Carmella, because she takes cares of all, you know, all of business service manager kind of job duties.

Q  Okay. And you knew of who Carmella was through your job?

A  No, actually I knew -- Carmella was my point of contact when I was getting hired. Carmella was Cathy's right

Dawn Flippin, CSR    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)    5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0030

hand at that time. So, you know, I knew Carmella very well.

Q  Okay. And did you ask her about parking at some point?

A  Yes, I did.

Q  And do you recall when that was? Not the exact date.

A  I don't -- not exact date, but I would assume it was -- it was a month or more after I started working with Bexar County. I would say maybe mid June.

Q  Okay. And what was her response?

A  Her response was like parking is very difficult to get out here, but she can -- she can -- she'll look into it.

Q  Okay. And what is your understanding or what was the next thing that occurred between you and Carmella regarding parking?

A  The next thing? I'm sorry, I didn't catch your question. Like next thing.

Q  You said you asked her about parking?

A  Uh-huh.

Q  Did she have a response or did you get parking or what?

A  No, I didn't get parking right away. I asked her and she said it would be very difficult to get it, but she would try. And then I went and, you know, maybe after a month I checked back with her.

And at that time I was having early morning meetings with Heritage -- at Heritage Plaza. So at that time I had requested I said Cathy, you know, Carmella, I'm -- I have to go -- I have to be there at 7 and I had to walk five blocks to get to where I need to get. So is there something she can do for me.

Q  And what did she say?

A  She was helpful. She said she would try.

Q  And did she get you parking at Heritage parking?

A  I -- I -- I recall she called Susan Yates. And -- and Susan Yates eventually gave everybody on the project team passes.

Q  Okay. To park at Heritage Plaza?

A  Yes.

MR. BROWN: Do you-all know here Heritage parking is?

Q  (By Mr. Brown) Heritage Plaza is not the annex, correct?

A  No, it's not the annex. Annex is be -- is behind -- is -- annex parkings are behind BCIT. Heritage Plaza is -- has a parking lot next to it, so she -- she issued couple of parking losses -- parking passes for me, Brian Lyssy, Richard Price. He was the project manager on the auditor side. So he -- she -- she give parking passes to everyone. But I think that was later. Later on.

Q  Okay. And did you have another conversation with Carmella about -- no, I'm sorry.

Did you understand Heritage Plaza to be permanent parking for you?

A  No, those were just the monthly passes. So we were, you know, until -- until I had business there.

Q  Okay. So was that only to leave your car there while you were having -- conducting business and then you would have to leave?

A  They were in and out passes. I wasn't given any instructions like that.

Q  Okay. At some point did you and Carmella have a conversation about parking in the garage, this building next door?

A  No.

Q  Okay. So you never asked her to get you parking in the garage or if you could get parking in the garage?

A  Well, I don't recall having any specific conversation like where. I was just ready to park anywhere.

Q  Okay.

A  So I -- it was just a general questions like can you get me parking somewhere. I wasn't really specific like get me this garage or anything like that.

Q  Okay. Did you have -- at some point did you park behind the annex?

A  Yes.

Q  And how did you come to find out there was parking spaces back there?

A  I -- I was told that -- that one of the chief network architect -- well, let me -- let me, you know, back up a little bit.

David Mandujano left, and his parking spot was empty in this garage. And Gilbert Sanchez was -- was the candidate to get that -- that manager's position. So I was told that Gilbert is going to move to a parking garage, and that spot behind -- behind BCIT I can park there.

Q  Okay. And you say you were told that. Who told you that?

A  Carmella.

Q  Okay. So Carmella told you that there was going to be some movement of individuals, and a parking space was going to open at the annex.

A  Uh-huh.

Q  Correct?

A  Well, she said there's a sparking space open until -- until they hire the new chief network architect.

Q  Okay.

A  So it was -- it was until we get a new person.

Q  So it was on a temporary basis?

A  Exactly.

29 (Pages 98 to 101)

Q Did she at some -- at any point express to you that you were allowed to park there in the morning for early morning meetings, but then you were to move your vehicle?

A We didn't go into all of those details.

Q Were there any details about parking there other than here's a space, you can park in it?

A That's my understanding.

Q Was there any discussion about you paying for parking?

A No.

Q And did she ever come to you and say you need to move your car because the meeting is over, or you need to move your car because it's not dark out anymore?

A No.

Q Did anything happen regarding that parking issue until October 4th, 2010?

A Not that I recall, no.

Q And October 4th, 2010 did you park in that space?

A Uh-huh.

Q Okay. And at some point during the day did the parking space come up?

A Yes.

Q Okay. What -- how did that come about?

A Well, it was early morning around I would say ninish, and I was -- I was in my office. Cathy -- Cathy came

into my office and asked if -- if my Mercedes is parked behind the building.

Q And your answer?

A Yes, it was my car.

Q Okay. And was there any discussion as to how you got the space or did Cathy say why are you parking there?

A No. She asked me directly is it my vehicle. And I said yes, ma'am, it is my vehicle. And she mentioned that I might have to pay for this. And I agreed that I'll be happy to do that.

Q Okay. And at any point during this conversation did Carmella come up -- I'm sorry -- Ms. Guerrero come up at any time?

A Yes. Carmella didn't come into my office. So Cathy was talking to me. And Carmella was passing by, but she heard conversation regarding the parking. And she stopped by. And at that time they're outside my office, but I just heard their conversation as to Carmella telling Ms. Maras that who is she going to pay, because this parking come with the building. And --

Q Okay.

A -- that's all I heard.

Q Was that the end of your involvement with the parking issue I'll say that day?

A Yes, that was it.

Q Okay.

A I -- since I'm outside contractor, I didn't think it was, you know, my -- my fight to pick. You know, I was just following orders. And -- and I just stayed away from it.

Q And your orders, just to be clear, came from Ms. Guerrero that you could park there?

A Yes.

Q Okay. Did you have a conversation other than October 4th with Ms. Maras about parking there?

A No.

Q Okay.

A Because I -- I was not talking to, you know, CIO of Bexar County. You know, in my professional conduct, I wouldn't go and talk to CIO of Bexar County and ask for parking or, you know, ask her about my, you know, needs to get settled in the office. You know, I would not go and ask her like, you know, where do I get stationery or, you know, how do I get a printer here, you know. So I -- I wouldn't want to bother her with those little things.

Q Okay. In the office where is your office in relation to Ms. Maras?

A Next to her. It was next to her at that time.

Q Okay. At that time it was next to her?

A No, actually it's her office and there's a big conference room in between, and then it's my office.

Q Okay. So you were -- were you close enough by that you could hear what was going on in her office if the door was open?

A No.

Q Hear her or on the phone, the speaker phone or anything?

A No, because we have this big conference room in between.

Q Okay. So if there was yelling in that office, you wouldn't have heard it?

A Usually I work with my ear phones on.

Q Okay.

A So I didn't hear anything.

Q Okay. So you heard nothing the rest of the day regardless of the topic in terms of yelling, doors slamming?

A I'm actually I'm not normally there when this happened because I leave around four.

Q Okay.

A So I --

Q But throughout the day?

A No, I -- I really didn't.

Q Okay.

MR. BROWN: That's all I have, but he can ask you questions.

30 (Pages 102 to 105)

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)                    5245eeb5-f6db-45f5-aa87-28085203e4ee

## Page 106

CROSS EXAMINATION BY EMPLOYEE

BY MR. LOPEZ:

Q Good morning, Ms. Singh.

A Hi.

Q From the time you came to work for Bexar County how long has that been until now?

A It has been one year, 11 months.

Q So almost two years?

A Yes, sir.

Q And throughout those two years Ms. Guerrero's been a part of the IT department?

A Yes, sir.

Q And you've had occasion to talk to her?

A Yes.

Q Communicate with her?

A Yes.

Q Send e-mails to her?

A Uh-huh.

Q During that time that you've communicated with her and worked alongside her, have you ever found Ms. Guerrero to be untruthful with you?

A No.

Q Has she ever been dishonest with you?

A Not to my knowledge.

Q Has she ever misled you?

## Page 107

A No.

Q From what you could observe in the two years of working in the IT department, could -- could you tell these Commissioners whether or not Carmella was a hard worker?

A I would -- I would agree she was very good at her job.

Q Whatever that may be, right?

A Yes. She was very good at her job. She ...

Q She's a real go-getter, right?

A Yes, she's a real go-getter. The way we are organized we have six technical managers and I think six -- six plus minus one. And all of us were technical, and Carmella was more on the budget side, budgeting and business service manager kind of things.

Q And during these two years have you ever had any reason to -- to know that Carmella was not doing what she was told?

A That's not my question to answer.

Q Okay. Fair enough.

A Please keep in mind I'm a outside contractor. I don't keep into politics. I stay away from it. I come in, get my work done, and I leave, so.

Q In fact, you still work for Ms. Maras, right?

A Yes, sir.

Q And before today did she have any discussions with

## Page 108

you on how you should testify here today?

A Who?

Q Ms. Maras.

A No.

Q Okay. You-all never discussed you coming up here?

A The only discussion I had was with --

MR. BROWN: Brown.

Q (By Mr. Lopez) And I'm not asking about any discussions that you had with Ms. Brown -- Mr. Brown, I'm sorry. But you didn't have any questions with Ms. Maras?

A I -- what kind of questions?

Q About this hearing.

A No. The only -- only -- my interaction with Ms. Maras was she asked me to come here, and that was a five minute discussion. And the next meeting I had was with the D.A.'s Office.

Q You folks do some pretty important work there at the IT department, right?

A Uh-huh.

Q And, in fact, the IT department coordinates all computers for the entire County, right?

A Uh-huh.

Q If you know the testimony has been that the budget is over 10 million bucks. And you're aware that Ms. Guerrero's been demoted, right?

## Page 109

A Yes, sir.

Q So the first time you came up there she was second in command, and then now they threw her out in the rank and file; you know that, right?

A Yes, sir.

Q And at least it's Ms. Maras' contention, if you know, that -- that she demoted Ms. Guerrero based on where you were parking on October 4th.

A (No audible response).

Q Given the fact that -- is that yes, you understand that?

A I -- okay. Let me --

Q And I just -- you understand that --

A I -- I --

Q -- she was demoted?

A Yes, I know she was demoted. I don't know the grounds.

Q Okay. And if it was the case that the grounds were that -- that all the important work that Carmella has done for the County and all the important work that the IT department does, that if -- if you knew that to be the case, and if Ms. Carmella was -- was demoted simply based on where you were parked on October 4th, do you think that's fair?

A That's not my call, sir. That's why we have the jury decide.

Dawn Flippin, CSR          210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0033

## Page 110

Q But just -- you're an employee, right? You've worked -- your self-employed?

A Yes, sir.

Q You know, given the big picture, is that something you think somebody should be demoted over over where you were parking?

A Like I said, sir, it's not my call. I really don't know the whole picture to answer the question.

Q The -- in terms of where you were parking on that day, Ms. Guerrero, worked to try to get you an accommodation, right?

A Yes.

Q And I hope you'll say that you were appreciative of that?

A Yes.

Q Because it's your testimony that you had to walk about five blocks?

A Exactly.

Q At seven in the morning?

A Uh-huh.

Q Sometimes nights?

A Yes, uh-huh.

Q When you were walking?

A Yes. Yeah, and well -- yes.

Q And you testified that -- that it was -- that you

## Page 111

guys have some tech folks. And I don't mean to be disrespectful. You're a tech folk, right?

A Uh-huh.

Q You mean you do computer stuff, right?

A Uh-huh.

Q That's your job for the County?

A (No audible response).

Q Ms. Guerrero doesn't do the -- that type of tech work, right?

A I --

Q Let me make it clear.

A Okay.

Q She's not a tech person, okay?

A Yes, and -- yes.

Q And so you would agree with me that Ms. Guerrero's job is to support you guys?

A Yes.

Q And the rest of the tech folk, right?

A Well, when -- when I came in that was my understanding.

Q And so by her trying to help you by an accommodation, she was doing what she was -- she's trying to help you do your job.

A Exactly.

Q Right?

## Page 112

A Uh-huh, exactly.

MR. LOPEZ: Nothing further. Thank you, Ms. Singh.

THE WITNESS: Thank you.

REDIRECT EXAMINATION BY COUNTY

BY MR. BROWN:

Q Just a couple more questions.

A Sure.

Q Since they asked you about Ms. Guerrero's honesty towards you and had she ever misled you or done anything to have you question her integrity we can say.

A Uh-huh.

Q Are you familiar with the Primavera project?

A Yes, I am.

Q And about how much money was involved in that project?

A As far as I recall it was a $500 million plus project. I might not -- my numbers might be off. This is my --

Q A big project?

A Big project.

Q Was that a flood project?

A Yes.

Q Okay. And had you been assigned to work on that project?

## Page 113

A Yes, I was initially assigned to work on that project.

Q Who assigned you?

A Cathy.

Q Ms. Maras?

A Yes.

Q Okay. At some point were you told you were off that project?

A I was told that this project is being assigned to Brian Lyssy. He's one of our business analysts.

Q And who told you that?

A I was told by Carmella.

Q Okay.

A Because she was his immediate supervisor.

Q So Carmella told you that -- essentially did she tell you you were no longer on the Primavera project?

A Well, she told me that it's a little -- it's a political project, and -- and Brian would be the best suited to work on that.

Q Okay. And did she at any point express whether Ms. Maras was in the loop on you being taken off that project?

A I didn't question, but I -- she -- I wasn't told that. I -- you know, I just followed the orders. I -- I didn't come to question, but, you know.

Q At some point --

Dawn Flippin, CSR                210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)                5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0034

## Page 114

A My understanding was that the orders are coming from Cathy.

Q Okay. And then at some point did she express to you that that -- that the project was political and Ms. Maras didn't understand the politics of it?

A Yes, she told me that project is very political and, you know, it takes -- it takes a lot of politics to get it done.

Q And at some point did you come to learn that Ms. Maras had no idea you had been taken off the project she had put you on?

A Way later.

Q But you did learn that?

A Yes.

Q And that Ms. Guerrero had taken you off on her own initiative, not per Ms. Maras' orders?

A I found that out later, but at that time my --

Q At the time you didn't know?

A I didn't know.

Q But the whole picture is Ms. Guerrero had gone behind the orders of Ms. Maras and pulled you off that project without Ms. Maras' permission, correct? Is that what you later learned?

A Yes, that's what I later learned.

Q And at any point did you learn that Ms. Maras had

## Page 115

gone and told Ms. Guerrero yes, let's switch the project, or was this all on Ms. Guerrero's own initiative did you learn?

A I'm sorry, I lost you there. Say it again.

Q Did you at any point learn that Ms. Maras had instructed this to happen or was it simply that she had put you on it and without any knowledge by Ms. Maras, Ms. Guerrero had gone behind her back and pulled you off the project; is that what you learned?

A That's what I learned through conversations with Cathy. Because Cathy kept on telling me like why aren't you there? And I never understood why she is asking me those kind of questions, you know. So to -- to me it was kind of I didn't know what's going on. It was mis-complication, misunderstanding to just to give it a benefit of the doubt, I thought it was a misunderstanding.

Q But you later learned it wasn't a misunderstanding.

A Yes.

Q Ms. Maras thought you were on the project?

A Yes, exactly.

Q So she was questioning I put you on this project; you're not going to meetings?

A Uh-huh.

Q Why aren't you there, correct?

A Yes, sir.

Q And Ms. Maras apparently didn't know at any time

## Page 116

that Ms. Guerrero had made the decision that this is a political $500 million project, and Ms. Guerrero's decision was I'm not going to tell Ms. Maras, but I'm putting somebody I want on it, correct? Was that the end result?

A Yes.

MR. BROWN: Thank you. That's all I have.

RECROSS EXAMINATION BY EMPLOYEE

BY MR. LOPEZ:

Q I've just got a couple of questions, Ms. Singh. You testified that on October 4th you were parked by the annex and that Ms. Singh [sic] asked you, you know, why you were parked there. Is that -- did I summarize that right?

A Ms. Maras.

Q I'm sorry, Ms. Maras.

A No, she didn't ask me --

Q Okay.

A -- why am I parked there. She asked me is that my vehicle, and I said yes.

Q And was she unaware that you were parking there?

A Ms. Maras?

Q Yes.

A I would think so.

Q Okay.

A Again, I didn't know that. I'm -- I'm guessing so.

Q Okay. So she's the Chief Information Officer. She

## Page 117

didn't know who was parking in the spot that you were parking, right? She's in charge of the whole outfit, right?

A Yes.

Q She didn't know that that's where you were parking, right?

A Ms. Maras didn't know.

Q Ms. Maras didn't know. Okay.

And you were questioned about this Primavera project, and she didn't know -- is it your testimony also that she -- Ms. Maras didn't know that you had been taken off that project?

A I -- I learned that later, like years later. I'm not saying, you know, I just found out later. I don't know.

Q Was -- at that time, you know, and Mr. Brown asked you well, did you learn that -- that Ms. Maras didn't know that you had been reassigned; do you remember that question that he asked you?

A Who? He asked me?

Q He asked you whether or not you had learned that Ms. Maras was unaware that you had been reassigned on the Primavera project; is that true?

A I -- I didn't know about it like for a long time.

Q Does it surprise you that the Chief Information Officer doesn't know routine things that are going on in the office such as parking or vendors like you being relocated or

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0035

## Page 118

being reassigned?

A Well, typically Chief Information Officer has, you know, bigger fish to fry. They have to worry about budget and, you know, bigger projects, satisfying Commissioner's questions. That's -- that's, you know, that's -- I've seen typical CIOs like very hollow. And I will say Cathy is more hands-on than any other CIO I have seen. So, again, but I don't know if she's drilling down on all those facts like who has parked where, I don't know that.

Q And that's why I drew it up here like this. Like she didn't know the little stuff about parking, right? That's what you said that she's got bigger -- bigger fish to fry, right?

A Uh-huh.

Q But the Primavera project is a $500 million deal, right? She should know who of her folks are working on that project, right?

A Like I said, that's not my question if she -- she should know or she don't know. That's not my question like.

Q And I just want to finish up. You know you're under oath here, right?

A Yes.

Q And you understand that that oath requires you, Ms. Singh, to tell the truth even if it somehow hurts Ms. Maras' --

## Page 119

A Uh-huh.

Q -- case, right?

A Uh-huh.

Q And so when you say it's not my question, what do you -- do you mean that you don't want to answer it because Ms. Maras is here and she --

A No.

Q -- still supervises you?

A No, no. Sir, you're asking me that shouldn't Ms. Maras know that. How -- how do I know? You know what I'm saying? Should she be knowing or not, because I'm not defining her job duties. You know, so I really don't know what she should be knowing or not. I am --

Q Should the CIO know of a $500 million project where a vendor like you has been relocated or reassigned?

A Well, to answer the question, I was assigned primarily for Lawson. And Lawson was a huge project. It was a 15 months $10 million project. So my primary assignment was Lawson, okay? And this was assigned to me on the side. So yes, I was going to all the Lawson meetings and law -- Primavera and -- let me answer the question.

Primavera wasn't coming on board for a year -- a year from when we were starting to have those meetings. So my -- her immediate -- she was taking care of immediate projects which was Lawson which was already started and in

## Page 120

motion. Primavera was coming along after a year or so. So that was -- to answer question, Lawson was my primary job duty; this was coming later on the -- on the horizon.

Q When you were reassigned on the Primavera project did you make a complaint to Ms. Maras?

A No.

Q Did you send her an e-mail about complaining that you had been reassigned?

A No.

Q Any conversations with her about being reassigned?

A No.

Q Is the fact that the Primavera project is being brought up now just simply something that Ms. Maras is bringing up to try to smear Ms. Guerrero?

A I don't know what her intentions.

MR. LOPEZ: Thank you, Ms. Singh.

FURTHER REDIRECT EXAMINATION BY COUNTY BY MR. BROWN:

Q When the second in command tells you to do something, do you assume that she has authority to do that?

A Yes, sir.

MR. BROWN: Thank you. That's all I have.

CHAIRMAN ELLIOTT: Okay. One clarifying question, Ms. Singh. Do you know when Ms. Maras learned that you were reassigned from the Primavera project?

## Page 121

MS. SINGH: When did -- I'm sorry?

CHAIRMAN ELLIOTT: When did Ms. Maras learn that you were reassigned from the Primavera project?

MS. SINGH: When did she learn? It was -- and actually I'm recollecting my dates here. I'm sorry, I won't be able to give you a date. But it was -- it was at that time when Art -- Art Willanew left the project. And he was -- he was the project champion on that -- on that. He was leading that project. And, you know, I started having some meetings with Critigen, you know. I think at that time we just started having some conversations about Primavera, and that's when we found out.

CHAIRMAN ELLIOTT: Okay. You started in June thereabout.

MS. SINGH: I started in May.

CHAIRMAN ELLIOTT: In May. Okay. And then Ms. Guerrero is no longer in her position in October. So was it sometime in between there?

MS. SINGH: No, ma'am. It was way -- way later than that.

CHAIRMAN ELLIOTT: That Ms. Maras found -- found out?

MS. SING: Yes, yes.

CHAIRMAN ELLIOTT: But it's during that time frame that Ms. Guerrero supposedly tells you you're no longer

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0036

reassigned; is that correct?

MS. SINGH: Yes.

CHAIRMAN ELLIOTT: Okay. Just trying to establish --

MS. SINGH: Yes.

CHAIRMAN ELLIOTT: -- chronology.

Okay. All right. All right. I think that's it, Ms. Singh. We appreciate your time.

MS. SINGH: Thank you.

CHAIRMAN ELLIOTT: And we would just ask again you don't discuss this.

MS. SINGH: Okay. Thank you.

CHAIRMAN ELLIOTT: Mr. Brown?

MR. BROWN: Are you going to grab your purse?

MS. SINGH: He -- Gilbert is holding my purse.

MR. BROWN: Can you send Gilbert?

MS. SINGH: Yes.

MR. BROWN: I'll call Gilbert.

CHAIRMAN ELLIOTT: Hello. Afternoon. Morning.

(Witness sworn).

Gilbert Sanchez,

having been sworn to tell the truth, testified as follows:

DIRECT EXAMINATION BY COUNTY

BY MR. BROWN:

Q    State your name, please.

A    Gilbert Luis Sanchez.

Q    And what is your current position?

A    Technical support manager.

Q    And is that for Bexar County?

A    Yes, sir.

Q    And who do you work under?

A    Cathy Maras.

Q    And how long have you had the position of technical support manager?

A    Since October of 2010.

Q    Okay. And what was your position prior to that?

A    Chief network architect.

Q    Okay. And how long had you held that position?

A    Approximately since 2004.

Q    Okay. How long have you been with the County?

A    Since September of 1998.

Q    Okay. And your job change in October 2010, was that a promotion?

A    Yes, sir.

Q    Okay. And what were your duties prior to 2010, October 2010?

A    From July to October I was interim technical support manager and also the chief network architect. So basically my responsibility was to keep the technical support section up and running to also be a -- a technical resource for BCIT.

Basically as a chief network architect, I supported server storage of the network. I oversaw one Network 3 and five Network 1 architects. And basically we were responsible for keeping the network up and running.

Q    And what was your job level in comparison or with Ms. Guerrero?

A    As chief network architect I was -- I reported to David Mandujano. He was a manager and Carmella Guerrero was a manager. So I was -- I would say I was supporting --

Q    To Ms. Guerrero?

A    Well, to all managers.

Q    Okay. In the chain of command was she in your direct chain of command?

A    No, she was not in my direct chain of command.

Q    Did you work for her at all?

A    No, sir.

Q    Okay. Did you use her -- not use her. I'm sorry. Did you rely on her for anything on a daily, weekly, monthly basis?

A    As the fiscal and personnel manager, I don't know what her official title was, we depended heavily on her for -- for fiscal guidance and for personnel guidance.

Q    Okay. And in October 2010 when you were promoted it's your understanding Ms. Guerrero was promoted also?

A    No, sir.

Q    She wasn't promoted?

A    I don't know if she was or not, sir.

Q    Okay. So there was no discussion in the office about it?

A    No, not really. There's not a -- we don't -- if it was a -- if it was a budgetary request, we really don't -- at the level I was at, there wasn't really any discussion. We don't really know about the budgetary as far as personnel like.

Q    Okay. So in your new position, what was your relation to Ms. Guerrero?

A    I was equal.

Q    Okay. And did you see the interactions of Ms. Guerrero in the office environment after her demotion?

A    Before or after her ten year -- ten day administrative leave?

Q    Okay. Before her ten day administrative leave.

A    I mean I interacted with her on a daily basis. And as far as her demeanor?

Q    What about the office's demeanor? Did you have feedback from employees? Did you know -- was there a problem with Ms. Guerrero? Did you have people come to you about her?

A    There -- I -- the discussions were speculation and hearsay, but basically --

MR. LOPEZ: If it is speculation or hearsay, I

35 (Pages 122 to 125)

## Page 126

don't think he can -- he can testify to that, Madam Commissioner.

Q (By Mr. Brown) Did you have an opinion as to the effect Ms. Guerrero had on the department in her position?

A Yes. The department, since Ms. Guerrero has left, is in a much better position and is -- and is viewed I think as a better department than we were before. And the difficulty with when Ms. Guerrero was the fiscal planning manager was that there was a lot of road blocks that were put up to getting things done, and so ...

MR. LOPEZ: Madam Commissioner, I'm going to object to this line of questioning or to his answers. The question is whether or not Ms. Guerrero did her job. He's talking post demotion things that -- that have no relevance in this proceeding.

CHAIRMAN ELLIOTT: Okay. We'd like to hear his opinion -- respond to the question. Go ahead.

A Could you repeat the question?

Q (By Mr. Brown) Changes that -- I guess we were talking about changes that occurred --

A Right.

Q -- since she was demoted in the department.

A Right.

Q And you're now pretty high up in the department?

A Correct.

## Page 127

Q You said there were road blocks put up prior to her demotion.

A Right.

Q Can you just discuss what you mean by road blocks? Who put them up if they did?

A I guess well, for example, you know, if I needed to buy something now, I basically -- I basically am responsible for I guess not only my budget, but BCIT's budget. So if Cathy needs something purchased or one of the other executives needs to get purchased, it's my responsibility to find the funding and to basically get it ordered.

When Carmella was the fiscal manager there was difficulty trying to get a project funded if she didn't think it was either approved in the budget or appropriate to spend the money, if that makes sense.

For example, we have to have the line items that are, let's say, it's for -- for building a road. But for some reason or other the road is already built or the road is no longer needed, but we need a train track. What we're going to -- now in this environment, I'm going to spend the money to build a train track because it's needed. But when Carmella was there, we would -- we couldn't build the train track because she would say no, it wasn't funded because it was not in the right appropriation.

Q Would you say the operations since she no longer --

## Page 128

since she's been demoted is better at the department?

A Absolutely.

Q And is that in a general sense or is that specific as to something you can point to?

A She didn't -- if specificity means that morale is -- is better, I would say yes just because there's not -- there's not a fear of having to deal with -- for example, you know, since I was always -- since 1998 I was classified in a different funding code for information technology. And so every year, you know, people would say hey, you know, your position is going to be cut because it's information technology, and Carmella was just going to cut it from information technology. You know, but -- and for me it was like okay, well, if it gets cut, it gets cut. It's no big deal to me. But there was a constant stress level of basically having to worry about that until the budget was approved to know if I had a -- I had a job or not. That's a specific example I can think of.

Q And now since she no longer has the position over apparently funding for -- or --

A Correct.

Q -- the budget --

A Correct.

Q -- you're saying morale is better and this whole operation is operating better?

## Page 129

A Yes.

Q And you feel the removal of specifically Ms. Guerrero is the reason for that?

A Part of it. Part of it is Cathy's leadership also.

Q Okay. So it's a combination of -- you think Cathy's leadership has made things better?

A Correct.

Q And part of that leadership was demoting Carmella Guerrero. And you believe that demotion and her removal from her position of power has also worked to improve BCIT?

A Correct.

Q Were those improvements vast or are we talking one small thing such as you don't know if you have a job next week is better since --

A Well, like I said, I think -- I think if you ask around Bexar County the elected officials or department heads, I think they would say that where BCIS was before and where BCIT is now, there's a vast difference in the quality and the responsiveness that we -- that we provide them now than what we did before.

Q And, again, that's a combination of Ms. Guerrero's removal and Ms. Maras' implementation of policies?

A Correct.

Q Correct?

A Right.

Electronically signed by Dawn Flippin (401-013-461-8760)                     5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0038

Q Did you know Ms. Maras before she got here?

A No, sir.

Q Okay. Has she promised you anything if you come in here and testified well?

A No, sir.

Q Okay. Do you have any reason to come in here and make good things up about Ms. Maras and bad things about Ms. Guerrero?

A No, sir.

Q Okay. Did you have a problem with Ms. Guerrero personally prior to her demotion?

A No, sir.

Q In fact, she wasn't your supervisor, was she?

A No, sir.

Q Okay. And throughout the County have people since she's -- well, prior to her demotion and since her demotion, some individuals have good things to say about her; is that just a fact -- a fact of working in a large county where some people might like her and some may not?

A I think -- I think different personalities get along with different -- with similar personalities. Personally, I never had an issue with Ms. Guerrero. You know, as a person or as a manager, you develop a certain management style and that management style may not be the same for a different person. Carmella had a specific management style that was not

similar to my management style. So in that sense, there was a conflict but, you know, as an individual, I have no issues with -- with Ms. Guerrero.

Q Do you think her management style caused the department to suffer when she was in a management position?

A Yes, sir.

Q And you think the department would suffer if she was placed back in that position?

A Yes, sir.

Q On October 4th did you have anything to do with this whole parking issue?

A No, other than to find out -- basically Cathy asked me, you know, to find out who parks where. And so basically, you know, Carmella was a resource. She was always the -- the -- the person that we went to to find out whether parking spaces were available or not. And so, you know, I asked her, you know, who parks where. And I think the protocol was to ask Raul Talamantes, because he actually has pieces of paperwork where the employee has to sign for an entrance card and an exit card.

Q Okay. So you had nothing do with Tina Singh and parking and where she parked?

A Tina Singh ended up parking in the parking space that I had been provided when David Mandujano was the manager.

Q But that wasn't your decision?

A Wasn't my decision.

Q Do you know whose decision it was?

A As far as I know Carmella placed Tina Singh in that -- in that position.

Q And throughout your tenure at the department was it your understanding Tina Singh would assign parking spaces -- I'm sorry -- Carmella Guerrero would assign parking spaces?

A Yes.

Q And we're talking about the free spaces behind BCIT?

A The free spaces behind BCIT from what I remember, because I don't know if it's -- it's more of a blend now, but the first three or four were actually assigned to O.J. And I think --

Q O.J.?

A -- we had seven parking spaces to the rear. Three were assigned to David Mandujano, and then there was two or three that were assigned to the Fire Marshall.

Q Who is O.J.?

A O.J. Lopez is now the EDC manager.

Q Okay. He's a BCIT manager?

A Correct.

Q Okay. And it was your understanding that the parking issue would go through Carmella, correct?

A Yes.

MR. BROWN: That's all I have.

CROSS EXAMINATION BY EMPLOYEE

BY MR. LOPEZ:

Q You've been a long time County employee?

A Yes, sir.

Q So you understand that there are certain policies that --

A Sure.

Q -- that govern the County?

A Sure.

(Employee Exhibit Number 2 marked).

Q (By Mr. Lopez) I'm going to show you what's marked -- I'm going to mark this as Employee Exhibit Number 2. This is the County parking policy.

A Okay.

Q You understand that?

A Yes, sir.

Q And these policies are generated by the Commissioners Court?

A Uh-huh.

Q Is that right?

A Yes, sir.

Q And let me give you this copy, Mr. Sanchez. I'm going to keep the poster.

A Thank you.

Q Commissioners policies, are these policies that the

County employees are supposed to follow?

A Yes, sir.

Q Are these policies, are they intended to -- to govern how parking is supposed to be done at the County if you know?

A It says for all assignment of parking spaces in Bexar County.

Q So as far as you're concerned if there is a policy coming from the Bexar County Commissioners Court, as a County employee, is it your job to follow it?

A Yes, sir.

Q And you testified that -- that it was Carmella who assigned parking; is that right?

A (No audible response).

Q I want to turn your attention to section 3B on page number two. I highlighted it for you. Could you read that for the Commissioners?

A Sure. It says the assignment of actual parking spaces or location of Bexar County parking facilities will be made by the infrastructure services department and will follow the criteria established in this policy.

Q So we're clear that in terms of assigning parking for -- for County parking, it's the infrastructure service department that does that, right?

A That's correct.

Q Carmella doesn't work in the infrastructure department, right?

A Correct.

Q Okay. You said you worked for David Mandujano and you took his position?

A I was promoted into his position, yes, sir.

Q He left the County, right?

A Yes, sir.

Q He was also a manager. Is the County doing better without him too -- or the IT department doing better without him too?

A They left at the same time, sir.

Q Who is Jeannette Kriewald?

A She's a --

Q Another manager?

A -- application management.

Q Is she still with the County?

A No, sir.

Q She's gone too?

A Yes, sir.

Q County better without her?

A (No audible response).

Q Okay. How about Gary Rose; who is he?

A EDC manager, prior EDC manager.

Q He left after Cathy got here?

A Correct.

Q The County is better without him too, right?

A (No audible response).

Q And Carmella, you went to -- you do know, Mr. Sanchez, that the reason Carmella got demoted is that Cathy or Ms. Maras claims that -- that she was lying to her, right?

A Yes.

Q And you don't have any knowledge of any lies that Carmella may have told Cathy or Ms. Maras, right?

A I'm not aware of ...

Q You're not aware of any lie --

A No.

Q -- that Carmella has ever told to you, are you?

A No.

Q Has she ever been untruthful to you as far as you know?

A No.

Q Has she ever -- have you ever noticed her to be insubordinate to orders that she's gotten?

A Uh ...

Q You know, you testified you didn't have much interaction with her, so --

A Right, not -- not insubordinate, but ...

Q Different management style?

A Different management style and difference of opinion. Whether that can be construed as insubordinate or not is up to the person that actually observes it.

Q So we have Carmella Guerrero, David Mandujano, Jeannette Kriewald, Gary Rose, four managers that reported to Cathy that are now gone, and that's the reason at least in your opinion partly why the County is doing better?

A Yes, sir.

Q Who is left for her to force out that was here when -- when she came on in September of '09 at the management level?

A As far as at the management level?

Q Yeah. Because almost everybody is gone. She's cleaned house at managers, right?

A Right. Right, so Bryan Roberts would be the I think the final person.

Q He's the last guy of the old guard that -- that Ms. Maras hasn't forced out in your opinion?

A (No audible response).

Q The -- you'll agree with me that whether or not Ms. Guerrero has a different management style than -- than what you have or Ms. Maras has, none of the things that you've told these Commissioners has anything to do about whether or not Ms. Guerrero has been untruthful with Ms. Maras in her -- in her job duties, right?

A   True.

MR. LOPEZ: Thank you, Mr. Sanchez.

REDIRECT EXAMINATION BY COUNTY

BY MR. BROWN:

Q   How long was Mr. Morgan in charge of the department, Dr. Morgan?

A   He got there three months after I did. So October '98, December, December, January, that time frame. And then he left in 2009.

Q   Okay. So ten years maybe?

A   Yeah, about ten years.

Q   Ten years. And Ms. Maras came in and obviously evaluated the top people, correct?

A   Correct.

Q   And some of those people -- did all those people resign?

A   From what I understand, yes.

Q   Okay. And as eloquently put, they resigned and weren't terminated. So how were they forced out of their jobs or did they just resign?

A   From my recollection all of them resigned.

Q   Do you know if Ms. Maras told them you resign or you're fired?

A   I was not involved -- I didn't witness it directly, but I do know that they -- they all did resign.

CHAIRMAN ELLIOTT: What I'm going to ask at this point is we not focus on folks that are no longer here as far as forced out, resigned. I don't want that to prejudice us. So if we could just stick to the question.

MR. BROWN: Okay. I'm just trying to address the implication that they have been forced to leave when in fact they haven't.

A   That was --

CHAIRMAN ELLIOTT: Okay. We've had an opportunity to hear both of you-all on that, so.

MR. LOPEZ: Those were his words the force out when I asked him.

MR. BROWN: That was the agreement with your words.

MR. LOPEZ: He could have changed them.

CHAIRMAN ELLIOTT: Okay. Let's proceed on.

MR. BROWN: All right.

Q   (By Mr. Brown) Parking assignments. If the second in command of a department comes and says here's what you're going to do, is it reasonable an employee would then listen to that and do that?

A   Yes.

Q   Okay. Is it your understanding that if a supervisor comes and tells you something is going to happen, it's your obligation as an employee to go to the Commissioners Court,

find every regulation they've implemented, question whether it's correct, and then go back to the manager and say I'm sorry, I don't think you're complying with the Commissioners rules. Or do you just simply listen if it's reasonable and not illegal and that's something you know is illegal, something you just do because your second in command has said that's what's going to happen?

A   Out of respect, that's correct.

Q   And out of common sense, wouldn't -- isn't that what an employee would do if a second in command says here's what's going to happen?

A   Yes.

Q   And if it's an issue as minor as they've said about parking, wouldn't it be reasonable you didn't run to the Bexar County Regulations and say oh, wait, I think Commissioners Court meant something different?

A   Well, the regulation is ambiguous, because it says the infrastructure department is responsible for assigning parking, but they assigned seven parking spaces to information services not to a specific person.

Q   So would --

A   So it was up to BCIS to determine who parked in those spots.

Q   So not only would it not be reasonable to run and check every Commissioners Court rule ever issued, you think it

was within the policy for someone at BCIT to assign those parking --

A   Correct.

Q   -- spaces? And also reasonable for an employee to not question that but simply do what was being told?

A   Correct.

Q   So it clearly wasn't improper to park somewhere being told by a superior to park there?

A   Correct.

Q   Correct? So the implication that you need to know every regulation put out by the Bexar County Commissioners isn't reasonable in a day-to-day operation of any business, is it?

A   The bureaucracy would get in -- in the way of progress.

Q   That's why you have superiors, correct?

A   Correct.

MR. BROWN: That's all I have.

RECROSS EXAMINATION BY EMPLOYEE

BY MR. LOPEZ:

Q   You testified that the parking policy is ambiguous. It's a bureaucracy, right?

A   Correct.

Q   Where you park is -- is, you know, has to do with tenure, rank, title, right?

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f8db-45f5-aa87-28085203e4ee

A According to the policy, yes.

Q The -- both infrastructure and county wide can do better at -- at delineating how we should park, right?

A Absolutely.

Q And, in fact, even in BCIT it's not an easy task, right?

A Correct.

Q Where people park, if they've got in and out privileges, right?

A Correct.

Q If they have to park at Heritage for a special project, right?

A Correct.

Q So if there is a misunderstanding about parking on a certain situation on a certain day, that's not really unreasonable, right?

A No.

MR. LOPEZ: Thank you.

CHAIRMAN ELLIOTT: Okay. Mr. Sanchez, we thank you --

MR. SANCHEZ: Great.

CHAIRMAN ELLIOTT: -- for your time and we again ask that you not discuss this, so.

THE WITNESS: Okay.

CHAIRMAN ELLIOTT: Thank you.

Mr. Brown, do you rest or not?

MR. BROWN: No. I'm going to call Ms. Maras. But do you want to go now or are you starving? Doesn't matter to me.

CHAIRMAN ELLIOTT: Well, Commissioners what do you want to do?

We're okay to press on.

MR. BROWN: Okay. We call Cathy Maras.

MR. LOPEZ: That's the Aggie mentality there.

(Witness sworn).

CATHY MARAS,

having been sworn to tell the truth, testified as follows:

DIRECT EXAMINATION BY COUNTY

BY MR. BROWN:

Q State your name, please.

A Cathy Maras.

Q And your position at Bexar County?

A I'm the Bexar County Chief Information Officer.

Q And is that what has been referred today as the CIO?

A Yes.

Q Okay. And you are the -- does that mean you are in charge of the County's computer systems?

A I'm in charge to keep operating the -- the County's infrastructure and the systems and the desktop systems, yes, sir.

Q And how long have you been at Bexar County?

A I've been at Bexar County since September 21st, 2009.

Q Okay. And briefly, how did you come to be at Bexar County?

A Bexar County advertised nationally for a new CIO. And I found it as -- on the internet, and I submitted an application.

Q Okay. And was there a vetting process would you say from the Commissioners?

A Yes. Soon after I submitted my application, I did receive word that I would be one of the finalists, and I was asked to come to San Antonio to interview.

Q And eventually the decision to hire you, was that a Commissioners Court decision?

A Yes.

Q Okay. The decision was based on a vote from our Commissioners?

A Yes, unanimously.

Q Unanimously. Okay.

And when did you -- do you know your official first day at Bexar County?

A September 21st, 2009.

Q Okay. And where did you come from in terms of actual living?

A I was living in Washington State.

Q Okay. And --

A Originally from Chicago, I was living in Washington State at the time.

Q Okay. So you were unfamiliar essentially with San Antonio?

A Yes, I've been here two or three times as a visitor to the Riverwalk.

Q Okay.

A And when I interviewed. But I didn't really --

Q But you didn't know San Antonio?

A No, sir.

Q And you sure certainly didn't know Bexar County?

A I did not know Bexar County.

Q In terms of government?

A I mean yeah, I read online on the website as much as I could read, but I didn't know.

Q Okay. And when you started were you told who your go-to person would be to kind of show you the ropes of Bexar County?

A Yes.

Q And who was that?

A I was told it was Carmella -- Carmella Guerrero.

Q Okay. And do you remember who told you that?

A The non -- the committee that hired me. Hiring

40 (Pages 142 to 145)

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0042

committee.

Q Okay. Would that consist of Commissioners?

A Commissioners.

Q Okay.

A At that time I reported to the Commissioners. Now I report to the County Manager.

Q Okay. So initially you reported directly to the Commissioners --

A Yes.

Q -- Court?

A Yes.

Q Okay. So was it your under -- based on their telling you that she's kind of who is going to show you around, was it your understanding that they supported Carmella Guerrero?

A Yes.

Q Okay. And they had faith in her to show you the ropes?

A Yes.

Q Okay. And in turn, did you understand that Ms. Guerrero was someone the Commissioners had confidence in?

A Yes.

Q Okay. When you came in to Bexar County and you met Ms. Guerrero, how were your initial meetings, good, bad?

A Fine. In fact, when I first came in, there was a

little issue with where I was staying. So I had to call her on a Sunday afternoon, and she came right away. Very warm, friendly, nice rapport. She was going to -- as Carmella mentioned, we had an orientation. So I had a period of orientation, a couple of weeks, where I went to all the elected officials, department heads and just really would gather information.

Because part of the -- the Commissioners Court was, you know, the BCIS at the time, there was not a lot of confidence. It didn't provide the value that the Commissioners Court realize they need as we're growing so fast. So we're at a different place than we were 18 years ago, even 5, 10 years ago here in Bexar County, just the growth of the County and what they wanted me to accomplish based on the hiring committee.

We were about to, you know, embark on a very large capital project to replace every system in Bexar County. So there wasn't one system we weren't going to replace. So operationally is where I really had to focus on.

Q And did you come into a system -- sorry. The head of it had been David -- Dr. David Morgan, correct?

A I never officially met him. He did interview. He was on the interviewing panel. But I never officially --

Q And it had been --

A -- knew him.

Q Sorry. It had been his department?

A Yeah, from -- yes.

Q For about ten years?

A Yes.

Q Did you come into an operation that was up to date, ready to go, you just had to kind of take over and make sure it kept running?

A No, I came in a -- at a time when the op -- the total operations were about to fail.

Q Okay.

A The systems were about to fail and -- and court was suspect and warned. I was afraid they weren't going to operate for very much time -- long, you know.

Q The courts?

A The courts. The systems -- the Legacy systems that the courts used to do their everyday court processes were on such unsupported operating software that when my first meeting with IBM said they basically wiped their hands of it and said you're on your own. Even though you paid support, we can't help you in case they failed, because they were on 14 year old operating software. That was my first day and a half, the two days.

Q Okay. So you walked into a system that essentially was on life support?

A Yes.

Q Okay. When you came in you had to focus on saving the system from absolute failure?

A Well, that and the -- the people -- we had very low morale. We had high absenteeism. In fact, we never even tracked daily absenteeism. People weren't there. I would try to go to somebody. We didn't -- the weren't there. So I started tracking it. I had Carmella have the admin staff tracking who was even there.

Each floor worked autonomously. We had enterprise data center and technical support on the first floor. I was told they never talked to anyone on the second and third floor. The second floor was where planning and technical support, my offices, also application support. They never talked to each other. The third floor was the new integrated justice system. They never talked to the others. We had admin staff on each floor. They never talked to each other.

So it was a -- it was a -- chaos is the word I -- I -- when I would drive home at 8:30, 9 o'clock every night. I'd get there at 7:00. I wouldn't even leave my office. I brought lunch. And I left at 7:00, 8 o'clock every day. It was hard for me all this change is happening. And if people were there for ten years, they -- they weren't real -- they weren't realizing the despair and the total chaos it -- it was. But I have many years experience in government. And

Electronically signed by Dawn Flippin (401-013-461-8760)                    5245eeb5-f6db-45f5-aa87-28085203e4ee

## Page 150

frankly, I've never seen systems in this disrepair. Things that never got updated, no enhancements. Data-entry clerks entering the same information in three, four times which caused errors as you were going down the -- down the system.

Every night I would get -- I would have them track what was breaking. We were getting calls for data all the time. And when you have data errors so many, that means your systems aren't operating. So -- so basically it was the infrastructure, it was the inherent code, it was all spaghetti code of Legacy systems, because people weren't working as a team. And that was the one thing I saw was totally lacking.

I talked to Carmella was it -- about it was the team work. How when I came in I not only scheduled meetings with all the elected officials and department heads and got a whole list of you don't do anything. I mean, I could -- I could give you the list of what they told me. You know, if you had the weak of heart you'd run. You'd run out of here. But I came from county government. I believe in county government. I know, you know, it can work. But if you don't work as a team and you don't pull together, it's very hard to do that.

And when you don't listen to people -- so I had a very open door policy which I was told was very different than my predecessor. I said hi. I introduced myself to everyone. I learned who you were. I wanted to understand

## Page 151

what you wanted to be. I had training dollars. So I was more inclusive of all the people, parking. And that's, you know, it was a very important for me to treat everyone the same, because I believe that's the only way we get out of this chaos was we worked as a team. And from the -- from the lowest person at BCIT to the -- we all worked together.

And I'm glad Gilbert mentioned it has changed. Through the budgets, I reduced the budget over $1 million dollars, 25 percent of staff. We are turning a corner. We're being more responsive. When things get broke, we're not going to lunch. We're saying hey, I'm going to -- I'm going to stay here and fix it. It's very important for me all of these things. It's -- it's -- it's what this County needed.

I mean, again I was airlifted in here. I didn't know anyone. Carmella Guerrero was my trusted advisor. All these other managers, I sensed that people were afraid to talk in meetings, and I didn't know why. Again, I didn't -- I told everyone what I need, what I -- what I ask of you is eight hours of good work for Bexar County. Eight hours of good work. Come to work, come prepared to work.

And I'm very technical. I -- I have certain degrees that I -- I was -- I'm able to blend. I have a masters in accounting. I have IT background. I was ten years as CIO at a major government. I have marketing. So I -- I know the business side. I was in private Amer -- you know,

## Page 152

private companies and public. So I understood there was a big, big (inaudible) and the morale was so low, because I was told my predecessor wanted to outsource everybody. So people were scared to come to work. How could they function if they were scared about their jobs? And I said you know what, I never heard that from the hiring committee. They just told me to fix this broken department. And when I came in, the department was so broken, I had to put the pieces together.

And the underpinnings of that is -- is honesty, is truth, integrity. You know, people -- you said it very eloquently that if we don't have that, if I can't listen to you and say tell me the straight; don't tell me well, you didn't really ask me on that day for that specific time. Frankly, I -- I -- I wanted the truth. I sought the truth. I asked the right questions. I have been around the block. I had to keep this County operating. The folks that stayed wanted to stay. The people that retired and left is because frank -- you know, I had to assess if they could do the job. That was my job. And --

Q Did you fire any of these people?

A No.

Q Okay.

A I asked them to do their job. I asked them this is your job; please do it. If you can't do it, I had to assess if they could do it. But if -- if you had a broken department

## Page 153

before, you can't say that these people just didn't want to do their job. I'm under the belief that people want to do a good job. I -- I agree with her. You come to work, you want to do a good job. Management is there to make sure there's -- there is, you know, the atmosphere, everyone is treated fairly. Because if you don't think words get through, you know, through the County fast of Cathy didn't treat this one fair, I treat everyone fairly, because that's how I want to be treated and that's how I've been raised.

So I got my own lunch, no one went for lunch for me. I made my own coffee. In fact, I brought a coffee pot in for everybody. I didn't want the coffee pot just in my office. I wanted to buy coffee. So I'd buy the coffee. I bought the coffee pot. I buy Thanksgiving. But, you know, I do these things because I love people. And these people here were -- were wanting somebody because they were so discouraged. BCIS, they're a bunch of whatever, you know, louse -- and I said no, they're not. They're good people that want to do the right thing. And that's what I attempted to do.

Q So the people that left -- you came in -- you came into a system that was essential -- as you described completely broken. That system was run by the people that are no longer here, most of them, correct?

A Yeah.

Dawn Flippin, CSR                210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)

5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0044

Q Okay. So their loss in Gilbert's testimony that the system is now much better is not a surprise, correct?

A Correct. I worked 12 -- I mean we worked real hard to get this.

Q And did you bring in people that you had cherry --

A No.

Q -- picked?

A No. I -- I -- and that was -- I wasn't from here. I didn't know anyone, and ...

Q Did you fly people in from Washington and --

A No.

Q -- Chicago?

A No. I said the people that are going to get us out of this is sitting in this room. And everyone looked at each other. They were -- they're like you really -- you really care about us? I said yes, I do. The people that's going to get us out and get this county IT department moving forward is sitting right here, and it's each one of you. But together we're going to succeed. Not separate. Together we're going to succeed.

So it was totally different persona, different -- I was a different personality. I'm very open. I'm -- I think of myself as a friendly. I tell joke. You know, I keep morale going, because we work so hard. This is not a nine to five job. It's not an eight to four job. You

know, I don't -- I don't go to all of my kids' games. I have an eight and a six year old. I'm an older parent. My husband's at home taking care of those kids because -- not working because I -- I am here.

People were worried Cathy, you're in there at seven a.m., you leave at seven. You're the last -- I said that's what takes this -- I love Bexar County. This is not a job that you go home at night and don't think about. So just like I -- I have a lot of accolades about my approach. So I want -- I wanted this to be a very successful partnership.

Q And with your being told that Carmella is your lead --

A Uh-huh.

Q -- source for information, you assumed she was favored by Commissioner's Court, correct?

A Not favored, but she told me right away how her background, her successes, that she was promised this raise every year and it never occurred. But, you know, she was promised this with me. Once I reengineered the department she said no.

Q So she --

A She talked about --

Q Regarding her --

A -- it all the time.

Q Regarding her raise and the promotion, was that one

of the initial things she came to you about?

A The first thing.

Q The first thing she came to you about?

A Uh-huh.

Q And what were -- what did she tell you?

A She goes in her -- in summary, I was promised this every year. I never got the -- received this raise, but you're going to get me this raise, Cathy, because now, you know, this was -- you're going to reengineer, you're going to recalibrate the department and --

Q And your bosses had just --

A -- a bunch of promises.

Q Sorry. Your bosses, the Commissioners, had just told you here's your source?

A Uh-huh. She was --

Q So in your opinion this had the full support of the Commissioners, your bosses. You weren't going to go in and suddenly buck the system and destroy the person that they had said here's who you're going to rely on, Cathy?

A Oh, I would never -- I mean, I told everyone and I heard a lot of hearsay about a lot of people when I was around, you know. And I'm -- I'm open-minded. And I -- I had -- I told everyone this is your time to --

MR. LOPEZ: I'm going to object that she's basically anything on hearsay. That's inadmissible.

A Well, people were, you know, and I said -- and that's what -- exactly why I didn't listen to anybody. I said you know what, it's a clean slate for everybody. So let's all work together as a team and work on behalf of Bexar County.

Q Did you come in wanting to clean house?

A No.

Q Did you come in with any bone to pick with Carmella Guerrero?

A No, I -- I did not.

Q Did you see her as a resource, not --

A Yes.

Q -- a negative?

A Yes.

Q And did you use her as a resource, not a negative?

A Yes.

Q I'm going to jump to the promotion.

A Uh-huh.

Q She told you you're getting me this promotion, correct?

A Uh-huh.

Q Okay. You had just been told by your bosses she's your resource?

A Uh-huh.

Q So when it came time for the promotion, did you support the promotion?

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

A   Yes.

Q   At that point had you had any interactions with Ms. Guerrero that would have told you that you had to question her integrity, her honesty?

A   I -- I saw some signs, but, you know, when you're coming in and you're under such -- you had to fix the operations. So the administrative side with her 18 years, 12 of which were in -- were in IT, I was like okay. Think of it like a mash unit. You're -- you're here in a mash unit, and you have the operations of the County about to not operate, what -- what would you work on? Carmella was working in the administrative side for 12 years. So bills were getting paid. I mean at that time I didn't know that these people were still kind of hesitant, but they were looking me -- sizing me up basically to see okay, is she her own person. So bills are getting paid. Things are happening on the administrative side, the budget was getting done.

So I was worrying about keeping the operations of Legacy systems going, making sure that we could enhance the systems. I had to rebuild all the server architecture. The e-mail systems would be down, cashiering was down multiple times. Nobody could tell me why it was down. It was down because we didn't set them up correctly. We, you know, we had to redo it. We were getting a lot of viruses and -- that propagated because our network wasn't -- didn't have, you

know, it was too flat. So a lot of things that I brought with me, my experience and my technical know-how, I was fixing, you know, again, keeping admin -- and that's why the time. That's why it took a while for me.

But at the time I did counsel her verbally with she was running late. So she'd be late. I said, you know, Carmella, all this starts at the top. You know, you have to be here. That was really a big thing for me. And some people might say boy, Cathy, you're a stickler. And I say you know what, when you're rebuilding an operation, those little things mean a lot for a lot of people. So I wanted to set the tone. You know, we're in our chairs, we're working hard. So I talked to her about her, you know, coming in ninish. It was really nine -- you know. I said I'm here -- you know, not that you have to be here at seven, but you got to be here, you know, on time if -- if -- you know. So I talked to her about that.

There was a lady that was selling jewelry on the first floor of our secure area where our mainframe is operating. There was a lady selling jewelry one day. Just so -- just by happen I didn't know. I came upon her. I said ma'am, oh, my gosh, this is a secure area. This is where the data of the County resides. And she's selling jewelry, because it was the Spurs -- I think they were going to go to the playoffs -- right there. And I'm like oh, gosh. And, you

know, that's all important to me. We here about data, we hear, you know, we hear about data loss.

But these things just were kind of getting, you know, things that weren't -- weren't adding up for me. But again, it was during a very tough time when we were trying to survive. So, you know, I was with a 14-hour day trying to make sure things were happening operationally in the administrative side.

And all of a sudden it all started coming together October 4th. October 4th all these little, you know, indiscretions that weren't following my directive -- even though I believe I'm very clear in my directives -- were happening. The reason I say that people say I'm very clear is other people were listening and following what I was saying. So I didn't know why I had to mince words with -- and they were called misunderstandings -- when I didn't think they were mis -- I was very direct about the parking.

Q   So at the time the promotion came around --

A   Uh-huh.

Q   -- you supported it. Is it because you didn't have a clear understanding that perhaps it wasn't something that should happen?

A   No. I want -- I had, you know, we talked about that, and I mentored her on her facial expressions. I said you want to be in -- you know, getting a promotion and making

more money means you're at a high level and people are, you know, looking towards you to have that maturity to be responsible to do the things that people expect of -- of that level. So it's not like just getting the money and running. It's not like operating as a business analyst anymore. You're operating at a trusted advisor to the CIO of Bexar County. You're operating at a different level. And that's -- and that's -- I was mentoring her, because many years they put the -- they put the request in and she never got it. And she was very, very unhappy about that to the fact --

Q   Was it your understanding that this was actually an annual request?

A   Yes.

Q   It had been requested time --

A   Multiple times, yes.

Q   And always did not go through?

A   Denied. And that was part of my good faith with my trusted advisor to set up a success pattern for her. But there was -- it's a -- it's a transition. It's also the truth on my side is for that, I was -- I was supporting you. I have to know the truth. I have to have someone that I can trust.

Q   Okay. So inevitably or at the end of the day, you did support the promotion, correct?

A   Yes.

Q   And had you known or had you had a question about

Electronically signed by Dawn Flippin (401-013-461-8760)     5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0046

whether she was being truthful with you and had definitive evidence in your mind that she was not truthful, would you have stopped the promotion?

A Yes.

Q So --

A But she always -- she always, you know.

Q Safe to say you didn't have that information?

A No.

Q At the time the promotion went through?

A Exactly I did not.

Q In about September, mid September is when the budget is finalized, correct?

A No. Yes. And I did not have any information con -- you know, certain things, but then they all started adding up.

Q You're still of the opinion that your bosses, the Commissioners, support Carmella; is that correct?

A I believe so, yeah. I haven't -- I have a new boss now.

Q But at that time?

A Uh-huh, yes.

Q The Commissioners --

A Yes.

Q -- had said here's your guide dog?

A Yes. She's going to help you through the transition.

Q So you support the promotion, the promotion goes through?

A Uh-huh.

Q Within -- officially October 1st. Three days later October 4th --

A Yes.

Q -- comes around?

A Yes.

Q Can you just explain what happened on that day that caused you to suddenly decide you cannot trust Carmella Guerrero with a position you had just promoted her to?

A Prior to October 4th, two times Carmella came to me can -- can Tina Singh get parking? First, it was at the Heritage Plaza. She said it was free; what's the big deal, Cath? It's, free. I said it's not free. You know, you've got to understand the timing of it. We were in -- it was during an election year, you know, and we -- you had to be cognizant of that we're in -- we're public figures. Giving free parking -- it was part of the lease, but it still costs money. It was in -- and it was imputed in the lease payment was the cost of this free parking.

Moreover, Tina -- and I mentioned this to Tina -- you make $100 an hour. You didn't have to park at the old K-Mart five blocks away. There are many surface parking lots near Heritage Plaza that you could have parked for a fee.

So it was -- it's -- it's not our duty -- it wasn't part of the contract to worry about her parking.

Again, we were under a very tough time keeping operations going. So I -- you know, I'm -- I was raised in Chicago. So I understand that parking is a premium. Many times I parked for $20, $30 in a lot in Chicago. So I always kidded the folks here that $5 or $10, I'm like try New York, it's $100. So -- so I told her please don't let her park there.

Q This was Heritage Plaza?

A Heritage Plaza. Why not give it to one of our County employees as an at-a-girl or at-a-boy? Hey, you just did a great job. You just got that website up. Why don't you -- here, here's parking. You work for the County. You're walking under 35. Here's free parking for a while. Why couldn't we do that? That's what I wanted to do as part of getting the morale up was give it to our employees, not to a $100 an hour, you know, contract employee who -- who basically drives a Mercedes Benz.

Secondly, she came back to me after I -- I said no to Heritage Plaza. She goes well, I want to give her parking here. I said why are we worrying about Tina Singh? Tina Singh makes a lot of money; she could park anywhere. Worry about Regina Picard walking, you know. I said give it to Regina. Regina is our webmaster. We were embarking on

major, major web initiatives. Regina was walking seven blocks under 35, taking her car, driving, parking her car, walking. I said well, you know, I said she needs parking. Give it to -- give it to the other managers, because only two managers, David Mandujano and Carmella Guerrero's people had any -- had all the parking.

We have four other areas. We have eServices, which does all the website, has meetings all over the County. Application support, again, interviews, has meetings all over the County. They never had any parking. They never had any parking. Also they have integrated justice, again, we had meetings across the County. And enterprise data center. So these people didn't have parking spots. I said let's broaden the parking to be inclusive. Again, my strategy was let's treat everyone the same. Let's give them parking. That's a good perk. I can't give them any bonus. We weren't getting any raises. Parking was something I could say good job. Good job, so --

Q When she testified that she didn't come to you twice and asking about parking for Ms. Singh, is that incorrect?

A Yes, it is incorrect.

Q You remember distinctly that she came twice to you and said can I get Ms. Singh parking?

A Yes.

Q And on those two occasions did you unequivocally

tell her do not give that woman parking?

A Yes, yes. Even if she paid for it, it's not our dog to fight. You know, again, it was all paper-based systems. I didn't want to be, you know.

Q And was -- were you clear to her that you did not want Ms. Singh getting any free parking that the County had access to?

A Yes.

Q Okay.

A I didn't -- I didn't care if she even paid. I said I don't even care if she pay -- you know, it's not my problem where my contract employee parks.

Q So the person who later would become your second in command, did you expect her to understand when you said do not give her any parking, that meant any?

A Yes.

Q Okay.

A I -- well, I understood it to be.

Q Okay. Were you pretty clear?

A Yes.

Q And is it -- is it your understanding that at some point Ms. Guerrero instead went behind your back and gave Ms. Singh free parking somewhere?

A When I saw the Mercedes, I thought I put it all together.

Q Okay. So on October 4th, that morning where were you going?

A Again, we were rebuilding an entire County. Excuse me. The Fire Marshall's office, they usually came to my office, because they -- I had meetings from 7:30 a.m. to 5 p.m. every day eating -- including lunch. I had lunch at my desk. I had meetings during lunch.

At that time I said you know what, they just moved into a new office on Commerce Street facing Commerce. Let's go there, because they wanted to show us the system and we were doing a demonstration of their new system. So I -- so Carmella, I said Carmella where do I go? And she walked me outside the annex, and I walked through the City of San Antonio parking lot. So I walked in front of the annex. I never walked in the back of the -- back of the annex. I literally went from my parked car in -- in number 27 to my office for 12 hours a day. I -- I -- I didn't -- I rarely went to lunch, I rarely went anywhere. I worked. It -- it was that type of heads down work since I started here at Bexar County.

So I walked in front. We had the demonstration. It just so happened I, you know, I didn't go back the same way that I came, because the door that they let me out of kind of dumped me out in the gang -- there was kind of a back by the Geo Building, the white old jail of the

County. And again, I was just trying to -- I said okay, let me walk that way. Well, as I walked back, I thought wow, you know, I never -- I'm like what's this -- what's this area? Never was told this existed, the parking spaces. I said oh, we have parking? Because I knew it was such a premium, but no one ever mentioned there was parking behind, you know, behind.

So I said -- and I -- and I saw the second -- I think the second one facing the police station. So close to the police station who frequently has the media there had this sign called if case -- BCIS, and it had this Mercedes there. And I think that was my realization, because I wanted to work for people -- and finally decided you know what? I'm really not being told the truth when I adamantly said twice not to provide this parking. I -- I just couldn't believe it. It just -- it all came -- all these little indiscretions built up and said you know what, this is a pattern of undermining my authority, and it's not going to stop. And how do I create a new BCIT when my trusted advisor doesn't really believe the new BCIT, the vision, my vision.

Q How did you know whose car that was?

A I just -- I -- I think maybe we were talking cars once. I just knew that nobody in BCIS -- I just, you know, sized it up. No one in BCIS has a Mercedes. I don't know. I -- I just.

Q So did you go into the building or what's the

next --

A Yeah.

Q -- thing you did?

A I asked Carmella. She's out smoking outside, and I asked her I said, you know, who -- whose Mercedes Benz is that? And she goes I don't know. And I said okay. And I went up, because I knew -- and I went up the elevator alone. And then I just went into Tina Singh's office. As Tina mentioned it was my office, the conference room, and then Tina's. And I said, you know, Tina, is that your Mercedes Benz parked in the back of the annex? And she said yes. She goes Carmella gave me that spot. And I said please you have to leave right away. You have to -- you have to move that car because ...

Q And the way this has been --

A Uh-huh.

Q -- trying to minimize is that you believed Ms. Guerrero lied to you that you didn't -- that she didn't know whose Mercedes that was. That's not the basis for the --

A No.

Q -- motion, right or the discipline? You didn't care what kind of car Tina Singh drove, correct?

A Exactly, yeah.

Q You just cared that you knew --

A It wasn't --

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)        5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0048

Q -- and verified that Ms. Singh parked a car where you said she was not supposed to have received any parking, okay?

A Yes.

Q The lie here is not that Ms. Guerrero didn't know whether she drove a Mercedes, correct?

A Correct.

Q The lie here that you found is that she had given whatever car she drove, that parking space, correct?

A Correct. And that's really the misunder -- everyone is like oh, that's a misunderstanding. No, when I ask you parking -- you know, this nitpicking, we didn't have time for that.

Q And that goes back to the sky is blue today and there may be a cloud in it. Well, you didn't tell me there was a cloud, so the sky isn't actually clear today. Are these the kind of little details people would come back to you --

A Yes.

Q -- and say wait, wait, wait, wait, wait, time out. You weren't very, very specific. And as a manager I don't think ahead. I do precisely what you say and I never go outside the box even though I'm your second in command. Is that the kind of thing you were dealing with --

A Yes.

Q -- in a situation like this?

A Yes. That's how it was -- it was cherry picking. And we didn't have time for that. And that's why the department was in such dire straits.

Q And you would expect your second in command when told do not give her any parking wouldn't think to themselves -- or hopefully if they're going to be your trusted advisor -- wouldn't say wait, I don't think she specified space seven, so if I give her that one, I'll be okay?

A Exactly.

Q In your mind it was don't give her any parking?

A Let her pay for it.

Q That's very direct.

A Yes.

Q And that's it?

A Exactly.

Q And so when they try to parse it down to well, the Mercedes wasn't mentioned that day or she didn't know about the Mercedes, that's not the key here, is it?

A It's not the key. It's -- yeah.

Q So you went to Ms. Singh and you said where did you get parking, and she said Ms. Guerrero gave me that space.

A Uh-huh.

Q And you said get out of the space.

A Yeah. I said you have to, you know, I said please leave the space when you go home. Don't park tomorrow.

Q And throughout the day, as you said, you came to realize all these small things over the year had come together?

A Yes.

Q What did you do to piece together the parking issue?

A I started --

Q (Inaudible) parking.

A I, you know, Carmella was -- it was really important for her to be in the room when I talked to people. And I allowed it. And people were getting more comfortable -- comfortable with me. And they knew I was a straight shooter, they knew that they could trust me. And that was a big thing.

So all of a sudden I started interviewing people to understand this. And it kind of --

Q And what --

A -- all came together.

Q The results of your interviews regarding the parking culminated --

A Were --

Q -- in what decision?

A I said who -- and I -- who does all the parking? Who do you go to? Carmella, Carmella. We go to -- like why are you asking me? So they thought I knew all this. That was another thing. You know, you might not think it's lying or not telling the truth when you're not telling them initially,

but it's something I should have known.

So, you know, you could kind of -- you could parse it, you could say something else, but to me I should have been told all this explicitly so I -- I'm prepared. Because what if a Commissioner called me? What if someone was walking down the street and they saw this Mercedes? Think of that embarrassment if -- if Judge Wolff called me. I worked for him. Cath, whose Mercedes is that in your BCIS thing? Uh, uh, uh, oh, you know.

So it was very important. The little things matter. Especially when you're in government little things matter. So it was -- it was -- at that time -- and I really believe she was undermining, waiting me to -- to really to leave.

Q For you to leave?

A Yes.

Q Okay.

A Because I -- I affected so much change. I affected so much change, because that's what the department needed, an infuse of energy, an infuse of different things and ideas. And I wanted everyone to enjoy it. My happiness now is when people say BCIT is so different. It's 360 degrees different. That gives me joy, because the same people who were so overtly pounded down, I mean -- I always tell people when I walked into BCIS, it was like automatons would be hitting the wall.

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0049

They wouldn't even know there was a wall there, because they didn't want to be seen. I really -- and I -- I -- I really didn't understand until I started. Again that's where the time takes. I don't make rash decisions. In fact, Carmella kept saying well, where's your -- where's your analysis, where's your analysis like it should take two weeks. I said well, I really need time to do all this. So I had to do observations and -- and validate that they were all truth.

Q Okay. Let's get back --

A Yeah.

Q -- to that day.

A Okay.

Q At some point during the day you discovered what you believed in your mind she had lied to you --

A Uh-huh.

Q -- when she said I don't know whose car that is?

A I don't know who -- who created those signs. I don't know who parks there. I don't know anything. We have a policy.

Q Okay. And the policy they've brought out --

A Yes.

Q -- 4.6.

A Yes.

Q The policies are only as good as the people who implement them, correct?

A Yes. And I -- and I --

Q So if Ms. Guerrero wasn't implementing the policy, that's not something you would know about, correct? Polices on the operation --

A Yes.

Q -- end of it, correct?

A Yes.

Q So she's waving a policy at you throughout the day, correct?

A Yeah, and I didn't know -- yes.

Q And in the discussions you had with her that day, is she making excuses as to why she allowed her to park there, or is she trying to tell you I didn't let her park there, I don't know -- the policy.

A Yeah.

Q The paper should have jumped out (inaudible) car?

A Exactly. A couple things. First of all, she yelled at me first. She was yelling at me. And this is a mul -- another time. There was another verbal counseling that I -- that I did was you can't yell at me. And the reason why she yelled at me we were -- were doing a -- we had a budget meeting and budget wanted to meet me on a Sunday. And they said just you and -- the budget department and you, Cathy. Don't bring anyone else. So I went -- went back to my office. She came running in, because, again, this was where her

upgrade was in. And I said -- and I told her that on Sunday I'm going to meet with them, and we're going to talk through the budget and the recommendations of the budget.

And she started yelling at me, you know, they're going to do this again. They're -- and, you know, and started and I -- yelling at me why didn't you, you know, stick up for me? Why didn't you, you know. And I -- I said please don't yell at me. I am your superior. You don't yell. Oh, well, I'm just frustrated. I've -- this annual request I've had in. I said don't you think I have your back? Don't you think I have your back? I'll talk through that with them.

Q So you counseled her that day don't address me --

A Don't yell at me.

Q Don't yell at me.

And then on this day, October 4th, as the day went on and -- did you have conversations with her about it?

A I couldn't believe that if someone walked by and saw a Mercedes in a BCIT parking lot, the very essence of we were trying to get a whole study done for the department looking at pay grades. You know, that was one of my major observations is the City of San Antonio's pay grades are like starting salaries are 20 percent, you know, just looking on their website. So I was trying to get a whole study done from an outside firm to come in and look at all of our pay grades so we wouldn't have these I need a raise, I -- you know. I --

have -- let's -- as part of the morale, let's look at all of them together as a IT department.

So that was -- that came to my mind. I mean I'm -- I'm a 30 year veteran of -- of working in management. I know when people -- when people see things -- I mean can you imagine the picture? The old adage when you're in government is you don't want something on the front page of the -- you know, don't have it. Can you imagine this picture of this Mercedes Benz with this BCIS sign, and I'm asking for a pay study. You know. It would have -- it would have been so -- so terrible. And again, as -- as -- as a manager you have to make sure that everything is correct and you're working through the policy. So it's just -- it -- I believe in it so much that you have to, you know.

So I told her you're making me look like a real a-hole. I did say that, a-hole. I didn't -- I didn't say the word. I said a-hole. You're making me look like an a-hole. Why are you doing this to me? I'm only working so hard. I -- I'm trying to do the best thing for Bexar County. So I didn't understand. And then I -- I -- I finally, you know, in my opinion she didn't -- you know, change is hard for people. Change is hard for people. Especially when you are the top dog. It's very hard.

Q And so what action did you take that day, anything?

A I talked -- I went to H.R. when, you know. I kind

Page 178

of just assessed where I was. I read the policy online. I kind of, you know --

Q So --

A Because I knew I couldn't -- I knew I couldn't just let this go, because it was too egregious for me. I -- I -- I knew then that these other little things were going to -- and then, you know, Carmella bragged to me numerous times about, you know, she knew the Civil Service so well, she knew exactly how to do it. And frankly, I thought that letter, she was teeing me up for, you know.

Q The October --

A Because --

Q -- 6th letter?

A Yeah, the October -- her October 6th was she knew Civil Service, she bragged about she had 100 percent rate during these commissions.

MR. LOPEZ: Madam Commissioner, I'm going to object that she answer just the question that's being asked. She's been going on --

MS. MARAS: Okay.

MR. LOPEZ: -- for over and over, and I've -- I've tried to bite my tongue, but --

MS. MARAS: Okay.

MR. LOPEZ: -- it's going on and on, and I feel for the record that I need to object.

Page 179

CHAIRMAN ELLIOTT: Okay. Noted. Just ask it.

A Sorry. There's a lot of time.

Q (By Mr. Brown) So October --

A So --

Q October 6th --

A Uh-huh. I received a letter.

Q -- you got the -- hold on.

October 6th you got the letter. She had told you multiple times she knew how the Civil Service system worked. She had 100 percent win record at Civil Service.

A Yes.

Q What was your opinion that letter was meant to do?

A My opinion was that letter was going to be in a Civil Service grievance. Because she knew that -- that I knew that she was insubordinate and lied to me that day, was dishonest. So she was just wanting something for the record.

Q Okay. When you -- at some point you decided discipline was going to be issued. You said October 4th you knew you had to do something?

A Uh-huh, yes.

Q Okay. Rather than issue the discipline on the spot without thought, did you speak with some people about the discipline that you --

A Yes, I spoke to H.R.

Q Okay. And did you speak to some of your superiors?

Page 180

A Yes, because I -- that was, you know.

Q Okay. You're still under the impression that the Commissioners Court, the Commissioners --

A Uh-huh.

Q -- and the County Manager, H.R. people all had faith in Carmella?

A Well, the County Manager wasn't the County Manager then. He was my peer.

Q Okay. So you didn't speak --

A David Smith. I didn't speak to him.

Q Okay. But people still had faith in Carmella. Did you have the opinion that if you suddenly issued a discipline for this person that had been told you need to trust, that it would be a strange reaction from these people that maybe a questioning of your authority and maybe thinking what are you doing? We told you this is a person you trust, and now you're issuing discipline?

A Yes. They weren't -- they didn't -- they didn't understand -- they didn't know the depths of how -- how dire the IT department was with all their systems. And we also were in a partner -- you know, so I had to approach them with that too. So it was -- it was hard for me to, you know, to --

MR. LOPEZ: Same objection, Madam Commissioner, that she just answer the question that's being asked.

Q (By Mr. Brown) So in order --

Page 181

A Yes.

Q Sorry.

A That's okay.

Q So in order to -- before you issued a discipline, you decided to deliberate, speak with others.

A Uh-huh.

Q Superiors.

A Uh-huh.

Q H.R. department.

A Yes.

Q And you contacted people. And what -- initially what did you want to do? What was your initial discipline going to be?

A Well, I was counseled that based on the policy, I could fire her on the spot. And I decided to demote her.

Q So you were told termination was appropriate?

A Yes.

Q Okay. Rather than go straight to termination for dishonesty by your second in command, after deliberation you decided demotion, correct?

A Yes.

Q Okay. And in terms of the policy, did you read Civil Service policy?

A Yes, yes.

Q Was it your understanding and is it your

49 (Pages 178 to 181)

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0051

## Page 182

understanding as we sit here that the Civil Service policy says here's the steps of progressive discipline; however, if something is serious enough, you can jump to a more serious level?

A Yes.

Q Correct?

A That's in the policy.

Q And as Ms. Guerrero testified, she understands that to be the policy also, correct?

A That's what I heard, yes.

Q Okay. And so you had been told termination was appropriate. Rather than terminate her, you decided I'm going to demote her. And did you then, in fact, issue the demotion?

A Yes.

Q And the whole time are you consulting with H.R. on how the process works and that you're going to do this demotion?

A Yes.

Q Okay. You issued the demotion. You felt this was -- did you feel this was the best and least step you could take for after your investigation what you had discovered had been lying to you?

A Yes.

Q Okay. And did you feel this was proper progressive discipline?

## Page 183

A Yes.

Q Okay. You issued the demotion to Ms. Guerrero. You sent her a copy, correct?

A I believe she had to --

Q Or delivered --

A -- come in and sign it.

Q Okay. So she got a copy. Okay. She responded to your demotion with the letter that's in the record of November 10th, correct?

A Yes.

Q Did you review this letter?

A Yes.

Q Okay.

A Yes.

Q Did you consider --

A Yes.

Q -- her defenses to the basis for your demotion?

A Yes.

Q Okay. So again, you -- this wasn't a rash decision. This is something you thought through up to -- up and to the point where she responded, you also considered what she told you, correct?

A Yes.

Q And after you read the letter, based on the facts you knew from your investigation, did you still believe

## Page 184

demotion and discipline was appropriate?

A Yes.

Q Okay. And did you understand in your mind that this was not a minor misunderstanding or a small issue about whether Ms. Singh drove a Cadillac, but an issue about honesty and integrity?

A Yes.

Q And in your opinion did you believe the person that you had literally promoted or not objected to a promotion three days prior deserved to be demoted to a position of non -- say, in a position where you don't have to trust them with just even a 500 -- one project is $5 million -- to a position where you couldn't trust her with that?

A Yes, I believe.

Q And as she testified, she handled a whole lot of stuff when you came in, including all the money?

A Yes.

Q Not only the money, but she said she handled H.R. You said you came into an H.R. nightmare, correct?

A Yes.

Q Morale was at zero?

A Yes.

Q Okay. People weren't communicating?

A Yes.

Q Correct? She's not only in charge of that, she's in

## Page 185

charge of a $10 million budget?

A Yes.

Q Correct? This a person that through your investigation you believe has lied to your face. Is this a person you think you could trust in the second in command of a $10 million budget and multiple personnel issues?

A No.

Q Based on that, you made the decision to -- and rather than terminate her, you demoted her to a position where she's not in charge of money.

A Uh-huh.

Q She's not in charge of people?

A Uh-huh.

Q As she testified, she's not in charge of anything she was in charge of before, correct?

A Correct.

Q Do you believe she has now settled at a level that's appropriate for Ms. Guerrero's abilities?

A Yes.

Q Okay. And as we've seen through the white pages, she had considerable support throughout her 18 years or 19 years at the County from various superiors, correct?

A Yes.

Q Okay. And from various departments have said we support Ms. Guerrero's decisions on this project or that

Electronically signed by Dawn Flippin (401-013-461-8760)                    5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0052

## Page 186

project and she's done a good job, correct?

A Yes.

Q Okay. Is it your understanding that somebody who has been a -- probably an employee and now the head of a department one day and one lie can unravel a person's whole career?

A When you're a trusted partner. You know, I -- you don't -- she wasn't my admin assistant.

Q Correct.

A She was my --

Q And that's --

A -- trusted advisor.

Q That's an important distinction?

A Yeah.

Q Civil Service rules are doable, correct?

A Yes.

Q They apply to every employee.

A Yeah.

Q Correct?

A Not every -- some are --

Q Well, every Civil Service --

A Yes.

Q -- County employee, correct?

A Yes.

Q And as someone who has been a manager for a long

## Page 187

time and had people under them, it makes sense that the exact same decision you might make regarding a counseling versus a demotion isn't going to be the same for an E1 in Bexar County versus an E11, correct?

A Correct.

Q You're not going to give a person that's not in a trusted position and handles a huge purse string the same discipline you might give a secretary, correct?

A Correct.

Q And those are things that common sense dictates in a Civil Service setting, correct?

A Yes.

Q And it also makes sense that you wouldn't have promoted her three days -- or not stopped her promotion three days prior had you had a witch hunt in mind to bring her down three days later, correct?

A Correct.

Q There was no witch hunt, was there?

A No.

Q Was it your intention on October 1st when her promotion went through that she was going to hold that position as long as she held it or perhaps move up?

A The position wasn't -- wasn't even finalized yet, and we were still working through that. A big part of it was the support. Being the IT services to go out to the

## Page 188

departments and make sure that we're delivering such as some of her accolades had, you know. She was -- she was the, you know, making them -- making us, IT meet all of the departments' requirements.

Q And did she ever come to you and ask for her previous e-mails and you denied her?

A I think there's a policy, you know, I -- we had to give her a different e-mail. I don't -- I'm ...

Q Not an e-mail address. I'm saying did she ever come -- she's got a lot of old e-mails in here that apparently the e-mails that are important to this she couldn't get ahold of?

A Yeah.

Q Did she ever come to you and say I want my old e-mails for my hearing and you said I'm not giving you any e-mails?

A Oh, no, I didn't say -- no, I didn't say that.

Q Did it ever even come up that she asked you for e-mails?

A Not to me, no.

Q Okay. And had she asked you for e-mails to support this hearing, would you have given them to her?

A Yes.

Q As they brought up the integrity and the issue of Ms. Singh when Ms. Singh testified about the Primavera

## Page 189

matter --

A Uh-huh.

Q -- are you familiar with that matter?

A Yes.

Q Had you assigned Ms. Guerrero to work on Primavera?

A No. Ms. Guerrero and I --

Q I'm sorry. Ms. Singh to work on --

A Ms. Singh.

Q -- Primavera?

A Yes, yeah, Ms. Singh.

Q My bad.

A Yeah. Okay.

Q You assigned Ms. Singh --

A Yes.

Q -- to work on Primavera.

A Yes.

Q And --

A After meeting with Art Villarreal.

Q Okay. But it -- Art's not under you, correct?

A No.

Q But as far as the people under you, Ms. Singh was the person you said is going to work on this project?

A Yes.

Q Okay. At any point did you have a meeting with Ms. Guerrero and come to a conclusion that Ms. Singh was going

Dawn Flippin, CSR          210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0053

to be removed from that project?

A No.

Q Okay. At any point did you know that Ms. Guerrero had gone behind your back and taken Ms. Singh off that project?

A Well, when -- I was at the meetings, because it was program managing all the 500 plus million dollars of all the flood control projects. They were having a tough time before I came to get them all programmed so they could apply their -- their -- finish their tasks and project manage each project individually so they could give a status to the Commissioners Court.

So Art tried this numerous times, and I said I'll help you with it. At that time he said oh, you know, he had certain ideas. I said well, Art, let's have a meeting with Critigen who was the vendor that was going to be the project manager. So at the time I said I would ask -- I believe I asked and I -- this is what I recollect is why is Brian Lyssy in these meetings? Where is Tina? And I was told oh, Tina's -- has other meetings. I go well, I -- I didn't, you know, I knew Brian was a, you know, a lower -- a very good business analyst, very good at what he does, but this was --

MR. LOPEZ: Your Honor, I'm going to object to any more discussion about the Primavera project. It's not included in the disciplinary action for which we're here which

is dated October the 27th, 2010. Had Ms. Singh -- I'm sorry -- had Ms. Maras wanted to pile on and add more charges, our rules perfectly provide that she could have amended her complaint. And to the extent that they're not included and they're not the subject of -- of our proceeding today, I'm going to object to any more testimony regarding the Primavera project.

CHAIRMAN ELLIOTT: I would like clarification, Ms. Maras. Mr. Lopez noted -- I noted your objection on it. But can you tell us when you learned that Ms. Singh was no longer on the Primavera project?

MS. MARAS: It was after Carmella was demoted.

CHAIRMAN ELLIOTT: And you --

MS. MARAS: It was --

CHAIRMAN ELLIOTT: -- learned of it how?

MS. MARAS: I -- I --I said well, why are you -- what happened with Primavera? Why -- why are you always busy when we have meetings? And that's when she told me that Carmella came in her office, took the file, and said I'm going to give it to Brian Lyssy who works for me, that it was a political jugger -- you know, political. And I didn't understand that. So that's what she said to me.

I said -- it was after she was already gone. See, after Carmella was out of that managerial role, all the managers reported to me. So I would ask. That's when I

realized it.

CHAIRMAN ELLIOTT: Mr. Brown, did you have further questioning on the Primavera or were you?

MR. BROWN: I'm good with Primavera.

CHAIRMAN ELLIOTT: Okay. So thank you.

Q (By Mr. Brown) Okay. Integrity is a big issue. They brought it up, they asked Ms. Singh about it. Since Ms. Guerrero has been demoted, have you had other instances where you've found out that you were not being told the truth about instances when Ms. Guerrero was your second in command?

A Yes.

MR. LOPEZ: And I have the same objection, Your Honor. If Ms. Maras wanted to pile on and add more instances of dishonesty, she should have amended her complaint, and it should have been free for us to discover. For her now to come in and completely bring up stuff that she never brought to Ms. Guerrero's attention, which never was provided in her complaint, which is not anywhere in the Civil Service record is improper and I object.

MR. BROWN: If I could respond?

CHAIRMAN ELLIOTT: Is there documentation on what you are asking her about?

MS. MARAS: There's --

CHAIRMAN ELLIOTT: As far as prior --

MS. MARAS: There's County documentation

through the purchasing agent

CHAIRMAN ELLIOTT: Right.

MS. MARAS: There's --

CHAIRMAN ELLIOTT: As far as concerns that you might have had prior. Is there --

MS. MARAS: Not prior.

CHAIRMAN ELLIOTT: -- amy documentation --

MS. MARAS: I discovered -- it was discovered after when she was out of the job of --

MR. LOPEZ: I'm going to object to this --

CHAIRMAN ELLIOTT: Just a minute, Mr. Lopez.

THE WITNESS: -- of paying invoice. When she -- when she left when she was demoted I took her areas and I put it on different people. I took all the invoicing and we discovered, you know, things after, so.

CHAIRMAN ELLIOTT: Okay.

MS. MARAS: I -- I didn't know.

MR. LOPEZ: There's not a shred -- shred of evidence of that. It's not included in her complaint. There's nothing on file with the Civil Service Commission. And I'm going to object to her coming in here and, you know, surprising and laying back trying to get the upper hand on this.

CHAIRMAN ELLIOTT: Mr. Lopez, your objection is noted. And I'd say we need to proceed on. And if it's not

52 (Pages 190 to 193)

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

## Page 194

part of our record, which I don't think it is, things that may have been found after Ms. Guerrero left her position I am not going to admit.

MS. MARAS: Okay.

MR. BROWN: Okay. But we are going to allow any character testimony he wants and the phone book of how great she is to be entered, Your Honor -- Commissioner? Although he's objected to talking about her character from this witness, he has no problem providing all of this. I didn't get any of this beforehand. He has no problem providing this. He's calling Chauncey Spencer, a man who hasn't worked for this County in 13 years, to talk about her character. I think it's only fair that we get to talk about what character discoveries have been discovered by Ms. Maras since she left.

As I said at the beginning of this hearing, are we going to go into a character assassination of Ms. Maras or a character bolstering of Ms. Guerrero. He said I'm going to call one witness to talk about character, which means he's going to talk about character. And if that's going to be an issue that he's bringing before this Commission, I think she needs to be able to talk about what happened after that she discovered that was totally improper behavior. And he says it's not in that thing, that --

MR. LOPEZ: It's -- it's nowhere.

## Page 195

MR. BROWN: -- we didn't -- it's somewhere. It's in a witness' firsthand knowledge, and that's good evidence. And for him to say we can't talk about anything after the demotion because that's character assassination or that's about her character and we don't want to talk about that and it wasn't in the demotion, it wasn't in the demotion because she didn't know about it at the time. And I wasn't going to bring it up, but I brought it up at the beginning of this hearing of are we going to have a character conversation? And he said yes.

MR. LOPEZ: Your Honor, all we can respond to is what's on file what she's been charged with. And to take it outside of that, to -- to allow her to just come in here and wind up and to just sit here and say well afterwards, we did this audit or we did that is unfair. It can't be a moving target. What we -- it's only fair to us to be able to respond what she's charged with. And she went through lengths, the three page letter to tell us what her charges are.

And now to be able to pile on, she could have amended her claims to say, you know, hey, I should have terminated you because, you know, you know, we found in -- you know, I'm not sure what she was going to say. It's just not fair.

CHAIRMAN ELLIOTT: Mr. Brown, the -- the information that you're asking Ms. Maras about that was

## Page 196

discovered after Ms. Guerrero left, is this something that is possible criminal in nature? Is it something that is going to result in possible action against Ms. Guerrero at this point?

MR. BROWN: To my knowledge one issue was criminally investigated and was not pursued.

CHAIRMAN ELLIOTT: By the County.

MR. BROWN: Pardon?

CHAIRMAN ELLIOTT: By the County. They didn't --

MR. BROWN: Yes, by the District Attorney's Office.

CHAIRMAN ELLIOTT: Okay. And that's been resolved as far as no action?

MR. BROWN: Yes.

CHAIRMAN ELLIOTT: Okay. All right. Then I would say that, you know, we're in agreement and we'll proceed on. We won't go down the -- the road regarding the character. We all are in agreement starting out that it's going to be very short and very limited. We have the information provided. So I'm not -- I don't think we're that concerned that that's going to take a lot of that time.

So we'd ask you to proceed, Mr. Brown.

MR. BROWN: Okay. Thank you.

My other questions were about the character witnesses they had. If we're not having them other than one,

## Page 197

I'm finished.

CHAIRMAN ELLIOTT: Mr. Lopez?

MR. LOPEZ: Madam commissioner.

CROSS EXAMINATION BY EMPLOYEE

BY MR. LOPEZ:

Q I want to show you this. Is that the promotion document, Ms. Maras?

A Yes, this is a document that Carmella prepared.

Q I'm not asking you who prepared it. Is that the promotion document?

A Yes.

Q Okay. And on page -- page 56, is that your signature?

A Yes, sir.

Q Is that dated on June the 30th?

A Yes, sir.

Q I want to figure out, because I -- I was a little unclear. Now, did you support that promotion or did you not?

A On June 30th I did. On October 4th I ...

Q Okay. So let's -- just so we're clear --

A Uh-huh.

Q -- when on October -- whenever you submitted the -- the promotion, you were in support of it, right?

A Yes.

Q And despite the fact that Carmella wanted the

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0055

promotion and wanted a raise, you still supported it on -- on June the 30th, right?

A Yes.

Q Okay. So it has nothing to do with, you know, whether or not Carmella was urging the promotion or that she had been promised it. On June the 6th of two thou -- I'm sorry -- June the 30th, 2010 you signed a document asking for her to be promoted, right?

A Yes.

Q Okay. So we're clear that it's not something, you know, that you had second thoughts about or that Carmella was urging; you as the head of IT wanted to promote her to an E12, correct?

A Yes.

Q Okay. I wasn't clear, and -- and -- and maybe I wasn't listening well. But I want to figure out -- let's just start with the lies. You said she lied to your face, right?

A Uh-huh.

Q Okay. Tell me lie number one. What is it?

A Do not give Tina Singh any park -- free -- any parking.

Q Do not give Tina --

A Singh, S-i-n ...

Q S-i-n-g-h?

A G-h, uh-huh.

Q Free parking.

A Any parking I said.

Q Okay. Any parking. That's lie number one?

A Uh-huh.

Q How is that a lie? That's what I was confused about is --

A Tina Singh's car was in number 7 behind the annex.

Q The other day I went down to our -- to a little basketball court we have in our backyard, and my 11 year old was -- was crying. And he said -- and I said what happened? And he said well, you know, Max threw the baseball -- threw the basketball at my head and I couldn't move it and it hit me. And so when I went to Max and I said Max, did you -- did you throw that basketball at his head, he said no. And it just turned out that my other son was out there on the back talking to his girlfriend on his cell phone. And he said yeah, I saw Max throw that baseball -- or that basketball at Alejandro. Okay. That's a lie. You say something that is untrue.

What part of that you just told the Commissioners lie number one do not give Tina Singh free --

A No, any parking.

Q -- any free parking?

A No, any parking.

Q Okay. Any parking?

A Any County.

Q Okay. Where in that statement is there any lie on behalf of Carmella?

A She said okay. She -- she said okay, Cath. She replied. Her reply.

Q Okay. So is that the same lie or is that a different lie?

A Same discussion.

Q So --

A I didn't leave the discussion until I heard her reply as okay, I won't.

Q Do not give Tina Singh any parking. Okay. Now that's a lie?

A Tina Singh's car was in -- behind the annex parked.

Q No, but I'm trying to figure out, Ms. Maras, what did she say to you, because you guys had some heated conversations on October the 4th, right?

A October the 4th after I -- I ...

Q Well, you saw the Mercedes, right?

A We talked about it.

Q You were mad, right?

A I was not happy. I wasn't --

Q You were upset, right?

A I was upset that she undermined my authority. That's what I -- I was upset.

Q But we're talking about the same day, October 4th, right?

A Yes.

Q Where is it on October the 4th that she tells you a lie that says anything about do not give Tina Singh any parking?

A I told her before October 4th.

Q Okay. And maybe I'm not being clear. What words came out of her mouth on October the 4th that you say are a lie? What came out of her mouth that you say is a lie on October the 4th?

A I don't know who's in --

Q So it's not this --

A Who's behind the parking.

Q So it's not this one right here. Okay. So this is not what -- this is not the lie, right, on second thought?

A Yes, it is a lie.

Q When did she tell you do not give Tina Singh any parking? Those are -- those --

A Tina Singh said in -- during in her -- in her office that Carmella gave me the free parking space.

Q I don't know if I'm not being clear, Ms. Maras. But I want to know what came out of Ms. Guerrero's mouth on October the 4th that you say is a lie. And this is the -- the number one lie that you said that she said.

## Page 202

A   Well, the actual lie occurred before I caught her in the lie October 4th. I'm sorry I ...

Q   How is that a lie? Isn't it simply -- because there's only really a couple of alternatives. It's either, you know, Cathy, I'm not going to listen to that, and that may be called insubordination, right? Or I misunderstood that, you know, that you gave her authorization. But how can it be a lie? How can the fact that she allowed Tina Singh to park there be a lie on October the 4th?

A   Because she came to me twice prior to October 4th and asked me if I wanted to give Tina Singh free parking, first at Heritage Plaza and then one of our spaces. And I said please do not give Tina Singh any parking.

Q   And you heard Ms. Guerrero testify earlier that she recalls that you said that she could park there when she had early morning meetings. You heard that testimony, right?

A   I don't think she testified that I was in the room when she said that.

Q   No.

A   You know.

Q   Her testimony was, Ms. Maras, that you gave her permission to allow Tina Singh to park there when she had early morning meetings. You heard that testimony earlier, right, from Ms. Guerrero? You were here. You remember?

A   Yes.

## Page 203

Q   Okay. You also heard Ms. Singh say Ms. Guerrero said that I could park here when I had early morning meetings, right?

A   Yes, but she didn't --

Q   Okay.

A   -- ask -- she -- that's -- that's the lie.

Q   How is that a lie? And I --

A   Because she -- because I told Carmella as my trusted advisor please do not give Tina Singh any parking. If she wants to park closer to Heritage Plaza where her seven a.m. meetings were, there's many surface -- and I -- I called them out, the surface. Do not give our parking spaces to Tina. So when -- when -- when Tina Singh said Carmella told me to park there, Carmella went right totally against what I directed her, Carmella to do. So that's a lie.

Q   So how -- isn't that just basically not doing what you told her?

A   Well --

Q   You said -- if we believe you, okay?

A   Okay.

Q   If we believe you, Ms. Maras, you said don't park -- don't give her any parking, and she gave her parking.

A   Okay.

Q   Isn't that just simply not doing what she was told?

A   Well, for an eleven year old your analogy was good,

## Page 204

because my six year old is like that. Who hit my daughter? My son's like I didn't.

Q   I don't mean to interrupt.

A   And we knew.

Q   I don't mean to --

A   So -- so --

Q   -- interrupt you. I just want --

A   -- for an eleven year old maybe, but for a trusted advisor where I emphatically told her not to twice, that's a lie.

Q   Okay. And you won't agree with me that that's simply not doing what you told her to do? Like for instance --

A   Okay.

Q   -- you need to come in on time and she doesn't, is that a lie too? How is that different?

A   Coming in at 9:20, she eventually is going to get written up by me. I gave her a verbal. But -- and it would be embarrassing to her as my trusted advisor to get written up, but I was kind of starting down those as a verbal.

So it's -- it's two separate concepts. I don't -- I don't understand, sir --

Q   Well, you --

A   -- what you're asking me.

Q   You testified earlier that --

## Page 205

A   You know, I would be, you know --

Q   Let me finish.

A   Okay.

Q   You came in here ready to pile on and dump on Carmella. You know, you've had 18 months to -- to get ready for today, right?

A   Sir.

Q   You met with Tina Singh yesterday, right?

A   To -- to deal with as to what she said, yes.

Q   You did, right?

A   Uh-huh.

Q   And you -- you tried earlier to pile on with some other things that -- that you now discovered, right?

A   It's not pile on. I wouldn't use that to (inaudible) --

Q   But what I'm trying to -- to figure out is how can that be different? If you told car -- because in this -- in your demotion letter you say nothing about Carmella being late or that you had to counsel her about being late, right?

A   It was -- I was -- I was told that if it wasn't in writing, I couldn't include it as part of -- I was getting H.R. assistance. It was only what I knew. I didn't know that. That's where the timing is.

Q   I know you want to -- I know you want to say a lot of things, Ms. Maras, but I just want you to -- I'm just

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0057

## Page 206

asking you did you include in your demotion letter that --

A  No.

Q  -- Carmella was --

A  It was a verbal, no.

Q  But you came in today and said hey, Commissioners, you know, I've had trouble with Carmella already, she'd been coming in late, right?

A  Here when I asked, yes.

Q  Okay. So you told her to come in on time. And if she doesn't come in on time --

A  Uh-huh.

Q  -- how is that any different from her saying Tina, you can park even though you told her not to? How is there any difference?

A  The difference would be if she told me I was not late and I knew she was late. So it -- it's -- I don't -- I'm sorry, I -- I don't understand. It's -- the difference would be if Carmella Guerrero would say no, Cath, I was in on time even though I knew she was -- she was late. That's a lie. This -- it's -- it's apples and oranges to me. I'm sorry.

Q  Maybe we're -- maybe I'm confused on what a lie is. We won't get into that.

What is -- what is the second lie that -- that you claim that on October the 4th Ms. Guerrero told you?

A  That she never knew who parked in any parking space,

## Page 207

that it was totally done by Raul, that she had no idea ever, ever whoever parked in the spaces. And I -- it was interesting to me when only two of them -- out of the six managers had the parking spaces. Four of the managers didn't have any parking spaces, but only two. So -- so basically it's a subset of the employees that worked for those two managers.

Q  So you're saying that lie number two that Carmella told you was she never knew who parked where, right?

A  Yeah, she -- she didn't know who parked in these -- who -- that, you know, all the spaces and who parked where.

Q  Okay. So and how did that -- how did that become a lie to you? How did you -- how did you determine that that was untruthful?

A  When I was talking to the other managers, I found an e-mail where Carmella right after David Mandujano left the County -- he resigned to go to another employer -- said she asked Raul Talamantes who's parking in these spots. August 6th I believe the e-mail.

Q  And that's the August 6th e-mail that you -- that you -- that you claim in your -- in your demotion letter?

A  Yes, sir.

Q  Okay. So in terms of the August 6th, everything happened on October the 4th, right?

A  Uh-huh.

## Page 208

Q  And then you issued your demotion letter on the 26th of 2010, right? Is that right?

A  I'm not sure if -- I think --

Q  Here, I'll show it to you.

A  -- it was later.

Q  I'm sorry, October 27th.

A  Yeah.

Q  Is that right, October 27th?

A  Is -- it's notice of the proposed promotion. I the -- the -- the demotion. The note -- and Carmella had time to --

Q  But this is the letter --

A  -- see. This is a note --

Q  -- you --

A  -- a proposed demo -- deposed -- proposed demotion.

Q  That's the letter you --

A  But not the actual demotion letter.

Q  Okay. But this is where you're giving her the reasons for her to be --

A  Yes, sir.

Q  And this happened on October the 10th, 2010, right?

A  Yes, I believe.

Q  And you had over three weeks from the date that everything happened, right, until you issued the demo -- or the notice of demotion, right?

## Page 209

A  Yes.

Q  And so during these three weeks, you found one e-mail dated October the 6th -- I mean, I'm sorry -- August the 6th, right, concerning what Carmella had sent the County infrastructure department?

A  I found one e-mail that confirmed my -- my demotion, but I -- I had other people talking about other things regarding her.

Q  I'm talking about the e-mail.

A  Okay.

Q  You're --

A  Yes.

Q  And this would be different if we were a different department, but you're the head of the IT department, right?

A  Yes.

Q  You-all handle all e-mails and all computers and all software for the in county -- for the entire County, right?

A  Yes.

Q  And you had over three weeks to cook up your demotion, right? To gather your evidence and to -- and to make sure that you had everything you needed to demote Carmella, right?

A  Based on October 4th happenings, not the broader -- not the -- there was other elements. And you said yourself I -- I couldn't speak to that I discovered that I couldn't --

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)            5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0058

## Page 210

I couldn't write into the demotion letter, because I didn't know about them before I gave her the proposed demotion.

Q But simply put, you had three weeks to come up with all the evidence that you were going to use to demote Carmella, right?

A Based on the findings that I had in the demotion letter, yes, sir.

Q And since you-all are the computer guys, you could have gotten into every e-mail for the County that you wanted more or less, right?

A I -- this didn't --

Q I -- you could --

A This did not come from Carmella's e-mail.

Q But in terms of being able to search through e-mails, as the County computer folks, you guys could have gotten into almost any e-mail you wanted, right?

A I guess I don't understand your -- your question, sir. I --

Q It's very simple, Ms. Maras.

A Uh-huh.

Q You had three weeks, and all you found was one e-mail despite the fact that you could have gotten any e-mail County wide that you wanted, right?

A But that was a critical e-mail confirming the dishonesty and undermining. I had other we couldn't talk

## Page 211

through today, other discoveries that I found that I -- I can't talk about now.

Q Did you the -- did you bring that e-mail?

A Yes.

Q Is that -- is this the one your counsel is showing to me?

A Yes. But that one --

MR. BROWN: August 6th?

MR. LOPEZ: Yeah.

A That one was speaking directly to the parking and the knowledge. And then I found out more broadly that many more people wanted parking but never could get it. So I uncovered the whole -- but I couldn't add.

Q (By Mr. Lopez) Okay. And so this e-mail you say confirms what car -- that Carmella was lying to you?

A Yes.

Q And -- and how do you suggest that that proves that?

A Okay. So I asked her multiple times, many times during the day who's in these spots, where are they? I don't know. I'm -- I'm going to have my administrative assistant go there and take license plate numbers. Which she had a starting point. You know, wouldn't -- wouldn't it be nice to say boy, Cath, I have a starting point. These are the -- these are all the folks that after David left -- because 100 percent of these, sir, nothing was different. These still

## Page 212

were the same people that at a later e-mail from Raul after she asked him -- Raul again were the same people. But I never even saw this. Wouldn't this have been inter -- great to see. Hey, Cath, I don't know, but these are the people as the last time I -- I asked him. I never even -- she wouldn't even confirm she knew anything about it.

What she did was she gave me the policy and said people just go over there and ask facilities -- infrastructure service is now called facilities -- and here it is, the policy. And I said well, facilities would -- would want us to nominate someone or say that yes, this person needs. Oh, no, it's all the policy, Cath. It's all the policy. Well, it wasn't policy. We knew we had these people in. David Mandujano and Carmella had all her staff in here.

Q Okay.

A It was -- it was an access issue. Nobody else had the ability or the access to get parking but David Mandujano and Carmella Guerrero's folks.

Q On the day in question the parking that you were interested in and that got you upset was Tina Singh's parking right?

A Uh-huh.

Q And, in fact, it's true that on that day Carmella went around trying to figure out who was parking where, right?

A That was all af -- no, that was all after. So the

## Page 213

time, it's all timing.

Q It was on -- it was on October the 4th that --

A Yes.

Q -- she was -- that you come in there and you're mad that there's a Mercedes parking in this good spot, and you want to know who else is parking there, right?

A Well, I wasn't mad. I mean I don't want to -- I was like Carmella, I see a Mercedes.

Q If you're using words like a-hole, do you just use those kind of words when you're not mad?

A That was later. So... First of all, she said many more words that I -- I said a-hole to.

Q You're going to have your chance to respond.

A Okay.

Q This is not a --

A So --

Q You don't have?

A So the --

Q -- to (inaudible) --

A So the timing of this was such I didn't know about this e-mail at the time. So I didn't know. I didn't know about parking, because frankly, I was in my office day and night.

So it all kind of came together like well, if -- if -- if I know that she basically was dishonest about

Dawn Flippin, CSR                210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)        5245eeb5-f6db-45f5-aa67-28085203e4ee

TR-0059

Tina parking back in there, what else? The parking, I never even heard about. I didn't know we had parking. I knew there was always oh, parking -- but no one ever said hey, we have five spots here, seven spots there. This is how all the managers slice up parking. It was all a closed -- a closed place. David and Carmella had all the parking. So -- so I kept saying well, who has this parking? I don't know. It's all part of this policy. And frankly, I was getting tired of someone lying to me over and over like I don't know anything about parking, you know. And -- and --

Q What is the over? You keep on saying that, but you have no proof for it. I want you to tell these Commissioners --

A Okay.

Q -- what you are talking about lies over and over that happened on October the 4th, okay?

A Okay. I told Carmella Guerrero two times --

Q Okay. We've already --

A -- not to --

Q We've already gone past that one.

A Okay.

Q That's --

A I -- then I found that behind my back Tina Singh was parking in a slot. That just galvanized everything that -- I was like oh, my gosh, if she would lie to me about parking,

what else is going to happen. What else is going to be there that I won't know and then the Commissioners will come down on me. It's, you know.

Q It's been -- I think it's been shown today there's a lot of things that you didn't know?

A No, it --

Q For instance, you didn't know about the Primavera project, right?

A No.

Q Okay.

A I knew about the Primavera project. Brian Lyssy --

Q The reassignment?

A That it was reassigned to Brian Lyssy. But I was at every meeting. In fact, I had to redesign the whole technical architecture for them, and I did that. So I knew about the Primavera. She didn't come forthcoming as to -- she told me that Tina was too busy with Lawson, and that's why we had to send Brian. And no -- no -- that was a misunderstanding? That was just telling me I assigned it to Tina because it had Lawson implications with the financial system.

I didn't think anything of it my trusted advisor telling me that I had -- she had to have Brian go there because Tina was at meetings. That's what I was told. Tina's at meetings. She can't attend any of these meetings. So I had to attend. I wanted Tina there because it was a

strategic direction we were going to, sir, and I had to be there. So it was more work for me, but I was at every meeting. So I knew -- in fact, I designed the whole technical architecture for that.

Q Let me ask you just the question that I --

A Okay.

Q -- started off with. You didn't know that Tina Singh had been reassigned on the Primavera project?

A I did not know.

Q Okay. And you didn't know that the County had different parking spots, right?

A Right.

Q And these are things that you probably should have known, right?

A That I was supposed to be told by a --

Q Well --

A -- trusted advisor.

Q Well, you're -- you're the head, right? You're the -- the buck stops with you as the IT CIO, right?

A And I -- and that's why I thought they were egregious and that's why I took --

Q Will you just answer my question, Ms. Maras? You're the CIO, right?

A Yes, I am the CIO.

Q You're the head of the entire department?

A I am the CIO.

Q That means you're in charge between networks, e-mails, beginning with everything that you found broken all the way down to everything --

A Yes.

Q -- administratively, right?

A Yeah.

Q So these are the things that you should have known, right?

A I'm supposed to know everything. And I'm supposed to be -- I was -- I was figuring them all out. The mainframe was 14 years, and Carmella didn't know. So she couldn't tell me. So there are certain things -- it's a two-way street.

Q She's not a technical person though, right?

A Correct.

Q Her job was limited to administrative --

A Yes.

Q -- things, right?

A Yes.

Q Helping your team do technical things, right?

A Yes.

Q Okay. And in terms of parking, you say you didn't know but you should have known. The parking spot that we're talking about for -- with Tina Singh, we're not talking one that's under 35, we're talking about the one that butts up

right next to the building, right?

A Yeah. And if -- if --

Q And in all day, your 15, 16 hour days you never --

A I never went back --

Q -- saw that parking spot?

A I --

Q You never saw that parking lot?

A I -- sir, the County was in such dire straits, I wish you were with me when I could tell you. It was totally -- the department itself was basically going to -- systems were going to stop functioning, and I had to keep it going. So parking, keeping courts as jail open, you be the judge. I chose -- I made the business decision, sir, to make sure the operations were working.

Q So this parking stuff --

A Parking came later.

Q -- you think is insignificant stuff, right?

A No, it was all in time. It was all in due time that I was figuring all this out. All in due time. And that's why there's a -- there's all this time that goes by until you figure out somebody. I'm not a rash person. I will give them the benefit of the doubt.

Q Have we put up all of the lies that Carmella told you on October the 4th?

A Yes. In the -- from the letter, yes.

Q Well, we -- are there any others that were told on October the 4th that weren't in the letter?

A That she didn't know anything about parking. She kept denying that she knew anything about parking. I don't know anything about parking. She couldn't even tell me from her employees who were in the parking spots, even though they all were from only two managers. So she kept denying it throughout the day.

Q Why would Ms. Guerrero -- why would Carmella have any reason to lie to you about parking?

A I have no idea.

Q It's pretty insignificant in terms of the IT department, right? You guys got bigger fish like Ms. Singh said, like you've been testifying all afternoon that, you know, it was broken and you needed to fix it, right? Parking was not one of them, right?

A I think it was a control issue. My opinion parking for Ms. Guerrero was -- was a control issue, because only she and David Mandujano had all the parking spaces. No other manager could even ask for one. So it was control in my opinion.

Q You testified and you also included in your letter that she was insubordinate. What is it that she did that was insubordinate?

A Started yelling at me in my office. Because when --

when she was getting -- I don't know, I don't know, she just started yelling at me. And that's when I closed the door and said you can't yell at me. I am a man -- your manager. You can't yell at me. That's what insubordination.

Q Okay. And you also claim in your demotion letter that she failed to perform her job requirements?

A Yes, because --

Q What did she fail -- what did she fail to do?

A Not telling me the correct information at the time I asked her.

Q We reviewed the parking policy.

MR. LOPEZ: And is that the one that we gave Mr. Sanchez?

MR. BROWN: He may have made out with that one. That has no highlighting on it.

Q (By Mr. Lopez) Okay. On number three, it's going to be on page two.

A Uh-huh.

Q You were here when he testified the policy is pretty clear on who assigned parking, right?

A If the request never got to infrastructure services, we're not -- we didn't talk about that. If someone stopped the request from going to infrastructure services.

Q I'm trying to -- I'm trying to streamline this as much as I can.

A Sorry, but you're asking me for ...

Q I'm just asking you to answer the question.

A You know, I -- well ...

Q Is it -- in section 3B --

A (Inaudible). Okay.

Q -- who does it say assigns parking?

A Will be made by infrastructure services and will follow the criteria established in this policy.

Q Okay. So --

A Yeah.

Q -- we're clear that in terms of County parking, infrastructure is going to assign it based on that policy, right?

A I think --

Q Based on that policy?

A -- it -- I don't ...

Q Well, you read it.

A I can't --

Q Do you not believe it to be true?

A Well, it's --

Q Or not be --

A -- the person -- it's the -- it's the folks. These are just policy as Mr. Brown stated. These are just -- these are -- this isn't a person; this isn't a requesting department. This is just a policy as a guideline. But the

requesting department provides the people. And that's what these are. These are the people that Carmella said yes, these are the people, Raul, I want you to give parking to.

Q But when it says in the policy --

A Uh-huh.

Q -- the assignment of actual parking spaces or location will be made by infrastructure services department.

A Well --

Q Did I read that correctly?

A Well, if that's what's written.

Q Did I read that correctly, yes or no?

A Well, we've got to read the whole --

Q Okay. And I --

A Will be made? You know.

Q Okay. The assignment of actual parking spots, spaces or location in the Bexar County parking facilities will be made by the infrastructure --

A Okay.

Q -- services department and will follow the criteria established in this policy. Did I read that correctly?

A That was how it's read. I don't know how infrastructure services knows who to assign parking to though.

Q So if Carmella tells you I don't assign parking, the policy says that infrastructure, that's supported by our Bexar County policies, right?

A How does Raul know who to give the parking to though? How did -- how did that happen?

Q You heard Ms. Guerrero testify that she's been a liaison, that she provides certain information to them, right?

A Okay. Yes.

Q Because --

A Names.

Q Because the policy has, you know, certain --

A So these names, right?

Q If I could --

A I'm sorry.

Q I know you're excited, okay?

A No, I'm not. I'm just I don't know --

Q That there's different people that get to get these spots, County Judge, County Commissioners. So infrastructure has certain things that they're going to look to when they're making a decision. And Carmella or people like her in other departments provide information; is that -- is that what you understood?

A Provided the names that they wanted to have in those parking spaces, yes.

Q And you heard Ms. Guerrero testify that -- that she provided names to them, but that it was Raul Talamantes that got to say yes or no after he did the review, right?

A I don't know how he could review what names we

recommended. I -- I --

Q Well --

A How could he review a name?

Q I know -- I know you want to avoid my questions.

A No, I don't want to avoid.

Q And I (inaudible).

A I -- I don't know -- I don't know your -- if --

Q Okay. If you don't want to avoid it, then just answer it.

A No. Okay.

Q You sat here during Ms. Guerrero's testimony, right?

A Uh-huh.

Q And you heard her testify --

A Uh-huh.

Q -- that she provides names --

A Names.

Q -- and that Mr. Talamantes -- and I think Mr. Brown called him the parking god -- he gets to say yes or no, right? You heard her say -- you heard that testimony, right?

A Yes.

Q Okay. And so have you dealt with Mr. Talamantes before?

A Yes.

Q Before October the 4th?

A Yes, I -- I --

Q Okay. And so if that's the way Carmella testified, do you have any reason to doubt that it's Mr. Talamantes, based on this policy, that's in charge of assigning parking?

A I think we supply names to Mr. Talamantes and he accepts them. My issue is the list wasn't conclusive. The list was only two managers. The list wasn't all six managers. And that's what the control that Carmella had, who got on the list.

Q Does Carmella not have some discretion in her job as all managers probably do?

A Because I didn't know that this list occurred, I would say that was part of our perks that we were trying to give. So as part of -- as a manager, I would say to her let's open up the access to other people. So that -- that's what I was doing on October 4th is saying you know what, the old way we were doing parking, I'm going to stop that. I'm going to make -- I'm going to re-look at this -- all this parking.

Q So if you're going to redo parking and redo a BCIT policy --

A Uh-huh.

Q -- you know, why did this have to be such a big deal then if you were going to redo it?

A It was after this -- this whole instance.

Q Okay. Now, you heard Ms. Guerrero testify that -- that Mr. Talamantes at times, he had to review the in and out

parking. I suspect that's the folks who've got to go in and out of the office because they've got to support other places, right?

A Uh-huh.

Q And you heard her testify that he sometimes said hey, you-all said these folks are going in and out and they're not?

A Uh-huh.

Q So you would agree with me that that's evidence that Mr. Talamantes is the one who makes the decisions regarding the assignment of -- of parking spots, right?

A Not makes the -- I think validates that --

Q Okay.

A -- that they go in and out.

Q We talked about the progression where you talked about with your lawyer regarding the progression of discipline. And this is policy 7.610. Are you familiar with that policy?

A The one I had was 7.6.11. It's .11 that I looked at. I looked at this one, but I ...

Q But are you familiar with that one?

A Yeah.

Q And so you have seen this policy before?

A Yes.

Q And so you're familiar with the progression of

discipline here at the County?

A Yes.

Q You understand that -- that the County has a policy of progressive discipline. Do you know what that means?

A Yes.

Q You know that it makes it a policy, the County does, that it gives its employees the opportunity to -- to correct infractions, right?

A Yes.

Q And you understand that policy 7.6.10 also is a policy that permits the employees that exhibit unsatisfactory job performance an opportunity to comply with an office, department or requirement, right?

A Yes.

Q So basically this policy which is County wide which is bind -- which is binding on your IT department, right?

A Yes.

Q Says that we know that there are going to be instances where somebody does something that they weren't supposed to or failing in their job, but we're going to give them a chance to correct it, right?

A Yes.

Q Okay. And so under the policy, there is a progression of -- of what should be done. First thing is oral counseling, correct?

A Yes.

Q Second thing is written reprimand, correct?

A Yes.

Q Third one is a suspension?

A Yes.

Q Fourth is a demotion, right?

A Yes.

Q In this case with Carmella you didn't do any oral counseling with her as far as a disciplinary action on October the 4th, right?

A Not -- not on October 4th.

Q Okay. And -- and in regards to the events on October 4th, you didn't give her an oral counseling as her discipline, right?

A I gave her a verbal counseling in my office --

Q But -- but --

A -- two or three times.

Q But when we're talking about discipline, that's oral counseling where you say hey, you're taking your lunch breaks too long, we're writing you -- you know, I've counseled that you and we put that in your file. You didn't do that, right?

A Oral counselings I do not believe go in your file.

Q Okay. Did you --

A That's why they're or -- I mean.

Q Did you make any written reprimand of Ms. Carmella

on that day as a progressive form of punishment?

A No. On what day? I'm sorry. On what day?

Q On regarding the October 4th --

A No.

Q -- events.

And in regards to the October 4th events you didn't suspend Ms. Carmella as part of the policy, right, or as part of her discipline, right?

A Not at that time.

Q You chose to go straight to the demotion, right?

A I -- I --

Q You bypass -- bypassed them all, right?

A I talked to H.R. and talked -- I mean, yes.

Q I'm correct, you bypassed them --

A Yes.

Q -- all and went straight -- and you're saying that because it was a serious nature?

A Yes, sir.

Q And this seriousness is that she allowed Tina to park there when you told her not to, right?

A It was the dishonest insubordination of why Tina was parking back there after I told her twice not to have Tina park in any free or any free or unfree, you know ...

Q At the beginning --

A ... parking.

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0063

## Page 230

Q Okay. At the beginning of our hearing Mr. Brown had alerted the Commissioners that you had abolished Carmella's position, right?

A Yes, as part of the economic downturn.

Q So not only did you --

A (Inaudible).

Q Not only did you demote Carmella, you got rid of her spot, right?

A It was part of our -- we had to recalibrate. The County is under a real severe revenue shortage and -- and real dire straits. And we were reworking the budget, and I had to find over $1 million dollars of savings because the general fund ...

Q And it's also a good idea to -- to get rid of Carmella's spot because if she was successful here, you wouldn't have to put her back there; is that what you -- is that what you were intending?

A Sir, I wasn't even ...

Q But in your opinion you agree with -- with Mr. Sanchez that the -- the department is better off without Carmella?

A I think yes. I think the -- we took her -- yes.

Q Okay. So you agree with him that, you know, getting rid of Carmella and then getting rid of all the other folks that -- that have left, that's made the department better,

## Page 231

right?

A I didn't get rid of all those other folks. They resigned or retired.

Q It wasn't part of your cleaning house?

A No. You know, I have been promoting everyone from within, and I haven't really hired a lot of people from the outside.

Q You don't think a 20-year employee with Ms. Guerrero's track record is deserving more than what you did in demoting her?

A Sir, I came in and I was -- been very fair to Carmella Guerrero and everyone else at BCIT. I didn't know anyone. I told everyone we're going to work and move forward. When this happened after other indiscretions, I had to take -- I had to take a management decision, a business decision for the benefit of Bexar County and for BCIT.

So yes, she told me about her background and all of her -- and, frankly, I pulled myself up through my boot straps too. So I always cherished that about Carmella that she, you know, she worked hard and worked ...

Q You keep on saying indiscretions. You know, you're trying to paint this picture for these Commissioners that she was not doing something that she was supposed to. You know, what are you talking about? It's not in your -- it's not in your October 10th disciplinary file, it's not on file with the

## Page 232

Civil Service Commission.

A Uh-huh.

Q So what are you talking about?

A The discovery I -- that I can't talk about.

Q No, but you just testified, Ms. Maras, that on October the 4th that on that day that your trusted advisor that you determined she needs to be downgraded --

A Yeah.

Q -- and demoted because of all of the then -- indiscretions.

A Lack of judgment.

Q Okay. Now, what --

A Okay.

Q You didn't include any of those in your charge.

A And again --

Q So I want to -- I want to know whether you're telling the Commissioners these indis -- you're making these indiscretions up just because it helps your case?

A No. Not so.

Q Then why didn't you include them in her letter?

A I couldn't because the letter had to focus on the parking.

Q You testified that on October the 4th that the culmination on October the 4th of other indiscretions.

A Yes.

## Page 233

Q What are those other --

A Okay.

Q -- indiscretions that we -- we have no idea about and you didn't include them anywhere in your --

A The lack of judgment of letting a person sell jewelry in my secure area. There's locks on the doors for a reason, sir. Nobody can get into the bowels of the County's data center. This lady was selling jewelry unescorted in a highly secure area. That's a lack of judgment.

Q If it's so --

A For a trusted advisor.

Q If it's so secure, how could she be selling there if --

A Because --

Q -- people were going to be walking through there already?

A My employees were there. Because Ms. Guerrero allowed her to go there unbeknownst to me.

Q Why didn't you write up Ms. Guerrero about the jewelry salesman -- about the jewelry set up?

A I sent her an mail and I have it where it says do not -- do not have this happen again. I told the lady she had to leave.

Q And then did -- did Ms. Guerrero ever allow -- ever allow her to --

Dawn Flippin, CSR                210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0064

A No.

Q -- be there again? Okay.

A But again --

Q So counseling Ms. Guerrero works, right? You said don't bring the jewelry salesman around again, and she stopped, right?

A But what was the next one going to be? I mean I -- I was busy doing a lot of things. You know, if she -- if something else happened? Oh, don't bring -- don't bring the jewelry saleswoman down in a secure area. I didn't think I had to say that to someone who is my trusted advisor. You know, it's like don't bring a gun to work. You know, it's like I don't, you know. I -- I -- I don't --

Q But in terms of --

A I'm sorry I didn't explicitly tell her that before, but I didn't think I had to with all her experience that we showed.

Q But in terms of whether or not counseling works, if you told her stop bringing the jewelry salesman and she did, that's evidence that -- that Ms. Guerrero is going to do what you tell her, and that the progressive disciplinary action that is required by all Bexar County policies is effective at least with Ms. Guerrero, right?

A Yes, at the time when I found out. I never was even told she was down there. See --

Q But --

A -- that's the problem --

Q -- when you told her to stop, she stopped, right?

A I know, but when I found out. The trouble is --

Q Did she stop --

A Yes.

Q -- when you told her --

A Yes.

Q -- to stop.

A Yes, yes.

Q Thank you.

MR. LOPEZ: I pass the witness, Madam Commissioner.

CHAIRMAN ELLIOTT: Mr. Brown, any follow-up?

REDIRECT EXAMINATION BY COUNTY

BY MR. BROWN:

Q Okay. Just a couple things.

Rather than again parsing this down to what was the lie and then misrepresenting what was said, and you write it up there, the lie was she told you it's not -- I'm sorry. The lie was not -- it was the dishonesty of saying I don't know who's parking there and giving Tina Singh parking. You said don't give her parking. She flat out ignored your order twice that said don't do it and went behind your back and gave her parking, correct?

A Yes.

Q And was that not only insubordination, but it was dishonest when she said I have no idea who is parking back there. I -- I -- and then she went to the office and said I -- I had nothing to do with Tina Singh parking there. Look, 4.6, 4.6.

A Yes.

Q She knew, correct?

A Yes.

Q Tina Singh confirmed she knew, correct?

A Yes.

Q Tina Singh suffered no repercussions or benefits as a result of what she said to you that day or her testimony here, correct?

A No.

Q Was it clear to you that the person you trusted had just flat out lied to you?

A Yes.

Q And it had not been a one day, one incident, one small little minor thing. It had been building over the whole summer when you had told her twice -- that she had come to you twice for this same woman and said no, don't do it?

A Yes.

Q Okay. And it was clear to you that that had happened, correct?

A Yes.

Q And this jewelry incident, you counseled her. You sent her an e-mail and you said hey, this person is in a secure area. I don't know about this. Don't do that, correct?

A Yes.

Q So she didn't do it?

A Yes.

Q Okay. Now, would you expect someone who was by far one of the best employees this County has ever had and is now second in command to exercise judgment so poor that you not only had to send her an e-mail about that, but that she never even told you about it beforehand and -- and asked you hey, can I let this person down here? Instead she let's the person in a secure area. And what they ask you to do is just keep counseling her. Every time she screws up, just issue a counseling for God's sakes. She'll reform. She'll fix her behavior. Is that reasonable?

A No, I didn't, you know.

Q Is that --

A At that level, no, she had to know this stuff.

Q Right. That might be reasonable for --

A For a E5, yeah.

Q -- an E1, correct?

A Yes.

Q  Or an E2 or an E3?

A  Yes.

Q  E4, E5?

Is that reasonable for the second in command to --

A  No.

Q  -- have to keep getting counseled and counseled and counseled?

A  No.

Q  Is that what you'd expect of the person who now is telling you from the day she walks in I want a raise, I want a promotion and you're going to get it for me?

A  Yes.

Q  Isn't that a person who says because -- inherently because I deserve it?

A  Yes.

Q  Because I can be trusted?

A  Yes.

Q  And then she shows you as things progress that you can't trust her?

A  Yes.

Q  She's made bad judgments?

A  Yes.

Q  And now she's asking for well, just keep counseling me, because once you tell me what I did wrong, I fix it all.

Let's not ever move to serious discipline here. Let's just keep counseling me, because I'm a real good listener after the fact. Is that reasonable?

A  No.

Q  Okay. And so on the day you made the decision, again, it wasn't a decision you took lightly, it was a decision you thought out, and you decided. I think the fact you promoted her three days before shows how much you trusted her.

A  Yes.

Q  Until you found out you couldn't trust her. And you then said I cannot have her handling my $10 million budget, because she -- if she'll lie to me about something this minor -- as they like to keep saying, this was a minor issue -- in your mind was it if she'll lie to me about something this minor --

A  Yes.

Q  -- what's next?

A  Yes. I was concerned. I was so concerned about that.

Q  Okay. And the concern wasn't oh, my goodness someone is parking there. The concern was if I have to keep issuing corrective behavior if she's going to make bad judgments, can I trust her in this position?

A  Correct, yes.

Q  And your decision after consulting with superiors and with H.R. was no, correct?

A  Correct, yes.

Q  And they said well, you demoted her all the way down. What else could you have done? You could have fired her according to other people you spoke with, right?

A  Yes.

Q  So not only did you consider this serious, but others agreed with you --

A  Yes.

Q  -- that this was serious. And you, in fact, took the least progressive discipline you thought was necessary, correct?

A  Yes.

Q  And in the end it's worked out that Ms. Guerrero at least up to this day as she said she was going to be a stellar employee until we got to this hearing. That's what she testified to. And she's done that, correct?

A  Yeah, she's been good, yes. It is an E5 process flow -- yes.

Q  And she's gotten a commendable, right?

A  Yes.

Q  And she holds that up as something exceptional to be a commendable employee at a job, correct?

A  Yes.

Q  And, in fact, isn't that what you'd expect from an employee?

A  Yes.

Q  All right. And she's lived up to every potential you think she has at the E5 level, correct?

A  Yes.

Q  But she did not live up to and she was not someone you thought could be an E11 anymore, correct?

A  Correct.

Q  And that's why that decision was made?

A  Yes.

Q  It wasn't because you don't like Mercedes, you don't like Tina Singh or the person you had promoted three days earlier you decided it was witch hunt time. Correct? None of those reasons for why this happened?

A  No, sir. I --

Q  Not a rash decision?

A  No. I'm a new person. I wanted to work with everybody.

Q  And you certainly didn't want to make the Commissioners mad who you knew trusted her?

A  Correct.

Q  Okay. So for you this was kind of perilous to go against what they believed was a person that they told you to trust, and all of a sudden you're bucking the Commissioners

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0066

**Page 242**

and you're saying wait, this is a person that either should be terminated or demoted. And they agreed, correct?

A   Yes.

Q   And H.R. agreed?

A   Uh-huh.

Q   Thank you.

MR. BROWN: That's all I have.

RECROSS EXAMINATION BY EMPLOYEE

BY MR. LOPEZ:

Q   Ms. Maras, you worked alongside Ms. Guerrero from the time you started working up until you demoted her, right?

A   Yes.

Q   And, in fact, you had probably about ten months to work alongside of her before you promoted her to her E11 position, right?

A   Yes, nine months. No.

Q   September to June, whatever it is?

A   September 21st, yeah. Yes.

Q   September to June, right?

A   The first three months I was going back and forth and transitioning, yes.

Q   But in terms of from --

A   Yes.

Q   And so you keep on saying that she had prior bad judgments. Well, you wouldn't have promoted her if she -- if

**Page 243**

you -- if you had seen her and observed her having so many bad judgment calls, right?

A   They were -- you know, when you bring them all together, but I promoted her because we were recalibrating the department and her annual request, and I promoted her because of her work.

Q   Ms. Maras, why do you answer my questions in a narrative form and your lawyer's questions in a yes or no? Are you trying to avoid my questions?

A   No, sir.

Q   Okay. Well, then --

A   I'm sorry.

Q   -- let me ask you this. Isn't it true that you would never have promoted Ms. Guerrero if she had been making all of the bad judgment calls that you say she did?

A   Correct.

Q   Okay. So it could be the case that -- that you're just making that up or piling on now after the fact, right?

A   No. There were verbal counselings. But I -- you're right, they weren't things I knew about.

MR. LOPEZ: Madam Commissioner, nothing further.

CHAIRMAN ELLIOTT: Okay. Mr. Brown?

MR. BROWN: Nothing further.

And we have -- we have one more witness so I

**Page 244**

don't know it's getting kind of (inaudible).

CHAIRMAN ELLIOTT: Okay. All right.

MR. BROWN: And he should be brief although I can't ...

CHAIRMAN ELLIOTT: No. Well, we're going to insure that it's brief.

Ms. Maras, before we dismiss you, I did have a question. And you may be able to answer, so I'm not sure.

Regarding evaluations of employees, the written evaluations, what time scale, is that on an annual basis?

MS. MARAS: Yes.

CHAIRMAN ELLIOTT: So would Ms. Guerrero -- I didn't see and I may have overlooked it -- did you ever do an evaluation on her during --

MS. MARAS: No, I did not.

CHAIRMAN ELLIOTT: Okay. And was that why? You all were together a year.

MS. MARAS: Yes. We were the CIO and -- it's not a County policy. The CIO, they were getting constant evaluated by. You know, we worked as a team, we had weekly meetings, but I didn't do a -- I didn't do a -- a handwritten one.

CHAIRMAN ELLIOTT: A written evaluation?

MS. MARAS: Yeah.

CHAIRMAN ELLIOTT: Okay. Was she due one?

**Page 245**

MS. MARAS: She was not -- not -- none of the managers received it from -- from me.

CHAIRMAN ELLIOTT: Okay.

MS. MARAS: They were changing. I mean we had a lot of upturn and -- and whatnot, but none of them received. Once she became a business analyst is when she received one.

CHAIRMAN ELLIOTT: Okay. All right. Do you all have any?

One last question. I know Ms. Guerrero's former position has been abolished. So the duties that she carried, what -- they've been farmed out or what?

MS. MARAS: Yes, I put them under the remaining managers.

CHAIRMAN ELLIOTT: Okay.

MS. MARAS: Build some synergy there.

CHAIRMAN ELLIOTT: And about when was the -- the position abolished?

MS. MARAS: October 1st.

CHAIRMAN ELLIOTT: October the 1st.

MS. MARAS: The beginning of the budget.

CHAIRMAN ELLIOTT: Sure.

COMMISSIONER CORTEZ: So who is in second in command right now?

MS. MARAS: No -- I mean no one. It's all the managers report to me and we have, you know, very daily basis

Electronically signed by Dawn Flippin (401-013-461-8760)                    5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0067

interaction.

COMMISSIONER CORTEZ: What level are they in the E?

MS. MARAS: Gilbert was -- is a E12.

COMMISSIONER CORTEZ: Okay.

MS. MARAS: That was upgraded when David Mandujano was in a grade. And then the remaining ones are E11s.

CHAIRMAN ELLIOTT: Okay. Thank you, Ms. Maras. We appreciate it.

At this time I know we have -- if you all are okay, we can either recess or we can proceed on with the one last witness that will be brief.

MR. BROWN: May I have --

MR. LOPEZ: Madam Commissioner, what I would -- what I'd like to suggest is if -- if Mr. Brown can put on his witness, and then we could take maybe a short bathroom break after that one.

CHAIRMAN ELLIOTT: That's fine.

I tell you what. No, I'm sorry. We're going to recess just very briefly. Can we do five minutes and everybody be back?

MR. LOPEZ: Yes, ma'am.

CHAIRMAN ELLIOTT: It is now 1:55. We are at recess to return at 2 o'clock sharp, please.

(Brief recess).

CHAIRMAN ELLIOTT: We're back in session. It's now 2:02.

Mr. Brown?

MR. BROWN: We have called and he is here, Mr. Bob Hampel.

(Witness sworn).

ROBERT HAMPEL,

having been sworn to tell the truth, testified as follows:

DIRECT EXAMINATION BY COUNTY

BY MR. BROWN:

Q    State your name, please.

A    Robert Hampel.

Q    And what is your current position at the County?

A    Deputy CIO.

Q    Okay. So you work under or with Ms. Maras?

A    I work under Ms. Maras.

Q    Okay. And the question was asked by one of the Commissioners who absorbed Ms. Guerrero's position. That wasn't you, was it?

A    No.

Q    Okay. Are you in there in a whole -- your job is a whole different job than hers was?

A    Correct.

Q    Okay. Prior to moving to BCIT, what was your job?

A    I was the manager of H.R. and H.R.I.S.

Q    At Bexar County?

A    At Bexar County, sorry.

Q    Okay. So at that -- now in October -- I'm going to jump to October of 2010.

A    Okay.

Q    What was your job?

A    I was the director of or the manager of H.R. and H.R.I.S.

Q    Okay. So you weren't under Ms. Maras at that time?

A    No.

Q    And as skeletal as you can make it, what was your job description?

A    As the manager of --

Q    H.R.

A    I was the -- the top H.R. person for the County. I had classification and compensation, I had benefits, I had Civil Service. I also had the mail room. I also had the H.R.I.S. team, the computer people who did the payroll and H.R. system.

Q    Okay. And how long did you have that job?

A    About five years.

Q    Okay. Is it fair to say you are intimately knowledgeable of Civil Service?

A    Yeah.

Q    You are --

A    I'm well versed I think.

Q    You had five years where it was under you, correct?

A    Correct.

Q    So you know Civil Service policies?

A    Yes.

Q    Rules?

A    Yes.

Q    And how it operates?

A    Yes.

Q    When a division head or any head is -- of a department is going to make a decision regarding a disciplinary action, is it common or recommended or normal for them to call H.R. for advice?

A    It depends on the elected official, but it's not uncommon for them to do it.

Q    Okay. So it's not out of the ordinary?

A    Correct.

Q    And in October did Ms. Maras contact you regarding a disciplinary action?

A    She did.

Q    And who did that action involve?

A    Ms. Guerrero.

Q    Okay. And what was your understanding from Ms. Maras as to the basis for the action and what the options

Dawn Flippin, CSR                210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0068

were for the action?

A I don't understand the second part of that.

Q What options were available to her in the Civil Service scheme?

A I'll tell the story and you can tell me if that answers the question or not.

Q Fair enough.

A Got a phone call from Ms. Maras basically saying that there had been an incident in her office, and she felt like she needed to release Ms. Guerrero from duty. And when I asked kind of what the situation was, she told a story about an incident that had happened regarding parking. And the -- the relevant part to me was the fact that she said I can no longer trust her in the role that she's in. And so that's why I think she needs to go.

Does that? Okay.

Q No, go ahead.

A Okay. So then as -- as we talk about things, we say okay, well, obviously there's Civil Service implications here. So we need to think about that. Talked about do you want to consider other options, do you want to take some time to think about it? And I think just because of timing, you know, next day comes around and -- and a day, two days, I'm not sure which -- Cathy came back to me and said, you know, I've -- I've thought it through, and I don't think termination is the

way to go. I think a demotion is the way to go.

And that kind of surprised me, because I thought she was pretty set on wanting to go the other way, and I was ready to help her do that. But because of the nature of the thing and what she wanted to do, I was -- I was happy to support her.

Q Okay. And at the end -- the end of the day is it the head of the department's decision?

A That's right.

Q Okay. So even if whether you disagree, don't agree, you're there to facilitate the decision she's made?

A I -- I -- if she goes -- if I advise her and she chooses not to take my advice, that's her call.

Q Okay. So she advised you she wasn't going termination, she was going demotion.

A That's what she preferred to do, uh-huh.

Q And based on what you had been told, did you feel that was a reasonable option?

A Absolutely.

Q Okay. And did you help her further after that with the process?

A We generally refer her to Andrea to say let's make sure that we're doing -- because there's the certain paperwork that needs to be done a certain way. The -- the advice that I always give them is if you're -- if you're doing anything

that's an adverse action according to the Civil Service Rules, you have to make sure that you can defend it, because you may end up in very much this situation. So that's what we always make sure that we talk about and -- and make sure that people understand as they go to do this. But again, I was comfortable with the decision she made, so I thought we were okay.

Q Okay. And then at some point did you -- you were transferred to or reassigned -- I don't know how it worked -- to BCIT, correct?

A Yeah, reassigned.

Q Okay. And in your time since you've been there, you've gotten to know how the department works, correct?

A Yes, uh-huh.

Q And you've gotten to know Ms. Maras?

A Yes.

Q Do you find her to be a deliberative person when it comes to decisions?

A Yes.

Q Do you think she came to the demotion decision irrationally or do you think she thought it through and sought advice and it was a proper decision?

A No, I think she thought it through and came to the right decision.

Q And as someone who has been in H.R. at least with

the County for seven, eight years --

A Almost ten.

Q -- almost ten years in H.R., you understand or can you explain why -- sorry. Let me back up.

Civil Service allows for jumping steps if the infraction is determined to be severe enough, correct?

A Correct.

Q Okay. And that's -- that's just a straight rule, right?

A Yeah, it's in the -- it's actually in the rules and it's --

Q Right.

A -- sort of established practice.

Q 7.6.11, correct?

A Okay. Yeah, if you --

Q This wasn't an interpretive action on Ms. Maras, it's a rule?

A Yeah.

Q Okay. And in your understanding of BCIT now H.R., is it reasonable that you wouldn't take the same action for an E1, 2, 3, 4?

A Exactly.

Q Okay. So you wouldn't take the same action for an E11 for a certain infraction -- let's just go with dishonesty -- for dishonesty that you would with an E5, 3, 2,

67 (Pages 250 to 253)

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0069

6?

A Absolutely not. Part of the discussion that we always have is what's the position that we're talking about. So the same infraction for an entry level professional does not have the same weight that it does for a trusted senior manager. And that's why I think in this case the jumping, if you will, to -- I think all the way up to termination was certainly justified.

Ms. Maras was an executive director of a 100 plus people department. She had one person that she was supposed to be confidentially relying on. That person was no longer trusted. I don't see how she can continue to function in that role for her.

Q And now you've moved to BCIT and you see the specific hands-on of what E5, 6s do, the various descriptions?

A Uh-huh.

Q Do you feel Ms. Maras is in a position that's adequate to the trust a person would have in an E5 as opposed to an E11?

A I'm not sure I followed that.

Q Sorry. Is it makes -- does it make sense that Ms. Maras would trust her as an E5, whereas she may not have trusted her as an E11?

A Yes, because she's doing different tasks.

Q And is she in a position of where she has less

ability if she does something improper to have a major effect on the department and the County?

A Control of resources is much less.

Q Okay. And as an E11 she testified she had been strong control over about $10 million?

A I don't know what it was at the time. I was in H.R.

Q If that was the budget.

A Might have been. Again, I was in H.R. at the time so I don't know.

Q Okay. So it made sense that as an E5, she's not going to have that kind of responsibility?

A Absolutely.

Q Okay.

A And again, if -- if there's confidential information that -- that is either planning in nature or H.R. in nature or that sort of thing, the position that she's in now doesn't have access to that. This other one does. If there's no trust, to me that's a -- that's the defining, if you will, factor.

Q Okay. So in your ten years in H.R., five years as the head of Civil Service, and knowing the facts as you do, knowing Ms. Maras, knowing the department, knowing everything that this involved, you're confident that the decision that was made was proper and should remain in place and should not be overturned by this Commission?

A Correct. I advised Ms. Maras of that.

MR. BROWN: Okay. That's all I have.

CROSS EXAMINATION BY EMPLOYEE

BY MR. LOPEZ:

Q How did you say your last name?

A Hampel.

Q Hampel?

A Yes, sir.

Q Good afternoon, Mr. Hampel. My name is Orlando Lopez. I represent Ms. Carmella Guerrero.

When Ms. Maras came to you after October 4th of 2010, did you ever meet with Ms. Maras face to face on that date.

A I don't know if it was on that day, but it was about this incident.

Q And what was your role in terms of -- of dealing with Ms. Maras at that time?

A As the -- as the H.R. manager for the County, my role for her is the same as it was for all of my clients, which was they -- they come to me if -- if they feel like they want to talk. Some -- some departments choose not to consult with H.R. and they go and they do their own thing.

She came to me and said there's this situation. And, again, I don't remember all of the facts as she told them to me that day. I remember her telling me I've lost

confidence in Carmella, I don't think I can trust her to be the person that I need her to be. That's what stuck in my head, because to me that's the defining thing.

So we had -- we had that conversation. And like I said, it was a day later or it was two days later she came back and said geez, I don't think I want to -- I've thought this over -- I don't think I want to do the dismissal. I think I want to do the demotion. And again I was a little bit surprised by that, because I really thought she was set on the one thing. And I thought it was fair that that would have been an okay thing to do.

Q Let me ask, you testified when Mr. Brown was questioning you that it's the department head who has the ultimate decision regarding discipline?

A Correct.

Q So in terms of your job in October of 2010, Ms. Maras had the full authority to discipline Ms. Guerrero?

A Correct.

Q She didn't need to get your permission, right?

A Did not.

Q And didn't need to get your authorization, right?

A Correct.

Q Didn't have to prove to your liking that -- that there was grounds for the demotion, right?

A Did not.

Dawn Flippin, CSR          210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0070

## Page 258

Q So when you -- when you tell the -- the Commission that you think that -- that the demotion should stay in effect, you haven't reviewed with any -- at least in October of 2010 -- at that point you hadn't reviewed any documentation of the demotion, right?

A I had not been asked to conduct a fact investigation.

Q That's -- that's exactly what I'm trying to figure out is when you're telling the Commission you-all should rubber stamp this, in October of 2010 you hadn't interviewed any witnesses, right?

A No.

Q Hadn't reviewed any documents that were turned over by the other side, right?

A No.

Q You hadn't gone through and done your own investigation or fact finding, right?

A No.

Q So when you made or when you tell the Commission to -- to keep on keeping on with the demotion, basically it's all based on whatever Ms. Maras told you, right?

A The facts as they were related to me at that time.

Q So your decision regarding whether it's proper or within the rules or should be upheld sole -- rests solely on whatever Ms. Maras thought about what was happening and what

## Page 259

Ms. Guerrero had done, right?

A It was based on the fact that she felt like she had lost trust in this person who was the number two. Didn't matter to me how she got there.

Q But --

A What mattered to me was if she says I've lost trust in this person and I can't trust them anymore, then yeah, I think dismissal makes sense.

Q And so you would agree with me though that if it's found that Ms. Maras' concerns were unfounded, that there hadn't been any lies or there hadn't been anything to violate the trust in the -- in the eyes of a reasonable person, then this demotion should, you know, should not go forward just because Ms. Maras wanted it to happen, right?

A No, I don't know that I agree with that.

Q So you're saying if Ms. Maras all of sudden comes in and says I can't trust you because you're wearing a khaki suit, you know, that's enough to -- to -- to --

A No, that's -- that's -- I think that's pushing it too far.

Q But -- but she's got the ultimate decision, right?

A She -- she could -- that -- absolutely she does.

Q She gets to make the decision whether you say hey, Cathy, I think you're doing this wrong. She could still do it, right?

## Page 260

A Correct.

Q Or you could do your own fact finding investigation, right?

A Correct. If I'm asked --

Q And in this case -- in this case you didn't do either, right?

A I wasn't asked to do a fact finding investigation.

Q She had already done all the fact finding herself, right?

A I don't know if it was all done at that point, but she had certainly come to a tentative conclusion.

Q But you -- then why can't you agree with me that if this Commission finds that there wasn't the evidence that Ms. Maras suggests that there is, that there is no reason that Ms. Guerrero should not be reinstated?

A I don't know that I'm in a position to make that judgment I guess is what I'm saying.

Q So you're saying you're going to let them decide the facts on the facts, right?

A Well, they have to. They're here.

Q Okay. Good.

MR. LOPEZ: Nothing further.

CHAIRMAN ELLIOTT: Mr. Brown?

MR. BROWN: Nothing.

MR. HAMPEL: Any questions from him?

## Page 261

CHAIRMAN ELLIOTT: No. Thank you.

MR. HAMPEL: Thank you.

MR. BROWN: The County has nothing further.

MR. LOPEZ: Employee calls --

CHAIRMAN ELLIOTT: And does --

MR. LOPEZ: I'm sorry.

CHAIRMAN ELLIOTT: Uh-huh. Okay.

MR. LOPEZ: Just trying to save some time for you guys.

Madam Commissioner, County -- I'm sorry -- the employee calls David Mandujano.

CHAIRMAN ELLIOTT: Good afternoon.

MR. MANDUJANO: Good afternoon.

CHAIRMAN ELLIOTT: You been here --

MR. MANDUJANO: The coat came off a long time ago.

CHAIRMAN ELLIOTT: -- all day? We appreciate your patience.

MR. MANDUJANO: Sure.

(Witness sworn).

DAVID MANDUJANO,
having been sworn to tell the truth, testified as follows:

DIRECT EXAMINATION BY EMPLOYEE
BY MR. LOPEZ:

Q Can you state your name for the record?

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0071

A   David Mandujano.

Q   Mr. Mandujano, you are formerly a BCIT employee?

A   Correct.

Q   You recently left within the last year or so?

A   Yes.

Q   You've been waiting all day since about nine?

A   Correct.

Q   For the sake of the Commission and -- AND mostly for you, I'm going to try to make this as brief as possible, okay?

A   I appreciate that.

Q   You understand that I represent Carmella Guerrero?

A   Yes.

Q   She was an employee alongside you with the Bexar County IT department?

A   Yes.

Q   And how many years did you work with her?

A   Ten years.

Q   Ten years. And in that time did you have any reason to doubt her competence?

A   No.

Q   Did you have any reason to believe that -- that Ms. Guerrero was deceitful or dishonest?

A   No.

Q   Was she the type of person that would tell you lies or try to hide facts?

A   No.

Q   Did you believe Ms. Guerrero was a hardworking and dedicated and loyal employee?

A   Yes.

Q   In fact, it's true that she was almost a 20-year employee of the County, right?

A   Correct.

Q   And you understand that we're here because she got demoted after you left, right?

A   Correct.

Q   And the basis for that demotion is that -- that Ms. Maras claims that Ms. Guerrero lied to her about her knowledge of parking matters, okay?

A   Okay.

Q   Do you understand that?

A   Yes, sir.

Q   And do you understand that Carmella was a liaison for parking with the -- with the infrastructure department?

A   Not necessarily.

Q   What did -- what did you understand that Ms. Guerrero's role was with parking?

A   Well, as far as parking -- so basically the way the process worked is I was given a list of parking spots. I would assign names of my employees to those parking spots. And I would submit that information to infrastructure services

and give a copy to Carmella.

Q   Okay. So in terms of assigning parking spots, that wasn't Ms. Guerrero's responsibility?

A   No, it was myself and another manager. We had a dozen or thirteen parking spots. I don't remember the exact number. I had the bulk of them, nine or ten; he had two or three. So that's how we assigned them to our employees that worked for us.

Q   So in terms of assigning, that was done by you?

A   Correct.

Q   And that you were a manager that was at Carmella's level?

A   Correct.

Q   The organizational chart was -- was Ms. Maras and then several managers right underneath her?

A   Correct.

Q   And so you were one of the ones that were right on the same level?

A   Correct.

Q   So despite that she had involvement in parking, she wasn't the ultimate decider on who parked where in terms of the spots?

A   Correct.

MR. LOPEZ: I pass the witness.

CROSS EXAMINATION BY COUNTY
BY MR. BROWN:

Q   Okay. Mr. Mandujano, you said that you assigned parking that you had been assigned to you, correct?

A   Correct.

Q   You're aware there's a County policy that they've brought up, and that violates that County policy. Ms. Maras was over you. How many times did she discipline you for violating this policy they're relying on today?

A   I don't think she ever knew about it.

Q   Okay.

MR. BROWN: I don't have any other questions.

MR. LOPEZ: Nothing further, Madam Commissioner.

CHAIRMAN ELLIOTT: Okay. This was very efficient.

Mr. Mandujano, we appreciate your time.

MR. MANDUJANO: Okay.

MR. LOPEZ: Mr. Cortez.

MR. MANDUJANO: Do I just stay around or can I leave or?

CHAIRMAN ELLIOTT: You're free to go.

MR. MANDUJANO: Thank you.

CHAIRMAN ELLIOTT: You're free to go.

MR. LOPEZ: Employee calls Chauncey Spencer,

Dawn Flippin, CSR          210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0072

## Page 266

Madam Commissioner.

MR. SPENCER: Good afternoon.

CHAIRMAN ELLIOTT: Hello, Mr. Spencer. Thank you for your patience.

MR. SPENCER: You're welcome.

CHAIRMAN ELLIOTT: We appreciate that.

(Witness sworn).

CHAUNCEY SPENCER,

having been sworn to tell the truth, testified as follows:

DIRECT EXAMINATION BY EMPLOYEE

BY MR. LOPEZ:

Q   Can you state your name for the record, please?

A   Chauncey Spencer.

Q   Mr. Spencer, you've been waiting since early this morning here?

A   Yes.

Q   I apologize and I'm going to --

A   All right.

Q   The reason I ask is because we're going to try to make this as -- as short and simple as possible.

You had the occasion to supervise Ms. Guerrero as an employee of the County, right?

A   I did.

Q   Can you tell the Commission what your experience was and how you came to supervise Ms. Guerrero?

## Page 267

A   I was a jail administrator for Bexar County for the Sheriff's Office of Bexar County. I ran the County jail. And Carmella -- and I'm going to call her Carmella because that's really all -- how I know her. She worked for me as the jail support manager. She didn't initially start out that way. She worked initially in the programs department.

And I had -- I had occasion to be in conflict with the Commissioners Court on the Sheriff's behalf and the privatization of the jail. And we looked for and found staff members who could assist us in putting together our strategy for combating the privatization issue. And Carmella ended up leading that charge. In fact, she learned more about it than I did in a shorter period of time. And one of her strong suits that -- of Carmella is that if you ask her something today and she doesn't know it, tomorrow you ask her the same question and she can give you all the details of it, because she would go and look for it.

I -- I -- when I first took over the jail, the position of jail support manager or executive to the jail administrator was held by another individual whom I found out in short -- short -- very short period of time he was over his head and I was under the gun. So I had to make the change. And over a period of about three or four months we moved, with the Sheriff's concurrence, Carmella into that position and never looked back.

## Page 268

I tell you one of her strong suits was that of finding -- if she didn't know the answer, to find it. But I think even a stronger suit that I found was to my benefit was that in my 40 years of management that included 20 years of military and numerous other jobs to include running a nonprofit organization, having someone on your staff that's totally dedicated to what you are doing and trying to insure that she always had your back was one of the things that I took advantage of.

And I took advantage of it in such that it was just me running the jail. I really had no assistant. And now there are two assistant chiefs that replaced myself and one. And that's how big the job is. It's probably 95 percent of the Sheriff's Office, because there's over a 1,000 employees. At the time it was well over 1,100 employees in the jail versus 3 or 400 in the rest of the Sheriff's Office.

So it was not an easy job. But she kept me out of a lot of trouble, because I tended to rely on her judgment. And if she messed up, she would be the first one coming to tell you and say Chief, I messed up. And -- and I had no -- I had no qualms about leaving the place in her care, I mean because I knew that she wouldn't do things that -- she wouldn't do things that would cause me grief the next day. So that's my story.

Q   Mr. Spencer, you found -- you'd agree with me that

## Page 269

Carmella was hardworking?

A   Absolutely.

Q   Dedicated and loyal?

A   Yes.

Q   And you understand she's had about a 20 year career here with the County?

A   Yes.

Q   Did you ever have occasion to have a situation where Ms. Guerrero was -- was deceitful or dishonest with you?

A   No.

Q   Would it surprise you that the reason we're here is that Ms. Maras contends that Ms. Guerrero lied to her?

A   More than surprises me, because I -- I find that hard to believe.

Q   It's different than what your experience with --

A   Yes.

Q   -- Ms. Guerrero was?

A   Absolutely.

MR. LOPEZ: Nothing further.

CROSS EXAMINATION BY COUNTY

BY MR. BROWN:

Q   Good afternoon.

A   Hi.

Q   When did you leave the County?

A   I don't know. I was so glad. Two thousand -- 2002,

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0073

## Page 270

somewhere along in there.

Q And did Ms. Guerrero work for you at that time?

A No. In fact, I was instrumental in her getting the job with the -- with the information services. Is that what it's called? I was instrumental in her getting this job here. I went to both Marcus ...

Q Jones?

A ... Johns and I forget the gentleman's name now. It's been a while. But he -- I couldn't promote her any further where -- where I was. There was not another position upwards from where she was. I couldn't get it approved through -- through the County to -- to up her position. So she came and worked for information services. And they sang her praise from almost the time she came aboard until -- I've been following her career, and she's done I think quite well. She like single-handedly I believe took the County through that Y2K -- Y2K situation back in, what was it, 2000?

Q 2000.

A Yes. And -- and when she worked with me one of the things that we in order to fend off the privatization thing went out of state to get prisoners for the jail to -- to increase the revenue of the -- of the jail. We increased the revenue by over $1 million by going out of state getting Colorado state prisoners and bringing them back and housing them in our jail. And Carmella with a couple other captains

## Page 271

and some sergeants, she led the team, went to Colorado and individually screened every inmate we brought back.

So she's been very hard working in the County here. She was interim for a number of years here while her and her replacements were coming aboard and/or had not been hired.

So it's difficult to -- to believe that I'm sitting here defending her really.

Q Okay. Do you remember the last day you supervised her, the last year maybe?

A No.

Q Was it in the nineties?

A Maybe.

Q Did she --

A Well, whenever she came here, she came from the jail directly to here. I don't know when that was.

Q Okay. So over at least 12 years ago?

A Yes. Oh, yes, yes.

Q Okay.

A I don't keep up with this. I'm retired. I'm pretty old for this stuff.

Q Okay. I understand. I was just shocked we had to bring in inmates, but okay.

A We did.

Q We've got plenty of criminals now.

## Page 272

MR. BROWN: That's all I have. I'm sorry you had to wait so long, but thank you for coming.

MR. SPENCER: Okay.

MR. LOPEZ: Nothing further, Madam Commissioner.

CHAIRMAN ELLIOTT: Okay. Mr. Spencer, thank you.

MR. SPENCER: Okay.

MR. BROWN: Thank you.

MR. SPENCER: Thank you.

MR. LOPEZ: Madam Commissioner, the employee would like to recall Carmella Guerrero to the stand.

CHAIRMAN ELLIOTT: This will be ...

MR. LOPEZ: Two minutes.

CARMELLA GUERRERO, having been previously sworn to tell the truth, testified as follows:

REBUTTAL EXAMINATION BY EMPLOYEE

BY MR. LOPEZ:

Q Do you remember you're still under oath, Ms. Guerrero?

A Yes, sir.

Q You sat here during the testimony of Ms. Maras?

A Yes, I did.

Q And you heard her tell the Commissioners that she

## Page 273

told you on two occasions that Tina Singh was not to have any parking?

A Yes, sir, I heard her testify to that.

Q Do you agree with that?

A I do not.

Q Tell the Commissioner how -- why?

A The first time I asked and the first time Ms. Maras and I myself ever discussed parking for Tina Singh was when I asked her if Tina Singh could park in the spot behind the building that was vacated by another manager for early morning meetings, because it was still dark outside. Ms. Maras agreed to that. There was nothing in writing. It was just a conversation between her and I.

So I believe that Ms. Maras understood at the time that I was letting Tina Singh park there in the morning, I -- I don't think that she had agreed to any like permanent parking for her or anything. But no, I did not get that directive from her.

Q Ms. Guerrero, I'm going to show you what was marked earlier as an exhibit is an e-mail that I believe is dated October the 6th of 2010. And --

A August 6th.

Q I'm sorry. October the 6th of 2010, right?

A August 6th.

Q August 6th. Okay.

Dawn Flippin, CSR          210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0074

Page 274

A   Okay.

Q   And that's the e-mail that Ms. Maras claims proves that you're a liar; do you remember that?

A   Yes, I do.

Q   Explain the significance of this e-mail and why you do not believe that that's any evidence that you said anything that's not true?

A   This e-mail is because after David Mandujano left who was in charge of assigning parking spaces for his employees -- also Ms. Maras did say that only two managers, myself and Mr. Mandujano assigned spaces. There were three managers. The other one is the EDC manager that Gilbert mentioned.

So after Mr. Mandujano and Joe Eberg, his second in charge, both left, I wanted to make sure that I had a current list of employees that had been assigned parking spaces. So this e-mail was an e-mail to Robert -- I mean Raul Talamantes in infrastructure services asking for a current list of all the employees that were parking in the garage.

When he gave me this list back I wanted to make sure that all these people still qualify by that policy they have to go in and out of the parking garage three to five times a week, because they're using their County vehicle -- I mean their personal vehicle for County business. So I sent this e-mail to Gilbert asking if these people still qualify.

Page 275

In other words, are they still in the positions that they were in when David left? Are they still going in and out? That's what this e-mail is that you're looking at.

Q   So that e-mail doesn't show that -- that you were trying to tell Ms. -- Ms. Maras that you didn't have any -- you didn't have any knowledge of who was parking anywhere, right?

A   No. As a matter of fact, my understanding from Ms. Maras on October 4th was that she wanted an up-to-date list of who was parking where. And so this was August 6th. In October she wants an up-to-date list that I need to get for her, because I don't assign parking and didn't have knowledge as to who was parking where, which is why I was running around the parking garage taking license plate numbers so that I could give her that information.

Q   So if you knew where everybody was parking, you wouldn't have had to have gone to the Sheriff's Department, right?

A   No, I would not.

Q   To get license plates?

A   No, I would not.

Q   You had to go parking lot to parking lot?

A   No.

Q   I'm going to show you Exhibit --

MR. LOPEZ:  Madam Commissioner, I'm not sure

Page 276

what number we are. I think that it's ...

MR. BROWN:  Three.

MR. LOPEZ: ... Number 3?

(Employee Exhibit Number 3 marked).

Q   (By Mr. Lopez) Is that an e-mail that you sent or an e-mail string that originated on October the 4th between you and Ms. Maras?

A   Yes.

Q   Explain to the Commissioners why it's important and why this proves that you were being -- that you weren't lying to Ms. Maras?

A   After the incident where Ms. Maras noticed that Tina Singh was parking in the back, she sent an e-mail to all the managers asking who has the five parking spaces or who has the five parking spaces in the parking garage. So basically I was responding to find out that I was working on an official list by license plate so I could make sure -- Gilbert Sanchez who took over the position did not know who was authorized to park and who was parking in those spaces either.

So as you're reading by these are early -- some of these are earlier e-mails between Gilbert Sanchez and myself where he says hey, we have a parking issue. Some people are parking in spaces they're not supposed to be. So I'm explaining to Ms. Maras early that morning oh, yes, this is why Gilbert and I were going to meet to try to get this

Page 277

list all worked out. And -- and that I was trying to get the information from infrastructure as to who was approved and who was not approved and -- I mean not not approved, but who was approved and who's in a like just going in and out or who's -- who's approved and they actually have a designated spot. So that was what I needed to find out.

And that's what I think these e-mails show that I was trying to respond to Ms. Maras all day long regarding her request to find out who was parking in those assigned spots and who had free parking. It was two different questions for me. So just providing her a list of people who had parking did not to me suffice to give her what she wanted. So I continued to look all day long into who is parking for free, who goes in and out for free, who's parking in a designated spot, and where are they designated to park.

Q   Sounds like it was somewhat of a mess?

A   Yeah, it was.

Q   With all due respect.

A   Yes, sir.

Q   The -- you have Talamantes in infrastructure assigning the spots?

A   Yes.

Q   According to Gilbert, he's -- he's also saying so -- such and such folks are supposed to be parking here, right?

A   Yes.

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)                    5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0075

Q And then we had Tina parking next to the building --

A Yes.

Q -- because you authorized that through Ms. Maras?

A Yes.

Q I want you to be clear. This is the last time you get to talk to the Commissioners. Did you lie to Ms. Maras about your parking responsibilities?

A No, I did not.

Q Or your knowledge of who exactly parked here and who parked there and what exactly was going on with each parking spot?

A I did not lie to Ms. Maras that day or any other day. And I've never lied to another supervisor that I can ever think of.

Q And you respect Ms. Maras, right?

A Yes, I do.

Q You respect the chain of command?

A Yes.

Q That the people that work for you, you expect them to -- to do what you tell them?

A Yes, I do.

Q Likewise, you expect -- you're expected to do what your superiors tell you, right?

A Yes.

Q And on October the 4th at any time leading up to it

was there a time when Ms. Maras told you to do something that you did not do?

A No, there is not.

Q For instance, Ms. Maras is calling it a lie, but it's not. I don't know why she is. But she told you do not let Tina park; do you remember that?

A Yes.

Q And that's different than how it went down, right?

A Yes, sir.

Q You had had permission for her to park?

A Yes.

Q On days that she had 7 o'clock meetings, right?

A Yes.

MR. LOPEZ: I'll pass the witness.

MR. BROWN: I don't have any.

MR. LOPEZ: Employee rests, Your Honor.

CHAIRMAN ELLIOTT: All right. Just a question I had. Mr. Brown, did you all have this string of e-mails as well?

MR. BROWN: Pardon me?

CHAIRMAN ELLIOTT: Yeah, did you -- until now did you have this as well?

MR. BROWN: I know that within here is some that's cut and paste from the August 6th.

CHAIRMAN ELLIOTT: Right. I saw that.

MR. BROWN: Or I don't mean cut and paste. I mean it's a chain. So we did have the one we presented. I've never seen the beginning of this chain. I'm sorry. Let me go backwards. I've never seen the end of this chain.

CHAIRMAN ELLIOTT: Ms. Maras, were these brought up at all, these e-mails? Did you ...

MS. MARAS: They were -- let me see. I never saw this. So this is after I found the car. So this all -- this all snowballed after I saw the -- the car. I want to start saying I better -- I have to look at all this. So even parking -- even with my other -- I had -- yes, I never -- this -- this all snowballed after I saw Tina's car.

CHAIRMAN ELLIOTT: Okay. It was just a question about part --

MS. MARAS: The timing of it, yeah.

CHAIRMAN ELLIOTT: -- of one and not the whole string at the time. Okay.

All right. So both -- thank you, Ms. Maras.

MS. MARAS: Uh-huh.

CHAIRMAN ELLIOTT: Ms. Guerrero, thank you.

MS. GUERRERO: Thank you.

CHAIRMAN ELLIOTT: So are we -- both sides are resting then?

MR. LOPEZ: Yes, ma'am.

CHAIRMAN ELLIOTT: Okay. I'm going to ask that

you-all limit your closing statements to five minutes each, please, if you could do that.

Mr. Brown?

MR. BROWN: Okay. Thank you.

As we started this was going to be a discussion of a minor issue on their side of the table, a major issue for Ms. Maras on this side of the table. And they've done a good job of breaking this down to a parking space and dislike of a Mercedes. That's not what it's about.

It comes down to Ms. Maras was quite clear that she told her second in command do not provide parking to this person. But obviously she did. We heard the testimony of Ms. Singh who had no interest in this outcome. Quite frankly, she hesitated to answer any questions and I don't think she wanted to be here.

As Ms. Singh said, there were no limits placed on when she could park in there. She was simply told here's a parking space you can have. Granted, it was temporary, but she was given parking to whatever time the new manager was going to need that space. That clearly went against -- in the words of Ms. Singh, not of Ms. Maras -- that clearly went against what Ms. Guerrero had been told.

On that day Ms. -- Ms. Maras discovered this. Discovered whose car it was. And these excuses started coming out about the policy dictates who parks there. You need to

Dawn Flippin, CSR                210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)                5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0076

follow the policy for Bexar County employees. All County employees need to know the policy. Mind you, her witness came in, David Mandujano, and said two -- two managers had spaces, not three as Ms. Guerrero contradicted her own witness. And when asked about this parking policy, even though she was over Mr. Mandujano and this policy they hold up as dictating every parking space in the County, he himself said she never mentioned this policy to me.

If she was so concerned about this parking policy and he was violating it as he testified he did according to Ms. Maras' side, as a manager wasn't it her role to go to him and say hey, we -- we've got this policy that dictates parking. She didn't do any of that. She let her friend and manager assign parking spaces. She herself assigned parking spaces, and he testified to that. Ms. Singh testified to that. This wasn't a question of whether she was assigning spaces. All the disinterested witnesses, even the ones from her side have said that's what happened.

The discussion here and who you believe is whether Ms. Maras ever said to her don't do this. Ms. Maras was pretty clear it was two occasions. This wasn't a general conversation. It wasn't vague. It was do not give that woman parking, not because she hated Ms. Singh, because she saw it as a way to incorporate it into her new scheme of running the department. Let's give it to County employees. County

employees deserve County parking.

The County pays rent at Heritage. We've got seven spots. Let's use that as an added (inaudible) she said. She explained quite well that it wasn't an off thing of oh, no, don't give her parking. It was a well thought out decision. And it is a parking space and it may not be a major issue to some people, but as you've heard today parking is a big deal with employees. I can vouch for that.

She thought it out. She even went so far as not to be the manager or the CIO that says don't give her parking. She explained why. I don't want to give her parking; I want to use that for this area. I want to give it to people that deserve it. Ms. Singh makes $100 an hour; she can pay for parking. This was clearly more than an offhand comment not only about her. It was well thought out. And as you've seen Ms. Maras thinks things out. She's deliberative. She deliberated about the parking, and she told her twice not to do it.

The day it came to a head October 4th, again it's not -- it's not something to be minimized. When the manager discovers the person she agreed to promote three days earlier, that's what makes this so unbelievable that they would think that she was on a witch hunt. If she was on a witch hunt three days before, she wouldn't have allowed this promotion to take place. That promotion speaks loudly that

she had faith in Ms. Guerrero until the day this happened. She wouldn't have wasted time with her budget. It's much easier to stop a promotion than it is to reverse one as we can see.

The fact she agreed to her promotion shows that she had faith in Ms. Maras [sic] until the moment she discovered she didn't. And when she didn't, she decided this is a major breach of trust. I've got a woman in charge of $10 million. Can I trust her? And her answer was no. The decisions that were discussed were should we terminate her? Her conclusion was no, I'm not going to terminate her. She went with a progressive step that she thought was reasonable, and that was a demotion.

And as you've heard and from what you've seen here, it's worked out wonderfully for the department. Mrs. Guerrero has excelled at a 4.80 rating. She's done very well in that position. She perhaps has settled after all these years into where she belongs. She's done an excellent job in her position. That's great. She's commendable. She's where she should be.

The actions taken as supported by Mr. Hampel, who had nothing to do with this at the time, he was an H.R. guy, he worked to folks we've seen in this room, he was consulted. She didn't make a rash decision. She said all right, this is progressive discipline, Bob, Mr. Hampel, Bob.

What do I do? Here's your options. Here's what you can do. I think termination is warranted.

She went to the progressive discipline step. She didn't go for the written counseling. She didn't go for the oral counseling. The counselings worked for violations of letting people in the building. The counselings may have worked had she ever been told that Primavera had gone totally against what she had wished, that Ms. Guerrero had gone her -- behind her back, as Ms. Singh testified, not Ms. Maras. As Ms. Singh testified, Ms. Guerrero had gone behind her back and put her person in a $500 million project and not told her supervisor. Those kind of things don't deserve counseling.

And I think we're here today over a major issue of a breach of trust. And as Mr. Hampel said, that's what it comes down to. When he heard all the facts, his focus was on all right, has she legitimately lost trust in this person that just got promoted four days ago. He believed that it's a true story, it's not made up, it's not a witch hunt, you don't promote someone and three days later demote them on a witch hunt.

As Ms. Maras testified, she hoped Ms. Guerrero would excel in that position and she'd keep her in that position and perhaps move her higher up. She lost faith. The loss of faith was reasonable. It was based on what she found out was a true act of deceit in going behind her back. And

Dawn Flippin, CSR                           210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)            5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0077

that's supported by Ms. Singh, not Ms. Maras. If you want to discount the two parties in this case and go with an outside witness, Ms. Singh made it clear that she never was told that parking is limited. She said she asked Maras a couple times over the summer. That corroborate that this was more than one occasion. Ms. Guerrero says it was one time she asked her and that was it. That's completely contradicted by Ms. Singh who said she asked Ms. Guerrero on more than one occasion.

And the e-mails relate to I couldn't get you parking here, that's one try. I'm trying again. I got you parking at Heritage. That shows that this was more than one -- one time and completely contradicts her testimony that this was a one time thing, she had never been told not to do this, and that supports Ms. Maras' decision that she had lost faith in this person.

And I think that with the County policy 7.6.11, she made a proper decision to skip the earlier minor steps of progressive discipline and jump to a demotion. Rather than a termination, she took the least discipline action that she felt would properly address the situation. She kept Ms. Guerrero in her position at the County, moved her down to an E5 which saved her from being terminated. And I think this reaction was correct.

I think the facts have shown through the independent witness that Ms. Guerrero was dishonest and

Mrs. Maras has legitimately lost faith. And we would ask the demotion be upheld and that Ms. Guerrero stay as an E5, and Ms. Maras be allowed to return to BCIT and keep fixing a problem that was major when she got there and apparently is turning around.

And so that is what the department and the County would ask. Thank you.

CHAIRMAN ELLIOTT: Thank you.

Mr. Lopez?

MR. LOPEZ: Commissioners, I'd like to start off with what Mr. Brown just said. And I'd like for you guys to understand and -- and question who in the world would do what Carmella did under the circumstances that we have? If you're to believe Ms. Maras that hey, I told you I don't want Ms. Singh to have any parking, she said I don't want her to have any free parking. I don't want her to have any parking at all. She makes 100 bucks an hour. Then why would she -- why would Carmella ever send e-mails to anybody about Tina Singh or Tina Singh parking? It just makes no sense.

Carmella works in the IT department. She is going to violate the Chief Information Officer's directives? She knows she can pull her e-mails. Ms. Maras pulled her e-mails after she demoted her. So who in their right mind would send e-mails trying to get Tina Singh parking if Ms. Maras had already told her not to? Because the exact

opposite happened. Ms. Maras never told Ms. Guerrero that Tina was to have no parking. Instead it was a situation where on these morning meetings you can have parking. And Ms. Singh said hey, I came in, I had to walk five blocks, it was seven in the morning, sometimes dark, and I wanted to be closer to the building.

The -- I have seen no evidence and there has been none -- no evidence submitted by the County that Ms. Guerrero was a liar or dishonest. When I tried to get her to explain what a lie was she said well, it was a lie because I told her not to do that. That's not a lie. A lie is saying the sky is blue when it's, you know, red. There was no lying.

She's also claiming that Ms. Guerrero lied to her about not knowing, you know, who was parking where. Carmella was a liaison. She had certain duties in regards to parking, but to be able to tell you who parked where on every single spot, she didn't know. And, in fact, on October the 4th she went through great lengths to find out. If she knew, she could have just gone to her computer, sent her an e-mail, pulled up an excel spreadsheet and given it to her. But that wasn't the case. She went to the County. She was like a private eye, you know, looking for license plates trying to figure out who was parking in the garage, who was parking by the annex, who was parking at Heritage. And the e-mails that we last admitted say that.

Even Gilbert Sanchez who came in here and wanted to trumpet hey, the County is doing better or the IT department is doing better without Carmella, even he says in those e-mails, you know, parking is a mess. I need more parking here, because I want to assign them for here, here and here. The fact is is that the parking -- it may be County wide -- but at least at the IT department was a little bit disorganized. You know, there were some spots here, some spots there. It's wherever you could find a spot. But it wasn't the case that Ms. Guerrero was lying about what she was doing, what her authority was regarding parking and how -- how she was able to assign it.

She's a 20-year employee who deserves better than Ms. Maras going off the handle. And by her own admission, you know, on October the 4th she's calling Robert Hampel saying I'm going to fire her. And then in a couple days it gets, you know, gets downgraded to a demotion. If she overreacted the first time, it's more than likely she overreacted with the demotion.

The Commission is here for a purpose. And she can only go to that point on the progression of demotion -- to a demotion if there couldn't have been any other means to address the situation. And she testified when I told her about the salesman, she stopped. Ms. Carmella, you don't climb up the ladder and the bureaucracy like the County by not

Dawn Flippin, CSR                    210.383.2290

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee

TR-0078

doing what you're told or being a liar or being deceitful. You've got the records in front of you. She's a great employee with a model record. It's not the person -- she knows and I think any kindergartner would know that you're not going to lie and be able to advance your career.

We, you know, in terms of -- of the position being abolished, we think it's -- it's very coincidental that it would happen. And we think it's further evidence that -- that there was, you know, a system in place to try to completely eliminate Carmella after she was demoted and after Ms. Maras flew off the handle.

The Civil Service procedure 7.6.14 although addresses whatever issue you may have in terms of -- of whether this abolishment of the position should play any role in your decision. And that is if an employee is to receive back pay by the order of the Commission, the employee shall receive full compensation at the rate of pay that was provided for their position at the time of the appeal or the amount of compensation considered fair by the Commission. Should the office or department refuse to reinstate the employee -- for instance if their position has been abolished -- then the employee shall be entitled to their full salary as though she had been reinstated. And so even if the position has been -- been revoked or been abolished, she's still entitled to reinstatement to her E11 and any back pay.

More important than any back pay is Ms. Maras has now marred the record of a 20-year employee. If you decide that to follow what Ms. Maras has done, you will have given her the authority to go out and so that Carmella has to tell everybody I got demoted because I'm a liar each and every job that she went to. And that's not what happened here. At worst it was a misunderstanding. At best Carmella didn't do one single thing wrong. And she does not deserve to be demoted and she deserves to be reinstated with full back pay.

CHAIRMAN ELLIOTT: Okay. Thank you all. It is now 2:55. We are going at this time into executive session pursuant to Chapter 551 of the Texas Government Code. And we will be back officially.

(Brief recess).

CHAIRMAN ELLIOTT: Okay. Thank you all for your patience. The time now is 3:35. We are returning from executive section. At this time we are about to call a motion for the appeal hearing Case Number 10-BCCS-022, Carmella Guerrero versus the Information Technology Department.

At this time do we have a motion?

COMMISSIONER GIMBLET: My motion is that the demotion of Carmella Guerrero should be overturned, and that Ms. Guerrero should be granted back pay and benefits for the difference in pay at the rate of pay when she was demoted until the position was eliminated in the budget on October 1st

2011. Ms. Guerrero will remain in her current position of technology business analyst at her current salary.

CHAIRMAN ELLIOTT: Do we have a second?

COMMISSIONER CORTEZ: Second.

CHAIRMAN ELLIOTT: All those in favor, we vote by saying aye.

COMMISSIONER GIMBLET: Aye.

COMMISSIONER CORTEZ: Aye.

CHAIRMAN ELLIOTT: Aye.

Time now is 3:35. And we would dismiss.

Is there a question?

MS. GUERRERO: I'd like to have an understanding. It was overturned and then I missed ...

CHAIRMAN ELLIOTT: The -- the decision was that your demo -- there is no position to put you. The E11 position that you were in is abolished.

MS. GUERRERO: Yes, ma'am.

CHAIRMAN ELLIOTT: So we are saying that you will stay in your current position, but we will award back pay up until when that position -- your former position was abolished, which is approximately a year.

MS. GUERRERO: So but he said I stay a business analyst at a business analyst -- analyst's salary?

CHAIRMAN ELLIOTT: At an E5 at the current pay -- pay scale, yes.

All right. We would like to thank you all. It's been a long hearing, but we appreciate you all invoking this process and just thank you for your time.

MR. LOPEZ: May we be excused, ma'am?

CHAIRMAN ELLIOTT: You're excused.

END OF PROCEEDINGS.

NO. 10-BCCS-002

CARMELLA GUERRERO,                )
        Employee                  )
                                  )    BEXAR COUNTY
                                  )    CIVIL SERVICE COMMISSION
vs.                               )
                                  )    BEXAR COUNTY, TEXAS
INFORMATION TECHNOLOGY            )
DEPARTMENT,                       )
BEXAR COUNTY, TEXAS,              )
        Department.               )

REPORTER'S CERTIFICATE

STATE OF TEXAS        )

COUNTY OF BEXAR       )

        I, DAWN FLIPPIN, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the above and foregoing transcript contains a true and correct transcription of a Bexar County Civil Service Commission hearing held on April 26, 2012 in Case Number 10-BCCS-022, which recording was transcribed by me by stenographic means to typewritten form to the best of my ability.

        I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

        Sworn to by me this 2nd day of October, 2013.

_____
DAWN FLIPPIN, CSR #4045
Expiration Date:  12-31-13

DAWN FLIPPIN, CSR
200 Alcalde Moreno
San Antonio, Texas 78232
210.383.2290
df-fiorino1046@att.net

Electronically signed by Dawn Flippin (401-013-461-8760)          5245eeb5-f6db-45f5-aa87-28085203e4ee



**BEXAR COUNTY**
## CIVIL SERVICE COMMISSION
**211 S. FLORES STREET**
**SAN ANTONIO, TEXAS 78204-1012**
**HR MAIN #: (210) 335-2545 _ Web Site: www.bexar.org**

**STATE OF TEXAS**

**COUNTY OF BEXAR**

I, Andrea San Miguel, Director of the Bexar County Civil Service Commission, do hereby certify that the foregoing is a true and correct copy of the original record, now in my lawful custody and possession, as appears of record filed in my office on December 10, 2010, Case #10-BCCS-022 Carmella Guerrero vs Information Technology Department.

**Signed this 8th day of October, 2013.**

Andrea San Miguel, Civil Service Director
Bexar County Civil Service Commission
Notary Public in and for Bexar County, Texas

**My Commission expires May 21, 2014.**

ANDREA SAN MIGUEL
Notary Public
STATE OF TEXAS
Commission Exp. 05-21-2014

TR-0081

| # | PayP Pay Date | S PayPer | E Pay Per | Amount | Should be | Month | Parking Rate | Should Be |
|---|---|---|---|---|---|---|---|---|
| | 12.15.2010 | 11.30.2010 | 12.08.2010 | $ 590.71 | $ 590.71 | 12.01.2010 | $ 50.00 | $ 50.00 |
| 1 | 12.30.2010 | 12.09-2010 | 12.16.2010 | $ 936.50 | $ 936.50 | 01.01.2011 | $ 50.00 | $ 50.00 |
| 2 | 01.14.2011 | 12.27.2010 | 01.09.2011 | $ 936.50 | $ 936.50 | 02.01.2011 | $ 50.00 | $ 50.00 |
| 3 | 01.31.2011 | 01.10.2011 | 01.24.2011 | $ 936.50 | $ 936.50 | 03.01.2011 | $ 50.00 | $ 50.00 |
| 4 | 02.15.2011 | 01.25.2011 | 02.08.2011 | $ 936.50 | $ 936.50 | 04.01.2011 | $ 50.00 | $ 50.00 |
| 5 | 02.28.2011 | 02.09.2011 | 02.21.2011 | $ 936.50 | $ 936.50 | 05.01.2011 | $ 50.00 | $ 50.00 |
| 6 | 03.15.2011 | 02.22.2011 | 03.08.2011 | $ 936.50 | $ 936.50 | 06.01.2011 | $ 50.00 | $ 50.00 |
| 7 | 03.31.2011 | 03.09.2011 | 03.24.2011 | $ 936.50 | $ 936.50 | 07.01.2011 | $ 55.00 | $ 55.00 |
| 8 | 04.14.2001 | 03.25.2011 | 04.10.2011 | $ 936.50 | $ 936.50 | 08.01.2011 | $ 55.00 | $ 55.00 |
| 9 | 04.29.2011 | 04.11.2011 | 04.24.2011 | $ 936.50 | $ 936.50 | 09.01.2011 | $ 55.00 | $ 55.00 |
| 10 | 05.13.2011 | 04.25.2011 | 05.08.2011 | $ 936.50 | $ 936.50 | 10.01.2011 | | $ 55.00 |
| 11 | 05.31.2011 | 05.09.2011 | 05.14.2011 | $ 936.50 | $ 936.50 | 11.01.2011 | | $ 55.00 |
| 12 | 06.15.2011 | 05.25.2011 | 06.08.2011 | $ 936.50 | $ 936.50 | | $ 515.00 | $ 625.00 |
| 13 | 06.30.2011 | 06.09.2011 | 06.23.2011 | $ 936.50 | $ 936.50 | | | |
| 14 | 07.15.2011 | 06.24.2011 | 07.10.2011 | $ 936.50 | $ 936.50 | | | |
| 15 | 07.29.2011 | 07.11.2011 | 07.24.2011 | $ 936.50 | $ 936.50 | | | |
| 16 | 08.15.2011 | 07.25.2011 | 08.08.2011 | $ 936.50 | $ 936.50 | | | |
| 17 | 08.31.2011 | 08.09.2011 | 08.24.2011 | $ 936.50 | $ 936.50 | | | |
| 18 | 09.15.2011 | 08.15.2011 | 09.08.2011 | $ 936.50 | $ 936.50 | | | |
| 19 | 09.30.2011 | 09.09.2011 | 09.25.2011 | $ 936.50 | $ 936.50 | | | |
| 20 | 10.14.2011 | 09.26.2011 | 09.30.2011 | $ 432.25 | $ 936.50 | | | |
| 21 | 10.31.2011 | 10.10.2011 | 10.24.2011 | | $ 936.50 | | | |
| 22 | 11.15.2011 | 10.25.2011 | 11.08.2011 | | $ 936.50 | | | |
| 23 | 11.30.2011 | 11.09.2011 | 11.23.2011 | | $ 936.50 | | | |
| 24 | 12.15.2011 | 11.24.2011 | 11.30.2011 | | $ 605.13 | | | |

$18,816.46    $22,735.34

|  | Paid Out | Full Year |
|---|---|---|
| Salary | $ 18,816.46 | $22,735.34 |
| Parking | $ 515.00 | $ 625.00 |
| | $ 19,331.46 | $23,360.34 |

Paid Out versus Full Year    ($4,028.88)

TR-0082

NO. 10-BCCS-022

| IN THE MATTER OF CARMELLA | &#124; BEXAR COUNTY CIVIL SERVICE |
| GUERRERO RELATIVE TO | &#124; COMMISSION, BEXAR COUNTY, TEXAS |
| EMPLOYMENT IN THE BEXAR COUNTY | &#124; |
| INFORMATION TECHNOLOGY | &#124; |
| DEPARTMENT, BEXAR COUNTY, TEXAS | &#124; |

\* \* \*

## ORDER

On the 26th day of April, 2012, came on to be heard the case of Carmella Guerrero vs Bexar County Information Technology Department (10-BCCS-022) before the Bexar County Civil Service Commission. Chairman Gina M. Elliott presided. Commissioner Ruben L. Cortez and Commissioner Joe Gimblet were also in attendance. Carmella Guerrero attended in person and was represented by her attorney Orlando Lopez. The Bexar County Information Technology Department appeared through Catherine Maras, Chief Information Officer, and was represented by Clark Brown, Assistant Criminal District Attorney, Civil Section. Also present were: Tina Singh, Contract Employee, Bexar County Information Technology Department; Gilbert Louis Sanchez, Technical Support Manager, Bexar County Information Technology Department; Robert Hampel, Deputy Chief Information Officer, Bexar County Information Technology Department; David Mandujano, Former Technical Support Manager, Bexar County Information Technology Department; Chauncey Spencer, Former Jail Administrator, Bexar County Sheriff's Office; Andrea San Miguel, Director for the Commission; and Nelda Tanaka, Office Assistant III, Bexar County Civil Service Commission.

After listening to testimony and reviewing the evidence submitted by both parties in this case, and after deliberating, the Commission, by unanimous decision, has determined that the demotion of Carmella Guerrero should be overturned and that Ms. Guerrero should be granted back pay and

TR-0083

**CASE #10-BCCS-022 CARMELLA GUERRERO VS BEXAR COUNTY INFORMATION TECHNOLOGY DEPARTMENT**

benefits for the difference in pay at the rate of pay when she was demoted until the position was eliminated in the budget on October 1, 2011. Ms. Guerrero will remain in her current position of Technology Business Analyst at her current salary.

**IT IS HEREBY ORDERED** that the demotion of Carmella Guerrero is overturned and that Ms. Guerrero will be granted back pay and benefits for the difference in pay at the rate of pay when she was demoted until the position was eliminated in the budget on October 1, 2011.

**IT IS FURTHER ORDERED** that Ms. Guerrero will remain in her current position of Technology Business Analyst at her current salary.

**IT IS FURTHER ORDERED** that pursuant to Local Government Code, Chapter 158, Subchapter A., County Civil Service System, Section 158.0123 (a) the Commission shall require a party who appeals a final decision to pay one-half of the cost of preparation of the original or a certified copy of the record of the Commission proceeding that is required to be sent to the reviewing court.

**SIGNED AND ENTERED** this the 26th day of April, 2012.

THE BEXAR COUNTY
CIVIL SERVICE COMMISSION

GINA M. ELLIOTT, CHAIRMAN

RUBEN L. CORTÉZ, COMMISSIONER

JOE GIMBLET, COMMISSIONER

TR-0084

**CASE #10-BCCS-022 CARMELLA GUERRERO VS BEXAR COUNTY INFORMATION TECHNOLOGY DEPARTMENT**

benefits for the difference in pay at the rate of pay when she was demoted until the position was eliminated in the budget on October 1, 2011. Ms. Guerrero will remain in her current position of Technology Business Analyst at her current salary.

**IT IS HEREBY ORDERED** that the demotion of Carmella Guerrero is overturned and that Ms. Guerrero will be granted back pay and benefits for the difference in pay at the rate of pay when she was demoted until the position was eliminated in the budget on October 1, 2011.

**IT IS FURTHER ORDERED** that Ms. Guerrero will remain in her current position of Technology Business Analyst at her current salary.

**IT IS FURTHER ORDERED** that pursuant to Local Government Code, Chapter 158, Subchapter A., County Civil Service System, Section 158.0123 (a) the Commission shall require a party who appeals a final decision to pay one-half of the cost of preparation of the original or a certified copy of the record of the Commission proceeding that is required to be sent to the reviewing court.

**SIGNED AND ENTERED** this the 26th day of April, 2012.

THE BEXAR COUNTY
CIVIL SERVICE COMMISSION

GINA M. ELLIOTT, CHAIRMAN

RUBEN L. CORTEZ, COMMISSIONER

JOE GIMBLET, COMMISSIONER

ACKNOWLEDGED RECEIPT: _Carmella Guerrero_

DATE: _5-1-12_          TIME: _3:25pm_

TR-0085



**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

OFFICIAL USE

| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

Sent To **Ms. Carmella Guerrero**
Street, Apt. No.; or PO Box No. **4707 Trailwood**
City, State, ZIP+4 **San Antonio, TX 78228**

PS Form 3800, January 2001    See Reverse for Instructions

7002 0510 0001 1736 6265

CERTIFIED MAIL

7002 0510 0001 1736 6265

neopost℠
04/30/2012
**US POSTAGE**

FIRST-CLASS MAIL
**$05.75⁰**
ZIP 78205
041L12202049

NIXIE    782 DE 1    00    06/26/12
    RETURN TO SENDER
    UNCLAIMED
    UNABLE TO FORWARD
BC: 78204101211    *0210-06220-30-37

Ms. Carmella Guerrero
4707 Trailwood
San Antonio, TX 78228

**BEXAR COUNTY CIVIL SERVICE COMMISION**

211 S. Flores Street
San Antonio, TX 78204-1012
**RETURN SERVICE REQUESTED**

UNCLAIMED

RECEIVED
JUN 27 2012
BEXAR COUNTY
CIVIL SERVICE COMMISSION

78226>1744 C077
78204 @1-012

TR-0086

**U.S. Postal Service**
## CERTIFIED MAIL RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To
**Mr. Orlando Lopez, Attorney-at-Law**
Street, Apt. No.; or PO Box No. **719 S. Flores Street, Ste. 100**
City, State, ZIP+4 **San Antonio, TX 78204**

PS Form 3800, January 2001          See Reverse for Instructions

7002 2272 6272 1736 0000 0510 2002

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete Item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Orlando Lopez
Attorney-at-Law
719 S. Flores Street, Suite 100
San Antonio, TX 78204

Case #10-BCCS-002 Carmella
Guerrero vs Bexar County
Information Technology Department

2. Article Number
(Transfer from service label)    7002 0510 0001 1736 6272

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                               ☐ Agent
                                ☐ Addressee
B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☒ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.
4. Restricted Delivery? (Extra Fee)             ☐ Yes

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

TR-0087

**Bexar County Civil Service Commission Hearing**
**Case #10-BCCS-022**
**Carmella Guerrero vs Bexar County Information Technology Department**
**Thursday, April 26, 2012**

| Office/Department Exhibits | | | |
|---|---|---|---|
| Exhibit Number | Exhibit | Exhibit Admitted | Appellant/ Grievant Objection |
| D-1 | e-mail 7/23/10 from Carmella Guerrero to Tina Singh regarding parking | Yes | No |
| D-2 | Letter to Cathy Maras dated October 6, 2010 regarding Incident on October 4, 2010 from Carmella Guerrero | Yes | No |
| D-3 | e-mail 9/1/10 from Carmella Guerrero to Gilbert Sanchez regarding parking | Yes | No |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| Appellant/Grievant Exhibits | | | |
|---|---|---|---|
| Exhibit Number | Exhibit | Exhibit Admitted | Office/ Department Objection |
| A-1 | Carmella Guerrero's Performance Reviews, Chacter References, Commending Emails, Commendations, Pre-Demotion, Post-Demotion, Promotion, and Resume and Certificates | Yes | No |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

TR-0088

**From:** Guerrero, Carmella
**Sent:** Wednesday, September 01, 2010 4:23 PM
**To:** Sanchez, Gilbert
**Subject:** FW: In & Out Parking

Do all of these people still qualify?

*Carmella T. Guerrero*
Planning & Technical Services Manager
Bexar County Information Services
(210)335-0225

---

**From:** Talamantes, Raul
**Sent:** Friday, August 06, 2010 3:43 PM
**To:** Guerrero, Carmella
**Subject:** RE: In & Out Parking

Toby Ullevig
Monty Breaux
Pete Martinez
Raul Sanchez
Eric Rodriguez
Hediin Rico
Pat Ayala
Carl Buckert
Joseph Sound
Palmer Walker
Dan Gonzalez
Jose Fernandez

---

**From:** Guerrero, Carmella
**Sent:** Friday, August 06, 2010 3:24 PM
**To:** Talamantes, Raul
**Subject:** In & Out Parking

David Mandujano and Joe Yebra are both gone and I do not have a curren parking in the Garage. Can you provide one?

*Carmella T. Guerrero*
Planning & Technical Services Manager
Bexar County Information Services
(210)335-0225

Department's Exhibit #3

TR-0089



BEXAR COUNTY INFORMATION TECHNOLOGY
203W. Nueva, Suite 200
San Antonio, Texas 78207-4507
(210) 335-0200

October 6, 2010

TO:    Cathy Maras, CIO

SUBJ: Incident on October 4, 2010

I am writing this letter regarding the incident that occurred in your office on Monday, 10/4/10. I went back and forth as to whether putting this in writing was the best way to go, however I was concerned that another discussion would result in another altercation.

It is important to me that you know my feelings on this matter. Beginning early Monday morning, you inquired about parking at the annex and directed me to do several things including asking Tina Singh to find parking elsewhere and to pay for said parking. I immediately came upstairs to notify Ms. Singh and you were already telling her. Your tone towards me was rude and accusatory in front of Ms. Singh. Throughout the day while we were working out the issues on BCIT parking, you were abrupt with me and in my opinion accusatory that David and I were utilizing the parking situation to our advantage. One example was the "wink-wink" you gave me in the meeting with OJ, Lulu and Linda and your reference to the fact that only David and I had these privileges. This is not true. I have been following County policy regarding parking since the policy inception in 1999.

After, spending a good majority of my day trying to fulfill your directive to find out who was parking in what spaces, I felt that you were growing angrier and angrier. At the end of the day, I went to provide you a copy of the policy for review and discussion at managers meeting. Again, you raised your voice, slapping the policy in your hand and accusing me of wrong doing and notifying me that you were taking me out of the loop. I turned to leave your office and made this comment: "I was just giving you a copy of the policy, I don't understand why you have been ugly to me all day". You raised your voice at me, jumped out of your chair, got up in my face, pointed your finger six times yelling "sit down", proceeded to the door and slammed it shut. You continued to yell at me saying that you are the CIO and it was your right to act like this. You yelled several times that I had a bad attitude and inappropriate mannerisms and that you were not going to stand for it. You directed to "fix" it. You also shouted that I was making you look like an "a-hole".

The majority of the employees on the 2nd floor heard this outburst and were very concerned. When I was in your office, I was afraid of you. In thirty years of my professional career, I have never been treated like this. I feel embarrassed and degraded in front of the employees of BCIT. Since this occurred, I have been approached by several staff asking if I was ok.

*Departments Exhibit #2*

TR-0090

Whether or not employees like me, I feel that they respect me and you have damaged that respect, at least in my eyes. I have worked in BCIT for the passed 12 years and in the County for 18 years and have never been in trouble with any employer for any reason nor have I been treated the way you treated me.
I believe that we have to work together and for the most part, I feel we are a good team. You become stressed as do I and you have a different way of handling that than I do. However, mutual respect for each other as human beings is imperative for me to move forward.

I want to go on record saying that I will work on my body language, faces, and mannerisms as you have asked me to do. I believe my attitude at work is good and my working relationships with co-workers, business partners and employees have never been challenged to date.

I also feel that in order to move forward, you owe me an apology for the yelling and screaming and slamming the door that caused intimidation, humiliation and embarrassment to me.

I am certain that we can move passed this if you agree. I did not want to leave on my vacation until we resolved the matter. I am available until 12:00 noon today if you want to discuss it with me.

Carmella Guerrero
IT Services Manager

| | |
|---|---|
| **From:** | Guerrero, Carmella |
| **Sent:** | Friday, July 23, 2010 3:23 PM |
| **To:** | Singh, Tina |
| **Subject:** | RE: Parking |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

awesome news....come see me when you have a chance

*Carmella T. Guerrero*
Planning & Technical Services Manager
Bexar County Information Services
(210)335-0225

---

**From:** Singh, Tina
**Sent:** Thursday, July 22, 2010 3:35 PM
**To:** Guerrero, Carmella
**Subject:** RE: Parking

Hi Carmella,
        Thank you for email, I appreciate your efforts.

Note- I received a blank call from you at 2.48, I could hear background sounds only, is it something you need from me.

Thanks
Tina

*Tina Singh*
*Technical Director*
*Financial System Implementation*
*Bexar County Information Services*
*210-335-0243 (O); (210) 382-3349 (Cell)*

**From:** Guerrero, Carmella
**Sent:** Thursday, July 22, 2010 1:08 PM
**To:** Singh, Tina
**Subject:** RE: Parking

How about if I ask if you can park at Heritage in one of their spots? I was not successful getting you parking here as you are not a County employee and the waiting list for County employees is 3 years long.

*Carmella T. Guerrero*
Planning & Technical Services Manager
Bexar County Information Services
(210)335-0225

Departments Exhibit #1

**Singh, Tina**

| | |
|---|---|
| **From:** | Singh, Tina |
| **Sent:** | Tuesday, July 27, 2010 1:40 PM |
| **To:** | Sanchez, Gilbert |
| **Cc:** | Guerrero, Carmella |
| **Subject:** | RE: Hi |

Hi Gilbert,

　　　　　Thanks for the information,

Tina

*Tina Singh*
*Technical Director*
*Financial System Implementation*
*Bexar County Information Services*
*210-335-0243 (O); (210) 382-3349 (Cell)*

**From:** Sanchez, Gilbert
**Sent:** Tuesday, July 27, 2010 12:59 PM
**To:** Singh, Tina
**Cc:** Guerrero, Carmella
**Subject:** RE: Hi

I believe the spot number is 7.

**From:** Singh, Tina
**Sent:** Tuesday, July 27, 2010 12:37 PM
**To:** Sanchez, Gilbert
**Cc:** Guerrero, Carmella
**Subject:** Hi

Hi Gilbert,

　　　　　I have been trying to contact you, please send me the number of spot you currently park in.

Thanks
Tina

*Tina Singh*
*Technical Director*
*Financial System Implementation*
*Bexar County Information Services*
*210-335-0243 (O); (210) 382-3349 (Cell)*

1

TR-0093

## San Miguel, Andrea

| | |
|---|---|
| **From:** | San Miguel, Andrea |
| **Sent:** | Monday, April 23, 2012 4:40 PM |
| **To:** | Orlando Lopez |
| **Cc:** | Natalie Bell |
| **Subject:** | Case #10-BCCS-022 Carmella Guerrero vs Information Technology |
| **Attachments:** | 10CGuerreroAdmin Leave.022.pdf; 10CGuerreroLetter Regarding Incident.022.pdf; 10CGuerreroResponse.022.pdf; 10CGuerreroAppeal.022.pdf; 10CGuerrero.022.pdf; 10CGuerreroDeptRespForm.022.pdf |

**Importance:**        High

Mr. Lopez,

Attached are the documents that were filed in Case #10-BCCS-022 Carmella Guerrero vs Information Technology.

If you have any questions, you may contact me at (210) 335-2688.

**Andrea San Miguel**
**Civil Service Director**
**Bexar County Civil Service Commission**
**211 S. Flores Street**
**San Antonio, TX 78204-1012**
**(210) 335-2688 Phone**
**(210) 335-2686 Fax**
**(210) 335-6333 Job Line**
asanmiguel@bexar.org

1

TR-0094

## San Miguel, Andrea

| | |
|---|---|
| **From:** | San Miguel, Andrea |
| **Sent:** | Friday, April 20, 2012 12:33 PM |
| **To:** | Brown, Clark |
| **Cc:** | Gina M. Elliott; Ruben Cortez; Joe Gimblet; Tanaka, Nelda |
| **Subject:** | Witness List for Case #10-BCCS-022 Carmella Guerrero vs Information Technology Department |
| **Attachments:** | 10CGuerreroWitnessList.022.pdf |
| **Importance:** | High |

Clark,

Attached is the witness list that I received from Orlando Lopez, Ms. Guerrero's attorney, for Case #10-BCCS-022 Carmella Guerrero vs Information Technology Department for her hearing on Thursday, April 26, 2012 at 9:00 a.m.

**Andrea San Miguel**
**Civil Service Director**
**Bexar County Civil Service Commission**
**211 S. Flores Street**
**San Antonio, TX 78204-1012**
**(210) 335-2688 Phone**
**(210) 335-2686 Fax**
**(210) 335-6333 Job Line**
asanmiguel@bexar.org

1

RECEIVED

APR 19 2012

BEXAR COUNTY
CIVIL SERVICE COMMISSION
10:03 nm    Andrea

# THE LOPEZ LAW FIRM
### A PROFESSIONAL CORPORATION

| Send to: | Andrea San Miguel<br>Bexar County Civil Service<br>Commission | From: | Orlando R. Lopez |
|---|---|---|---|
| Re: | Carmella Guerrero v. Bexar County Information Technology Department; Before the Bexar County Civil Services Commission; Case No. 10-BCCS-022 | Office location: | |
| Office location: | | Date: | 4.19.12 |
| Fax number: | 210.335.2686 | Phone number: | 210.472.2100 |

☐ URGENT   ☐ REPLY ASAP   ☐ PLEASE COMMENT   ☐ PLEASE REVIEW   ☐ FOR YOUR INFORMATION

1

TOTAL PAGES, INCLUDING COVER:

MESSAGE:

Ms. San Miguel

I represent Carmella Guerrero in the referenced matter. I write to request a copy of (1) Ms. Guerrero's complete personnel file with Bexar County, and (2) a complete copy of all documents filed in this cause with the Bexar County Civil Service Commission. If you will provide me the cost for the copies, we will have the copy charges paid as soon as possible. If you have any questions, please do not hesitate to contact me. Thanks.

The information transmitted with this sheet is private and confidential and may be protected by various legal privileges. The information transmitted with this sheet is intended solely for the individual or entity designated above. If the recipient of this information is not the intended recipient, or the employee or agent of the intended recipient responsible for delivering it to such person, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of the information contained herein is strictly prohibited. The transmission of any information contained herein should in no way be considered to be a waiver of any legal privilege unless expressly stated. If you have received this fax in error, please notify us immediately by telephone and mail the contents to us at our letterhead address above.

• 719 S. FLORES, SUITE 100 • SAN ANTONIO, TEXAS 78204 •
• 210.472.2100 TELEPHONE • 210.472.2101 TELECOPIER •

TR-0096

**RECEIVED**

APR 19 2012

BEFORE THE BEXAR COUNTY CIVIL SERVICE COMMISSION      **BEXAR COUNTY**
**CIVIL SERVICE COMMISSION**
4:22pm Andrea

CARMELLA GUERRERO                    §
                                     §
V.                                   §      CASE NO. 10-BCCS-022
                                     §
BEXAR COUNTY INFORMATION             §
TECHNOLOGY DEPARTMENT                §

## EMPLOYEE'S WITNESS LIST

TO THE HONORABLE COMMISSION:

Employee, Carmella Guerrero, attaches as Exhibit "A" a list of the witnesses she may call at the hearing on her appeal in connection with the above styled and numbered cause.

Respectfully submitted,

THE LOPEZ LAW FIRM, P.C.
719 S. Flores, Suite 100
San Antonio, Texas 78204
Telephone: 210.472.2100
Telecopier: 210.472.2101

ORLANDO R. LOPEZ
STATE BAR NO. 24010196

ATTORNEYS FOR EMPLOYEE

Page 1 of 2

TR-0097

## CERTIFICATE OF SERVICE

I certify that a copy of this document has been forwarded to the following counsel of record via facsimile on this 19* day of April, 2012:

Clarkson F. Brown
Bexar County District Attorney Civil Section
300 Dolorosa, Suite 5059
San Antonio, Texas 78204

ORLANDO R. LOPEZ

### Exhibit "A"

1. Carmella Guerrero
   4707 Trailwood
   San Antonio, Texas 78228

2. Roxanne Arellano
   802 Antler Post
   San Antonio, Texas 78245

3. David Mandujano
   86120 Taylor Walk
   San Antonio, Texas 78023

4. Jacque Callenan
   203 W. Nueva, Suite 300
   San Antonio, Texas 78207

5. Chauncey Spencer
   13891 Sienna Court
   San Antonio, Texas 78249

TR-0098

RECEIVED

APR 19 2012

BEXAR COUNTY
CIVIL SERVICE COMMISSION
4:22 pm   andrea

# THE LOPEZ LAW FIRM
### A PROFESSIONAL CORPORATION

| Send to: | Andrea San Miguel<br>Bexar County Civil Service<br>Commission | From: | Orlando R. Lopez |
|---|---|---|---|
| Re: | Carmella Guerrero v. Bexar County Information Technology Department; Before the Bexar County Civil Services Commission; Case No. 10-BCCS-022 | Office location: | |
| Office location: | | Date: | 4.19.12 |
| Fax number: | 210.335.2686 | Phone number: | 210.472.2100 |

☐ URGENT   ☐ REPLY ASAP   ☐ PLEASE COMMENT   ☐ PLEASE REVIEW   ☐ FOR YOUR INFORMATION

**TOTAL PAGES, INCLUDING COVER:**   3

**MESSAGE:**

The information transmitted with this sheet is private and confidential and may be protected by various legal privileges. The information transmitted with this sheet is intended solely for the individual or entity designated above. If the recipient of this information is not the intended recipient, or the employee or agent of the intended recipient responsible for delivering it to such person, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of the information contained herein is strictly prohibited. The transmission of any information contained herein should in no way be considered to be a waiver of any legal privilege unless expressly stated. If you have received this fax in error, please notify us immediately by telephone and mail the contents to us at our letterhead address above.

• 719 S. FLORES, SUITE 100 • SAN ANTONIO, TEXAS 78204 •
• 210.472.2100 TELEPHONE • 210.472.2101 TELECOPIER •

TR-0099



**BEXAR COUNTY**
# HUMAN RESOURCES
**211 S. FLORES STREET**
**SAN ANTONIO, TEXAS 78204-1012**
**HR MAIN #: (210) 335-2545 _ Web Site: www.bexar.org**

April 12, 2012

Ms. Carmella Guerrero
4707 Trailwood
San Antonio, TX 78228

Dear Ms. Guerrero:

RE:    Hearing - Case #10-BCCS-022 Carmella
Guerrero vs Information Technology
Department

The appeal in the aforementioned cause has been scheduled for Thursday, April 26, 2012, at 9:00 a.m., in the Bexar County Civil Service Commission Conference Room, 211 S. Flores Street, San Antonio, TX 78204.

It is requested by the Civil Service Commissioners that you bring any and all witnesses you believe are necessary to the hearing that can substantiate your statements. You are advised that you have the right to have counsel.

It is most imperative that you be present at the hearing. If an emergency arises and you are unable to attend, you must submit a written request for postponement to me no later than one week prior to the hearing stating the reasons for the requested postponement. If you do not submit this written request prior to one week, you will have to appear and request the postponement at that time before the Civil Service Commissioners and show just cause for the postponement and the reasons for failing to give notice less than one week prior to the scheduled hearing. The Commission will determine whether the postponement will be granted at that time. Failure to appear at the appointed time will result in outright dismissal of your grievance for failure to prosecute.

Sincerely,

Andrea San Miguel
Civil Service Director

ASM/nt

cc:    Bexar County Civil Service Commissioners
Ms. Catherine Maras, Chief Information Officer of Bexar County Information Technology
Mr. Clark Brown, Assistant Criminal District Attorney, Civil Section
Mr. Orlando Lopez, Attorney-at-Law

CERTIFIED MAIL

TR-0100



**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

**OFFICIAL USE**

#10-BCCS-022.
Carmella Guerrero
ys Information
Technology Dept.

| Postage | $ |
|---|---|
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Sent To Ms. Carmella Guerrero
Street, Apt. No.; 4707 Trailwood
or PO Box No.
City, State, ZIP+4 San Antonio, TX 78228

PS Form 3800, June 2002          See Reverse for Instructions

7002 3150 0004 4896 8353

**CERTIFIED MAIL™**

FIRST-CLASS MAIL

$05.75

ZIP 78205
041L12202049

7002 3150 0004 4896 8353

Ms. Carmella Guerrero
4707 Trailwood
San Antonio, TX 78228

NIXIE   782  DE 1        -00 06/03/12

RETURN TO SENDER
UNCLAIMED
UNABLE TO FORWARD

BC: 78204101211    *2199-02811-03-16

**BEXAR COUNTY CIVIL SERVICE COMMISSION**

211 S. Flores Street
San Antonio, TX 78204-1012
RETURN SERVICE REQUESTED

**RECEIVED**

JUN 4 2012

BEXAR COUNTY
CIVIL SERVICE COMMISSION
2:25pm

78204@1012

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

**OFFICIAL USE**

| | | |
|---|---|---|
| Postage | $ | #10-BCCS-022 |
| Certified Fee | | Carmella Guerrero |
| Return Reciept Fee (Endorsement Required) | | vs Information |
| Restricted Delivery Fee (Endorsement Required) | | Technology Dept. Postmark |
| Total Postage & Fees | $ | |

Sent To
Mr. Orlando Lopez

Street, Apt. No., or PO Box No.
Attorney at Law

City, State, Zip+4
719 S. Flores, Suite 100
San Antonio, TX 78204

PS Form 3800, June 2002                    See Reverse for Instructions

7002 3150 0004 4896 8346

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

#10-BCCS-022 Carmella Guerrero vs Information Technology Dept.

Mr. Orlando Lopez
Attorney at Law
719 S. Flores, Suite 100
San Antonio, TX 78204

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ □ Agent □ Addressee

B. Received by (Printed Name)      C. Date of Delivery

D. Is delivery address different from item 1? □ Yes
If YES, enter delivery address below: □ No

3. Service Type
□ Certified Mail  □ Express Mail
□ Registered  □ Return Receipt for Merchandise
□ Insured Mail  □ C.O.D.

4. Restricted Delivery? (Extra Fee)  □ Yes

2. Article Number (Transfer from service label)
7002 3150 0004 4896 8346

PS Form 3811, August 2001      Domestic Return Receipt      102595-02-M-1540

TR-0102



**BEXAR COUNTY**
**HUMAN RESOURCES**
211 S. FLORES STREET
SAN ANTONIO, TEXAS 78204-1012
HR MAIN #: (210) 335-2545 _ Web Site: www.bexar.org

April 12, 2012

Ms. Catherine Maras
Chief Information Officer
Bexar County Information Technology
200 W. Nueva, Suite 200
San Antonio, TX 78207-4507

Dear Ms. Maras:

 RE: Hearing - Case #10-BCCS-022 Carmella
 Guerrero vs Information Technology
 Department

The appeal in the aforementioned cause has been scheduled for Thursday, April 26, 2012, at 9:00 a.m., in the Bexar County Civil Service Commission Conference Room, 211 S. Flores Street, San Antonio, TX 78204.

It is requested by the Civil Service Commissioners that you bring any and all witnesses you believe are necessary to the hearing that can substantiate your statements. You are advised that you have the right to have counsel.

It is most imperative that you be present at the hearing. If an emergency arises and you are unable to attend, you must submit a written request for postponement to me no later than one week prior to the hearing stating the reasons for the requested postponement. If you do not submit this written request prior to one week, you will have to appear and request the postponement at that time before the Civil Service Commissioners and show just cause for the postponement and the reasons for failing to give notice less than one week prior to the scheduled hearing. The Commission will determine whether the postponement will be granted at that time. Failure to appear at the appointed time will result in outright dismissal of your grievance for failure to prosecute.

Sincerely,

Andrea San Miguel
Civil Service Director

ASM/nt

cc: Bexar County Civil Service Commissioners
 Ms. Carmella Guerrero
 Mr. Clark Brown, Assistant Criminal District Attorney, Civil Section
 Mr. Orlando Lopez, Attorney-at-Law

HAND DELIVERED

TR-0103

BEXAR COUNTY CIVIL SERVICE COMMISSION
DEPARTMENT RESPONSE FORM

**RECEIVED**

JAN 4 2011

BEXAR COUNTY
CIVIL SERVICE COMMISSION
7:47 a~ ~

**I. BACKGROUND DATA**

CASE NUMBER: <u>10-BCCS-022 Carmella Guerrero vs Information Technology Department</u>
APPELLANT: <u>Carmella Guerrero</u>
TITLE/POSITION: Technology Business Analyst E05
DEPARTMENT: Bexar County Information Technology
DIVISION:
IMMEDIATE SUPERVISOR: Sherry Ascolese
DEPARTMENT SUPERVISOR: Linda E. Perez
DIVISION SUPERVISOR: Catherine Maras
GRIEVANCE SYSTEM PROCEDURES COMPLETED? YES: ___X___ NO: _____
GRIEVANCE SYSTEM DECISION: _____Demotion_____

**II. OFFENSE**

Bexar County Civil Service Rules and Regulations Policy Number 7.6.09 b, c, & j

**1. SPECIFIC RULE/POLICY VIOLATED**

Bexar County Civil Service Commission Rules and Regulations Disciplinary Actions

**3. DISCIPLINARY ACTION**

Demotion

**4. FACT SUMMARY** (Alleged action that caused the need for discipline) (Be specific and include names of persons, witnesses, dates, places, results of any investigations and other relevant information.)

See attached Notice of Proposed Disciplinary Action dated Oct 27, 2010.

**4. COMPLAINING WITNESSES** (If any)

*Catherine Maras*
Catherine Maras

(USE ATTACHMENT IF NECESSARY)

TR-0104

| | |
|---|---|
| **From:** | Perez, Linda |
| **Sent:** | Tuesday, January 04, 2011 7:47 AM |
| **To:** | SanMiguel, Andrea |
| **Cc:** | Maras, Catherine; Perez, Linda |
| **Subject:** | BCCSC Department Response Forms |
| **Attachments:** | Carmella Guerrero Department Response Form (2).pdf; MH Department Response Form.pdf |

Andrea,

Please find attached the Department Response forms due for Carmella
Guerrero and Mike Harris.  Please let me know if there is anything
else due for these cases.

What are our next steps?

Thanks Andrea...lep

Linda E. Perez
Applications Development Manager
Bexar County Information Services
Office (210) 335-0213
FAX    (210) 335-0299
lperez@bexar.org

1

TR-0105

## SanMiguel, Andrea

| | |
|---|---|
| **From:** | SanMiguel, Andrea |
| **Sent:** | Tuesday, December 21, 2010 11:35 PM |
| **To:** | Maras, Catherine |
| **Cc:** | Schweninger, Edward; Cortez, Frances; Tanaka, Nelda |
| **Subject:** | Department Response Form for Case #10-BCCS-022 Carmella Guerrero vs Information Technology Department |
| **Attachments:** | 10CGuerrero.022.pdf; 10CGuerreroAppeal.022.pdf; 10CGuerreroResponse.022.pdf; 10CGuerreroAdmin Leave.022.pdf; 10CGuerreroLetter Regarding Incident.022.pdf; 7.6.14 Suspension Demotion Termination -- Appeal and Hearing.pdf; BCCSDeptResponseForm.doc |

**Importance:** High

Ms. Maras,

Attached is a copy of an appeal filed by Carmella Guerrero requesting a hearing before the Bexar County Civil Service Commission for her demotion. A copy was also provided to the Civil Section of the District Attorney's Office. The Bexar County Civil Service Commission Rules and Regulations, Policy 7.6.14 Suspension, Demotion or Termination – Appeal and Hearing and the Department Response Form are also attached. Please complete the Department Response Form and return it to me within ten (10) business days from the date of receipt.

After receipt of the Department Response Form, a hearing will be scheduled. If you have any questions, you may contact me at 335-2688.

**Andrea San Miguel**
**Civil Service Director**
**Bexar County Civil Service Commission**
**Heritage Plaza Building**
**400 S. Main**
**San Antonio, TX 78204-1114**
**(210) 335-2688 Phone**
**(210) 335-2686 Fax**
**(210) 335-6333 Job Line**
asanmiguel@bexar.org

1

TR-0106

**BEXAR COUNTY**
# CIVIL SERVICE COMMISSION
**HERITAGE PLAZA BUILDING**
**400 S. MAIN**
**SAN ANTONIO, TEXAS 78204-1114**
**Job Line: (210) 335-6333 , Web Site: www.bexar.org**

TO:        Ms. Catherine Maras
             Chief Information Officer

FROM:    Andrea San Miguel
             Civil Service Director

DATE:    December 21, 2010

SUBJECT:  Department Response Form for Case #10-BCCS-022 Carmella Guerrero vs Information Technology Department

Attached is a copy of an appeal filed by Carmella Guerrero requesting a hearing before the Bexar County Civil Service Commission for her demotion. A copy was also provided to the Civil Section of the District Attorney's Office. The Bexar County Civil Service Commission Rules and Regulations, Policy 7.6.14 Suspension, Demotion or Termination – Appeal and Hearing and the Department Response Form are also attached. Please complete the Department Response Form and return it to me within ten (10) business days from the date of receipt.

After receipt of the Department Response Form, a hearing will be scheduled. If you have any questions, you may contact me at 335-2688.


ASM

cc:    Mr. Ed Schweninger, Civil Section Chief

Attachments

TR-0107

# BEXAR COUNTY CIVIL SERVICE COMMISSION
# EMPLOYEE'S APPEAL FORM

NAME OF EMPLOYEE: Carmella Guerrero  JOB TITLE: Technology Business Analyst
ADDRESS: 4707 Trailwood                          DEPARTMENT: Information Technology
CITY/STATE/ZIP CODE: San Antonio, TX 78228          DIVISION: Planning & Technical Services
HOME PHONE: 210-435-2879                          WORK PHONE: 210-335-0229
E-MAIL ADDRESS:    carmellaguerrero@bexar.org                  CELL PHONE: 210-633-7529
IMMEDIATE SUPERVISOR:    Sherry Ascolese          PHONE NUMBER:    335-0239
DEPARTMENT SUPERVISOR: Catherine Maras          PHONE NUMBER:    335-0207
DIVISION SUPERVISOR:    Linda Perez          PHONE NUMBER:    335-0213
GRIEVANCE SYSTEM PROCEDURES COMPLETED? YES:          X    NO:
GRIEVANCE SYSTEM DECISION:    Demotion from Grade E-11 to Grade E-5

EXPLAIN NATURE OF APPEAL (INCLUDING NAME OF PERSONS(S), DATE(S), PLACE(S) INVOLVED AND LIST WITNESS(ES) :

ACTION APPEALED:   Demotion

DATE OF INCIDENT:   October 4, 2010

PLACE OF INCIDENT: Office of Catherine Maras, CIO - BCIT

INCIDENT (FACTUAL STATEMENT):

On Monday October 4, 2010, Catherine Maras, the Chief Information Officer, questioned me concerning the county's parking policies and privileges and my involvement on behalf of the department in connection with parking. I answered the questions to the best of my knowledge and emailed Ms. Maras additional information regarding parking. At approximately 4:00 P.M., I went to Ms. Maras' office to talk about my email response and provide her with a copy of the Bexar County Parking Policy. Ms. Maras yelled at me and slammed the door shut. I did not raise my voice during this visit to her office.

On October 13, 2010, Ms. Maras called me and asked me to report to her office. I reported immediately. Ms. Maras handed me a letter placing me on administrative leave for ten business days. Ms. Maras informed me that an investigation was pending regarding the October 4, 2010 incident. Ms. Maras demanded that I relinquish my badge, my keys, my cellular phone, and my laptop.

On October 27, 2010, Ms. Maras asked me to report to her office. Ms. Maras served me with a proposed demotion to a Technology Business Analyst position at a Grade E-05. I provided my response to her proposed demotion on November 10, 2010. Ms. Maras served me with her decision to demote me to a Technology Business Analyst Grade E-05 on November 29, 2010 and directed me to report to work on November 30, 2010 at 9:00 A.M.

WITNESSES:

Witness names will be provided.

SPECIFIC RULE YOU WERE CHARGED WITH VIOLATING:

Insubordination-7.6.09(b)
Dishonesty-7.6.09(c)
Failure to perform job responsibilities-7.6.09(i)

**REASON YOU ARE APPEALING:**

I have been a recognized and valued employee of Bexar County since 1993. I have worked my way up the system with a tireless work ethic, loyalty and professionalism. My work record with Bexar County is spotless and I have received numerous commendations, raises, and promotions due to my accomplishments over the last seventeen and a half years. I have established an excellent rapport with my employees, co-workers, supervisors, business partners including elected officials and department heads. My performance evaluations have been exceptional to date.

Until the incident at issue, I have never been admonished or disciplined as a Bexar County employee. I believe there is no basis for the proposed six-grade demotion and the $21,000 pay cut, because there are no grounds for disciplining me in this matter. While an employee of Bexar County, I have never been accused of insubordination, dishonesty and/or failure to perform my job responsibilities. In fact, Ms. Maras just promoted me to an IT Services Manager on October 1, 2010.

I am appealing the proposed demotion, and am seeking a reinstatement of my former position and back pay. I have attached to this appeal the following:

A. Proposed Demotion Letter Dated October 27, 2010;
B. Employee Response Letter Dated November 10, 2010;
C. Final Demotion Letter Dated November 29, 2010;
D. Employee Evaluations;
E. Employee Resume;
F. Employee Character References.

_____   _12-10-10_____
SIGNATURE OF EMPLOYEE              DATE OF APPEAL

RECEIVED BY:_____      _Office Assistant III_____
                NAME              JOB TITLE

DATE:_December 10, 2010_____      TIME: _3:58pm_____

REPRESENTED BY: Orlando R. Lopez, Lopez Law Firm, First National Bank Tower, 6243 I-H 10 W., Suite 205, San Antonio, Texas 78201, olopez@lopez-law.com
(Please include name, address, phone number and e-mail address)

TR-0109

RECEIVED

DEC 10 2010

BEXAR COUNTY
CIVIL SERVICE COMMISSION
3:58pm JJ



**BEXAR COUNTY INFORMATION TECHNOLOGY**
203 W. NUEVA, SUITE 200
SAN ANTONIO, TEXAS 78207-4507
(210) 335-0200

October 27, 2010

Carmella Guerrero
Bexar County Information Technology

Reference:     Notice of Proposed Disciplinary Action

Ms. Guerrero:

Under the provisions of Bexar County Civil Service Commission Rules and Regulations, Policy Number 7.6.11, Disciplinary Actions, you are hereby advised that the action proposed is demotion to Technology Business Analyst Grade E-05 at an annual salary of $58,140. A demotion is applicable when the office or department determines that a violation of a rule or policy is serious enough to warrant a demotion without prior use of less severe discipline.

The reasons for this proposed action are due to violations of the Bexar County Civil Service Rules and Regulations, as listed in Policy Number 7.6.09, Reasons for Discipline:

**b. Insubordination – unwilling to follow orders of a supervisor or higher level of authority;**
**c. Dishonesty-characterized by lack of trust, honesty or truthfulness;**
**J. Failure to perform job requirements as directed by manager.**

The specific reasons for this action:

On Monday, October 4, 2010 as I walked back from the Fire Marshal's office after a meeting, I noticed a black Mercedes 300 (Mercedes) automobile parked in a Bexar County Information Technology (BCIT) designated space located in back of our Annex building along with other vehicles. This was the first time that I walked in back of the Annex and discovered the BCIT parking signs; therefore, I was not aware of the seven designated parking spaces in back of the Annex building for BCIT employees. As I approached the entrance of our building, I noticed that you were outside smoking a cigarette so I inquired about the Mercedes and who posted the BCIT parking signs. You stated that Infrastructure Services must have posted the parking signs, and you did not know who owned the Mercedes. I surmised that the owner of the vehicle was Tina Singh (Ms. Singh), our Lawson Technical Director, who is an outside contractor since you approached me a few months ago about providing her a free parking space. When you asked me about providing a free parking space for Ms. Singh, I replied no. You then retorted that Ms. Singh wanted to pay for the parking spot, but I informed you if we have available parking we need to provide this convenience to BCIT employees who have scheduled meetings across the county on a daily basis. I further relayed to you that it was not our duty or part of our contract with Ms. Singh to provide her free parking.

1

Since you denied any knowledge about the owner of the Mercedes, I entered the building in order to ask Ms. Singh if she owned the Mercedes. Ms. Singh stated that she was the owner of the vehicle, and that you provided her with the authorization to park in the BCIT designated spot in back of our building. In addition, you approached Gilbert Sanchez, the interim Technical Support Manager, (Mr. Sanchez) about a week after David Mandujano resigned in early August, and requested that he park in the County garage, because you wanted Ms. Singh to park in his old spot in back of our building. You then provided him with a parking garage card key in order to park in the County garage the next day. Mr. Sanchez told me that he obeyed your directive, because he stated that you have been handling employee parking for many years and the practice has been to coordinate all parking issues with you. Moreover, you designed a placard for BCIT vendors to use at County facilities. The placard reads: If you have any questions, please call Carmella Guerrero at 335-0225. Therefore, the practice within BCIT was to follow your orders, even though you informed me many times on October 4, 2010 that Infrastructure Services handles parking and you told me about Administrative Policy 4.6. and that you were never in charge of employee parking.

Accordingly, on October 4, 2010, you stated multiple times throughout the day that you were working with Infrastructure Services to determine the names of the BCIT employees parking either behind the Annex building or in the County garage. You told me that you were not in charge of parking and at about 4pm you came unannounced to my office and provided me with the Administrative Policy No. 4.6 document. I again asked you the same question: how many designated parking spots does BCIT have in addition to the in and out ones? At that time, you became very frustrated, and you began to raise your voice to me about why do I keep asking me about parking. I am not in charge of parking-Infrastructure Services handles it, and you stated that you did reach out to Infrastructure Services on Monday, October 4, 2010 on my behalf trying to fulfill my directive. However, you sent an e-mail to Infrastructure Services on Friday, August 6, 2010 requesting a current list of employees using the in and out parking privileges in the County garage after both David Mandujano and Joe Yebra resigned. You reached out to Infrastructure Services over two months ago to validate the list of employees who possess parking privileges.

Later in the day, you also stated that I provided authorization for Ms. Singh to park in a spot behind our building until you could work out providing Ms. Singh free parking with Susan Yeatts, the County Auditor located at Heritage Plaza. I never provided you with the authorization. I informed you that Ms. Singh should pay for parking at Heritage Plaza, but you countered that parking is free, because the County receives five parking spaces as part of the rental agreement. I stated that the County is indirectly paying for those parking spaces through the rental agreement, and, thus, the parking spaces are not free.

It is incumbent upon you to provide me with truthful and concise answers to questions that I ask you, even when you do not agree with my approach.

It is important that you understand that this is a proposed action and that you have a right to reply, either orally or in writing, and to submit any evidence which supports your position. Any such oral or written statements will be duly considered before a final decision is reached.

Any reply you wish to make will be addressed to: Catherine Maras, Chief Information Officer, Bexar County Information Services Department, 203 W. Nueva, Suite 200, San Antonio, Texas 78207-4S07.

You must reply to this letter within ten (10) business days from the date of receipt, and you will remain on Administrative Leave until a final decision is made. The day of receipt of the Notice of Proposed Disciplinary Action does not count against the ten (10) business day deadline.

2

TR-0111

You are further advised that a final decision will be made regarding this proposed action within ten (10) business days from receipt of your response, unless the parties agree to extend the ten (10) business day deadline. You will be notified promptly of this decision no later than the time the action will be made effective.

Catherine Maras
Chief Information Officer

I acknowledge receipt of this document:

_____                    _____
Carmella Guerrero                                              Date

Cc:     BCIT Personnel File
        Clark Brown, District Attorney's Office
        Andrea San Miguel, Civil Service Office

3

TR-0112

RECEIVED

DEC 10 2010
BEXAR COUNTY
CIVIL SERVICE COMMISSION
3:58pm ____

# THE LOPEZ LAW FIRM
### A PROFESSIONAL CORPORATION

November 10, 2010

**VIA HAND DELIVERY**

Catherine Maras
Chief Information Officer
Bexar County Information Technology
203 W. Nueva, Suite 200
San Antonio, Texas 78207-4507

RE:     Employee Policy No. 7.6.11 Response

Dear Ms. Maras:

This law firm represents Carmella Guerrero.  On or about October 27, 2010, you provided Ms. Guerrero a Notice of Proposed Disciplinary Action purporting to demote Ms. Guerrero to a Technology Business Analyst Grade E-05.  In accordance with Policy No. 7.6.11, Ms. Guerrero provides this response to your proposed disciplinary action.

## Record of Achievement

Ms. Guerrero has been a valued employee with Bexar County since 1993.  Ms. Guerrero began her career with Bexar County as an administrator in the Bexar County Sheriff's Department.  Ms. Guerrero held several positions with the sheriff's department and was ceremoniously promoted in the department until she became the Jail Support Services Manager in 1997.  In 1998, Ms. Guerrero transferred to the Bexar County Information Services Department, and served as a contract coordinator.  While an employee of the information services department, Ms. Guerrero was promoted three times until she finally was promoted to second in command of the information services department where she served as the department's IT Services Department Manager.

Ms. Guerrero has had a distinguished career with Bexar County, and has worked her way up the system with her tireless work ethic, loyalty, and professionalism.  Ms. Guerrero's work record with Bexar County is spotless, and she has received numerous raises and promotions due to her accomplishments.  Ms. Guerrero has been a proven leader, an ideal employee, and exceptional colleague to her many coworkers within Bexar County for almost two decades.  Until your recent proposed disciplinary action, Ms. Guerrero has never been admonished or disciplined as a Bexar County employee.

• FIRST NATIONAL BANK TOWER • 6243 I. H. 10 WEST, SUITE 205 • SAN ANTONIO, TEXAS 78201 •
• 210.472.2100 TELEPHONE • 210.472.2101 TELECOPIER •

TR-0113

In fact, you promoted Ms. Guerrero to her current position after you took over the department in 2009.

<u>Specific Reply to Grounds for Demotion</u>

It is apparent from the record that your decision to demote Ms. Guerrero is based on simple miscommunication and personality differences. There is no evidence, however, that Ms. Guerrero was insubordinate, was dishonest, or failed in carrying out the requirements of her job. Your reasons for Ms. Guerrero's proposed demotion seem to be that (1) Ms. Guerrero misled you about her authority to direct parking for the department, and (2) Ms. Guerrero disregarded your directive that Tina Singh pay for parking. We do not believe the facts support these reasons for the proposed demotion.

1.    <u>Ms. Guerrero did not mislead you about her authority to assign parking.</u>

Bexar County Administrative Policy No. 4.6, the relevant parking policy for the county, is clear that the Parking Garage Division of Infrastructure Services Department is responsible for administering the county's parking facilities. Additionally, the Infrastructure Services Department ("ISD") is responsible for the assignment of parking privileges within the county's parking facilities. The plain language of the policy is clear that ISD is responsible for the assignment of parking privileges; and, not Ms. Guerrero.

Of course, over time, Ms. Guerrero has assisted your department in coordinating with ISD to determine which employees qualified for certain parking privileges, and even corresponded with ISD to track certain parking assignments. Ms. Guerrero's work in this regard, however, did not rise to the level of making Ms. Guerrero ultimately responsible for overseeing all of the parking in your department. As you know, Ms. Guerrero has many more pressing and important responsibilities in connection with the county's IT department. Instead, the person responsible for assigning parking spaces for ISD was David Mandujuano, whom Ms. Guerrero communicated with after you instructed Ms. Guerrero to obtain a list of who had privileges to park in the designated spaces at issue. In fact, Ms. Guerrero had to email ISD to determine the hierarchy for the parking spaces at issue because Ms. Guerrero was not responsible for making those assignments.

Simply put, it seems that you intend to demote Ms. Guerrero because she told you that she was not in charge of parking when you believe the practice is the department was for Ms. Guerrero to assist in some of those tasks. Ms. Guerrero by virtue of her position within your department does not have any authority to assign parking. Ms. Guerrero was clear with you that she did not have the authority you claim she did have. To the extent that either you or persons within your department believed that Ms. Guerrero was responsible for making parking assignments, such belief is misplaced and most likely a result of miscommunication. Ms. Guerrero has always been honest with you about her job and her job responsibilities, and she would have no reason to mislead you about what she can and cannot do in regards to parking. Moreover Administrative Policy No. 4.6 is clear as to who is responsible for assigning parking spaces—ISD. Ms. Guerrero was equally clear with you that it was ISD that assigned parking and not her.

• First National Bank Tower • 6243 I. H. 10 West, Suite 205 • San Antonio, Texas 78201 •
• 210.472.2100 Telephone • 210.472.2101 Telecopier •

TR-0114

**2.  Ms. Guerrero followed your directive regarding Ms. Singh's parking.**

Ms. Singh is a contract vendor for the county, and sometimes must attend early morning meetings at Heritage Plaza.  Ms. Guerrero was under the belief that you authorized Ms. Singh to utilize the designated space at issue on mornings that Ms. Singh had early meetings; otherwise, you instructed Ms. Singh that she would make arrangements to pay for her parking.  To that end, Ms. Guerrero informed Ms. Singh by email that she could only park in the designated space for the early morning meetings, and that Ms. Singh would need to coordinate with ISD for a permanent parking space and that she would be required to pay for the parking.  Ms. Singh confirmed the parking instructions with Ms. Guerrero and Ms. Singh was referred to ISD.  Since October 4, 2010, Ms. Singh has related to Ms. Guerrero that she should not have been parking in the space at issue.

We believe the record is clear that Ms. Guerrero followed the instructions you gave her regarding Ms. Singh's parking.  We believe it was Ms. Singh's responsibility to coordinate with ISD and/or the auditor's office and make arrangements to pay for her parking privileges.  Ms. Guerrero did what was asked of her in this regard, and to the extent Ms. Singh was parking in the space at issue, it was an oversight on Ms. Singh's part because Ms. Guerrero was clear with Ms. Singh about the requirement that Ms. Singh coordinate and pay for her own parking with ISD.  Miscommunication may have played a role in this situation as well.

### Conclusion

Ms. Maras, Ms. Guerrero has been a valued employee for Bexar County for almost two decades.  Her dedication to the county, her job, and to your department is unquestioned.  You have worked with Ms. Guerrero for over twelve months, and you should know that Ms. Guerrero is not the type of person that will skirt her responsibilities; and certainly, you should know that Ms. Guerrero would not lie to you or be dishonest, as you have suggested.

Ms. Guerrero is not responsible for the parking assignments as she attempted to inform you.  She was not trying to mislead you or hide from any of her responsibilities.  Additionally, Ms. Guerrero did her part to inform Ms. Singh that Ms. Singh had only limited parking privileges at the designated parking space and that she would need to make arrangements to pay for her parking as you instructed Ms. Guerrero.  It does not seem fair to punish Ms. Guerrero if Ms. Singh did not follow those instructions.

Finally, Ms. Guerrero is an important part of our team and Bexar County, and she very much wishes to continue in her current position.  If there was an exchange for words that caused this matter to escalate unnecessarily, we are certain measures can be taken, such as counseling, to avoid such exchanges in the future.  Under Administrative Policy No. 7.6.11, we also do not believe Ms. Guerrero's alleged conduct was serious enough to warrant your proposed demotion without prior use of less severe discipline.  We understand that did you did not even attempt to impose any type of less severe discipline.

• FIRST NATIONAL BANK TOWER • 6243 I. H. 10 WEST, SUITE 205 • SAN ANTONIO, TEXAS 78201 •
• 210.472.2100 TELEPHONE • 210.472.2101 TELECOPIER •

TR-0115

Accordingly, we believe your proposed demotion is unreasonable under these circumstances, and respectfully request that you not proceed with the proposed demotion.

Thank you for your time and attention.

Very truly yours,

*Orlando R. Lopez*

Orlando R. Lopez

cc:    Carmella Guerrero

• FIRST NATIONAL BANK TOWER • 6243 I. H. 10 WEST, SUITE 205 • SAN ANTONIO, TEXAS 78201 •
• 210.472.2100 TELEPHONE • 210.472.2101 TELECOPIER •

TR-0116

RECEIVED

DEC 10 2010

BEXAR COUNTY
CIVIL SERVICE COMMISSION
3:58pm TJ



**BEXAR COUNTY INFORMATION TECHNOLOGY**
203 W. NUEVA, SUITE 200
SAN ANTONIO, TEXAS 78207-4507
(210) 335-0200

November 29, 2010

Carmella Guerrero
Bexar County Information Technology

Reference:        Notice of Disciplinary Action Decision

Ms. Guerrero:

Reference is made to the letter of October 27, 2010 to you concerning the proposed disciplinary action and your response received November 10, 2010.

Under the provisions of Bexar County Civil Service Commission Rules and Regulations, Policy Number 7.6.11, Disciplinary Actions, you are hereby advised of your demotion to Technology Business Analyst Grade E-05 at an annual salary of $58,140, effective November 30, 2010. You are to report to work on November 30, 2010 at 9am. Attached is a copy of the job description for this position.

The reasons for this action are due to violations of the Bexar County Civil Service Rules and Regulations, as listed in Policy Number 7.6.09, Reasons for Discipline:

b. Insubordination – unwilling to follow orders of a supervisor or higher level of authority;
c. Dishonesty–characterized by lack of trust, honesty or truthfulness;
j. Failure to perform job requirements as directed by manager.

The specific reasons for this action:

On Monday, October 4, 2010 as I walked back from the Fire Marshal's office after a meeting, I noticed a black Mercedes 300 (Mercedes) automobile parked in a Bexar County Information Technology (BCIT) designated space located in back of our Annex building along with other vehicles. This was the first time that I walked in back of the Annex and discovered the BCIT parking signs; therefore, I was not aware of the seven designated parking spaces in back of the Annex building for BCIT employees. As I approached the entrance of our building, I noticed that you were outside smoking a cigarette so I inquired about the Mercedes and who posted the BCIT parking signs. You stated that Infrastructure Services must have posted the parking signs, and you did not know who owned the Mercedes. I surmised that the owner of the vehicle was Tina Singh (Ms. Singh), our Lawson Technical Director, who is an outside contractor since you approached me a few months ago about providing her a free parking space. When you asked me about providing a free parking space for Ms. Singh, I replied no. You then retorted that Ms. Singh wanted to pay for the parking spot, but I informed you if we have available parking we need to provide this convenience to BCIT employees who have scheduled meetings across the county on a daily basis. I further relayed to you that it was not our duty or part of our contract with Ms. Singh to provide her free parking.

1

TR-0117

Since you denied any knowledge about the owner of the Mercedes, I entered the building in order to ask Ms. Singh if she owned the Mercedes. Ms. Singh stated that she was the owner of the vehicle, and that you provided her with the authorization to park in the BCIT designated spot in back of our building. In addition, you approached Gilbert Sanchez, the interim Technical Support Manager, and (Mr. Sanchez) about a week after David Mandujano resigned in early August, and requested that he park in the County garage, because you wanted Ms. Singh to park in his old spot in back of our building. You then provided him with a parking garage card key in order to park in the County garage the next day. Mr. Sanchez told me that he obeyed your directive, because he stated that you have been handling employee parking for many years and the practice has been to coordinate all parking issues with you. Moreover, you designed a placard for BCIT vendors to use at County facilities. The placard reads: If you have any questions, please call Carmelia Guerrero at 335-0225. Therefore, the practice within BCIT was to follow your orders, even though you informed me many times on October 4, 2010 that Infrastructure Services handles parking and you told me about Administrative Policy 4.6. and that you were never in charge of employee parking.

Accordingly, on October 4, 2010, you stated multiple times throughout the day that you were working with Infrastructure Services to determine the names of the BCIT employees parking either behind the Annex building or in the County garage. You told me that you were not in charge of parking and at about 4pm you came unannounced to my office and provided me with the Administrative Policy No. 4.6 document. I again asked you the same question: how many designated parking spots does BCIT have in addition to the in and out ones? At that time, you became very frustrated, and you began to raise your voice to me about why do I keep asking me about parking. I am not in charge of parking-Infrastructure Services handles it, and you stated that you did reach out to Infrastructure Services on Monday, October 4, 2010 on my behalf trying to fulfill my directive. However, you sent an e-mail to Infrastructure Services on Friday, August 6, 2010 requesting a current list of employees using the in and out parking privileges in the County garage after both David Mandujano and Joe Yebra resigned. You reached out to Infrastructure Services over two months ago to validate the list of employees who possess parking privileges.

Later in the day, you also stated that I provided authorization for Ms. Singh to park in a spot behind our building until you could work out providing Ms. Singh free parking with Susan Yeatts, the County Auditor located at Heritage Plaza. I never provided you with the authorization. I informed you that Ms. Singh should pay for parking at Heritage Plaza, but you countered that parking is free, because the County receives five parking spaces as part of the rental agreement. I stated that the County is indirectly paying for those parking spaces through the rental agreement, and, thus, the parking spaces are not free.

It is incumbent upon you to provide me with truthful and concise answers to questions that I ask you, even when you do not agree with my approach.

You have the right to appeal this disciplinary action. Any appeal by you must be made directly with Andrea San Miguel, Civil Service Director, Bexar County Civil Service Commission Office, Heritage Plaza Building, 400 S. Main, San Antonio, Texas, 78204, within ten (10) business days from the date of this letter. The day of receipt of the Notice of Disciplinary Action does not count against the ten (10) business day deadline. You may obtain additional information concerning your appeal rights from the Civil Service Commission Office if you so desire.

Catherine Maras
Chief Information Officer

2

TR-0118

I acknowledge receipt of this document:

_Guerrero_
Carmella Guerrero.

_11-29-10_
Date

Cc:     BCIT Personnel File
        Clark Brown, District Attorney's Office
        Andrea San Miguel, Civil Service Office

TR-0119

RECEIVED.

nEC 10 2010

BEXAR COUNTY
CIVIL SERVICE COMMISSION
3:58pm  82

CONFIDENTIAL
COUNTY OF BEXAR
EMPLOYEE PERFORMANCE APPRAISAL

| | |
|---|---|
| NAME: Carmella Guerrero | JOB TITLE  Planning & Technical Services Manager |
| DEPARTMENT  Information Services | APPRAISAL DATE:  November 21, 2007 |
| DIVISION:  Planning & Technical Services | LAST APPRAISAL DATE:  December 8, 2006 |
| EMPLOYMENT/ PROMOTION DATI  October, 2005 | APPRAISAL PERIOD FROM:  Oct-06  TO:  Oct-07 |

REASON FOR APPRAISAL:            ☑ ANNUAL            ☐ END OF PROBATION
                                ☐ 6 MONTH           ☐ OTHER _____

EMPLOYEE'S OVERALL RATING:

| | | | | | |
|---|---|---|---|---|---|
| ☑ | Distinguished | 4.51 – 5.00 | ☐ Needs Improvement | 1.51 – 2.59 |
| ☐ | Commendable | 3.51 – 4.50 | ☐ Unacceptable | 1.50 or below |
| ☐ | Meets Expectations | 2.60 – 3.50 | | |

☐ This employee has been involved in a disciplinary action during this evaluation period, the significance of which is not evident in the appraisal dimensions (disciplinary action documentation is available in the employee's personnel file.
☐ Other

| | WEIGHT | | SCORE | RATING |
|---|---|---|---|---|
| 1. APPLICATION OF JOB KNOWLEDGE | 0.20 | X | 4.75 | 0.95 |
| 2. PUBLIC CONTACT | 0.10 | X | 4.75 | 0.48 |
| 3. EMPLOYEE RELATIONS | 0.05 | X | 4.75 | 0.24 |
| 4. INITIATIVE | 0.15 | X | 4.75 | 0.71 |
| 5. QUALITY OF WORK | 0.10 | X | 4.75 | 0.48 |
| 6. QUANTITY OF WORK | 0.05 | X | 4.75 | 0.24 |
| 7. COMMUNICATION SKILLS | 0.05 | X | 4.75 | 0.24 |
| 8. ATTENDANCE & PUNCTUALITY | 0.00 | X | 0.00 | 0.00 |
| 9. OPERATION & CARE OF EQUIPMENT | 0.00 | X | 0.00 | 0.00 |
| 10. CONCERN FOR SAFETY | 0.00 | X | 0.00 | 0.00 |
| 11. BUDGETING | 0.00 | | 0.00 | 0.00 |
| | | | | |
| SUPERVISORY DIMENSIONS: | | | | |
| 12. LEADERSHIP SKILLS | 0.10 | X | 4.75 | 0.48 |
| 13. HUMAN RESOURCE MANAGEMENT | 0.10 | X | 5.00 | 0.50 |
| 14. FISCAL MANAGEMENT | 0.10 | X | 5.00 | 0.50 |

1.00

OVERALL PERFORMANCE RATING TOTAL:        4.80

**Whenever a score in the range a of 5, 2 or 1 is given, supporting details must be provided. Attach additional paper if needed.**

DIMENSION            COMMENTS
                     Please see the attached Performance Plan

<u>GOAL EVALUATION AND GOAL SETTING:</u>

Progress achieved in attaining goals set in **previous** appraisal period:

1.) Please see the attached Performance Plan for Accomplishments _____

2.) _____

3.) _____

Goals and Objectives for **next** appraisal period: (Developed jointly by the Evaluator and Employee)

1.) Please see the attached Performane Plan for Goals _____

2.) _____

3.) _____

4.) _____

<u>Evaluator Comments:</u>

*Ms. Guerrero is one of the best managers I have ever worked with.*

Evaluator's Signature: _____     Date: _11/21/2007_

| Employee Comments: |
| --- |
| I am excited about the opportunities this past rating period to get involved in Communications/telephony, CMAG coordination and City/County Radio project. I have learned a tremendous amount of information and have been able to utilize this information to assist County users. I take my responsibilities seriously and continually look for opportunities of improvement. I appreciate the support I get from Dr. Morgan and the other managers. However, I give most of the credit to my sixteen emplolyees, who strive every day to to make the Planning & Technical Services Division excel. |

**I certify that this performance appraisal has been discussed with me.**

I agree ☑      I disagree ☐      with the scores on this evaluation.

I wish ☐      I do not wish ☐      to appeal this appraisal rating and will submit my written appeal in accordance with the office or department guidelines.

Employee's Signature: _____     Date: _11/21/07_

Administrative Review: _____     Date: _____

**RECEIVED**

DEC 10 2010

BEXAR COUNTY
CIVIL SERVICE COMMISSION
3:58 pm

CONFIDENTIAL
COUNTY OF BEXAR
EMPLOYEE PERFORMANCE APPRAISAL

NAME: _____Carmella Guerrero_____  JOB TITLE ___Planning & Technical Services Manager___
DEPARTMENT: ___Bexar County Information Services___  APPRAISAL DATE: _____December 8, 2006_____
DIVISION: ___Fiscal & Administrative Services___  LAST APPRAISAL DATE: _____October 23, 2003_____
EMPLOYMENT DATE: _____November 23, 1998_____  APPRAISAL PERIOD FROM: _Oct-03_ TO: _Oct-06_

REASON FOR APPRAISAL:  ☑ ANNUAL  ☐ END OF PROBATION
  ☐ 6 MONTH  ☑ OTHER  __Skipped a year due to new responsibilities__

EMPLOYEE'S OVERALL RATING:
  ☑ Distinguished  4.51 – 5.00  ☐ Needs Improvement  1.51 – 2.59
  ☐ Commendable  3.51 – 4.50  ☐ Unacceptable  1.50 or below
  ☐ Competent  2.60 – 3.50

☐ This employee has been involved in a disciplinary action during this evaluation period, the significance of which is not evident in the appraisal dimensions (disciplinary action documentation is available in the employee's personnel file.
☐ Other

| | WEIGHT | | SCORE | RATING |
|---|---|---|---|---|
| 1. APPLICATION OF JOB KNOWLEDGE | 0.20 | X | 4.75 | 0.95 |
| 2. PUBLIC CONTACT | 0.10 | X | 4.75 | 0.48 |
| 3. EMPLOYEE RELATIONS | 0.05 | X | 4.75 | 0.24 |
| 4. INITIATIVE | 0.15 | X | 4.99 | 0.75 |
| 5. QUALITY OF WORK | 0.10 | X | 4.75 | 0.48 |
| 6. QUANTITY OF WORK | 0.05 | X | 4.75 | 0.24 |
| 7. COMMUNICATION SKILLS | 0.05 | X | 4.50 | 0.23 |
| 8. ATTENDANCE & PUNCTUALITY | 0.00 | X | 0.00 | 0.00 |
| 9. OPERATION & CARE OF EQUIPMENT | 0.00 | X | 0.00 | 0.00 |
| 10. CONCERN FOR SAFETY | 0.00 | X | 0.00 | 0.00 |
| 11. BUDGETING | 0.00 | | 0.00 | 0.00 |
| SUPERVISORY DIMENSIONS: | | | | |
| 12. LEADERSHIP SKILLS | 0.10 | X | 4.75 | 0.48 |
| 13. HUMAN RESOURCE MANAGEMENT | 0.10 | X | 4.75 | 0.48 |
| 14. FISCAL MANAGEMENT | 0.10 | X | 4.99 | 0.50 |

1.00

OVERALL PERFORMANCE RATING TOTAL: _____4.80_____

Whenever a score of 5, 2 or 1 is given, supporting details must be provided. Attach additional paper if needed.

| DIMENSION | COMMENTS |
|---|---|
| #4 | Please see attached Performance Plan |
| #14 | Please see attached Performance Plan |

TR-0122

1

COMMENTS: _____

Over the last two years I have had the opportunity to gain additional responsibilities and have been challenged to expand my knowledge in the technical field. I have gained the responsibility of county-wide communications, city-count radio project issues and technical training. I look forward to participating on the county-wide effort to implement video conferencing as well.

Employee's Signature: _____  Date: _____

COMMENTS: _____

Evaluator's Signature: _____  Date: 12/20/2006

Department Authority or Designee's Signature: _____  Date: _____

---

**APPEAL SECTION (used only if employee is appealing this performance appraisal)**

I certify that this performance appraisal has been discussed with me and I agree ☐ disagree ☐ with the scores.
I wish to appeal this appraisal and I will submit a written request for appropriate action.

Employee's Signature: _____ Date: _____

Bexar County Civil Service Rules, Temporary Chapter X, Personal Grievances.
(For Employees Covered Under Bexar County Civil Service Rules)
I have been provided a copy of the rules _____ (Employee's initials)

I acknowledge the employee will pursue the appropriate appeal process.

Evaluator's Signature: _____ Date: _____

---

GOAL EVALUATION AND GOAL SETTING: _____

Progress achieved in attaining goals set in previous appraisal period:

Please see attached Performance Plan and Strategic Plan Worksheet

Goals and Objectives for next appraisal period: (Developed jointly by the Evaluator and Employee)

Pleae see attached Performance Plan and Strategic Plan Worksheet

TR-0123

2

RECEIVED

DEC 10 2010

BEXAR COUNTY
CIVIL SERVICE COMMISSION
3:58pm  $\overline{B}$ J

**CONFIDENTIAL**
**COUNTY OF BEXAR**
**EMPLOYEE PERFORMANCE APPRAISAL**

NAME: Carmella Guerrero     JOB TITLE   Fiscal and Administrative Services Manager

DEPARTMENT: Bexar County Information Services     APPRAISAL DATE:   October 23, 2003

DIVISION: Fiscal & Administrative Services     LAST APPRAISAL DATE:   October 30, 2002

EMPLOYMENT DATE:   November 23, 1998     APPRAISAL PERIOD FROM: Oct-02   TO:   Oct-03

REASON FOR APPRAISAL:     ☑ ANNUAL     ☐ END OF PROBATION
    ☐ 6 MONTH     ☐ OTHER

EMPLOYEE'S OVERALL RATING:

| | | | | | |
|---|---|---|---|---|---|
| ☑ | Distinguished | 4.51 – 5.00 | ☐ Needs Improvement | 1.51 – 2.59 | |
| ☐ | Commendable | 3.51 – 4.50 | ☐ Unacceptable | 1.50 or below | |
| ☐ | Competent | 2.60 – 3.50. | | | |

☐ This employee has been involved in a disciplinary action during this evaluation period, the significance of which is not evident in the appraisal dimensions (disciplinary action documentation is available in the employee's personnel file.
☐ Other

| | WEIGHT | | SCORE | RATING |
|---|---|---|---|---|
| 1. APPLICATION OF JOB KNOWLEDGE | 0.20 | X | 4.75 | 0.95 |
| 2. PUBLIC CONTACT | 0.10 | X | 4.75 | 0.48 |
| 3. EMPLOYEE RELATIONS | 0.05 | X | 4.75 | 0.24 |
| 4. INITIATIVE | 0.15 | X | 5.00 | 0.75 |
| 5. QUALITY OF WORK | 0.10 | X | 4.75 | 0.48 |
| 6. QUANTITY OF WORK | 0.05 | X | 4.50 | 0.23 |
| 7. COMMUNICATION SKILLS | 0.05 | X | 4.50 | 0.23 |
| 8. ATTENDANCE & PUNCTUALITY | 0.00 | X | 0.00 | 0.00 |
| 9. OPERATION & CARE OF EQUIPMENT | 0.00 | X | 0.00 | 0.00 |
| 10. CONCERN FOR SAFETY | 0.00 | X | 0.00 | 0.00 |
| 11. BUDGETING | 0.00 | | 0.00 | 0.00 |
| **SUPERVISORY DIMENSIONS:** | | | | |
| 12. LEADERSHIP SKILLS | 0.10 | X | 4.75 | 0.48 |
| 13. HUMAN RESOURCE MANAGEMENT | 0.10 | X | 5.00 | 0.50 |
| 14. FISCAL MANAGEMENT | 0.10 | X | 4.75 | 0.48 |

1.00

OVERALL PERFORMANCE RATING TOTAL:     4.79

**Whenever a score of 5, 2 or 1 is given, supporting details must be provided. Attach additional paper if needed.**

| DIMENSION | COMMENTS |
|---|---|
| #4 | Please see attached Performance Plan |
| #11 | Please see attached Performance Plan |
| #13 | Please see attached Performance Plan |

TR-0124     1

COMMENTS: _____

This fiscal year has been challenging in all aspects. I believe the creation of the Chief Operating Officer was a very positive move for BCIS. In addition, we were successful at cutting the proposed budget by the required 5% and reorganizing management. I believe that I was instrumental in the sucess of the latter two changes within BCIS and will continue to strive towards future improvements within the organization that benefit our business partners.

Employee's Signature: _____ Date: 10/23/03

COMMENTS: Carmella is an invaluable employee and her dedication is exemplary.

Evaluator's Signature: _____ Date: 10/23/03

Department Authority or Designee's Signature: _____ Date: 10/23/03

---

**APPEAL SECTION (used only if employee is appealing this performance appraisal)**

I certify that this performance appraisal has been discussed with me and I agree ☐ disagree ☐ with the scores.
I wish to appeal this appraisal and I will submit a written request for appropriate action.

Employee's Signature: _____ Date: _____

Bexar County Civil Service Rules, Temporary Chapter X, Personal Grievances.
**(For Employees Covered Under Bexar County Civil Service Rules)**
I have been provided a copy of the rules _____ (Employee's initials)

I acknowledge the employee will pursue the appropriate appeal process.

Evaluator's Signature: _____ Date: _____

---

GOAL EVALUATION AND GOAL SETTING: _____

Progress achieved in attaining goals set in previous appraisal period:

Please see attached Performance Plan and Strategic Plan Worksheet

Goals and Objectives for next appraisal period: (Developed jointly by the Evaluator and Employee)

Pleae see attached Performance Plan and Strategic Plan Worksheet

2

TR-0125

RECEIVED

DEC 10 2010

BEXAR COUNTY
CIVIL SERVICE COMMISSION
3:58pm  II J

**CONFIDENTIAL**
**COUNTY OF BEXAR**
**EMPLOYEE PERFORMANCE APPRAISAL**

NAME __Carmella Guerrero__                    JOB TITLE _Fiscal & Administrative Services Manager_

DEPARTMENT __Information Services__            APPRAISAL DATE ___10/30/02___

DIVISION _Fiscal & Administrative Services Division_    LAST APPRAISAL DATE ___7/19/01___

EMPLOYMENT DATE__11/23/98__                   APPRAISAL PERIOD FROM _7/01_ TO __7/02__

REASON FOR APPRAISAL:    [X] Annual          [ ] End of Probation
                         [ ] 6 Month          [ ] Other_____

EMPLOYEE'S OVERALL RATING:

      [X] Distinguished    4.51 - 5.00         [ ] Needs Improvement    1.51 - 2.59
      [ ] Commendable      3.51 - 4.50         [ ] Unacceptable         1.50 or below
      [ ] Competent        2.60 - 3.50

[ ]    This employee has been involved in a disciplinary action during this evaluation period, the significance of which is not evident in the appraisal
       dimensions (disciplinary action documentation is available in the employee's personnel file).

[ ]    Other:_____

| | | WEIGHT | | SCORE | RATING |
|---|---|---|---|---|---|
| 1. | APPLICATION OF JOB KNOWLEDGE | .20 | x | 4.50 | .90 |
| 2. | PUBLIC CONTACT | .10 | x | 4.75 | .48 |
| 3. | EMPLOYEE RELATIONS | .05 | x | 4.50 | .23 |
| 4. | INITIATIVE | .15 | x | 4.90 | .74 |
| 5. | QUALITY OF WORK | .10 | x | 4.75 | .48 |
| 6. | QUANTITY OF WORK | .05 | x | 4.90 | .25 |
| 7. | COMMUNICATION SKILLS | .05 | x | 4.50 | .23 |
| 8. | ATTENDANCE & PUNCTUALITY | NA | x | NA | N/A |
| 9. | OPERATION & CARE OF EQUIPMENT | NA | x | NA | NA |
| 10. | CONCERN FOR SAFETY | NA | x | NA | NA |
| 11. | BUDGETING | NA | x | NA | NA |

SUPERVISORY DIMENSIONS:

| | | | | | |
|---|---|---|---|---|---|
| 12. | LEADERSHIP SKILLS | .10 | x | 4.75 | .48 |
| 13. | HUMAN RESOURCE MANAGEMENT | .10 | x | 4.50 | .45 |
| 14. | FISCAL MANAGEMENT | .10 | x | 4.75 | .48 |
| | | 1.00 | | | |

OVERALL PERFORMANCE RATING TOTAL ___4.72___

**Whenever a score of 5, 2 or 1 is given, supporting details must provided. Attach additional paper if needed.**

DIMENSION    COMMENTS

**A Fiscal & Administrative Services Performance Plan inclusive of achievements for this rating period as well as goals for the next rating period is attached as part of this evaluation.**

TR-0126

Comments:

Employee's Signature: _____Guerrero_____ Date: _11/1/02_

Comments:

_____
_____
_____

Evaluator's Signature: _____ Date: _11/1/02_

Comments:_____
_____
_____

Department Authority or Designee's Signature: _____ Date: _11/1/02_

---

**APPEAL SECTION (used only if employee is appealing this performance appraisal)**

I certify that this performance appraisal has been discussed with me and I agree _____ disagree_____ with the scores. I wish to appeal this appraisal and I will submit a written request for appropriate action.

Employee's Signature: _____ Date: _____

Bexar County Civil Service Rules, Temporary Chapter X, Personal Grievances.
**(For Employees Covered Under Bexar County Civil Service Rules.)**
I have been provided a copy of the rules _____ (Employee's initials)

I acknowledge the employee will pursue the appropriate appeal process.

Evaluator's Signature: _____ Date: _____

---

GOAL EVALUATION AND GOAL SETTING: (If additional space is needed, please use separate sheet)
Progress achieved in attaining goals set in **previous** appraisal period:

1. Please see attached Performance Plan and Strategic Plan Worksheet _____

2. _____

3. _____

Goals and Objectives for **next** appraisal period: (Developed jointly by the Evaluator and Employee)

1. Please see attached Performance Plan and Strategic Plan Worksheet _____

2. _____

3. _____

TR-0127

RECEIVED

DEC 10 2010

BEXAR COUNTY
CIVIL SERVICE COMMISSION
3:58pm 83

**CONFIDENTIAL**
**COUNTY OF BEXAR**
**EMPLOYEE PERFORMANCE APPRAISAL**

NAME __Carmella Guerrero__                          JOB TITLE __Business Services Manager__

DEPARTMENT __Information Services__                 APPRAISAL DATE __7/19/01__

DIVISION __Business Services Division__             LAST APPRAISAL DATE __02/28/01__

EMPLOYMENT DATE __11/23/98__                        APPRAISAL PERIOD FROM __7/00__ TO __7/01__

REASON FOR APPRAISAL:    [X] Annual            [ ] End of Probation
                         [ ] 6 Month           [ ] Other_____

EMPLOYEE'S OVERALL RATING:

   [X] Distinguished    4.51 - 5.00          [ ] Needs Improvement    1.51 - 2.59
   [ ] Commendable      3.51 - 4.50          [ ] Unacceptable         1.50 or below
   [ ] Competent        2.60 - 3.50

[ ]    This employee has been involved in a disciplinary action during this evaluation period, the significance of which is not evident in the appraisal
    dimensions (disciplinary action documentation is available in the employee's personnel file).

[ ]    Other_____

| | | WEIGHT | | SCORE | RATING |
|---|---|---|---|---|---|
| 1. | APPLICATION OF JOB KNOWLEDGE | .20 | x | 4.50 | .90 |
| 2. | PUBLIC CONTACT | .10 | x | 4.50 | .45 |
| 3. | EMPLOYEE RELATIONS | .05 | x | 4.50 | .23 |
| 4. | INITIATIVE | .15 | x | 4.90 | .74 |
| 5. | QUALITY OF WORK | .10 | x | 4.75 | .48 |
| 6. | QUANTITY OF WORK | .05 | x | 4.90 | .25 |
| 7. | COMMUNICATION SKILLS | .05 | x | 4.50 | .23 |
| 8. | ATTENDANCE & PUNCTUALITY | NA | x | NA | N/A |
| 9. | OPERATION & CARE OF EQUIPMENT | NA | x | NA | NA |
| 10. | CONCERN FOR SAFETY | NA | x | NA | NA |
| 11. | BUDGETING | NA | x | NA | NA |

SUPERVISORY DIMENSIONS:

| | | | | | |
|---|---|---|---|---|---|
| 12. | LEADERSHIP SKILLS | .10 | x | 4.75 | .48 |
| 13. | HUMAN RESOURCE MANAGEMENT | .10 | x | 4.50 | .45 |
| 14. | FISCAL MANAGEMENT | .10 | x | 4.50 | .45 |
| | | 1.00 | | | |

OVERALL PERFORMANCE RATING TOTAL __4.66__

**Whenever a score of 5, 2 or 1 is given, supporting details must provided. Attach additional paper if needed.**

DIMENSION    COMMENTS

**A Business Services Performance Plan inclusive of achievements for this rating period as well as goals for the next rating period is attached as part of this evaluation.**

TR-0128

Comments:

Although I appreciate the challenges my position in BCIS has afforded me. I am concerned about my evaluation score decreasing. I will continue to work at excelling in my position and make positive improvements in the crucial areas of Public Contact. Quantity of Work and Human Resource Management.

Employee's Signature: _____Carmella Shrewers_____ Date: _7/19/01_

Comments:

_____

_____

_____

Evaluator's Signature: _____ Date: _7-24-2001_

Comments:_____

_____

_____

Department Authority or Designee's Signature: _____ Date: _____

---

**APPEAL SECTION (used only if employee is appealing this performance appraisal)**

I certify that this performance appraisal has been discussed with me and I agree _____ disagree_____ with the scores.
I wish to appeal this appraisal and I will submit a written request for appropriate action.

Employee's Signature: _____ Date: _____

Bexar County Civil Service Rules, Temporary Chapter X, Personal Grievances.
**(For Employees Covered Under Bexar County Civil Service Rules.)**
I have been provided a copy of the rules _____ (Employee's initials)

I acknowledge the employee will pursue the appropriate appeal process.

Evaluator's Signature: _____ Date: _____

---

GOAL EVALUATION AND GOAL SETTING: (If additional space is needed, please use separate sheet)
Progress achieved in attaining goals set in **previous** appraisal period:

1. Please see attached Performance Plan. February. 2001 _____

2. _____

3. _____

Goals and Objectives for **next** appraisal period: (Developed jointly by the Evaluator and Employee)

1. Please see attached Performance Plan. July. 2001 _____

2. _____

TR-0129

*FY 01* : 2.14%

*RECEIVED*

NAME__Carmella Guerrero_____    JOB  TITLE __Business Services Manager__ 0 2010

DEPARTMENT __Information Services_____    . .  APPRAISAL DATE __2/28/01__ BEXAR COUNTY
CIVIL SERVICE COMMISSION
DIVISION __Business Services Division__    .AST APPRAISAL DATE ___01/31/00__    3:58pm Ⓐ J

EMPLOYMENT DATE__11/--    ?PRAISAL PERIOD FROM__1/00___ TO __2.01__

REASON FOR APPR.\    :nd of Probation
?ther___Special for Merit_____

EMPLOYEE'S OVERALL    *3.14* *$4043 old* *$4170 new*

[X] Distinguished .    \s Improvement    1.51 - 2.59
[ ] Commendable    :eptable    1.50 or below
[ ] Competent

[ ]    This employee has been in    \, the significance of which is not evident in the appraisal
dimensions (disciplinary act.    _.J file).

[ ]    Other:_____

|  |  | WEIGHT |  | SCORE |  | RATING |
|---|---|---|---|---|---|---|
| 1. | APPLICATION OF JOB K___LEDGE | .20 | x | 4.50 |  | .90 |
| 2. | PUBLIC CONTACT | .10 | x | 4.75 |  | .48 |
| 3. | EMPLOYEE RELATIONS | .05 | x | 4.50 |  | .23 |
| 4. | INITIATIVE | .15 | x | 4.75 |  | .71 |
| 5. | QUALITY OF WORK | .10 | x | 4.75 |  | .48 |
| 6. | QUANTITY OF WORK | .05 | x | 5.00 |  | .25 |
| 7. | COMMUNICATION SKILLS | .05 | x | 4.50 |  | .23 |
| 8. | ATTENDANCE & PUNCTUALITY | NA | x | NA |  | N/A |
| 9. | OPERATION & CARE OF EQUIPMENT | NA | x | NA |  | NA |
| 10. | CONCERN FOR SAFETY | NA | x | NA |  | NA |
| 11. | BUDGETING | NA | x | NA |  | NA |

SUPERVISORY DIMENSIONS:

| 12. | LEADERSHIP SKILLS | .10 | x | 4.75 | . | .48 |
| 13. | HUMAN RESOURCE MANAGEMENT | .10 | x | 5.00 |  | .50 |
| 14. | FISCAL MANAGEMENT | .10 | x | 4.50 |  | .45 |
|  |  | 1.00 |  |  |  |  |

OVERALL PERFORMANCE RATING TOTAL ___4.72___

**Whenever a score of 5, 2 or 1 is given, supporting details must provided.  Attach additional paper if needed.**

DIMENSION    COMMENTS .

. **A Business Services Performance Plan inclusive of achievements for this rating period as well as goals for the next rating period is attached as part of this evaluation.**

TR-0130

Comments: *I appreciate the opportunity this position and my supervisor have given me.*

Employee's Signature: _____ Date: 2/28/01

Comments: _____

_____

Evaluator's Signature: _____ Date: 2/28/01

Comments: _____

_____

Department Authority or Designee's Signature: _____ Date: _____

**APPEAL SECTION (used only if employee is appealing this performance appraisal)**

I certify that this performance appraisal has been discussed with me and I agree _____ disagree_____ with the scores. I wish to appeal this appraisal and I will submit a written request for appropriate action.

Employee's Signature: _____ Date: _____

Bexar County Civil Service Rules, Temporary Chapter X, Personal Grievances.
**(For Employees Covered Under Bexar County Civil Service Rules.)**
I have been provided a copy of the rules _____ (Employee's initials)

I acknowledge the employee will pursue the appropriate appeal process.

Evaluator's Signature: _____ Date: _____

GOAL EVALUATION AND GOAL SETTING: (If additional space is needed, please use separate sheet)
Progress achieved in attaining goals set in **previous** appraisal period:

1. Please see attached Performance Plan. January 2000 _____

2. _____

3. _____

Goals and Objectives for **next** appraisal period: (Developed jointly by the Evaluator and Employee)

1. Please see attached Performance Plan. February 2001 _____

2. _____

3. _____

TR-0131

Comments: *I will continue to strive for be a good hardworking employee. I appreciate the opportunities I have been given to date.*

Employee's Signature: *Carmella Guerrero*　　　Date: _1/31/00_

---

Comments: _____

_____

_____

Evaluator's Signature: _____　　　Date: _1/31/2000_

---

Comments: _____

_____

_____

Department Authority or Designee's Signature: _____　　　Date: _____

---

I certify that this performance appraisal has been discussed with me and I agree _____ disagree _____ with the scores.

I wish to appeal this appraisal and will submit a written request for appropriate action.

Employee's Signature: _____　　　Date: _____

Bexar County Civil Service Rules, Temporary Chapter X, Personal Grievances.

I have been provided a copy of the rules _____(Employee Initials)

**(For Employees Covered Under Bexar County Civil Service Rules.)**

I acknowledge the employee will pursue the appropriate appeal process.

Evaluator's Signature: _____　　　Date: _____

---

GOAL EVALUATION AND GOAL SETTING: (If additional space is needed, please use separate sheet)

Progress achieved in attaining goals set in **previous** appraisal period:

1. Successful completion of Y2K project goals.  COMPLETED

2. Enhance Computer literacy skills & IS business processes & practices.  CONTINUAL LEARNING PROCESS

3.

Goals and Objectives for **next** appraisal period: (Developed jointly by the Evaluator and Employee)

1. *See attached Performance Plan*

2. _____

3. _____

TR-0132

CONFIDENTIAL
# COUNTY OF BEXAR
## EMPLOYEE PERFORMANCE APPRAISAL

CIVIL SERVICE COMMISSION
BEXAR COUNTY

DEC 10 2010

RECEIVED

NAME __Carmella Guerrero_____    JOB TITLE __Year 2000 Contract Coordinator_____

DEPARTMENT _Information Services_____   APPRAISAL DATE __May 27, 1999_____

DIVISION _Year 2000 Project Office_____   LAST APPRAISAL DATE __n/a_____.

EMPLOYMENT DATE __11/23/1998_____   APPRAISAL PERIOD FROM __11/1998_ TO _05/1999_

REASON FOR APPRAISAL:   Annual              End of Probation ____X____
                        6 Month ___X_____   Other _____.

EMPLOYEE'S OVERALL RATING:

| | | | |
|---|---|---|---|
| Distinguished | 4.51 - 5.00 | Needs Improvement | 1.51 - 2.59 |
| Commendable | 3.51 - 4.50 | Unacceptable | 1.50 or below |
| Competent | 2.60 - 3.50 | | |

This employee has been involved in a disciplinary action during this evaluation period, the significance of which is not evident in the appraisal dimensions (disciplinary action documentation is available in the employee's personnel file).

Other:_____

| PERFORMANCE DIMENSIONS: | WEIGHT | | SCORE | RATING |
|---|---|---|---|---|
| 1. APPLICATION OF JOB KNOWLEDGE | .25 | x | 4 | 1.00 |
| 2. PUBLIC CONTACT | .05 | x | 4 | .20 |
| 3. EMPLOYEE RELATIONS | .05 | x | 4 | .20 |
| 4. INITIATIVE | .15 | x | 5 | .75 |
| 5. QUALITY OF WORK | .15 | x | 5 | .75 |
| 6. QUANTITY OF WORK | .15 | x | 5 | .75 |
| 7. COMMUNICATION SKILLS | .10 | x | 4 | .40 |
| 8. ATTENDANCE & PUNCTUALITY | .05 | x | 5 | .25 |
| 9. OPERATION & CARE OF EQUIPMENT | n/a | x | n/a | n/a |
| 10. CONCERN FOR SAFETY | n/a | x | n/a | n/a |
| 11. BUDGETING | .05 | x | 5 | .25 |

| SUPERVISORY DIMENSIONS: | | | | |
|---|---|---|---|---|
| 12. LEADERSHIP SKILLS | n/a | x | n/a | n/a |
| 13. HUMAN RESOURCE MANAGEMENT | n/a | x | n/a | n/a |
| 14. FISCAL MANAGEMENT | n/a | x | n/a | n/a |
| | 1.00 | | | |

OVERALL PERFORMANCE RATING TOTAL          _4.55_

Whenever a score of 5, 2 or 1 is given, supporting details must be provided. Attach additional paper if needed.

DIMENSION    COMMENTS
_____      _See attached documentation._____
_____      _____
_____      _____
_____      _____

TR-0133

Comments: _I concur with this evaluation and will strive to improve my job performance._

Employee's Signature: _Carmella Guerrero_     Date: _6/3/99_

Comments: _I am requesting a waiver to the personnel rules to pay this employee at mid point of the range based upon her superb performance_

Evaluator's Signature: _David E Mayny_     Date: _June 2, 1999_

Comments: _Ms. Guerro is one the very best employees I have had the pleasure of working with in 30 years of government_

Department Authority or Designee's Signature: _____ Date: _6/3/1999_

certify that this performance appraisal has been discussed with me and I agree _____ disagree _____ with the scores.

wish to appeal this appraisal and will submit a written request for appropriate action.

Employee's Signature: _____ Date: _____

Bexar County Civil Service Rules, Temporary Chapter X, Personal Grievances.

have been provided a copy of the rules _____ (Employee Initials)
(For Employees Covered Under Bexar County Civil Service Rules.)

acknowledge the employee will pursue the appropriate appeal process.

Evaluator's Signature: _____ Date: _____

TR-0134

**RECEIVED**

DEC 10 2010

BEXAR COUNTY
CIVIL SERVICE COMMISSION
3:58pm~~B 1

# CARMELLA GUERRERO

# YEAR 2000 CONTRACT COORDINATOR

# EMPLOYEE PERFORMANCE APPRAISAL

## JUNE 1, 1999

### FOR THE PERIOD NOVEMBER 1998 – MAY 1999

### PERFORMANCE DIMENSIONS: SUPPORTING DETAILS

---

### 4. INITIATIVE

---

Ms. Guerrero's initiative in all aspects of her job performance is superb. She serves as a role model for others who work with and around her. Ms. Guerrero's participation in Greater San Antonio Year 2000 Coalition activities brings praise to her personally, and is a very positive reflection on the County. Carmella is known as a person who gets things done, and that has earned her the respect of her peers both within and outside the County.

Ms. Guerrero also has an aptitude for detail work, which serves her well in her duties as a Year 2000 Contracts Coordinator. Over the course of her projects, She frequently recognizes minute traces of problems and is keen to examine the trail of evidence seeking a full understanding and an effective and timely solution. For example, Ms. Guerrero has been fully involved in various projects associated with Year 2000 and the County's radio systems. She identified potential problems (not directly related to the Year 2000) and worked to inform the affected offices and departments.

In the execution of her primary duties as a Y2K Contract Coordinator, Ms. Guerrero recognized the need for timely progress on the Embedded Systems inventory efforts. In order to expedite the process, Ms. Guerrero took the initiative to form a Year 2000 Task Force, and tasked the task force members with the preliminary inventory. This effort conserved the Year 2000 project's valuable resources in avoiding the cost of a contractor-staffed preliminary inventory. In addition, with the preliminary inventory essentially complete, the County was in a better position to negotiate the Embedded Systems assessment and remediation contract. The original estimates ranged to $1 Million dollars. The preliminary contract cost was estimated at $750,000. The final negotiated contract cost is $667,000. These cost management efforts were due in large part to the information Ms. Guerrero quickly and accurately compiled through the effective use of the Task Force.

---

### 5. QUALITY OF WORK

---

Ms. Guerrero has a keen eye for detail in her work product, and an aggressive attitude towards completing any projects to which she assigned. Her productivity in terms of the volume of work produced is easily matched by the quality of those work products. Ms. Guerrero is a good listener; a wonderful asset in avoiding simple mistakes. However, she also brings her own style to a project and isn't afraid to ask questions or to offer suggestions if something about the assignment seems unclear. These attributes enable Ms. Guerrero to "get it right the first time" almost every time.

TR-0135

Ms. Guerrero's work is professional and timely, with relatively few errors of any kind. Her work products are seen by many outside the County, and their consistently high quality serve to enhance the County's overall public image. Ms. Guerrero's oral presentations are also well done, and have the same effect of enhancing the County's public profile, as well as her own.

Since her arrival in the Year 2000 Project Office, Ms. Guerrero has enhanced many of the essential skills and abilities she needs to excel. Her proficiency in use of the computer; her specific knowledge in the area of Year 2000 and embedded systems, and; her general knowledge of County government operations and processes have all increased. These serve to increase the overall quality of her work output.

---

## 6. QUANTITY OF WORK

---

It is difficult to communicate the volume of Ms. Guerrero work using only words, because so many of her work products are intangible. Ms. Guerrero is a leader in defining the processes and procedures that help direct the Year 2000 project. The final results are visible in the timelines and inventory spreadsheets she uses to track and manage her projects. What is less visible is the amount of work saved through the efficiency and effectiveness of Ms. Guerrero's work habits.

The key to the quantity of work Ms. Guerrero produces is this: she is always prepared for the next day's work. She doesn't lose time because her part of a project remains to be done. On the contrary, most of her peers and co-workers know they had better get on board, or risk missing the train. While many workers can appear to be very busy while producing very little, Ms. Guerrero is a consistent producer of high quality work. She manages her time very well, balancing her mandatory work duties with other work-related responsibilities she seeks and accepts. Her participation in Year 2000 projects for the Greater San Antonio Y2K Coalition, as well as at the State level further indicate the workload Ms. Guerrero is capable of handling. Yet, each of these projects receives her full attention with no reduction in the quality of the work produced. One way Ms. Guerrero handles the tremendous workload she shoulders is by working longer hours than required. She frequently takes a briefcase full of work home to complete, and rarely misses a day of work. All of these things combine to make Ms. Guerrero a consistently high producer. The attached list of accomplishments documents her efforts.

---

## 8. ATTENDANCE AND PUNCTUALITY

---

Ms. Guerrero is a very punctual and reliable employee. She consistently avoids missing workdays, regardless of the cause. Ms. Guerrero sets a standard in her personal accountability, and it is very evident that she takes her attendance and punctuality very seriously.

Ms. Guerrero is prompt in returning telephone calls and pages. This is not only an example of her professional courtesy, but of the high regard in which she holds punctuality. Her promptness and attitude hold for non-County events and meetings as well, serving as a very positive reflection on the County.

TR-0136

The development and preparation of the Department's FY 1999-2000 budget was complicated by the numerous proposed changes initiated as a part of the departmental reorganization. Although not directly a part of her job duties, Ms. Guerrero was instrumental in negotiating the myriad requirements necessary for submitting the proposed changes. She successfully mediated between opposing perspectives held by the Department's managers. Ms. Guerrero guided and coached the budget and development work to avoid unnecessary work, and to make the submission as concise and clear as possible. Department managers and staff alike have come to rely on her budget process expertise.

Ms. Guerrero is also a careful steward of the Year 2000 Project budget category for which she is responsible: embedded systems. As previously mentioned, she "stretched the dollars" through a more efficient and equally effective preliminary inventory process using County employees and staff. This effort came about because of her budget analysis and projections indicating the embedded systems funding category would require a tight fist and careful execution to avoid potential overruns.

Even in executing the Year 2000 Project Office's internal budget, Ms. Guerrero carefully monitors expenditures to ensure a sufficient cash flow throughout the budget year. She recommended several changes to the original office equipment requests, and even coordinated with the County's Jail Industries program to refurbish existing desks, avoiding the cost of purchasing new ones. This is indicative of Ms. Guerrero's careful, conservative and skilled approach to budget development and execution.

# Carmella Guerrero

❖ ❖ ❖

4707 Trailwood  
San Antonio, TX  78228

Phone (210)456-2378 (Home)  
(210)635-7529 (Cell)

RECEIVED

DEC 10 2010

BEXAR COUNTY  
CIVIL SERVICE COMMISSION  
3:51 pm ☒ J

## SUMMARY OF QUALIFICATIONS

- ✓ Over 20 years management experience
- ✓ Over 17 years in Bexar County Government
- ✓ Proven experience in business administration, budget development/oversight, resource management and inventory control
- ✓ Proven experience in contract negotiations, development and oversight
- ✓ Proven leadership skills, team building, and strategic planning experience
- ✓ Proven customer service and public relations skills

## WORK HISTORY

*Oct 2010 to Present*     *IT Services Manager - Bexar County Information Services*

Reclassification to this position occurred in October of this year. The position description was drafted and not fully implemented to present.

*Aug 2006 – Sept 2010*     *Planning & Technical Services Manage - Bexar County Information Services*

Manages and oversees information technology strategic planning goals and objectives for technology business analysis, communications, technology training and audio/video communications; acts as the representative to County Offices and Departments, Elected Officials, Commissioners Court and outside agencies; manages the development and maintenance of the BCIT departmental budget; estimates funding for staff, equipment, materials and supplies and directs the monitoring and approval of expenditures; oversees execution of the procurement process for internal BCIT funds and the Countywide Technology Fund; responsible for the County voice and video network infrastructure; oversees vendor services/products for cellular, voice, data, and video equipment; coordinates with the Sheriff's Office for all City/County Radio Project issues; manages the negotiation, processing and preparation of external service contracts, RFP's and maintenance agreements; oversees all personnel functions including high level personnel issues involving management; oversees supervision, training and evaluation of Senior Technology Business Analysts, Video Teleconference Manager, Office/Contracts Supervisor, Communications Coordinator and Senior Training & Support Specialists.

*Oct 2001 – Aug 2006*     *Fiscal & Administrative Services Manager - Bexar County Information Services*

Supervised, trained and evaluated professional and administrative staff; managed department budget development and execution of all budget processes. Managed and coordinated negotiation, processing and preparation of internal and external service contracts, RFP's, and service/maintenance agreements; responsible for EEO plan to maintain workforce utilization; managed all personnel functions; developed and maintained all departmental policies and procedures including activity based costing, billing processes and management activities; represented BCIT on task forces, internal and external committees and Countywide meetings; oversight of all Commissioners Court items; managed department assets; managed accounts payable and receivable for BCIT.

*July 1999-Sept 2001*     *Business Services Manager - Bexar County Information Services*

TR-0138

Managed all administrative and business functions in BCIT; supervised, trained and evaluated administrative and clerical staff; managed all vendor and client service contracts; developed and monitored overall department budget; managed departmental business functions and coordinated all special projects; responsible for personnel administration; managed BCIT facility assets.

*Nov 1998-July 1999      Year 2000 Contract Coordinator - Bexar County Information Services*

Planned, organized and developed strategies and milestones for new computer systems; identified remediation requirements; planned, organized and developed strategies for projects; acquired contractor services and monitored such services; coordinated specification compliance and achievement of milestones; provided technical assistance to County users; drafted system documentation; developed Y2K Task Force; developed and staffed RFP processes; and developed embedded systems inventory and remediation plan for the entire County.

*Jan 1997-Nov 1998      Jail Support Services Manager -Bexar County Sheriff's Office*

Managed jail support operations in the Adult Detention Division, inclusive of Human Services, Clothing/Property, Laundry, Inmate Grievance and Jail Industries; supervised professional and administrative staff; investigated support operational problems; analyzed data; recommended solutions; monitored outside contracts such as the food services contract and the inmate phone system for the Adult Detention System; developed and monitored the annual budget for the Adult Detention Division; received, researched and prepared responses for the Sheriff and Jail Administrator on issues of citizen complaints; assisted the Jail Administrator with special projects such as development of programs and services and preparation of Commissioners Court items; coordinated and participated in various problem solving meetings and committees related with the Adult Detention Center.

## RELEVANT EXPERIENCE

*June 1995-Jan1997      Special Assistant to the Jail Administrator,  Bexar County Sheriff's Office*

*Nov 1994-June 1995      Program Manager Human Services, Bexar County Sheriff's Office*

*Oct 1993-Nov 1994      MATCH/PATCH Coordinator Assistant, Bexar County Sheriff's Office*

*Dec 1992-April 1993      Administrative Assistant, New Mexico Children, Youth & Families*

*May 1991-Oct 1992      Psychological Technician Supervisor, New Mexico Department of Health*

*May 1991-Oct 1992      Staff Development Specialist, New Mexico Department of Health*

*Sept 1990-May 1991      Psychological Technician II, New Mexico Department of Health*

*June 1998-Sept 1990      Job Development/Placement Specialist, Albuquerque Job Corps Center*

*May 1985-May 1990      Hospital Advocate and Speaker, Albuquerque Rape Crisis Center*

## EDUCATION

124 hours towards Bachelor of Science/Criminal Justice
Associate of Arts - Police Science
University of Albuquerque, Albuquerque, New Mexico

TR-0139

**BEXAR** **COUNTY**

**MARGARET G. MONTEMAYOR**
**DISTRICT CLERK**

**RECEIVED**

**DEC 10 2010**

**BEXAR COUNTY**
**CIVIL SERVICE COMMISSION**
*3:56pm ℒ J*

December 10, 2010

To Whom It May Concern:

I am writing this letter of recommendation for Ms. Carmella Guerrero whom I have known and worked with throughout my years as District Clerk.

Carmella has demonstrated an amazing ability to keep up with a myriad of job responsibilities while providing support to a diverse group of people. She conducts herself in a positive, earnest and professional manner. Her consideration for others has made her an indispensable part of BCIT and the County.

Carmella has always led by example. Her strong work ethic, her loyalty to the County and BCIT and her staunch support of her staff is admired by all who have been fortunate enough to work with her.

She is a well respected professional who has been recognized for her dedication and leadership on many occasions.

Margaret G. Montemayor
Bexar County District Clerk

mgm/ea

**RECEIVED**

**DEC 1 0 2010**

BEXAR COUNTY
CIVIL SERVICE COMMISSION
3:56pm ☒2



## BEXAR COUNTY ELECTIONS DEPARTMENT

To Whom It May Concern:

It is with great pleasure that I write this letter of reference for Ms. Carmella Guerrero whom I have had the privilege of knowing for many years.

Ms. Guerrero has worked for me in the capacity of a Regional Sending Site Manager for many years. Her dedication and work ethic have earned her the trust and respect of the Elections Judges and my Elections staff. The Regional Sending Site is a critical component of the election process. Ms. Guerrero's exceptional skills and attention to detail with regard to her work have made every election she has worked a success. She always maintains composure in difficult and stressful situations and works eagerly to resolve any situation which may arise. Her site is always managed well as evidenced by her "no error" rate for each election.

My department is a customer to the Information Technology Department. All my dealings with Ms. Guerrero in the many positions she has held in the IT Department have been positive. I believe her years of experience in the County have equipped her with the skills to work effectively with a diverse group of people. She has proven herself to be a capable leader and is an asset to this County.

Ms Guerrero has been invaluable in assisting me in the workings of the Civil Service issues from this department. I have relied on her expertise in understanding the process.

Finally, Ms. Guerrero is always willing to offer assistance whether it is volunteering for an election or helping to resolve technical issue. She has always followed through to ensure that any issues are resolved in a professional and timely manner.

Jacquelyn F. Callanen
Bexar County Elections Administrator



RECEIVED

DEC 10 2010

BEXAR COUNTY
CIVIL SERVICE COMMISSION
3:58pm~ 12J

## BEXAR COUNTY
## PURCHASING DEPARTMENT

Vista Verde Plaza * 233 N. Pecos. Suite 320 * San Antonio. Texas * 78207-3178

DANIEL R. GARZA
County Purchasing Agent

December 9, 2010

RE: Character Statement on Ms. Carmella Guerrero

To whom it may concern:

I had the privilege of working with Ms. Carmella Guerrero on several procurement projects. Ms. Guerrero has always conducted herself in the utmost professional manner. An example is a project we worked on that called for an annual forecast procurement of Dell computers for County staff. This procurement was conducted through a Cooperative Agreement through Department of Information Resources (DIR) exceeding one million dollars. Considering the dollar threshold, Purchasing collaborated with Ms. Guerrero to prepare a Commissioners Court Agenda Item, which was subsequently approved. This step was used as a model for all Cooperative Procurements involving thresholds and Commissioners Court approval.

Ms. Guerrero has also been instrumental in the employment process for the Purchasing Department's management staff. Ms. Guerrero was on the interview panel for one of the Assistant Purchasing Agent positions to include involvement in the interview process for the County Purchasing Agent position.

I personally obtained managerial advice from Ms. Guerrero on staff disciplinary issues. Ms. Guerrero provided me with disciplinary process letter templates, which were approved by Civil Service.

Ms. Guerrero has been a great colleague and confidant throughout my career with the County.

Please feel free contacting me for further information.

Best regards,

Daniel R. Garza
County Purchasing Agent

TR-0142

**RECEIVED**

DEC 10 2010

BEXAR COUNTY
CIVIL SERVICE COMMISSION
*3:58pm ₴ 2*



## CRIMINAL DISTRICT COURT ADMINISTRATION
CADENA-REEVES JUSTICE CENTER TOWER
300 DOLOROSA, SUITE 301
SAN ANTONIO, TEXAS 78205
(210) 335-2544
FAX: (210) 335-2252

**MELISSA BARLOW FISCHER**
**GENERAL ADMINISTRATIVE COUNSEL**

December 8, 2010

RE: CARMELLA GUERRERO

To Whom it May Concern:

I am happy to act as a character reference for Carmella Guerrero, and I do so without hesitation. I have known Carmella for almost 12 years, working with her on various projects through the years starting with the county's plan to be ready for Y2K in 1999. I would see her at least a couple of times a month, sometimes more, in committee meetings concerning issues of importance to our county and county employees. She was usually there representing BCIT, and I was there representing the Criminal District Courts.

Early on I came to recognize her value to these committees. She always had thoughtful insight and I appreciated her ability to express her ideas and opinions in a respectful, professional manner. You can always count on Carmella to tell you what she thinks, and even if you may disagree on occasion, you will understand the logic behind her thoughts. She is very intelligent, charming, friendly, and I have thoroughly enjoyed working with her these past 12 years.

I highly recommend Carmella for any position she is applying for, and will stand as a character reference for her whenever necessary. I am available at (210) 335-3474 or on my cell at (210) 215-0479 to answer any questions. Please do not hesitate to call.

Sincerely,

Melissa Barlow Fischer

TR-0143

**THE DISTRICT COURTS OF BEXAR COUNTY**

RECEIVED

DEC 10 2010

BEXAR COUNTY
CIVIL SERVICE COMMISSION
3:58pm

BEXAR COUNTY COURTHOUSE
100 DOLOROSA
SAN ANTONIO, TEXAS 78205

December 9, 2010

TO WHOM IT MAY CONCERN:

Re:    Carmella Guerrero

I serve as General Administrative Counsel for Civil District Courts Administration that provides legal, administrative and liaison support to the 14 Civil District Courts, 2 Child Support Associate Judges and 2 Children's Court Associate Judges.

During my nine and one-half years as General Counsel, I have had the pleasure of working with Ms. Carmella Guerrero in her former capacity in the Information Technology Department. Ms. Guerrero has always provided excellent support to our Department. She presents herself in a professional manner. Her knowledge of BCIT procedures and procurement processes has been an asset to me and the Judges I serve.

Over the past few years, Ms. Guerrero and her staff supported technology improvements in the area of audio/visual and video teleconferencing in the 37th, 131st, 150th, 285th, and 407th District Courts, as well at the Child Support Court and the Children's Court. She worked diligently to assure that funding was in place and that her staff had the support to complete the work.

It is obvious that Ms. Guerrero takes pride in her work.  Her responsiveness, to the County's technology needs, is commendable.

Sincerely,

Gary W. Hutton
General Administrative Counsel
Bexar County Civil District Courts



**BEXAR** **COUNTY**

## MARGARET G. MONTEMAYOR
### DISTRICT CLERK

December 10, 2010

To Whom It May Concern:

I had the pleasure of meeting Carmella Guerrero eight (8) years ago. She has always shown great professionalism in whatever endeavor she sets her mind to accomplish. Carmella has always been the go to person; whenever you have a problem, she always manages to resolve whatever issue you bring to her.

Carmella always interacts well with the public. She can always be counted on to work with others in a pleasant matter.

Carmella is extremely cooperative and professional with anyone that she comes in contact with.

Sincerely,

Elva Abundis-Esparza
Chief Deputy, District Clerk's Office

RECEIVED

DEC 10 2010

BEXAR COUNTY
CIVIL SERVICE COMMISSION
5:56 pm 22

JUSTICE COURT, PRECINCT 3
8918 TESORO DRIVE, SUITE 300
SAN ANTONIO, TEXAS 78217-6238



TELEPHONE: (210) 335-4700
FACSIMILE: (210) 335-4705

## KEITH BAKER
### JUSTICE OF THE PEACE

December 8, 2010

To Whom It May Concern:

Please accept this letter as a formal character reference for Ms. Carmella Guerrero, formerly the IT Services Manager for Bexar County Information Services. I have had the pleasure of knowing Ms. Guerrero in her professional capacity in the IT department for many years. My experiences with Ms. Guerrero have been pleasant and professional. As Court Manager for Justice of the Peace, Precinct 3, I have called on Ms. Guerrero many times for assistance with technology purchases and IT services. She is responsive, professional and always gets the job done in record time.

Ms. Guerrero, on several occasions, has had to coordinate between five Court Administrators with different Elected Judges and always seems to get consensus to assure our projects are brought to fruition.

I have also had the pleasure of serving with Ms. Guerrero on County-wide committees. The knowledge on County-wide issues she brings to the table has always amazed me. She is an asset to her Department and to the County as a whole.

Janet Miller
Justice Court Manager, Pct. 3
(210) 335-4707

TR-0146

**RECEIVED**

**DEC 10 2010**

**BEXAR COUNTY**
**CIVIL SERVICE COMMISSION**
3:58 pm &3

December 9, 2010

To Whom It May Concern:

I am happy to provide this brief letter attesting to the many talents of .Ms Carmella Guerrero. I had the good fortune of having her as part of my staff while serving as the Jail Administrator of the Bexar County Jail. My first major crisis as Jail Administrator was a scheduled jail inspection by the jai standards commission. Ms Guerrero volunteered to assist in preparing the jail and all its mandatory programming into compliance and was recognized by the inspectors. We eventually promoted her to Jail Support Services Manager.

I had the upmost respect and confidence in her abilities because I knew the she would do the due diligence necessary to provide me with the best options. During the time that she was on my staff there was never an issue that a questionable course of action was taken that she didn't come to me and say "Chief, I blew it".

Ms. Guerrero was/is a hard worker dedicated to the mission assigned not just to he, but to all members of the unit. Equally impressive is her dogged determination to the best in the job she is responsible for. If there were projects or other functions assigned to her that were not her forte she would pick your brain, research the topic and in no time one would not know this was all new to her.

One such project that demonstrates how well she was respected was the assemblage of a team sent to Colorado to review hard core criminals in selecting those we could bring back to Bexar County to help fill our jail and delay the privatization of our jail operations-and at the same time put money into the County coffers. Ms. Guerrero headed up that delegation without one single glitch. Ms. Guerrero, as I'm sure she does now, coordinated the entire operation and assisted in screening the prisoner's records.

I was the one who recommended Ms. Guerrero to Dr. David Morgan, the previous CIO, when he took the County job. Feedback from him was nothing but laudatory. Within months Ms. Guerrero was David's go to girl, passing more and more duties and responsibilities to her. From my many visits to the court or operations within the jail---Ms. Guerrero was the go to person in the department. She was the ideal employee. She came to work on time and stayed as late as needed to get the project done.

A good manager should want employees who are strong in their beliefs and are allowed to provide their input. Ms. Guerrero will argue her point but when you say "no-this is the way I want it done---she becomes your strongest advocate". They don't come much better than her.

Sincerely,

Chauncey A. Spencer
Major, U.S,A (ret)
Former Jail Administrator B.C.S.O.

TR-0147

# THE LOPEZ LAW FIRM
## A PROFESSIONAL CORPORATION

RECEIVED

NOV 16 2010

BEXAR COUNTY
CIVIL SERVICE COMMISSION

8:30 a.m. andrea

November 10, 2010

**VIA HAND DELIVERY**

Catherine Maras
Chief Information Officer
Bexar County Information Technology
203 W. Nueva, Suite 200
San Antonio, Texas 78207-4507

RE: Employee Policy No. 7.6.11 Response

Dear Ms. Maras:

This law firm represents Carmella Guerrero. On or about October 27, 2010, you provided Ms. Guerrero a Notice of Proposed Disciplinary Action purporting to demote Ms. Guerrero to a Technology Business Analyst Grade E-05. In accordance with Policy No. 7.6.11, Ms. Guerrero provides this response to your proposed disciplinary action.

## Record of Achievement

Ms. Guerrero has been a valued employee with Bexar County since 1993. Ms. Guerrero began her career with Bexar County as an administrator in the Bexar County Sheriff's Department. Ms. Guerrero held several positions with the sheriff's department and was ceremoniously promoted in the department until she became the Jail Support Services Manager in 1997. In 1998, Ms. Guerrero transferred to the Bexar County Information Services Department, and served as a contract coordinator. While an employee of the information services department, Ms. Guerrero was promoted three times until she finally was promoted to second in command of the information services department where she served as the department's IT Services Department Manager.

Ms. Guerrero has had a distinguished career with Bexar County, and has worked her way up the system with her tireless work ethic, loyalty, and professionalism. Ms. Guerrero's work record with Bexar County is spotless, and she has received numerous raises and promotions due to her accomplishments. Ms. Guerrero has been a proven leader, an ideal employee, and exceptional colleague to her many coworkers within Bexar County for almost two decades. Until your recent proposed disciplinary action, Ms. Guerrero has never been admonished or disciplined as a Bexar County employee.

• FIRST NATIONAL BANK TOWER • 6243 I. H. 10 WEST, SUITE 205 • SAN ANTONIO, TEXAS 78201 •
• 210.472.2100 TELEPHONE • 210.472.2101 TELECOPIER •

TR-0148

In fact, you promoted Ms. Guerrero to her current position after you took over the department in 2009.

## Specific Reply to Grounds for Demotion

It is apparent from the record that your decision to demote Ms. Guerrero is based on simple miscommunication and personality differences. There is no evidence, however, that Ms. Guerrero was insubordinate, was dishonest, or failed in carrying out the requirements of her job. Your reasons for Ms. Guerrero's proposed demotion seem to be that (1) Ms. Guerrero misled you about her authority to direct parking for the department, and (2) Ms. Guerrero disregarded your directive that Tina Singh pay for parking. We do not believe the facts support these reasons for the proposed demotion.

1.    **Ms. Guerrero did not mislead you about her authority to assign parking.**

Bexar County Administrative Policy No. 4.6, the relevant parking policy for the county, is clear that the Parking Garage Division of Infrastructure Services Department is responsible for administering the county's parking facilities. Additionally, the Infrastructure Services Department ("ISD") is responsible for the assignment of parking privileges within the county's parking facilities. The plain language of the policy is clear that ISD is responsible for the assignment of parking privileges; and, not Ms. Guerrero.

Of course, over time, Ms. Guerrero has assisted your department in coordinating with ISD to determine which employees qualified for certain parking privileges, and even corresponded with ISD to track certain parking assignments. Ms. Guerrero's work in this regard, however, did not rise to the level of making Ms. Guerrero ultimately responsible for overseeing all of the parking in your department. As you know, Ms. Guerrero has many more pressing and important responsibilities in connection with the county's IT department. Instead, the person responsible for assigning parking spaces for ISD was David Mandujuano, whom Ms. Guerrero communicated with after you instructed Ms. Guerrero to obtain a list of who had privileges to park in the designated spaces at issue. In fact, Ms. Guerrero had to email ISD to determine the hierarchy for the parking spaces at issue because Ms. Guerrero was not responsible for making those assignments.

Simply put, it seems that you intend to demote Ms. Guerrero because she told you that she was not in charge of parking when you believe the practice is the department was for Ms. Guerrero to assist in some of those tasks. Ms. Guerrero by virtue of her position within your department does not have any authority to assign parking. Ms. Guerrero was clear with you that she did not have the authority you claim she did have. To the extent that either you or persons within your department believed that Ms. Guerrero was responsible for making parking assignments, such belief is misplaced and most likely a result of miscommunication. Ms. Guerrero has always been honest with you about her job and her job responsibilities, and she would have no reason to mislead you about what she can and cannot do in regards to parking. Moreover Administrative Policy No. 4.6 is clear as to who is responsible for assigning parking spaces—ISD. Ms. Guerrero was equally clear with you that it was ISD that assigned parking and not her.

• First National Bank Tower • 6243 I. H. 10 West, Suite 205 • San Antonio, Texas 78201 •
• 210.472.2100 Telephone • 210.472.2101 Telecopier •


TR-0149

2. **Ms. Guerrero followed your directive regarding Ms. Singh's parking.**

Ms. Singh is a contract vendor for the county, and sometimes must attend early morning meetings at Heritage Plaza. Ms. Guerrero was under the belief that you authorized Ms. Singh to utilize the designated space at issue on mornings that Ms. Singh had early meetings; otherwise, you instructed Ms. Singh that she would make arrangements to pay for her parking. To that end, Ms. Guerrero informed Ms. Singh by email that she could only park in the designated space for the early morning meetings, and that Ms. Singh would need to coordinate with ISD for a permanent parking space and that she would be required to pay for the parking. Ms. Singh confirmed the parking instructions with Ms. Guerrero and Ms. Singh was referred to ISD. Since October 4, 2010, Ms. Singh has related to Ms. Guerrero that she should not have been parking in the space at issue.

We believe the record is clear that Ms. Guerrero followed the instructions you gave her regarding Ms. Singh's parking. We believe it was Ms. Singh's responsibility to coordinate with ISD and/or the auditor's office and make arrangements to pay for her parking privileges. Ms. Guerrero did what was asked of her in this regard, and to the extent Ms. Singh was parking in the space at issue, it was an oversight on Ms. Singh's part because Ms. Guerrero was clear with Ms. Singh about the requirement that Ms. Singh coordinate and pay for her own parking with ISD. Miscommunication may have played a role in this situation as well.

## Conclusion

Ms. Maras, Ms. Guerrero has been a valued employee for Bexar County for almost two decades. Her dedication to the county, her job, and to your department is unquestioned. You have worked with Ms. Guerrero for over twelve months, and you should know that Ms. Guerrero is not the type of person that will skirt her responsibilities; and certainly, you should know that Ms. Guerrero would not lie to you or be dishonest, as you have suggested.

Ms. Guerrero is not responsible for the parking assignments as she attempted to inform you. She was not trying to mislead you or hide from any of her responsibilities. Additionally, Ms. Guerrero did her part to inform Ms. Singh that Ms. Singh had only limited parking privileges at the designated parking space and that she would need to make arrangements to pay for her parking as you instructed Ms. Guerrero. It does not seem fair to punish Ms. Guerrero if Ms. Singh did not follow those instructions.

Finally, Ms. Guerrero is an important part of our team and Bexar County, and she very much wishes to continue in her current position. If there was an exchange for words that caused this matter to escalate unnecessarily, we are certain measures can be taken, such as counseling, to avoid such exchanges in the future. Under Administrative Policy No. 7.6.11, we also do not believe Ms. Guerrero's alleged conduct was serious enough to warrant your proposed demotion without prior use of less severe discipline. We understand that did you did not even attempt to impose any type of less severe discipline.

• FIRST NATIONAL BANK TOWER • 6243 I. H. 10 WEST, SUITE 205 • SAN ANTONIO, TEXAS 78201 •
• 210.472.2100 TELEPHONE • 210.472.2101 TELECOPIER •

TR-0150

Accordingly, we believe your proposed demotion is unreasonable under these circumstances, and respectfully request that you not proceed with the proposed demotion.

Thank you for your time and attention.

Very truly yours,

*Orlando R. Lopez*

Orlando R. Lopez

cc:     Carmella Guerrero

• FIRST NATIONAL BANK TOWER • 6243 I. H. 10 WEST, SUITE 205 • SAN ANTONIO, TEXAS 78201 •
• 210.472.2100 TELEPHONE • 210.472.2101 TELECOPIER •

TR-0151



**BEXAR COUNTY INFORMATION TECHNOLOGY**
203 W. Nueva, Suite 200
San Antonio, Texas 78207-4507
(210) 335-0200

**RECEIVED**

OCT 15 2010

BEXAR COUNTY
CIVIL SERVICE COMMISSION
1:30 pm Andru

October 6, 2010

TO:    Cathy Maras, CIO

SUBJ: Incident on October 4, 2010

   I am writing this letter regarding the incident that occurred in your office on Monday, 10/4/10. I went back and forth as to whether putting this in writing was the best way to go, however I was concerned that another discussion would result in another altercation.

   It is important to me that you know my feelings on this matter. Beginning early Monday morning, you inquired about parking at the annex and directed me to do several things including asking Tina Singh to find parking elsewhere and to pay for said parking. I immediately came upstairs to notify Ms. Singh and you were already telling her. Your tone towards me was rude and accusatory in front of Ms. Singh. Throughout the day while we were working out the issues on BCIT parking, you were abrupt with me and in my opinion accusatory that David and I were utilizing the parking situation to our advantage. One example was the "wink-wink" you gave me in the meeting with OJ, Lulu and Linda and your reference to the fact that only David and I had these privileges. This is not true. I have been following County policy regarding parking since the policy inception in 1999.

After, spending a good majority of my day trying to fulfill your directive to find out who was parking in what spaces, I felt that you were growing angrier and angrier. At the end of the day, I went to provide you a copy of the policy for review and discussion at managers meeting. Again, you raised your voice, slapping the policy in your hand and accusing me of wrong doing and notifying me that you were taking me out of the loop. I turned to leave your office and made this comment: "I was just giving you a copy of the policy, I don't understand why you have been ugly to me all day". You raised your voice at me, jumped out of your chair, got up in my face, pointed your finger six times yelling "sit down", proceeded to the door and slammed it shut. You continued to yell at me saying that you are the CIO and it was your right to act like this. You yelled several times that I had a bad attitude and inappropriate mannerisms and that you were not going to stand for it. You directed to "fix" it. You also shouted that I was making you look like an "a-hole".

The majority of the employees on the 2nd floor heard this outburst and were very concerned. When I was in your office, I was afraid of you. In thirty years of my professional career, I have never been treated like this. I feel embarrassed and degraded in front of the employees of BCIT. Since this occurred, I have been approached by several staff asking if I was ok.

TR-0152

Whether or not employees like me, I feel that they respect me and you have damaged that respect, at least in my eyes. I have worked in BCIT for the passed 12 years and in the County for 18 years and have never been in trouble with any employer for any reason nor have I been treated the way you treated me. I believe that we have to work together and for the most part, I feel we are a good team. You become stressed as do I and you have a different way of handling that than I do. However, mutual respect for each other as human beings is imperative for me to move forward.

I want to go on record saying that I will work on my body language, faces, and mannerisms as you have asked me to do. I believe my attitude at work is good and my working relationships with co-workers, business partners and employees have never been challenged to date.

I also feel that in order to move forward, you owe me an apology for the yelling and screaming and slamming the door that caused intimidation, humiliation and embarrassment to me.

I am certain that we can move passed this if you agree. I did not want to leave on my vacation until we resolved the matter. I am available until 12:00 noon today if you want to discuss it with me.

Carmella Guerrero
IT Services Manager

October 13, 2010

Ms. Carmella Guerrero
4707 Trailwood
San Antonio, Texas  78228

**RECEIVED**

OCT 13 2010

BEXAR COUNTY
CIVIL SERVICE COMMISSION
12:55 pm  Andrew

Dear Ms. Guerrero:

SUBJECT:  Order of Administrative Leave

Effective October 13,  2010, you are being placed on Administrative
Leave with pay for a period of ten business days pursuant to Bexar
County Human Resources Policy 7.4.04 Administrative Leave.

During the period you are on Administrative Leave, you are asked to limit
your communication, during working hours, to either me or county
Human Resources.  In addition, you must be available to report, in
person, to me if necessary during your Leave.

Sincerely,

*Catherine Maras*

Catherine Maras

CC: Bexar County Civil Service Commission

I acknowledge receipt of this document:

_____                    _10 - 13 10_
Employee Signature                                 Date

TR-0154

FILED
9/24/2014 12:37:01 PM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Consuelo Gomez

CAUSE NO. 2012-CI-8758

| | | |
|---|---|---|
| CARMELLA GUERRERO | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| VS. | § | 225TH JUDICIAL DISTRICT |
| | § | |
| | § | |
| | § | |
| BEXAR COUNTY CIVIL SERVICE | § | |
| COMMISSION | § | BEXAR COUNTY, TEXAS |

## NOTICE OF FILING OF THE BEXAR COUNTY
## CIVIL SERVICE COMMISSION RECORD

Plaintiff, Carmella Guerrero, provides her Notice of Filing of the Bexar County

Civil Service Commission Record.  In support, Plaintiff shows as follows:

On or about August 21, 2014, the Bexar County Civil Service Commission

conducted a hearing in the referenced matter.  Plaintiff attaches as Exhibit "A" the

record of such proceeding in accordance with the Texas Rules of Civil Procedure and

the Texas Local Government Code.

Respectfully submitted,

LOPEZ SCOTT, L.L.C.
719 S. Flores, Suite 100
San Antonio, Texas 78215
Telephone:   210.472.2100
Telecopier:   210.472.2101


/s/ Orlando R. Lopez
_____
ORLANDO R. LOPEZ
State Bar No. 24010196

ATTORNEYS FOR PLAINTIFF

TR-0155

## CERTIFICATE OF SERVICE

I certify that a copy of this document has been forwarded to the following counsel of record via electronic mail on this 24th day of September, 2014:

Clarkson F. Brown
Bexar County District Attorney Civil Section
300 Dolorosa, Suite 5059
San Antonio, Texas 78204

/s/ Orlando R. Lopez
_____
ORLANDO R. LOPEZ

CAUSE NO. 2012-CI-08758

CARMELLA GUERRERO,                    )     IN THE DISTRICT COURT
          Plaintiff                   )
                                      )
                                      )     225th JUDICIAL DISTRICT
vs.                                   )
                                      )
INFORMATION TECHNOLOGY                )
DEPARTMENT,                           )
BEXAR COUNTY, TEXAS,                  )
          Defendant                   )     BEXAR COUNTY, TEXAS

* * * * * * * * * * *

NO. 10-BCCS-002

CARMELLA GUERRERO,                    )
          Employee                    )
                                      )     BEXAR COUNTY
                                      )     CIVIL SERVICE COMMISSION
vs.                                   )
                                      )     BEXAR COUNTY, TEXAS
INFORMATION TECHNOLOGY                )
DEPARTMENT,                           )
BEXAR COUNTY, TEXAS,                  )
          Department.                 )

TRANSCRIPT OF AUDIO RECORDED PROCEEDINGS

EVIDENTIARY HEARING OF CARMELLA GUERRERO
AUGUST 21, 2014
HELD BEFORE
THE BEXAR COUNTY CIVIL SERVICE COMMISSION
CHAIRMAN GINA M. ELLIOTT, PRESIDING

DAWN FLIPPIN, CSR
200 Alcalde Moreno
San Antonio, Texas 78232

**APPEARANCES**

**FOR THE PLAINTIFF:**

**Mr. Orlando R. Lopez**
The Lopez Law Firm
719 S. Flores, Suite 100
San Antonio, TX  78215
210-472-2100


**FOR THE DEFENDANT:**

**Mr. Clark Brown**
Bexar County District Attorney's Office - Civil Division
300 Dolorosa Street, Suite 5049
San Antonio, Texas 78205
(210) 335-3918



ALSO PRESENT:

Commissioner Elliott
Commissioner Gimblet
Commissioner Arriaga
Ms. Carmella Guerrero, Employee
Bob Hampel, County Representative

**INDEX**

|  | Page |
|---|---|
| County Opening Statement | 8 |
| Employee Opening Statement | 17 |

* * * * * * * * * * * * *

**WITNESS:  HENRY REYES**

| | |
|---|---|
| Direct Examination By Mr. Lopez | 25 |
| Cross Examination By Mr. Brown | 42 |
| Redirect Examination by Mr. Lopez | 49 |

**WITNESS:  ELVA ABUNDIS**

| | |
|---|---|
| Direct Examination By Mr. Lopez | 50 |
| Cross Examination By Mr. Brown | 56 |
| Redirect Examination by Mr. Lopez | 65 |
| Recross Examination by Mr. Brown | 66 |

**WITNESS:  ANDREA SAN MIGUEL**

| | |
|---|---|
| Direct Examination By Mr. Lopez | 67 |
| Cross Examination By Mr. Brown | 78 |
| Redirect Examination by Mr. Lopez | 84 |
| Recross Examination by Mr. Brown | 86 |

**WITNESS:  CARMELLA GUERRERO**

| | |
|---|---|
| Direct Examination By Mr. Lopez | 88 |
| Cross Examination By Mr. Brown | 105 |

**INDEX**

|  | Page |
|---|---|
| Plaintiff Closing Statement | 107 |
| Defendant Closing Statement | 114 |
| Commission's Decision | 121 |

**PROCEEDINGS:**

CHAIRPERSON ELLIOTT: Good morning. Today is August 21st. It is now 9:02.

Call to order the Bexar County Civil Service Commission meeting. Present are Commissioners Gloria Arriaga, Joe Gimblet and myself, Gina Elliott.

MALE VOICE: Item number 3 is going to be evidentiary hearing concerning Case Number 20-BCCS-022, Carmella Guerrero versus Information Technology Department pursuant to the 225th Judicial District Court of Bexar County, Texas, Cause Number 2012-CI-08758.

We received a notice from Ms. Guerrero's attorney, Mr. Orlando Lopez, indicating that a court order was issued regarding Case Number 10-BCCS-022 to -- as an evidentiary hearing to introduce additional evidence. This is an open hearing and all parties are present.

If we can go ahead and get everyone sworn in for the remaining cases of the day. Anyone that is going to be testifying today as a witness we'd ask that you go ahead and stand and raise your right hand to be sworn in.

(Witnesses sworn).

CHAIRPERSON ELLIOTT: Thank you.

MS. BOWEN: Commissioners, if I may, my name is Susan Bowen. I'm with the Bexar County District Attorney's Office. I'm here for the second two cases that are going to

be heard. May we just step out into one of the conference rooms while you're having Ms. Guerrero's hearing?

CHAIRPERSON ELLIOTT: Yes.

MS. BOWEN: Thank you very much.

CHAIRPERSON ELLIOTT: Okay. We want to go ahead and get started if you all wanted to make an opening statement.

MR. LOPEZ: Certainly.

MR. BROWN: Are you going to invoke the Rule?

MR. LOPEZ: I wasn't planning on it.

MR. BROWN: The County would.

CHAIRPERSON ELLIOTT: Like to invoke the Rule?

At this time we have a request by the County to invoke the Rule. What that means is that only those who are testifying at the moment will be present in this room during the hearing. So we would ask -- it also requires that anyone that is going to testify not have a discussion outside of this hearing room.

So we will ask -- I don't know who's coming first.

MR. LOPEZ: Yes, ma'am. We'd ask Henry Reyes, Elva Abundis and Andrea San Miguel to -- to be excused.

CHAIRPERSON ELLIOTT: Okay. All right.

MALE VOICE: Appellant, witnesses will be in the training room right across the hall. Amy Reyes will be

right outside the hallway here escorting the officers to the site.

CHAIRPERSON ELLIOTT: Thank you.

MR. BROWN: One other matter. Are you going to flash up the affidavit in this hearing?

MR. LOPEZ: He's going here -- he's going to be here to adopt it. I'm not going to flash it up until he adopts it.

MR. BROWN: Okay.

CHAIRPERSON ELLIOTT: Okay. Are you ready?

MR. LOPEZ: Yes, ma'am.

I represent Carmella Guerrero. As Mr. Gimblet and you know, we were here on April the 26th of 2012, and we had a full-day evidentiary hearing. Ms. Arriaga, I am going to do my best to make a special presentation since you are new to the Commission and you were not part of the proceeding and the decision that was made on April 26th of 2012.

Ms. Guerrero is a long-time Bexar County employee. Over 20 years. She started off as a file clerk and she moved her way up all the way to an E11 where she was the IT Services manager for the Bexar County Information Technology Department. She had at that time when she was at her E11 position, she was being paid at approximately $80,000.00 a year.

She was selected for that position by the Chief

Information Officer.  Catherine Mares promoted her to that position.  Thought so much about her when she came to take over the IT Department that she placed her in one of the top, if not the top, nontechnical packing positions within the Information Technology Department.

In 2010 in the fall, Ms. Mares and Ms. Guerrero became involved in a dispute regarding some trivial parking issues.  And Ms. Mares, based on the dispute concerning the parking, demoted Ms. Guerrero from an E11 all the way down to an E5.  She was an E11, answered only to the Chief Information Officer, had her own office, had responsibilities galore for the Information Technology Department.  Because of a dispute over parking that was trivial, she demoted her six grades, downgraded her salary from approximately $80,000.00 to the mid fifties.  She lost responsibilities, she lost rank.

Ms. Guerrero filed an appeal with the Bexar County Civil Service Commission because she believed that she was unlawfully demoted.  So on or about November 29th, 2010, Ms. Guerrero is demoted.  On April 26th, 2012 the Bexar County Civil Service Commission heard Ms. Guerrero's appeal.

Basically, this parking issue, Ms. Arriaga, Mr. Gimblet, Ms. Elliott was a he said/she said.  Ms. Mares accused Ms. Guerrero of being a liar, being dishonest, being insubordinate.  We had an all-day trial before this Commission.  At the conclusion of this Commission, Ms.

Arriaga, these Commissioners unanimously determined that her demotion should be overturned.

Had we stopped there, we wouldn't be here today, Ms. Arriaga, because what had happened is -- and I'll go back for this time line -- that Ms. Guerrero was demoted in November of 2010. In 2011 in October, BCIT, the department and the County eliminated her position. Basically just wiped it from the books and said we're no longer going to have an IT services manager. So when the Commissioners overturned her demotion, they said by their own words that there was no evidence that she had -- that she should have been demoted. Instead she was a great employee, had worked hard, and there was no basis in law and fact for her to have been demoted.

The Commissioners were attempting to right a wrong that had been done to Ms. Guerrero by Ms. Mares. The situation that they were in was that they believed that they could not reinstate her to a position that had been deleted. And so what they did was they overturned it, saying this employee should not have been demoted, but they kept her in her E5 position.

So Ms. Guerrero gets her day in court on April 26th, 2012. She's vindicated. She's able to put on evidence that has been accepted by this Commission that she's not a liar, that she's not insubordinate and that she's not dishonest. All she did was just clear her name, because since

that date, she has still been doing her E5 work and she's still been getting paid in the mid fifty range as opposed to the eighty or nine-some-odd thousand that we believe she's entitled to had the County not eliminated her position.

After the hearing, Ms. Guerrero was dissatisfied with still being at her demoted position. So we filed a lawsuit in District Court. And we alleged that the Commission made a mistake in terms of leaving her in her demoted position. The County took the position in District Court that there's nothing that the County could do for Ms. Guerrero. Sure, she was overturned, sure, she was vindicated, but there's no position to reinstate her to. We can't put her in a position that no longer exists.

Mr. Clark has advanced that argument before this Commission, many hearings in front of the trial court, and, in fact, he made that argument to Judge Littlejohn. Judge Littlejohn initially dismissed Ms. Guerrero's lawsuit saying there wasn't any jurisdiction for this case. We appealed the case to the Fourth Court, and the Fourth Court reversed Judge Littlejohn's decision, and said Ms. Guerrero has a right to sue the County in District Court because she was still demoted after her hearing here.

The Fourth Court in rendering their opinion that the dismissal should not have been made, pointed out exactly the reason we are here, and why it is -- why it is

that it is unfair that Ms. Guerrero was still in her demoted position. Because we argued to them. We said that just smacks of unfairness, it smacks of not being equitable with your employees. And the Fourth Court in their holding when they decided that her lawsuit could go forward made this holding in their last statement. They said: Allowing a County employee -- allowing Carmella Guerrero to pursue her right to judicial review unaffected by subsequent budgetary actions is a just and reasonable result.

That's what the Fourth Court said about Ms. Guerrero's case. The County told the Fourth Court we eliminated your position through a normal budget action. We were doing a reduction in force, we wanted to make our budget, we wanted to make our employee force smaller so that we could change with the times; that's why we deleted your position. And we disagree. We believe that the position was deleted intentionally because BCIT and the County did not want Ms. Guerrero back at her position.

We get back to the trial court before Judge Sakai. We asked Judge Sakai for the opportunity to come to you to give you additional evidence of why she should be reinstated to her E11 position and why she should get her full back pay and her former E11 position with any raises that she would have been entitled to. And here's the rule we had to -- we had to accommodate for when we were before Judge Sakai. It

says: A party -- that's Ms. Guerrero -- may apply to the Court to present additional evidence. What we had to do is we had to -- the second part of that rule says: If the Court is satisfied that additional evidence is material and there's good causes for reason of the failure to present, the Court may order that the additional evidence be taken before the Commission. What's real important in this part of the rule is material.

Now, we believe that there are at least three reasons why you have the authority and you must reinstate her to her E11 position and give her her back pay and give her her full benefits.

Reason number one, we believe that the County intentionally -- and you're going to hear from our witnesses -- intentionally deleted that position so that Carmella would not be able to get her position back if she was successful and prevailed here. We think it was a pretext, we think it was underhanded, we think it was some form of some type of cahoots or conspiracy to oust Ms. Guerrero if she won here before the Civil Service Commission.

Number two, when the County -- and you'll hear Mr. Brown. There is nothing we can do for you. We eliminated your position. You know, our hands are tied. We'd love to help you, but, you know, your job is gone and that's tough. That's just not true. The County has a multibillion dollar

budget with almost 4,000 employees. You're going to hear from our witnesses that are going to testify that many employees just like Carmella, just like Ms. Guerrero, have been treated differently. Employees whose position has been deleted have been moved around. Employees who have been disgruntled at their jobs have either come to the Commission and been moved to different sections; we have employees that were ousted by elected officials and demoted to like an E1 and still getting paid as an E11.

So we believe the evidence is going to show that when the County says we can't do anything, it's flat wrong. They're being untruthful. Because they're the County. They got a multibillion dollar budget. They have 4,000 employees. If you've got that many employees, you're going to have situations where an accommodation can be made and should be made for Ms. Guerrero.

Number three -- and we're going to get to the policy -- your own policies of Human Resources in the Civil Service Commission say that if you reinstate her and she goes back to try to get her job and Ms. Mares says no, your own policies dictate that she should still receive her E11 salary.

So those are the three reasons and that's the evidence that we suggested to Peter Sakai. We said they intentionally deleted her position, we know they treated employees differently, and we know that the County's policies

allow for her to get her salary at worst if they decide not to take her back into her position.

So what we had to convince Judge Sakai is is that evidence material, okay? Otherwise, we wouldn't be able to come to you. And so under this rule it says that the Commission -- that's you three -- may change their findings by reason of the additional evidence and shall file the additional evidence with the Court. So under this rule, we're here to give you some additional evidence, material evidence. And why that's important is what Judge Sakai was saying with his order was what is material? Judge Sakai is telling us, telling you, telling the record that something is material if it is of real importance or consequence, being such would affect or taken into consideration by a reasonable person in acting or making a decision.

Here is the rule that Judge Sakai was being guided by. And he said, Mr. Lopez, what is your additional evidence? And I said well, we know they deleted her position intentionally, we know they've treated other employees differently, and we know that their own policies allow for reinstatement even under these circumstances. Judge Sakai heard that argument, he looked at the rule and said that's important, that's material; the Commission needs to hear that evidence.

And Judge Sakai -- and here's the policy that

we're talking about. Policy 7.6.14 says that in number 17 -- and it's in your evidence packet as Number 5. It says: Should the office or department refuse to reinstate the employee as ordered by the Commission, the employee shall be entitled to their full salary just as though they had been reinstated as before. Those are your rules. Those are your policies.

So Judge Sakai said I'm looking at this rule, Mr. Lopez has suggested and proven to me that he has important material evidence to show the Commission and including this policy that says you could put her back even if they deleted her position. And that's what -- as Mr. Leos said -- that's what Judge Sakai said in a written order on the record that is governing this case that as referenced by Mr. Leos that says Ms. Guerrero and only Ms. Guerrero is entitled to present to you additional evidence, and that you have the power, you have the authority under Judge Sakai's Order that says you may change your findings.

So we're here today and you're going to hear from witnesses that are going to prove three things. Number one, that the County intentionally deleted her position while she was on appeal. Number two, that the County treats employees differently and has done that in the past. And that based on those situations, you have the power to make it right for Ms. Guerrero. And then number three, if you don't believe

anything else, your policies say if they don't want to reinstate her, at least give her her money back.

And you will hear from our witnesses, and we believe after the conclusion of this evidence and this hearing that you will have ample evidence to change your finding, reinstate her to her E11 position, give her her back pay, and give her all her full benefits and salary raises and cost of living allowances that she should have been entitled to had she not wrongfully been demoted back in 2010.

Thank you.

CHAIRPERSON ELLIOTT: Thank you, Mr. Lopez.

Mr. Brown?

MR. BROWN: Yes. Thank you. Good morning.

CHAIRPERSON ELLIOTT: Good morning.

MR. BROWN: I have a brief.

We know where the case was and where it is now. We're back here because Judge Sakai punted a decision that he didn't want to make back to you all. And that's essentially what happened.

The procedural history of this issue, you issued your order, you explicitly overturned the discipline and you put her in the only thing you could, the position that she held, because you cannot create or put a person in a position that doesn't exist. That is solely the County Commissioners. The court can't do it and you can't do it.

Unsatisfied with that decision, Ms. Guerrero appealed. The appeal went. The District Court where we filed a motion before Judge Littlejohn saying we don't feel you have jurisdiction because we feel the Commissioners gave all the relief they could, she didn't rule one way or the other on what relief she could grant. She just simply said I agree I don't have jurisdiction and dismissed the case.

They then appealed it to the Fourth Court. Again, the Fourth Court looked at it and said she's an employee, she at least gets to go to court and make her argument that you all might have the power to reinstate someone to an eliminated position. They made no ruling, they made nothing to say yes, you can do that. No court has yet said you can do that. They simply said she gets her chance to go argue that in front of the District Court. So they sent it back down to the District Court.

It got back down to the District Court, and one thing Ms. Lopez left out was that Ms. Guerrero then filed a Motion for Summary Judgment asking Judge Sakai for all the relief he's asking you to provide. Judge Sakai, reading all the arguments they made, including 7.6.14, including the argument that you had the power to reinstate her, and they asked the judge to do what you didn't do. Judge Sakai explicitly denied all that relief. He did not find that he could put her in a position that the County Commissioners

hadn't created. He didn't find you could do it. He found that your ruling would stand, because he's not going to go with what she wants. And he had it stamped.

Again, they weren't satisfied because again nobody had said you can do anything to help her to pur her in a position, because only County Commissioners can do that.

Unsatisfied with that, they went back to Judge Sakai and said give us one more bite at the apple, please. Here's our last resort. Our last remedy is we can find this obscure provision, and we can tell you we have material evidence, and let us go back to Commissioners Court. Well, being a judge, he didn't judge. He said all right, I'll just send you back and you all can just keep doing this and don't make me decide. You all go decide and have the Commissioners hear some more evidence. And if they're convinced that they can do what many, many courts have said they can't do, and that's create a position that only County Commissioners can create, let them find evidence they can do that, find support in the law. And if they feel they need to change their original order -- which every court that's looked at it has said your original order was fine -- then we're going to give them one more chance to do that. And he didn't indicate either way whether you should or you shouldn't; he just said you-all go back and talk to them and see what they say.

So when he sends you back under the rule that

was on the wall, which is the one that has the rehearing, and it states that you may change your decision, you may have additional evidence; it likewise means that you don't have to do anything. You don't have to change your ruling. You can stand by your ruling.

And the rest of this brief talks about why you can't order her into a position that the Commissioners Court eliminated, and in case after case after case citing how only the Commissioners Court can create or eliminate positions. And you can't do it, and a court can't do it. Only the five -- four Commissioners and County Judge Nelson Wolff can do it. And they have the full prerogative to do it in any budget year they want, and that's what they did in this year.

There were six -- fifteen or sixteen frozen positions. The only one -- none of them were filled at the time they were eliminated. The whole County was going through a recession. Every department where a position was empty became frozen. And that frozen position was then eliminated if possible because the County needed to save money. It was during the worst time in this County in many years. This was one of the positions they eliminated. Had she been in the position, they simply would have eliminated it and she wouldn't have been there. She would have just had no job. Instead she has a job at the County because of your decision to keep her in that position.

So even if she goes back to her old job and you order it created and we get down the road in a couple of years and some court finally says yes, all this law from all these years way, way back is wrong, and Civil Service can override County Commissioners and you can order her back to that position, the next day the County Commissioners could say that we don't need that position. We haven't needed it for all these years. It's eliminated. We don't need it in the County Budget.

And that's why the County controls the budget. They need to make those decisions as to how many bodies we need, how much money we have, and what we're going to do with it. And that's what this case law says throughout the end of this brief. That's the only people that can make that decision. So no matter what is put on here, it shouldn't change your decision in the end that you provided all the relief that you had the authority to provide.

If she want to get to a court and some court says you're wrong, I'm wrong, and 100 years of cases are wrong, then let's do that. But I still find no authority and they cannot present to you any authority that you have the authority to do anything more than you did in your original hearing.

And the fact that we're back here doesn't mean any judge thought your original order was wrong. If a judge

did, he could have ruled himself. They don't have to send it back here. Judge Sakai could have ruled on their Summary Judgment and given them all the relief they asked there that they now ask here. He looked at it and he said no, I'm not giving you that relief. All I'm giving you is another bite at the apple to go back to the Civil Service.

So we feel that no matter what evidence is presented in good faith, bad faith, it doesn't change the fact that you can't order the Commissioners to create a position out of their budget, and your original order should stand. And then this matter will go back to court and we'll see where it goes from there.

But I think it would be strange for this Commission to all of a sudden start changing budgets around. Because each year the Commissioners Court would then be forced, knowing that if you eliminate positions, then every Civil Service employee that doesn't like what we've done is going to run over here you say you did it in one case; just order them to put me back to work. You have the authority. You now control the County manning powers. And you've taken that position from the County Commissioners. We're going to end all up in a big fight over your authority and their authority, and there has been plenty of case law that says you don't have that authority and no District Court has that authority.

And I think you understood your restraints on that in the first place. I know Ms. Carmella understood that; she testified to it. And so we would ask at the end of the day, no matter what testimony you hear, to uphold your original finding. And we'll send the finding back to the District Court. And if the District Court wants to change the law, let them do it. But I don't think we should start changing law at a Civil Service level. We would ask that you uphold your original hearing and that you should make no changes to your original order.

CHAIRPERSON ELLIOTT: Thank you, Mr. Brown.

Now, did you want to -- do you have any witnesses? Does the County have any that they wanted to ...

MR. BROWN: I think the way this has to work is they go first, because they've come back as the plaintiff to put on more evidence.

CHAIRPERSON ELLIOTT: Okay.

MR. BROWN: Because I think you have the burden on it, and now that we're back here, it's not an original hearing.

MR. LOPEZ: I was not -- I was not anticipating that the County would be calling their own witnesses, but.

MR. BROWN: We'd only call witnesses to rebut.

CHAIRPERSON ELLIOTT: That rebuttal.

MR. LOPEZ: I want to make a quick rebuttal,

because what Mr. Brown is doing -- and he's tried to do this at every hearing -- he's trying to suggest that you are ordering the creation of a job. That's not what you're doing, and that's not what we're asking you to do. We're not asking you to create a new job in the budget for Ms. Guerrero. All we're asking you to do is to follow your own rules that say should the office or department refuse to reinstate the employee, under that rule if you reinstated her, she goes back, she gets her briefcase, she goes up to Ms. Mares and says Ms. Mares, the Commissioners at Civil Service Commission gave me my job back so I'm here to start working. Ms. Mares is going to say your job is deleted, and she can refuse to put her back in her job because it has been deleted. But even if she does, she's still entitled to her full salary just as she had never been demoted.

So we're not asking you to play Judge Wolff or County Commissioner Wolff and, you know, create a budget, make a budget, make a job, any of the things that Mr. Brown said. We're not asking you to do anything like that. All we're saying is look at the evidence. Was she entitled to reinstatement, not counting -- it doesn't matter about the deletion of a position -- was she entitled to be reinstated?

You already said that. You said yes. Because you said that she was not -- she was not warranted a demotion. She should not have been demoted. So you've said already on

your own words she should be reinstated. And if she can't be reinstated because her job has been deleted, she still gets her money. That's your rule. That's what you-all are here to do. But we're not asking you to go up there and make a multimillion dollar budget and, you know, do all the things that Mr. Brown says about creating a job. We're not asking for any of that.

Madam Elliott, we call Hank Flores -- Henry Flores -- Henry Reyes. I'm sorry.

CHAIRPERSON ELLIOTT: Okay. Mr. Reyes?

Hello. Good morning.

MR. REYES: Good morning.

MR. LOPEZ: May I proceed?

CHAIRPERSON ELLIOTT: Yes, please.

HENRY FLORES,

having been sworn to tell the truth, testified as follows:

DIRECT EXAMINATION BY PLAINTIFF

BY MR. LOPEZ:

    Q    Can you please state your name for the record, sir?

    A    For the record my name is Hank Reyes.

    Q    And you're also known as Henry Reyes?

    A    I am.

    Q    Can you tell the Commissioners what your job is now?

    A    I am the director of finance with the Fiesta Commission.

Q    And before you were the director of finance for the Fiesta Commission, what was your job?

A    I was the budget director for Bexar County.

Q    Can you explain to the Commissioners, Mr. Reyes, what your job responsibilities and duties were as the budget director for the County?

A    In a nutshell, it was putting together a $1.6 billion budget for the entire County.  It was looking at program changes, doing analyses, projecting how much that we anticipate spending for current fiscal years and projecting forward fiscal years, not only for operating budgets but as debt service as well.

Q    And how would you go about putting together a budget?

A    It was a bottom up process to an extent.  But we would get feedback from all of the offices and departments. We would ask them what their needs were, and we do evaluations on those.

Q    And would that entail meeting with department heads and personnel?

A    Extensively, yes.

Q    And what portions of the budget were you responsible for?

A    All of them.

Q    The entire budget?

A    Yes.

Q    And so you would have been responsible for compiling and formulating the budget for the IT Department?

A    Yes.

Q    Which we have referred in this hearing as BCIT, Bexar County Information --

A    That's correct.

Q    And did you have discussions -- who did you discuss the budget while you were working as the budget director with IT?

A    Primarily I would have discussions not only with the executive director for BCIT, with any of their managers, as well as with my budget analysts and ultimately with the County Manager.

Q    Now, you're the budget director or you were the budget director.  Did you have a staff of your own?

A    Yes.

Q    And how many staffers did you have?

A    Approximately six budget analysts.

Q    And your team was responsible for doing the entire budget, right?

A    Correct.

Q    And who did you answer to at the County?

A    The County Manager.

Q    And who is that?

A    David Smith.

Q    So while you were with the County, you answered to David Smith which was the County Manager?

A    Yes.

Q    Okay.  I want to take you to a time during the 2011 budget period.  Do you remember that time?

A    Yes.

Q    Okay.  Do you remember giving my office a statement, Mr. Reyes, which I've identified as Exhibit Number 7?

A    I do.

Q    And is that your signature --

A    It is.

Q    -- on page two?

A    It is.

Q    And it's a notarized affidavit?

A    It is.

Q    And in your affidavit -- well, tell the Commissioners, in the affidavit you just testified to exactly your responsibilities that you did in your affidavit, right?

A    That's correct.

Q    And you also have -- in paragraph number four you have described the 2011 budget process?

A    Yes, I have.

Q    Okay.  And then in paragraphs five, six and seven you discuss certain portions of the facts that happened during

that time as related to IT and Ms. Guerrero, right?

A    That is correct.

Q    Okay.  Tell the Commission --

MR. BROWN:  Commissioners, at this point I'm going to object to that affidavit.  The way I read it -- and he can correct me if I'm wrong -- he wasn't involved in the conversations he referred to in the affidavit.  It was relayed to him by someone else.  What you have is hearsay, which is inadmissible in these hearings.  He has no firsthand knowledge of what he's purportedly telling you there.

CHAIRPERSON ELLIOTT:  How do you respond to that, Mr. Lopez?

MR. LOPEZ:  I would respond, if you will allow me just a few more questions, he does have personal knowledge and it is not hearsay.  And I can clear that up if it is a question.

CHAIRPERSON ELLIOTT:  We'll allow it for right now.

MR. LOPEZ:  Okay.

CHAIRPERSON ELLIOTT:  See if it's hearsay or not.

Q    (By Mr. Lopez)  Mr. Reyes, tell the Commissioners the communications that you had concerning the IT Department in 2011 as it relates to Ms. Guerrero's E11 position.

A    It came specifically from David Smith where he's

declared that he had discussions with Ms. Mares about this issue of whether he was in error in what he was telling me. I don't feel that it's -- it's relevant, because I was given directions regarding Ms. Guerrero's position.

Q   Let's be a little more specific, Mr. Reyes. Tell the Commissioners what Mr. Smith told you about her position and how he went about doing it.

A   It had become an issue with the County and with BCIT specifically. And one of the easiest ways to rectify the issue was to eliminate the position.

Q   And by issue, you mean that Mr. Smith told you that there was a problem at BCIT with Ms. Guerrero and Ms. Mares?

A   Correct.

Q   Now, you heard Mr. Brown testify that you did -- that this is hearsay. You met with Mr. Smith, right?

A   That's right.

Q   In his office?

A   That's correct.

Q   And during that meeting while you were putting the budget together, he told you we've got a problem with Ms. Guerrero?

A   That's his direction.

Q   And that he told you to do what?

A   Eliminate the position.

Q   Now, did he tell you to eliminate Ms. Guerrero's

position because he thought that Ms. Guerrero wasn't doing a good job?

    A    No.

    Q    Did he give you any reason that that position should be eliminated?

    A    Other than it had become an issue for BCIT.

    Q    But in terms of did he say hey, we need to save some money, so that's why we need to get rid of it?  Was there anything budgetary about his meeting and discussions with you?

    A    It affected the County Budget.

    Q    Okay.  But in terms of, you know, he didn't give you any other legitimate reasons of why he should have that position eliminated, right?

    A    If you're asking whether it was an efficiency issue, whether it was a cost saving issue, no.

    Q    It was simply because she had become a problem?

    A    Yes.

    Q    And did you understand that problem to be because she had her appeal ongoing here?

    A    I understood that problem to be because she and Ms. Mares had a falling out.

    Q    And at the time when you gave this affidavit and at the time in 2011, you were fully aware that she was appealing her demotion, right?

    A    Yes.

Q   And that based on orders that you got, you helped the County eliminate her position, right?

A   Yes.

Q   With no questions asked, you did that, right?

A   Yes.

Q   And in your affidavit where you say that Ms. Guerrero had become a problem and they wanted to get rid of it, that's the exact testimony that you're giving the Commission?

A   Yes, it is.

Q   Based on a conversation with David Smith, your boss, right?

A   Yes.

Q   Who was the County Manager at the time, right?

A   Yes.

Q   And oversaw the entire County, correct?

A   Yes.  Well ...

Q   Pardon me?

A   He oversaw the departments under the purview of Commissioners Court.

Q   Okay.  Mr. Reyes, one of the things that the County has been trying to say is we eliminated Ms. Guerrero's position and we eliminated a bunch of other positions too.  We weren't singling out Ms. Guerrero.  We've had that discussion, right?

A    Yes, sir.

Q    That we were getting rid of 16 or 17 other positions, right?

A    Correct.

Q    I'm going to show you what we've marked as Exhibit Number 8.  Do you recognize Exhibit Number 8?

A    Yes, I do.

Q    What is Exhibit Number 8?

A    It is the information technology section of the effective budget.

Q    Is that your handiwork?

A    Yes, it is.

Q    That's the documents that you would put together to form the budget?

A    Yes, it is.

Q    And, in fact, can you tell the Commissioners whether that's a true and correct copy of the IT budget for budget year 2011?

A    It is.

Q    Okay.

MR. LOPEZ:  I move for the introduction of Number 8 so that I can show it on the screen.

Q    (By Mr. Lopez)  So this is the IT budget, correct?

A    It is.

Q    Okay.  Now, we've got some mission statements and

things that don't relate to numbers, right?

A    Correct.

Q    Okay.  But if we go down to the bottom of the second page -- I'm sorry, the bottom of the fourth page, what is -- for the Commissioners -- what is program change number three? What are we doing here?

A    We are eliminating positions.

Q    Okay.  So when the County says hey, we eliminated Ms. Guerrero's position with a bunch of others, right, this is the part -- the portion of the budget that they're talking about, right?

A    Yes, it is.

Q    And it goes for two pages here?

A    Yes, it does.

Q    Okay.  Now, for the Commission's sake here, tell us here what these numbers mean.  Like it says here the deletion of 16 positions for a total general fund savings of 559,043 bucks, right?

A    Yes.

Q    Okay.  Now, there's a list of all the positions that were deleted, right?

A    Correct.

Q    Now, the County has suggested that a bunch of other people had lost their job just like Ms. Guerrero, that 15 other positions and jobs were lost with hers.  Because

that's -- that's what it says, right, 16 positions are deleted, right?

A    16 positions are deleted.

Q    So if I read that, I'm thinking that could be 16 people that are out of a job, right?  That's one way of looking at it, right?

A    Yes.

Q    That's not true though, right?

A    No.

Q    It's not true because tell us what the number under the position means?

A    Each position within the Bexar County system is issued a number.  Each position is unique with that specific number so that we can identify whether a position is eligible -- eligible to be filled.

Q    And then we have a position title that just tells us what that person does, right?

A    Yes.

Q    Now, most important, tell us what these numbers are here in the budget, FRO 0511.

A    Those indicate that those positions were vacant and frozen, not eligible to be filled but not yet eliminated.

Q    So just to be real simple, was there a living body in any position that says frozen?

A    No.

Q   So if there is a designation that says frozen, there was nobody there, right?

A   Correct.

Q   So Analyst Programmer One, nobody in it, right?

A   No.

Q   Nobody in Analyst Programmer Two, right?

A   No.

Q   If I just went straight down every one of these, there was not a person in the job, right?

A   Frozen positions are vacant.

Q   Let's look at the very top one up here, IT services manager; who is that -- who was that?

A   It was Ms. Guerrero.

Q   Okay.  So her job gets eliminated through this budget action, right?

A   Correct.

Q   She was the only one that had any rights in that job, right?

A   Yes.

Q   Because she had filed an appeal, correct?

A   Yes.

Q   And she was waiting to get before the Commissioners to give her the evi -- give them the evidence, right?

A   Correct.

Q   And so would you agree with me that it is untrue

that her job was eliminated as a regular course in regular reduction in force, right?

A   That's true.

Q   That with your help with David Smith, you-all eliminated a problem for BCIT by getting rid of her because they didn't want her back because of her appeal here, right?

A   That's correct.

Q   Now, Mr. Reyes, how long were you in the budget office?

A   I was in the budget office over 15 years.

Q   And so how long were you the budget director?

A   I was the budget director for at least seven of those years.

Q   Now, would you agree with me that the County has had situations like Ms. Guerrero's in the past, right?

A   Yes.

Q   Where the County has moved employees or transferred them, right?

A   Yes.

Q   For being disgruntled or being demoted or being promoted, right?

A   Yes.

Q   That with 4,000 employees at the County, these things happen and the County has the power to make it right, correct?  Yes or no.

A    Yes.

Q    Okay.  In your -- in your job as the budget director, have you seen instances where somebody in Ms. Guerrero's position, you know, has been afforded an accommodation, you know, even when positions have been deleted, right?

A    Correct.

Q    And how is that handled at the County?

A    The first stroke of a pen.  It is under Mr. Smith's purview to create positions.

Q    For instance, do you know who Elva Abundis is?

A    I do.

Q    She used to work for the Bexar County District Clerk, right?

A    Correct.

Q    And when Mrs. Montemayor was no longer in office and the new District Clerk came in, can you tell the Commissioners what happened?

A    She was demoted.

Q    Okay.  But she had Civil Service rights, correct?

A    Correct.

Q    And so in the budget office there was an accommodation made, correct?

A    The accommodation for her was to allow her to keep her pay.

Q    So you're saying that with Ms. Abundis' case, she was an E11 before she got demoted by the new District Clerk, right?

A    Correct.

Q    So they demoted her down to an E1, right?

A    I believe so.

Q    Was she paid as an E1?

A    No.

Q    She was paid at her E11 position, right?

A    Correct.

Q    Okay.  Are there any other situations like Ms. Abundis' and Ms. Guerrero's that you remember the County --

A    I -- I do know of several instances where the executive director or the powers that be no longer got along with certain employees, so they were moved and afforded another position.

Q    Now, when Mr. Brown suggested to the Commission that jobs just can't be created, that the Commissioners Court are the only ones that can do that; is that true?

A    Mr. Smith can create positions.  It is up to Commissioners Court to approve those positions.

Q    Okay.  So it's not really the Commissioners Court that's creating this job; it's --

A    Correct.

Q    There's a structure by which these jobs can be made, right?

A    Yes.

Q    And that allowances be made for their salaries, right?

A    Correct.

Q    And the transfers that we're talking about, right?

A    Yes.

Q    Does the name Brian Menges come to -- ring a bell?

A    Yes.

Q    Tell the Commissioners what happened to him.

A    He was in pretrial services.  There was an issue that he fell into in pretrial services.  So he was allowed to retire from the County.  However, a position was created by the County in resource management for him the position.

Q     So he was in a similar spot; they treated him differently than they treated Ms. Guerrero, right?

A    Correct.

Q    What about Bob Hampel; is that one that rings a bell?

A    Yes.

Q    Tell the Commissioners what happened to him.

A    He was moved to BCIT.

Q    Why?

A    There was an issue between him and Mr. Smith.

Q    And so he was just moved in the -- in the BCIT under -- under maybe even an accommodation that we're asking for for Ms. Guerrero, right?

A    Yes, sir.

Q    Who is Seth Mitchell?

A    He formerly worked for the County Judge in Civil.

Q    What happened to him?

A    There was an issue in Commissioners Court, so he was moved.

Q    Just with the stroke of a pen like you're talking about?

A    Yes, sir.

Q    So you're telling these Commissioners that they have the power, the County has the power to be able to reinstate her to her former salary, correct?

A    Yes.

Q    That all they have to do is reinstate her and the County has the ability to do it even without the Commissioners Court making a new job, right?

A    Correct.

Q    I'm going to go back to our policy here, Mr. Reyes. Under number 17 it says:  Should the office or department refuse to reinstate the employee as ordered by the Commission, the employee shall be entitled to their full salary just as if they had been reinstated as ordered, right?  Did I read that

correctly?

A     (No audible response).

Q     Now, that's the -- that's the basis of some of the testimony that you've been providing the Commissioners, right?

A     That is an adopted policy, yes.

Q     That says that if they don't take her back for any reason, if the position has been deleted, she still gets the money that she should have been making, right?

A     Right.

Q     And that's precisely what we're talking about in number 17, right?

A     It is.

Q     And that's a County policy while you were with the County, right?

A     It is.

Q     One that you had to use in the budget to accommodate for these types of situations, right?

A     It is.

          MR. LOPEZ:  Madam Elliott, I pass the witness.

          CHAIRPERSON ELLIOTT:  Mr. Brown, do you have questions?

                    CROSS EXAMINATION BY DEFENDANT

BY MR. BROWN:

Q     In regards to the positions being frozen, the implication is that Ms. Guerrero was in the position when it

was frozen and then eliminated.  She wasn't in that position, was she?

A    She was not.

Q    So no one was in that position when it was --

A    (Inaudible).

Q    May I finish?

A    Please.

Q    No one was in that position when it was eliminated, correct?

A    Correct.

Q    So along with the others, it was eliminated the exact same way the other 15 or 16 were eliminated, an empty position was eliminated in the budget process, correct?

A    According to the budget book, yes.

Q    And you stated that the Commissioners have the final say on approving or disapproving a position, creation of a position, right, or the elimination?

A    Correct.

Q    So David Smith can do whatever he wants --

A    Yes.

Q    -- come up with a plan and bring it to the Commissioners, and they have to say yes or no, correct?

A    They do.

Q    So in the end it is only the Commissioners that can create or delete a position?

A    Ultimately.

Q    Right.  David Smith only makes suggestions, correct?

A    Yes.

Q    And in Elva's position do you know the facts behind why she was -- a deal was given to Elva after she was demoted?

A    No, I do not know -- do not know specifically why she was demoted.  I was just given my walking orders to make it happen.

Q    Do you know if the Civil Service ordered that she be put back in --

A    I do not know.

Q    -- in the other position?

A    I do not know.

Q    So do you know if the Civil Service in that case had the power or felt they had the power to order the Commissioners to do something and ordered it?

A    That would be speculation.

Q    So you don't know that?

A    I don't.

Q    So you don't know if her position is at all similar to Carmella Guerrero's situation?

A    I do know that I was given orders just as in the case of Carmella to make this happen.

Q    And as far as you know or don't know, the Commissioners may have been the ones to approve that, correct?

A     I don't know.

Q     Not David Smith?

A     From discussions with him, it would sound like it's his idea, but again --

Q     But eventually approved by the Commissioners?

A     Yes.

Q     So, again, it has to be the Commissioners that make the final decision?

A     It would.

Q     Now, as far as Brian Menges, do you know his situation why he left the County?

A     Yes.

Q     What were those?

A     He had a falling out with trial services.

Q     What was the falling out?

A     He was showing favoritism to a specific employee.

Q     And had there been any allegations against him?

A     No, sir.

Q     No allegations?

A     It was taken care of.

Q     What does that mean?

A     Just as in this situation, he was promptly moved -- removed from that situation and another position was created for him.

Q     And did he -- does he, in fact, work for the County

full time now?

A    I do not know.  I have not been with the County for over a year.

Q    So you don't know that he's a temp or a part-time employee?

A    I don't know.

Q    Do you know if the Civil Service ordered him back to the position that he had left?

A    I do not know that.

Q    All right.  Seth Mitchell; what was his situation?

A    There was an issue with him and one of the Commissioners.

Q    Was he Civil Service protected?

A    No.

Q    So Civil Service had nothing to do with his reinstatement, correct?

A    Not him.

Q    So they didn't order the Commissioners Court to create a position for him then, correct?

A    No.  That would have been David Smith.

Q    So at the end of the day, all these people, none of them came through Commissioners Court to have this done. So in your experience, do you have anybody you can point to where this Commissioners Court ordered a position created to put someone in --

A    Where this Commissioners Court?

Q    I'm sorry.  The Civil Service ordered the Commissioners Court to put a position in a position [sic] and the Commissioners Court created it based on an order of the Civil Service?

A    Not from the Civil Service, no.

Q    Correct.  Only Commissioners Court can do that?

A    With the recommendation of David Smith.

Q    Sure.  They take recommendations from staff and they say yea or nay, right?

A    Correct.

Q    Okay.  And why did you leave the County?

A    I was -- I no longer agreed with the direction that the County was going in.

Q    And did you have disagreements that had to do with David Smith?

A    Face to face, no.

Q    Are they back to back?

A    Back to back.  He's not (inaudible).

Q    You said face to face.  I don't know, any way -- did you have some kind of --

A    He never told me that I -- there was an issue with my position.  I never told him that there was an issue.

Q    So you just had an issue with how the County was being run?

A    Correct.

Q    Nothing specific?

A    Specifically the way he ran the County.

Q    Okay.  So you didn't like the way David Smith ran the County?

A    It wasn't the way that he ran the County; it was a lot of these deals that were going on.

Q    You didn't feel were on the up and up or what?

A    No.

Q    Okay.  So you disapproved of David Smith's handling of County matters?

A    In certain circumstances, yes.

Q    Okay.  So you're not here as a big supporter of David Smith, are you?

A    I don't think that's of any relevance.

Q    Relevant to your motives to testify today.

MR. BROWN:  I don't have anything else.

MR. LOPEZ:  I'll object to the side bar.

MR. BROWN:  It wasn't a side bar.  It was a statement.

MR. LOPEZ:  It wasn't a question.

MR. BROWN:  Whatever you say.

MR. LOPEZ:  I'll put my objection on the record, Your Honor.

CHAIRPERSON ELLIOTT:  Objection noted.

MR. LOPEZ: I've just got a couple more.

CHAIRPERSON ELLIOTT: Any others, Mr. Brown?

MR. BROWN: No.

REDIRECT EXAMINATION BY PLAINTIFF

BY MR. LOPEZ:

Q    Are you being honest today with the Commissioners?

A    Absolutely.

Q    So any disagreement you had with the direction of the way the County was going, that's not affecting your --

A    It totally has nothing to do with why I'm here.

Q    You're telling the truth --

A    I am currently the director of finance for the Fiesta Commission. It's a really nice job. I have no problems there or looking back on my past career, no issues.

Q    Mr. Reyes, Mr. Clark asked you some questions about these individual employees that we were talking about. You're not suggesting to the Commission -- Commissioners that you know everything about what their situation was, right?

A    No.

Q    You're basically just saying as the budget officer, you had to make accommodations for them, right?

A    I was given my marching orders and I followed through.

Q    Find a new spot, find money, get this person in another job, right?

A    That's right.

MR. LOPEZ:  I pass the witness, Your Honor.

CHAIRPERSON ELLIOTT:  Anything further, Mr. Brown?

MR. BROWN:  Nothing here.

CHAIRPERSON ELLIOTT:  Okay.  Mr. Reyes, you are excused.  Thank you.

MR. LOPEZ:  Ms. Guerrero calls Elva Abundis.

CHAIRPERSON ELLIOTT:  Good morning.

MS. ABUNDIS:  Good morning.

ELVA ABUNDIS,

having been sworn to tell the truth, testified as follows:

DIRECT EXAMINATION BY PLAINTIFF

BY MR. LOPEZ:

Q    Can you state your name for the record, ma'am?

A    Elva Abundis Esparza.

Q    Can I call you Ms. Abundis?

A    Yes.

Q    Ms. Abundis, can you tell the Commissioners how you're employed?

A    I'm employed with the City of San Antonio for City Councilwoman Shirley Gonzales, District 5.

Q    At some point before you went to work with Councilwoman Gonzales, did you work for the County?

A    Yes.

Q   How long did you work for the County?

A   11 years.

Q   And what was your -- what were your jobs with the County?

A   In 2003 when I came to the County, I was an aid to the District Clerk.  And then from there, I moved up to Chief of Administration Public Information, and then to Chief Deputy.

Q   So you were the Chief Deputy for the District Clerk's Office?

A   For Margaret Montemayor.  Former District Clerk, Margaret Montemayor.

Q   And so she was -- do you remember from what years she was the --

A   From two thou -- January of 2003 to December 31st of 2010.

Q   So from '03 to 2010 you worked for the District Clerk's Office?

A   Former District Clerk, Margaret Montemayor.

Q   Okay.  And for the last period of your time you were the Chief Deputy?

A   Aid to the District Clerk, and then Chief of Administration, and then the Chief Deputy.  In 2006 I think I was promoted to Chief Deputy.

Q   Chief Deputy, that's sounds real important.

A    It's the second in command to head up the department.

Q    So you were the highest ranking nonelected official person in the District Clerk's Office?

A    Yes.

Q    So you answered only to Ms. Montemayor?

A    Yes.

Q    What happened in 2010?

A    In November 2010 Ms. Montemayor lost her reelection. And so in November of -- I think it was maybe at the end of November, I didn't know if I was going to have a job or anything.  I had interviewed with the new District Clerk, Donna Kay McKinney, and she said that she didn't know if she was going to keep me.  I did mention to her well, I'm grandfathered in, so -- Civil Service protected grandfathered in.  And she says I know that, but I don't know if I'm going to keep you.

And so I just went ahead and just started making phone calls.  Within just one day out of the blue -- and I remember it was right before Christmas, I get a call from Bob Hooper who was the Human Resources employee representative.  And he says Elva, I've known you for quite some time, I have a working relationship with you, and I just want to let you know what's going on.  And I said what's going on?  And he said the Human Resources is trying to say that

because they don't have an open position comparable to where you're grandfathered in, they don't have to keep you. He says I suggest that you get a lawyer. And I said why? He goes because they're going to let you go. He goes I've already told them that they can't do that to you, that your Civil Service protected and they have to find a job comparable to your position. And I said oh, wow.

So I went out and got a lawyer right away. And he was able to save my job by talking to Ms. McKinney; although, Ms. McKinney then took it upon herself and demoted me to a 1. Although I was able to keep my salary, which was my Civil Service protected salary of $61,500.00, she still demoted me to a 1. And then she started me off as a Criminal Court Clerk for nine months. And I did my job, I loved my job. I came to work every day, never missed a day.

And then nine months after that, she moved me to records department, and I was scanning files for a year and a half. And I didn't mind doing that, because I loved my job and I needed a job, and I was still getting paid the $61,500.00.

And then January 7th of 2013 she moved me to the warehouse. And I was climbing ladders, taking files down, standing --

Q   Let me interrupt you for a quick second, Ms. Abundis.

A   Uh-huh.

Q   So that we're clear, you're saying that when you were the Chief Deputy, what was your rank?

A   I believe it was a --

Q   E11?

A   -- E11 I believe.  I'm not really sure.  Yeah.

Q   And you were making approximately what?

A   $81,000.00.

Q   And so you're telling the Commissioners that when the new District Clerk came in, she said she didn't want to keep you at this E11 anymore, right?

A   Well, she didn't have to, because that -- that position, it's mandatory.  But -- it's mandated.  I'm sorry.  But I was still supposed to stay, because I was grandfathered in in my previous position as an E10.

Q   Okay.  So you're telling the Commissioners that you were making $81,000.00 as an E11, second in command of the entire District Clerk's Office, right?

A   Yes.

Q   And that as a result of your protections in your Civil Service, they demoted you to a what?

A   An E10.

Q   I'm sorry.

A   Oh, a nonexempt 1.

Q   Okay.  So you were doing E11 jobs, right?  Or job

responsibilities for --

A    Uh-huh.

Q    -- Ms. Montemayor?

A    Uh-huh.

Q    And then for the new District Clerk she bumped you all the way down to responsibilities of an E1, right?

A    Right.

Q    So that's what you're saying to the Commissioners that you were scanning, you were climbing ladders, you were doing --

A    Uh-huh.

Q    -- you know, E1 work as opposed to E11 work, right?

A    Right.  Right.

Q    The County, were they paying you under E1 money?

A    No.  They were paying me under E10 which was $61,500.

Q    So they paid -- even though you were doing E1 work, you were getting E10 money, right?

A    Yes.

Q    And basically just like this policy that we're talking about today, you were -- you were able to be paid just as if you were still in your old job, right?

A    Uh-huh.

Q    Okay.

A    My -- the -- not my old job, but the job that I was

Civil Service protected.

Q   So regardless in your situation with the County, you were doing an E1 -- and not to slight an E1 job.  You were doing E1 work and being paid --

A   I was doing non -- nonexempt 1 work.

Q   And so the County made that accommodation for you, right?

A   Yes.

Q   Kept you at your promoted position even though you were doing E1 work, right?

A   Yes.

MR. LOPEZ:  Madam Commissioner, I pass the witness.

CROSS EXAMINATION BY DEFENDANT

BY MR. BROWN:

Q   Elva.

A   Yes.

Q   May I call you Elva?

A   Yes.

Q   I've never called you anything else.

So you were -- at the time you were demoted, you were working for a newly elected official.

A   Yes.

Q   Correct?  And that elected official controls their office, correct?

A    Yes.

Q    So this doesn't come under David Smith's purview to control that office?

A    I -- not that I know.

Q    I mean Ms. Montemayor controlled her office, her personnel?

A    Yes.

Q    David Smith couldn't come in and say no, Margaret, you're not doing that; you're doing this?

A    Well, he could if he wanted to.  It was up to Mrs. Montemayor if she'd do it.

Q    Right.  She had the final say then?

A    Yes.

Q    Not David Smith?

A    No.

Q    And when you were --

A    She had the final say on her positions, her exempt positions, but not her nonexempt positions.

Q    Correct.  And you were an exempt position?

A    Uh-huh.

Q    And so when you -- when a newly elected official comes in, as commonly happens, they bring in a new Chief Deputy and their higher staff, correct?

A    Uh-huh.

Q    Higher level.  And that's what happened?

A    Uh-huh.

Q    And you learned they were going to try to terminate you; is that correct?

A    Uh-huh.

Q    And so you fought that. And how -- did you fight that through Civil Service?

A    I -- well, what happened was, yes, I did file a grievance with Civil Service. But when Bob Hooper called me and told me that for me to get an attorney because H.R. was saying that -- not Civil Service. Civil Service was saying that they had to keep me because I was grandfathered in. But H.R. was saying that they didn't have to keep me, because there was not a position comparable to my Civil Service protected position of the E10. And so since they didn't have one, that they were going to let me go.

And he suggested I get an attorney. And I said okay. And so that's when I went and I -- I talked to my son who was an attorney. And my son got me an attorney here in San Antonio who's an attorney in Houston. And so they got me an attorney, but the attorney, all he did was come and talk to Ms. McKinney. And Ms. McKinney's reaction to that was oh, I don't know what she's crying about. I have to keep her anyway, because she's Civil Service protected.

But I never received the letters at all that were saying that they were going to keep me. It wasn't until

one day at Commissioners Court that Commissioner Rodriguez comes out and asks -- and I believe you were there Mr. Hampel -- he comes out and he asks Ms. McKinney because Ms. McKinney was there doing a presentation. And when she turned around he says oh, by the way, Ms. McKinney, I'd like to know what's going to happen with Elva Abundis. And she goes well, I don't know. It's -- it's up to H.R. Ask Bob Hampel. And Mr. Hampel got up and he said well, I've been trying to, you know, talk to you, Ms. McKinney, but you won't talk to me.

Well, then Commissioner Rodriguez tells them I want a letter sent to Elva by Friday letting her know her pay and that -- what is she going to be doing. And so I received my letter that I was going to be earning $61,500.00. They didn't tell me what I was going to be doing. And then Ms. McKinney, the following week, places me in the courts. And -- and which that was an actual E4, but I had a position number of an E1.

And I didn't mind. I had a job and I enjoyed my job. And I enjoyed when they put me scanning. I enjoyed when they sent me to the warehouse to work with all the men. I was the only woman there. I had a job.

And on the day that I was fired, the minute they left, I called Commissioner Rodriguez, and I said I was fired. And he said yes, I was trying to get ahold of you, but

I couldn't reach you because there's no phones. And when it happened was on January 7 when I was placed in that position at the warehouse. Ms. McKinney's staff came in and took all the phones. No one was allowed to have a phone out there, because they didn't want to have me having interaction with anybody at the courthouse.

So we didn't have phones. So Commissioner Rodriguez was not able to reach me to let -- to let me know that I was being let go. And then he said I wanted to call you and tell you that you were going to be let go, because Commissioner Wolff -- I ran into Commissioner Wolff, yes, last night, and he said they're going to let go of Elva, because Ms. McKinney says Elva is campaigning against her, which was not true. I would still be working there under her, and I would have been loyal to her just like I was loyal to Ms. Montemayor for eight years. Whether she had me as a 1, a 2, a 3, a 3, I was doing my job. I loved my job, and ...

Q    You hadn't decided to run against her at this --

A    No.  I --

Q    -- point?

A    No.  At that point, no.  I would have never run against her.  And I had even told Ms. McKinney I don't want you to feel that I'm going to run against you.  I'll never run against you.  I love my job.

Q    So did the Commission, Civil Service Commission ever

get involved in your case and order anything?

A   No, never.  Because I filed my grievance which till today hasn't been heard.

Q   Okay.  But your original.  Not -- your grievance about getting terminated; is that what you're talking about?

A   Uh-huh.

Q   Okay.  The original position of moving you out of your Chief Deputy position to a clerk position, that never came through Civil Service, right?

A   No, because --

Q   Civil Service never ordered the Commissioners to do anything on your behalf?

A   No, because it was resolved in Commissioners Court by Commissioner Rodriguez.

Q   By one Commissioner?

A   Uh-huh.

Q   Correct?

A   Uh-huh.

Q   Not by a vote of all five Commissioners?

A   Huh-uh.

Q   And when you were let go, your position was eliminated, correct?

A   Right.

Q   So you were let go because your position was deleted?

A    Well, okay.  Well, and you got to remember I was the Chief Deputy, so I know the -- the ropes around.  And when I was placed in that position, Ms. McKinney eliminated all the civil assignment clerks positions which were E1s.  They kept one open, one position open.  And they stuck me in their one position.  So I knew eventually I was going to be let go.  Because there was -- out of those 11 civil assignment clerk positions that we had, they only kept one open, because they needed a position number to stick me in, and they stick me in that position number.  Even though I didn't work as a civil assignment clerk; I worked as a Criminal Court Clerk, I worked as a scanning clerk, they moved me around.

          And like I said I didn't care.  I loved my job. I had a paycheck.

Q    Okay.  Technically, you lost your job due to the elimination --

A    Right.

Q    -- of the position, correct?

A    Exactly.  Because they eliminated that position years before.  They eliminated it in 2011.  But in 2013 they chose to now eliminate the last position number 1.

Q    And was that through the budget process?

A    No.

Q    How was that done?

A    I -- it was just done on March 15th, because she got

wind that I was campaigning against her. That's -- that's the excuse she used. She -- she told Kevin Wolff, Commissioner Kevin Wolff that they were going to let me go because I was campaigning against her. And which was not true. I would have never run against her. I would have -- I loved my job. And I respected her.

Every time she moved me, I never complained. I did my work, I came to work on time, and I even excelled. I was the employee that was always getting certificates for best scanner, best everything.

Q   And in your job as Chief Deputy when the budget would come up, you would submit creations or eliminations of positions to the County, correct?

A   In the eight years that I was there at the District Clerk's Office, we only eliminated one position the entire eight years. And that was the administrative aid only because Ms. Montemayor had promoted me to Chief of Administration. In the eight years that I was there, we never fired other than for cause. And I can honestly tell you the eight years we might have filed maybe -- fired maybe five -- five, six employees, and it was for good cause.

Q   And if you needed to create a position or delete a position, whether you did or not, your knowledge would be that you would submit that in the budget process, correct?

A   Yes.

Q    And the Commissioners would decide whether to approve that?

A    Yes.  But mine was never -- because my position --

Q    I know.  Not your --

A    -- was done --

Q    -- position.

A    -- in the middle of -- of a budget.  And when I called over here to Civil Service, Andrea San Miguel told me they can't -- when I told her that they had let me go -- she said they can't do that.  We're -- we're not in the budget.  I said well, they did it.

Q    Okay.  Now, your situation was different than Ms. Guerrero's?

A    I don't know Mrs. Guerrero's situation.  I just -- I know a little bit of it.  But I -- I can't say that hers is no different than mine.  We were both terminated.

Q    Technically she's never been terminated.

A    Okay.  Well, I --

Q    You were ter -- you were eliminated --

A    Eliminated.

Q    -- during the budget process?

A    Because of a budget process of which of a position that had been eliminated since 2011, but they only kept one position open, because they needed that position number to stick me into.  So I knew when I saw the budget -- because the

budget is public information -- and I saw that I was the only one civil criminal assignment clerk, I knew one day I was going to be fired.  And the day came March 15, 2013.

Q    Okay.

MR. BROWN:  That's all I have.

MR. LOPEZ:  Just a couple quick questions, Ms. Elliott.

REDIRECT EXAMINATION BY PLAINTIFF

BY MR. LOPEZ:

Q    Mr. Clark asked you about your situation versus Ms. Guerrero's situation.  All we're trying to figure out for the Commissioners is that there was a time you were making $81,000.00 as the Chief Deputy, right?

A    Yes.

Q    And that you were going to get demoted or your job may have been in jeopardy, correct?

A    Right.

Q    But then they put you in an E1 job, right?

A    An E1.

Q    And E1.  And then they -- even though you were doing reduced activities at that lower level, you were still getting the E11 money, right?

A    The E10.

Q    The E10 money, right?

A    $61,500.00.

Q    You were getting much more than what an E1 was --

A    Oh, yeah.

Q    -- was getting, right?

A    An E1, yes.

MR. LOPEZ:  Nothing further.

RECROSS EXAMINATION BY DEFENDANT

BY MR. BROWN:

Q    Now, you were not paid pursuant to an order of the Civil Service, correct?

A    No.

Q    You were paid under a Human Resources rule or a Civil Service rule, correct?

A    A Civil Service rule.

Q    Not this rule?

A    I don't know about that rule.

Q    This rule relates to when they order something. They never ordered anything on your behalf, correct?

A    No, I -- I never ...

Q    So the payment you got wasn't as a result of a ruling under this provision by this Civil Service, right?

A    No.

MR. BROWN:  Thank you.

MR. LOPEZ:  Nothing further.

CHAIRPERSON ELLIOTT:  Ms. Abundis, Thank you --

MS. ABUNDIS:  You're welcome.

CHAIRPERSON ELLIOTT: -- very much.

At this time it is 10:13. We will recess. Let's come back right at 10:30. Okay. Thank you.

(Brief recess).

CHAIRPERSON ELLIOTT: Okay. The time is 10:30 and the Commission meeting is reconvened.

Mr. Lopez?

MR. LOPEZ: Yes, ma'am. Ms. Guerrero calls Andrea San Miguel.

ANDREA SAN MIGUEL, having been sworn to tell the truth, testified as follows:

DIRECT EXAMINATION BY PLAINTIFF

BY MR. LOPEZ:

Q    Can you state your name for the record?

A    Andrea San Miguel.

Q    Ms. San Miguel, is this place familiar to you?

A    Yes. It sure is.

Q    Can you tell the Commissioners why?

A    Because I was the -- I'm the retired Civil Service Director. I worked here for 39 years and 3 months. I just retired at the end of January of this year.

Q    Ms. San Miguel, my mother would kill me if she heard me trying to age you at all, but you've been here almost since the Civil Service Commission was created, right?

A    A little bit after it started. It started in 1971,

and I started October 14th, 1974.

Q    So almost through the entire life of the Bexar County Civil Service Commission you've been work -- you worked at the Commission up until now, right?

A    Yes.

Q    And what were your job responsibilities?

A    I started as the secretary.  And then I moved up to what they called Chief Clerk, and then they changed the title to Civil Service Director.  And it was handling all the Civil Service appeals and grievances for the Bexar County Civil Service and also the Sheriff's Civil Service.  I also did recruitment, and I assisted employees and the departments on the procedures for Civil Service hearings.

Q    Now, Ms. San Miguel, other than the Commissioners, with your last position were you the highest ranking official at the Civil Service Commission?

A    In the section -- in the section, yes.  But there was the H.R. Director and the H.R. Manager over the whole H.R. department.

Q    But for lack of better words, you ran the Civil Service Commission, right?

A    Yes.

Q    As its Director?

A    Yes.

Q    You were responsible for handling or administrating

hearings and grievances?

A    That's correct.

Q    And in that job did you become familiar with the Commission's policies?

A    Yes.

Q    I'm going to show you what we've marked as Exhibit Number 5.  Can you tell the Commissioners what Exhibit Number 5 is?

A    This is the Bexar County Civil Service Commission Rules and Regulations, Policy 7.6.14, suspension, demotion or termination appeal and hearing.  And this was effective March 16th, 2007.  These are the current rules on the -- the Commission's policy on that.

Q    Ms. San Miguel, you were the Director of the Commission when Ms. Guerrero began her appeal here, right?

A    That's correct.

Q    And, in fact, you were the Director back on April 26th, 2012 when we had the hearing and trial where her demotion was overturned, correct?

A    Yes.

Q    And Policy 7.6.14 is the policy that would be applied and is binding on the Commissioners as well as Ms. Guerrero, right?

A    Yes.

Q    Okay.  And you're familiar with this policy, right?

A    Yes.

Q    Now, am I correct in saying that this policy governs the entire process by which someone can appeal their demotion, right?

A    Yes.

Q    Now, if we look at number 16, it tells us that if an executive session is held, the Commission shall reconvene an open session and make a decision.  Did I read that correctly?

A    Yes.

Q    That means that after the Commissioners hear the evidence, they have the opportunity to go into executive session and make a decision on this case, right?

A    That's correct.

Q    And the Commission or the Commissioners, they are -- they're limited on the three things they can do, right?  And that's spelled out in the policy, right?

A    Yes.

Q    They can choose to deny the appeal, right?

A    That's correct.

Q    And so if they chose to deny the appeal, basically they would be saying in Ms. Guerrero's case that the demotion was warranted and that she should have been demoted, right?

A    That's correct.

Q    That's one of the things the Commissioners could have done on April 26th.  They didn't do that, right?

A   No.

Q   They decided that the appeal of the demotion or the department's decision on the demotion, what Ms. Mares did to her, they didn't uphold that, right?

A   That's correct.

Q   Okay.  The second thing they can do is they can impose a lesser penalty, right?

A   Yes.

Q   That means, you know -- well, you're the former Director.  Tell them what that means.

A   That means if -- if a person -- in this case if a person is terminated, they can reduce that to a suspension or demotion or reprimand or counseling.  Anything lower than the penalty that was imposed.

Q   They didn't do that in Ms. Guerrero's case either, right?

A   No.

Q   So the only other thing that the Commissioners could do is to -- let's go to the next page here -- is to reverse the discipline, right?

A   They can overturn the disciplinary action, yes.

Q   I'm calling it reverse, but overturn, right?

A   Uh-huh.

Q   And that's what they did in this case, right?

A   That's correct.

Q   They -- they decided that the demotion was not warranted, so they overturned her demotion, right?

A   Yes.

Q   Okay.  Now, if we go to number 17, this policy says -- and I've highlighted it -- it says:  Should the office or department refuse to reinstate the employee as ordered by the Commission, the employee shall be entitled to their full salary just as though they had been reinstated as ordered. Did I read that correctly?

A   Yes.

Q   You're familiar with paragraph number 17, right?

A   Yes.

Q   Can you tell the Commissioners how it came to be that number 17 became a part of Policy 7.6.14?

A   This had been back from the seventies where we had some of the elected officials at times when the Commission would reinstate an employee and they refused to take the employee back.  And so the Commission adopted a policy, and it was probably -- it also was from the previous Civil Service Rules -- that if the elected official or department head refused to take the employee back and the Commission had ordered them reinstated, that they would have to pay that employee even though they weren't -- they didn't want them at the job.

Q   Okay.  So you're telling the Commissioners that

number 17 was a safety provision for employees, right?

A    Yes.

Q    That it was a safety provision for these Commissioners, right?

A    Yes.

Q    Basically you're telling the Commissioners that you were a part of the process that put this rule into place.  And that the reason it was put into place was because Commissioners like these respectful folks were issuing orders of reinstatement, and elected officials, County Commissioners, whomever they are, were saying we don't have to listen to you; we're not going to reinstate them.  Is that what you're telling them?

A    Yes.

Q    So this rule was put in place so that these people could have some power to govern over these types of proceedings, right?

A    Yes.

Q    And so you're telling us if in Ms. Guerrero's case, if they reinstated her and they issued her an order of reinstatement, they signed it, said that she gets her back pay and she gets reinstated, and Ms. Guerrero takes that to Ms. Mares and Ms. Mares says I'm not going to take you back because we deleted the position, what would happen under this rule?

A    What the Commission ordered, they ordered her reinstated, but they only ordered the reinstatement up through when the position was deleted.

Q    Let me rephrase my question, because I don't think I asked it very well.

Under this policy, if the Commissioners today -- today, not back in 2012 -- if today they issued an order of reinstatement and that order was refused by BCIT, what would happen under Policy 7.6.14?

A    If it was refused, she would continue to get her pay.

Q    At her former position number before she was demoted, correct?

A    Right.

Q    So based on this policy, the Commissioners have the power to reinstate her, correct?

A    (No audible response).

Q    Or under Policy 7.6.14, they have the power to reinstate her, right?

A    Yes, they do.

Q    And if that reinstatement is refused by Ms. Mares because the position is deleted, she would still be entitled to her back pay and her former salary even as if she was ordered to be re -- or they took her back, right?

A    This -- it's different.  This is the first time in

any of the cases that I had where we had a position being -- that was deleted before while there was an appeal pending.  So I'm not sure how to answer that, because I don't know -- I mean as far as --

Q    All we -- all we can do is look at the policy, right?

A    Yeah.  I mean if she -- if the position was there and she was -- and they refused to take her back, she gets her pay.

Q    That's not what the policy says though, right?  The policy says if she's refused reinstatement.

A    If she's refused reinstatement, then she's entitled to the full salary as though it had been reinstated as ordered by the Commission.

Q    Okay.  Now, you said, Ms. San Miguel, that in all of your years at the County that you've never seen a situation like Ms. Guerrero's, right?

A    Not where the position was eliminated while there was an appeal pending.

Q    Do you think that's unfair to have been done?

A    I think they should have waited until the appeal was done.

Q    Otherwise, what is the importance of your office as a Director or these Commissioners, right?

A    It affects their decision, yes.

Q These Commissioners were appointed to make sure that the County ran their business fairly and treated their employees fairly, correct?

A Yes.

Q And that's why we have rules of why Ms. Guerrero gets the opportunity to come here and give her side of the case, right?

A Right.

Q And you would agree with me that it is extremely unfair to have deleted her position before she got her day in court here, right?

A Yes, because it does have an impact on her -- on her position.

Q Because it --

A Or her appeal.

Q Because it could be said that we were going to -- we're going to get rid of Ms. Guerrero either by demoting her because we think we've got cause; and even if we don't, we're going to, you know, do an end run and delete her position even while it's on appeal, right?

A Yes.

Q If they could do that all the time, what would we need these Commissioners for, right?

A That's correct.

Q Why would we need to file things up here, right?

A    Yes.

Q    What would these policies be -- you know, why would we need these policies, right?

A    That's correct.

Q    You spent 40 years in this office, right?

A    39.

Q    I'm sorry.

A    And three months.

Q    You tell me that their work is important, right?

A    It is --

Q    To make --

A    -- very.

Q    To make sure that the County is run fairly, right?

A    That's correct.

Q    So that employees shouldn't be demoted just because somebody, you know, gets upset, right?

A    They have the right to challenge anything that's -- any action that's taken against them.

Q    Under these Commission's policies she has some rights, correct?

A    Yes.

Q    And they have the power to be able to reinstate her under these policies, right?

A    Yes.

MR. LOPEZ:  Nothing further.

CROSS EXAMINATION BY DEFENDANT

BY MR. BROWN:

Q    Andrea, hi.

A    Hi.

Q    You and I have talked about this situation numerous times.  And your advice to me has always been in my agreement they cannot reinstate someone to a budgeted eliminated position.

A    The Civil Service policies state that the Commission has no authority over budgetary matters.

Q    And creation and elimination of positions --

A    Correct.

Q    -- are budgetary matters; is that correct?

A    That's up to Commissioners Court.

Q    And solely Commissioners Court, correct?

A    For creating positions, yes.

Q    And eliminating positions, right?

A    Yes.  The Commission doesn't eliminate positions.

Q    Right.  And they can't create them via order either, correct?

A    They don't create the positions, no.

Q    So if a position has been eliminated by the budget -- and this is the exact same situation we have here that you and I discussed -- when an elimination has occurred prior to the hearing being resolved, if the position is no

longer in existence, the most the Commissioners can do is reinstate that person to the position they had up until the time it was eliminated, award them back pay up until the time it was eliminated, and then make other findings as they see fit within the positions that are available; is that correct?

A    When a position is eliminated -- if a position is eliminated, the employee doesn't have any appeal rights to that.

Q    To that position?

A    To that -- to file an appeal.  If it's -- if it's eliminated by the court, the employees cannot appeal that position.

Q    Right.  And in a situation where it's eliminated during the pendency of an appeal --

A    This is the only time that's happened.

Q    Correct.  So Mr. Lopez stating that this would just ruin the County, we wouldn't need Civil Service, this would go on all the time, that's not the fact, right?  It was never used this way before, was it?

A    Not until this case.

Q    For one case.  So it's not that the Civil Service isn't needed because this is rampant around the County, correct?  It's only happened once?

A    It's only happened once.  And --

Q    And your --

A    -- this is the only time.

Q    -- opinion at the time was that you expressed to me that the most they could do when a position is eliminated is exactly what they did, give her back pay up until the time the position was eliminated and reverse the demotion. But they couldn't say she also gets put in a non -- in a position that doesn't exist?

A    They can't -- they cannot create a position.

Q    Okay. So do you feel as you felt back then that they gave her the most relief they could?

A    Based on what -- based on what they had and what I've been told as far as positions being created, the Commission -- I was told the Commission cannot create positions. So if they can't create positions and they eliminate it, the Commission ruled that she gets her back pay up through that point.

Q    And they can't order her into a position that doesn't exist, correct?

A    They -- not on -- not based on this rule. But based on the County Policy that they can't create positions, they can't put her -- they can't create something that they don't have.

Q    So this rule never comes into play. If the Commission can't order her into a position that doesn't exist, the department could never refuse to reinstate her, because

they cannot in the first place order her into an exempt -- or an eliminated position, correct? Because to order her into an eliminated position would require the creation of that position.

A They can't create anything.

Q But the fact of --

A As --

Q If they say you're ordered --

MR. LOPEZ: I'd ask that she be allowed to finish her question.

A They can't create a position. They cannot create a position. This rule says they get their pay whether they're -- they're -- if they're refused reinstated. Again, this is the first time we've ever had this.

The reason the Commission ruled that way is because the position was no longer in place or they felt okay, we can't create a position and we're going to give her the back pay up through when it was eliminated.

Q (By Mr. Brown) Because at the time it was eliminated, if she had been in the position, she simply wouldn't have had a job, right?

A Right. If she --

Q Because she had no appellate rights?

A If she was in the position and they eliminate it, then she has no appeal rights.

Q   And certainly by coming to Civil Service, she can't have greater rights now than she would have had the position -- had she never been demoted; does that make sense?

A   In other words, she can't -- she can't challenge anything over that amount is what you're saying?

Q   She can't -- had the position been eliminated by Commissioners Court as it was in the budget and she was in it --

A   She would -- if she was in it and the position was eliminated, she has no appeal rights at that time.

Q   Right.  So it doesn't make sense that she could come in, pull one sentence out of the rules and say that this somehow allows the Commissioners to recreate the position that was eliminated, put her back in it, thus put her in a better position than she had been in had she never been demoted. That can't be what this rule was meant to be, right?

A   This was when the department refused to reinstate them.

Q   Into an existing position?

A   And the elected official refused to pay them, they were going to get paid whether they worked or not.

Q   Right.  But that's under the assumption again that the position still existed?

A   That this never had -- we never had this case before.  We've never had anything like this where they

eliminated it prior to the -- while an appeal was pending.

Q  Well, Mr. Lopez asked you about the mean -- why this was put into place.  When it was put into place, it wasn't put into place so that Civil Service now had the power to order positions be recreated, right?

A  It was -- it was on current positions that they were placing them back in.  Like I said, this had never -- they had never eliminated a position prior to that time.  Prior -- while an appeal was pending.

Q  Correct.  And nothing says they can't, correct?

A  No.  Usually they're done during the budget year in the past.  Commission -- the Commissioners Court would eliminate budgets -- positions during budget year.  This was when the person had an appeal at any time of the year and they didn't take them back, they would put them back in place.

Q  But there's nothing precluding Commissioners from eliminating positions while an appeal is pending, correct?

A  There is nothing in the Civil Service Rules.  I don't know what the pol -- if there is anything in the Commissioners Court, what their policy is, I don't know.

Q  But you're not aware of any policy or rule?

A  Not in the Civil Service.

Q  Okay.

MR. BROWN:  That's all I have.

REDIRECT EXAMINATION BY PLAINTIFF

BY MR. LOPEZ:

Q    Ms. San Miguel, we're looking at number 17 here.  It says:  Should the office or department refuse to reinstate the employee as ordered by the Commission, the employee shall be entitled to their full salary just as though they had been reinstated as ordered.  Is there anything in that sentence that says anything about creating a job?

A    No.

Q    Okay.  So when he's asking you questions about whether the Commissioners are creating a job, this rule talks nothing about creating jobs, right?

A    No, because the Commission doesn't have authority to create.

Q    We're talking just about money, right?  We're not talking about eliminated positions or current positions; we're just talking about money under number 17, right?

A    It's just talking about, yeah, reinstating them to a position.

Q    And so if we go back to why the rule was put into place, a Commissioner would say I'm not taking Orlando back. I don't care what the Commission says; I'm not taking him back.  This rule was put into place so that if I wasn't taken back, then I'd still get the money that I was entitled to, right?

A    Right.

Q    And so the Commissioners could tell me or the elected official could tell me for any reason they're not taking me back, right?  They could say -- they could say, isn't it true, that yes, Commissioners, you said that Mr. Lopez should be reinstated, but County -- Judge Wolff could say I'm not taking back Mr. Lopez, right?

A    Right.

Q    And he could give me any reason why he doesn't want to take me back, right?

A    Right.

Q    Too short, too ugly, too dumb, whatever it is, right?  The rule doesn't talk about having to give a reason of why they're not reinstated, right?

A    No, it doesn't say.

Q    It just says if you don't reinstate them, they still get their money, right?

A    Yes.

Q    That's how the policy was written, right?

A    Yes.

Q    To protect employees such as Ms. Guerrero, right?

A    Yes.

        MR. LOPEZ:  Nothing further.

RECROSS EXAMINATION BY DEFENDANT

BY MR. BROWN:

Q    Andrea, go with me on this one or listen (inaudible).

A    Okay.

Q    This can only come into place as written if the elected official refuses to put the person back in to the position they had, but that has to assume the position still exists, correct?

A    If they were reinstated, then they're supposed to get the back pay.

Q    Right.  But they can only be reinstated to existing positions, correct?

A    Again, that's something that -- this is the only time we've had that, so it didn't address that because we've never had an issue where they abolished them.  This was usually where the positions were available; they refused, and they put them back.

Q    Right.

A    We've never address -- we've never had anything like this where they abolished it while the appeal was pending.

Q    So there has never been a ruling or a decision that this one sentence allows this Commission to order the County Commissioners to recreate an abolished position so that they can then put them in that position and receive that back pay?

TR-0241

A    It doesn't talk about recreation; it just says ordered as reinstated by the Commission, but it doesn't say --

Q    But you would agree that --

A    -- anything about re-creation or abolishment.

Q    You would agree that if a position had been eliminated, only the Commissioners can recreate that position, correct?

A    Only the Commissioners can recreate it.

Q    Okay.

MR. BROWN:  Thank you.

FURTHER REDIRECT EXAMINATION BY PLAINTIFF

MR. LOPEZ:

Q    Ms. San Miguel, we're looking at the policy.  The people who put this policy together, they could have fixed that real easy, right?  Because they -- it says right now: Should the office or department refuse to reinstate the employee.

Now, what's missing here where I've got this red dot, what's missing, would you agree with me, that refuses to reinstate the employee to a current or existing position. It doesn't say that, right?

A    No, it doesn't say that.

Q    It could have been included, right?

A    Probably could have been included, yes.

Q    But it wasn't, right?

A    No.

Q    So we just have this rule, right?

A    This is the only rule we have.

Q    And it doesn't say anything that you can only be reinstated with money to a current or existing position, right?  It doesn't say that, right?

A    No.  It just says refuse to reinstate the employee as ordered by the Commission.

MR. LOPEZ:  Thank you, Ms. San Miguel.

CHAIRPERSON ELLIOTT:  Thank you.

MR. LOPEZ:  The employee calls Carmella Guerrero, Madam Elliott.

CHAIRPERSON ELLIOTT:  All right.

CARMELLA GUERRERO,

having been sworn to tell the truth, testified as follows:

EXAMINATION BY PLAINTIFF

BY MR. LOPEZ:

Q    Ms. Guerrero, for the benefit of Madam Arriaga, can you tell her how long you've been with the County?

A    I'm going on 21 years.  Just short a couple of months.

Q    How did you start with the County?

A    I was hired by the Bexar County Sheriff's Office way back when, working in the mothers and their children and fathers and their children program.  Very kind of low level

technician type person.  At that time it was a brand new program.

Q    And you worked your way all the way up to the ...

A    Yes.  When I left the jail when I left the Sheriff's Office, I was the jail program's manager.  So I was responsible for all jail programs.  Had 52 employees under me, officers and civilians.  We ran all GED classes, laundry services, food services, all those types of programs within the jail.

Q    Ms. Guerrero, at some point you came to work for BCIT, and you were promoted all the way to an E11, right?

A    Yes.

Q    By Mares, right?

A    Yes.

Q    And then there was a dispute that arose over some parking?

A    Yes.

Q    And Ms. Mares demoted you from an E11 to E5?

A    Yes.

Q    And isn't it true, Ms. Guerrero, that Ms. Mares cited some pretty nasty reasons of why you should be demoted, right?

A    Yes, she did.

Q    She called you a liar?

A    Yes.

TR-0244

Q    Said you were dishonest?

A    Yes.

Q    Said that you were insubordinate?

A    Yes.

Q    Basically that you don't do what you're told, what you're supposed to, right?

A    Yes, ma'am.  I mean sir.  Yes, sir.

Q    That doesn't seem to make sense, does it?

A    No.

Q    How you get promoted over 21 years with the County, that doesn't make sense, right?

A    No.

Q    Do you -- would you agree with me and to the Commissioners that, you know, liars and dishonest people and the people that don't do the things they're supposed to don't get promoted all the way to E11s, right?

A    No, I do not believe they do.

Q    We had your day in court on April 26th.  You got to take the stand, we presented evidence.  And this fine Commission overturned your demotion, right?

A    Yes, they did.

Q    They did leave you in your E5 spot, right?

A    Yes.

Q    And so for another two years have you been doing E11 work or E5 work?

A   E5 work.  Well, a little bit of your -- no, just kidding.  E5 work.

Q   So after April 26th, you walked back into your office, you know, and you were able to hold your head high because you were able to tell your employ -- your fellow employees that you're not a liar or dishonest or don't do what you're supposed to, right?

A   Yes.

Q   And it's been over two years since that date, right?

A   Yes.

Q   And you're still doing E5 work, right?

A   Yes.

Q   You've kept your head up and done the exact work that you've been paid to do?

A   Yes, sir.

Q   However, you've still been advancing the argument that you think that you're entitled to additional relief, right?

A   Yes.

Q   Why is it that -- why would somebody who was called a liar, dishonest, doesn't do what they're supposed to, you know, it would occur to me that most people wouldn't do that.  Most people once they were vindicated, I wouldn't suspect that they'd go back to doing the lowly job that they were demoted for unfairly.  Why do you do it?

A    I love my job.  And I knew eventually -- I thought eventually this would work itself out.  I -- when I went back, it was very humbling when I went back the day that I was demoted, because the employees that worked for me I now worked for.  One of my employees was now my new supervisor.

That was difficult for me, but I also felt that there was something wrong with the way the policy was written.  There was something wrong with the way the County was doing business if they could eliminate my position in the pendency of appeal so that I could not get the relief that I felt I was entitled to after 20 years of excellent service, what I believe is excellent service.  And so I feel like I've held on.  I went to work, I held my head high for my fellow employees and I think for all Bexar County employees.

Since I've been back which is over -- well, it's been three and a half years since the actual demotion -- I've received several commendations.  Ms. Mares and Mr. Hampel have given me big projects.  I think they have a lot of confidence in me.  I haven't let anybody down.  I don't get in trouble.  I really love my job.  I plan to be here another 10 years.  And I don't think that I need to be, you know, reinstated to a position that was eliminated being Ms. Mares' right-hand man.  I feel I'm just as valuable in any other position they put me in.

However, I also feel that it took me 21 years

to get where I was, and, you know, just in one day, you know, I lost $22,000.00 in salary, and it's been very difficult for me to try to catch up. And so I continue to do a good job and I go to work every day, but I still feel like somehow the policy needs to be rewritten for other employees that this might happen to. And I also feel that I should be compensated at the level that I was at, because I was vindicated because they said I didn't do anything wrong. But I didn't get what I -- took me 21 years to earn back.

Q  And basically you're saying you just want this policy enforced and applied to you, right?

A  Yes.

Q  That if Ms. Mares doesn't take you back because she deleted your position, you're still entitled to your former salary, right?

A  Yes.

Q  And you think that was approximately $22,000.00 a year that you've lost?

A  Yes.

Q  Do you have a family?

A  Yes.

Q  Do you have kids?

A  Yes.

Q  Has that demotion of salary, has it affected you?

A  Very much.

Q    And so all you're saying is if Ms. Mares can't put you back into a deleted position when they order you reinstated, that you just want to get paid the way that you should have been, right?

A    Yes, sir.

Q    Ms. Guerrero, have you done an analysis of how much you think that you're entitled to as a salary today?

A    Yes, I did.

Q    Okay.  And did you prepare something?

A    Yes, I did.

Q    Okay.  And is that what we have marked in the exhibit packet as Number 9?

A    Yes.

Q    Can you explain to the Commission what Exhibit Number 9 is?

A    Basically the first part of the chart talks about the -- I was -- you may or may not remember and Ms. Arriaga, I know you were not here -- but I had been promoted.  I was an E10 manager when Ms. Mares came in.  I spent about a year working with her, training her, catching her up to speed on County business.  Right before the budget process, she promoted me to an E11.  So I went from the salary of $79,224.00 to $80,616.00.  I only held that salary for a month when Ms. Mares demoted me.  So basically I was demoted six grade levels to a 5 -- to an E5 at $58,140.00.

The second part of the chart -- and I believe it's County rules, so I'm not testifying that I know what all the rules are for H.R. But when an employee gets demoted that much, they have to keep them at the maximum of the salary. They can't -- they can't, you know -- they have to, when you get demoted that much, there's some kind of range of penetration that says you're paid the max. So I am at the max of the grade 5. So I can never get any other raises in the position I'm in no matter how well I do. If the County gets a raise, I get a one-time check. I don't -- there's nothing ever added to my salary. I will make that much until I go somewhere else.

So the second part of the chart basically takes the raises that the County got and that were awarded by Commissioners Court and that are in the County Budget approved by Commissioners Court, and it takes me -- the actual salary that I have when the County got the first raise of two percent, which is a cost of living increase. And I got a one-time check of $1,162.00. If I had been making $80,616.00, I would have received a two percent cost of living increase on that, which would have taken my salary to $82,228.00.

That same fiscal year all of the BCIT managers received an eight percent increase in pay. Because I had just recently been demoted, I was not afforded that eight percent increase, but all the rest of the managers did get it. That

is also published in the -- in the budget book. So at the $82,000.00 if I apply an eight percent increase on that, my salary would have gone up to $88,806.00.

That next fiscal year Commissioners Court approved a three percent cost of living increase. I got a one-time check of $1,700.00. My salary still remained $58,140.00, but if I had been applied to my salary like they applied it everybody else in the County that is not at their maximum, then my pay would have been $91,470.00.

Subsequently in the last fiscal year, Commissioners Court approved a three percent COLA. Again, I got a one-time check. And -- and if it had been applied to my salary, then I would be making $94,214.00.

Q   Now, I'm an Aggie, so my math is not always the best, okay? Where did you come up with like you're saying that you would have got a two percent COLA raise, eight percent raise, three percent, three percent. Did you just -- did you make those numbers up?

A   No, sir.

Q   Okay. Let me see here. Is this the IT budget?

A   Yes, it is.

Q   Number 11?

A   Yes, it is.

Q   And I'm clicking here. Help me.

A   It goes above that I think. Program change number

two; is that what you're looking for?

Q   Yes.  So when we look at program number two --
program change number two -- and we're looking at the IT
budget, which is Number 8 in the book -- you're saying that
here is the eight percent that you would have been entitled to
as part of the budget, right?

A   Yes.

Q   And these are for all the managers?

A   Yes.

Q   And that's how you included that in your chart.

A   Yes.

Q   Right?  Okay.

Now, you also say that you were entitled to
another two percent.  And that's in your booklet on Number 10,
right?

A   Uh-huh, yes, sir.

Q   So this is -- we've got the full copy in the booklet
on Number 10.  This is the contingencies and this is where --
this is right out of the Bexar County Budget, right?

A   Yes, sir.

Q   Where it says you would have gotten a two percent
cost of living adjustment for all active regular full-time and
part-time employees not covered by collective bargaining?

A   Yes, sir.

Q   That's where you got the two percent, right?

A    Yes, sir.

Q    So then you're saying there's another two percent, right?  I'm sorry that's the 2010 two percent?

A    Yes.

Q    And then was there another three percent that you're talking about?

A    Yes.

Q    And this was out of the next year's budget?

A    Yes.

Q    So that's how you got to the three percent cost of living in your chart, right?

A    Yes.

Q    And then there was one more for '13 and '14?

A    Yes.

Q    So the numbers in your chart where you talk about your raises, two percent, eight percent, three percent, three percent, those were right out -- straight out of the budget book, right?

A    Yes.

Q    Okay.  And those are, in fact, what was awarded, right?

A    Yes.

Q    So you're telling the Commission how much do you believe your current salary should be based on those raises and cost of living adjustments?

A    $94,214.00.

Q    Okay.  Did you also run an analysis, Ms. Guerrero, of what you believe you're entitled to in back pay?

A    Yes.

Q    Can you explain to the -- to the Commissioners what that is?

A    So basically when the Commission awarded my back pay, they awarded it up until the time the position was eliminated.  And so basically I took into account that back pay that was already awarded to me.  So I didn't start this chart until post the day that I did receive back pay for, because I did get 10 months of back pay in the original order.  So -- excuse me.  So I started the chart at that time.

And basically I took the salary that I should have been earning at an E11, which is $80,616.00 and added the increases in salary to that.  So the eight percent that the managers received and the two percent COLA that were issued, then my salary would have gone up to -- so basically I did it on a monthly basis so that you could see that my actual salary stayed $4,885.00 a month, but my -- my salary should have been increasing as the COLAs and the increases were added.

So I did that on a monthly basis going all the way down.  So I have included the eight percent, the two percent, the three percent, and the three percent on a monthly basis from the time that I was awarded the original back pay

to present time. --

Q    And so you came up with a figure?

A    Yes, I did.

Q    What is the amount that you believe that you're entitled to through back pay?

A    Well, I realized that I already received several one-time checks, so I subtracted that amount from the total. I obviously don't --

Q    Is that the --

A    -- want to get paid twice.

Q    Is that the 4,644 bucks?

A    Yes, it is.  Yes, it is.

Q    So that gets you to $91,273.00?

A    Yes.  And then the next one is as a County manager, you're allowed a privilege I guess of parking free in the County parking garage by County policy.  So I was parking free up until the day I was demoted.  And so in the first -- in the first back pay settlement -- or not settlement -- but in the first back pay, they did award me what it would have cost for parking if I had still been a manager.  So I did get that up until that date.  And so the second figure there is what I have had to pay for parking.

Q    So the 1,925 bucks is a parking reimbursement?

A    Yes.

Q    That you would have received had you still been a

manager?

A I wouldn't have received it.

Q I'm sorry. You would have been parking for free?

A Yes.

Q So you got thrown in a cube by Ms. Mares and then she took away your parking as a result too?

A Yes.

Q And so that grand total is -- is that the amount that's correct?

A Yes, sir.

Q And if we go to the next page, this is the back up for your parking privileges, right?

A Yes, sir.

Q Okay. Now, you understand that the County has taken the position that there is nothing they could do for you because your position had been eliminated, right?

A Yes, sir.

Q Now, do you agree that there's nothing that the County can do for you in your situation?

A No, I do not.

Q You believe that the County has the ability and the power to give you your back pay and your salary if they order you reinstated?

A Yes, I do.

Q Based on the policy that we discussed all morning,

right?

A    Yes.

Q    And the one that you testified to, right?

A    Yes.

Q    Now, do you remember sitting down with the County on July the 29th?

A    Yes, I do.

Q    What happened on July the 29th?

A    The County and -- and us decided to go to mediation to try to settle the case.  It's been very trying on everybody, my family, County officials, employees.  It's -- it's been three and a half years of a lot of turmoil.  I am ready.  I was ready to kind of put this to rest and move forward.

So we agreed to a settlement and set the day of mediation with the County, and I believe it went really well.  We settled I think very fairly and so did the County, and we all walked away happy.  So I thought it was over.  I was very relieved.

Q    So you tried to settle this case, right?

A    Yes.

Q    And, in fact, if we look at Exhibit Number 13 in the pamphlet, is that the Mediated Settlement Agreement?

A    Number 13.  I'm sorry.

Q    Take a look at Number 13 and tell the Commissioners

what 13 is.

A    Yes, this is the -- the agreement that we came up with, the District Attorney's Office, using an agreed upon mediator for my case.

Q    And, in fact, despite the County taking the position that there is nothing they could do for you, they made an agreement with you, right?

A    Yes, they did.

Q    And what does that agreement entail?

A    It entailed that I would be reinstated to a category E9, which is a couple of grades lower than I was, but I felt I don't have to be deputy in chief in charge of anything.  I just really wanted to go back to work.  And the second part of that was that they would reinstate my salary to $81,500.00 a year, and that I would be allotted $66,000.00 in back pay.

Q    So despite the fact that the County has taken the position we can't do anything for you, the position has been deleted, we can't move you, we can't do anything, they agreed at a mediation to do that, right?

A    Yes, they did.

Q    And, in fact, do you remember at that mediation was there another -- was there an additional agreement that the County agreed to?

A    Yes.  They said they were going to do everything in their power to create a position for me outside of BCIT so

that it wouldn't be an issue for Ms. Mares.

Q   So we have the County saying they can't do anything for you, but on July 29th they made an agreement with you that you should -- or that they would agree to give you back pay and give you your former salary, right?

A   Yes.

Q   This agreement was rejected by Commissioners Court?

A   I believe so.  I'm not -- I do not understand how that happened.  They went into executive session and nothing happened, so.

Q   Is there anything else you'd like to tell the Commissioners before I turn you over to Mr. Brown?

A   No.  I think I've kind of said it all.  I really appreciate the work you all do for the County.  I think it is amazing that we employees are afforded the opportunity to be heard, whether we're right or wrong, by an outside third-party Commission as yourselves.

I do think that somehow even if I'm the first, maybe there's a first for a reason.  I think that if -- if the case is that the County can eliminate a position that is in pendency of appeal because it's going to cause a problem for somebody else, that that should not be allowable either by law or by policy, that the employee should have a right to appeal a position all the way to the end without fear of it just being a budget action or oh, we don't like Carmella anymore;

let's just get rid of that position.  I don't think that's fair and it should not be legal.

And so I hope moving forward that, you know, some changes can come out of this.  And I hope to continue working in the County as long as possible doing the good job that I'm doing right now.  I've got since my demotion 32 commendations that I feel very proud of, and I continue to work that hard every day so that I can continue to feel good about myself.

MR. LOPEZ:  Madam Elliott, I'll pass the witness.

CROSS EXAMINATION BY DEFENDANT

BY MR. BROWN:

Q    The day of this mediation, I was the one who negotiated for the County, wasn't I?

A    Yes, sir.

Q    And no County personnel was there, correct?

A    No, sir.

Q    And as you see throughout this, it states a number of times that it's subject to the express approval of the Bexar County Commissioners Court, correct?

A    Yes, sir.

Q    So it was clear that the power yet again all rested with the Bexar County Commissioners Court?

A    Yes, sir.

Q   So we drew up something to offer, and the ultimate power decided not to accept it, correct?

A   That's correct.

Q   And that's the power they retain in creating and deleting positions as people testified to here.  They held that same power in deciding how the County's money is to be spent, and they decided not to accept what we drafted, correct?

A   Yes, I believe so.  Yes.

MR. BROWN:  That's all I have.

MR. LOPEZ:  Nothing further, Your Honor.

CHAIRPERSON ELLIOTT:  Ms. Guerrero, thank you.

MS. GUERRERO:  Thank you.

MR. LOPEZ:  Madam Elliott, the employee rests.

CHAIRPERSON ELLIOTT:  Okay.

MR. LOPEZ:  I'd like to reserve the opportunity for a closing argument.

CHAIRPERSON ELLIOTT:  Okay.  Mr. Brown?

MR. BROWN:  Oh, I'm sorry.

CHAIRPERSON ELLIOTT:  We're going to go to closing arguments at this time.

So Mr. Lopez?

MR. LOPEZ:  Certainly.  I'm going to hand you guys -- guys -- I apologize.  I'm going to hand you --

CHAIRPERSON ELLIOTT:  The team.

MS. ARRIAGA: Thank you.

MR. LOPEZ: The Bexar County Commissioners -- Bexar County Civil Service Commission is a very, very important tribunal. It was created years ago so that employees could have the ability to not be fired, demoted or take disciplinary action against them for no reason.

And there's cases that talk about exactly what Mr. Brown has been talking about. This case -- and I've highlighted on the copy that I've given you -- what it talks about is there it says that -- and this was a case with the City, but it's the same rules. And it says that when a municipal corporation under the charter has the power to create an ordinance, an office, it has the power to abolish it of course. That's what Clark -- Mr. Brown has been saying all day. They have the power to create. Nobody else has the power to create but Commissioners Court.

But it says: When Civil Service veterans and preference laws are involved, the action of City Council must be taken in good faith to affect an economy in the operations or betterment of municipal service as there is no real fundamental distinction between a lawful abolition of an unnecessary position and discharge of a faithful employee in violation of the rights secured to him by statute, and that the latter cannot be concealed.

And it goes further down and it says: If the

attempt to abolish an office is merely coverable and the real objective is to legislate one out of office or a service position, the courts are not bound by the apparent form of action, but will disregard the pretense and be governed by the substance of the action. Tenure office of Civil Service laws cannot be evaded by a sham or pretended abolishment of a position.

Our courts -- this is a court that -- a case that involves the City of San Antonio, right here in Bexar County. Somebody at the City was doing similar shenanigans, adopted -- abolishing a position and saying we had the power when they went to Civil Service. But this case is exactly the power that you have as a Commission. It says yeah, Commissioners Court makes jobs, creates jobs. They have the ultimate power like Mr. Brown has said. But even that power is not absolute. They're not God. No matter how much they may think they are.

Our laws, your commit -- you were appointed precisely what this case says is that you have the ability to look into why somebody is doing it. Was it done unfairly? Was it done for a pretense as a sham? Or was it done, you know, for a legitimate purpose? And so when the County says, you know, there's nothing you can do because Commissioners Court is the only one that can do it, case law says differently. It says you have the power to review that

decision and come up to a different decision.

Now, I'm going to hand you another case here. This is an opinion from the Texas Attorney General's Office. And it's a good illustration of why you're necessary. This is the case of the Attorney General Opinion JC-0529. Here is the number. Here's what's important here is that why was the Civil Service Commission and the legislation that established the Civil Service Commissions put into place? And this is the legislative history and the reports of the legislature when they put this rule and this law into place.

And it says in here -- and I'm reading right in the middle -- is that: The prospect of losing a job if the department head loses an election inevitably discourages prospective employees. The County and the legislature wanted good, valuable skillful employees to come work for the County, such as Ms. Guerrero. 21 years of service.

The County is a big corporation. They're a big -- they're a big ticket entity, and they want to be run and they want to be employing good people. But good people don't want to come work for the County if somebody loses an election or you're going to be having to rely on Commissioners Court to make political decisions. You can't attract good talent that way. And the legislature determined that we need to find a way that we can bring good people and they won't be discouraged from working there because a department head or an

elected official is going to single them out and not take action.

That is the entire reason why the Commission, why you were put into place. And that is you have the power to referee this type of dispute. They want good people, they have good people, and they should not be able to go out there and eliminate her position just because she's got an appeal going or if they don't want her. Our rules say that she has to only be demoted or fired for cause. And that's what the Commission and the legislature was intended to do is you step in and protect good employees from political action or action that is unlawful and does not have any merit.

Precisely the evidence that you heard today that you heard from Mr. Reyes. He told you that it was engineered that her position be deleted while her appeal was pending before you. They didn't give any budget reason. It wasn't numbers. It wasn't, you know, a reduction in force. It was Mr. Smith came and said hey, we got a problem with Ms. Carmella; get rid of the job. He didn't ask one question and he helped do it.

You also heard him testify about the way the reduction in force happened. She was the only one that had any rights to the position; everybody else was frozen. So when the County says this was just a normal reduction in force, this is a normal budget trying to save some money, it

wasn't. That was not the case. There was nobody in any of the 15 other positions. She was the only one that had a right. She had an appeal pending before you, and they eliminated that job while she had that appeal coming forward. So you heard from Mr. Reyes that it was a pretext, that they did it on purpose because she had this appeal going.

We heard Mr. Reyes testify as the budget officer that there was countless other situations where the County has taken steps to accommodate somebody, move them around, pay them more, promoted them, transferred them, brought them out of retirement. So when the County says we can't do anything because it's only Commissioners Court, it's just not true. It's just not true. The County can do just about anything they want.

And, in fact, you know, we looked at the Settlement Agreement. The County was going to move her to another level of promotion, was going to give her a bunch of back pay, was going to give her, you know, a salary that she was at. So when the County says we can't do nothing, that's just wrong. They did.

More importantly, and you heard from Ms. San Miguel and you heard from Ms. Guerrero that if we're not going to follow the Commissions rules, then we've got to ask why do we even have them? And we believe that under this policy that Ms. Guerrero has the ability to get relief from you. You can

reinstate her, award her her back pay, put her at her former salary. And if when she goes with that order to Ms. Mares and Ms. Mares says can't do it, Carmella; we deleted your position, then this policy takes effect. Even if you cannot put her in a position that has been deleted, she still should get her salary just like you ordered.

Now, it was interesting the history of this Number 17. Basically, Ms. San Miguel said that people like you were sitting donating your time to service on this Commission, were spending your days when you could be working legislating and making decisions over these employees. And when you ordered something, that basically what the department heads and the Commissioners Court were doing they're saying Ms. Elliott, here's your order of reinstatement, we don't have to listen to it. We're Commissioners Court; we can do anything we want. This policy was put into place precisely for that reason. Because what you do is important, it has meaning and it should be binding, and the department heads should not be able to just put those orders in the trash and disregard what you're doing.

We believe that the evidence is clear that she's entitled to her back pay. We believe that she's entitled to her former salary with all of the raises. We believe that she's entitled to that whether or not Ms. Mares takes her back into her position because the policy so allows.

So we're asking you to reinstate her to her E11 position with full back pay and salary, salary of $94,214.00. You saw how she calculated it. We believe that she's entitled to an additional $93,198.00 in back pay because she put straight through how she calculated in those amounts. And if Ms. Mares says I can't take you back because I deleted that job, she's still fully entitled to those amounts and to continue to do whatever job. Just like Ms. Abundis. She could stay in her E5 job, because that's what the policy says; she just needs to be paid at that amount and be put that amount in the back pay.

You have the power. We're here on a unique case. We've given you a lot of legal arguments and we've cited a bunch of rules. I've given you case law and sound somewhat like a lawyer. But you don't need to be a lawyer to really look at this case and to come up with any other decision other than this is unfair. This is -- this is not how the County -- how anybody should treat a 21-year veteran at a company or an organization or the County. Demote them for no good reason, delete that job while she has an appeal. It's just unfair.

I think that if we went outside, you know, with a, you know, with an i-phone and we interviewed 100 people, I think 101 of those 100 people would say this is wrong, this is unfair, and it should not be allowed. If you allow that to

happen to Ms. Guerrero, the power and the ability of employees to be able to rely on the Commission for their day in court is going to be weakened if not fatally, fatally taken away.

Thank you.

CHAIRPERSON ELLIOTT: Mr. Brown.

MR. BROWN: Well, we are bound by rules and we are bound by the law and we are bound by court cases that say only the Commissioners Court can create a position. We had witnesses come in here one after the other. Henry Reyes who obviously had a bone to pick with David Smith. That's why he left immediately. He had no testimony that this Civil Service Commission has ever ordered someone put into an eliminated position. He testified that things have happened where David Smith has recommended yeah, we move this person here for one reason, we do this to that person. But at the end, his testimony was those are only recommendations, and the only people that can do it are the Commissioners Court. He never testified that you had ordered it or that he had not unilaterally ordered -- David Smith had not unilaterally. At the end of the day, he said only the Commissioners Court can create or delete a position.

Ms. Abundis, she testified she never even got before this Commission to have the position where Ms. Guerrero was in for you to order her back to her position. So her facts aren't even remotely similar to this one.

We have Andrea San Miguel who came in and was hesitant, but she admitted that this Commission has never been -- has never created a position or they ordered someone back into an eliminated position. And she agreed that only the Commissioners Court can create or eliminate a position. She said this situation is unique because it hasn't happened before, but she didn't say it couldn't happen; just that it's only come up one time.

She also agreed that if Ms. Guerrero was put in the position that you put her in at the end of the last hearing, but if you hadn't taken the one step and say and she's back in her -- to an E5 position, she would have no job today, because that position is gone, and the County would have found perfect grounds to say okay, you're reinstated to an eliminated position. Thank you for working for us; you don't have a job anymore. And you would not have the power to go against the Commissioners Court and say no, you need to recreate a position for her even though you eliminated it.

And all this stuff about how well, they eliminated one position to get her, and the other 15 didn't have people in them. Her position didn't have a person in it. It was eliminated and it was just as empty as the other positions. So your original order actually gave more relief than she was probably entitled to by ordering that she stay an E5. The order that should have been entered or can be entered

now is the most relief you could have given was you get your back pay because we don't think you should have been demoted, you get your back pay up to the date that position was eliminated, and you're in the position you would have been in the day the position was eliminated, which means you don't have a job anymore. Instead you gave her a job because you knew you couldn't create a position that had been eliminated.

They rely on Rule 7.6.14 which has absolutely zero applicability here. That rule is in the instance where it has to be where a job exists to put a person in, because you go back to the other rule in my brief of all the cases that say you can't create a position. 7.6.14 has to work in unison with the other rules that say you can't create positions, but if there's no position there, you can't reinstate her to one that doesn't exist. Those work together.

And so when they say well, ignore the fact that the position is gone; you just order her back to somewhere that doesn't exist and make Ms. Mares pay her all the money she would have been paid, that makes no sense and it would be -- it would make no sense for the County to operate that way. For any employee that loses a job through attrition or through eliminated positions to be able to come in here and come up with some grievance and say well, the true reason was they didn't like me, and have this Commission be able to say yep, Commissioners Court, we're going to order her back. You

may not have a position. You need to create one and you need to keep paying her at the salary she had. That is well beyond the power of this Commission or the court.

And as I said, they brought this to Judge Sakai. And they thought that this -- they brought a Summary Judgment to Judge Sakai. Judge Sakai looked at every issue they've talked about here today. He looked at 7.6.14, he looked at whether they can create jobs and give her her position back, he looked at the County Commissioners and whether they have the sole authority to create jobs, and he looked at whether you have the authority to create jobs and order her back to a position that's been eliminated. They filed that in their Summary Judgment.

He reviewed it, he denied it entirely. He found nothing that they argued was something that would support him changing the decision you made. The only relief he gave her was to send her back here and have another bite at the apple to try to convince you that you can do something that you can't. And there's been no evidence presented that shows that you should change that original position. Other than -- if you're going to change that original order, it should be ordered that she's now back in her eliminated position and she no longer has a job at Bexar County.

And it's -- oh, and the final thing they bring up is this settlement. The settlement emphasizes beyond

anything that the Commissioners control what we do. We negotiated a settlement, we went to the Commissioners and we said here's a settlement we've come up with. We're bringing it to you because only you can decide. No one else can decide whether to accept this and create a position or transfer her to an old position. They would have had to create a position, Commissioners Court, accept our offer to pay her back pay and attorney's fees. They looked at it, they reviewed it in executive session, and they said no, we're not doing that. We have the power to and we're not exercising that power. We have the sole power to do that and we're not exercising that power. And so the Commissioners have all along stuck by your ruling and haven't challenged that. They've upheld what you ruled the first time as has every judge that's looked at it.

So we would ask that you uphold your original ruling, you find nothing here has changed your mind. The law certainly hasn't changed in three or four or for a hundred years. And that you either reinstate your original ruling or reinstate -- or instate a ruling that says we reverse your demotion, you got your back pay to when your position was eliminated, and erase the part that she remains at an E5 position, and simply let her be in a position she would have been in had the eliminated position existed.

So I think those are the only two options you have. You opted for the lesser of the two the first time.

But I think those are the only two options and orders you can make based on the law and what's been presented to you today.

MR. LOPEZ: I've just got one brief response is we were set for trial before Judge Sakai. We hadn't had -- we had not had a trial before Judge Sakai. So any talk of a Summary Judgment Motion is just -- is just nonsense. You know, and shouldn't bear on anything, because Peter Sakai -- Judge Peter Sakai was going to have a trial on this. However, Judge Sakai determined that hearing the evidence that we presented, he said this needs to go back to the Commission, because, Ms. Guerrero, you have material, important evidence that would allow them to change their minds to change their order -- because --

MR. BROWN: Are you representing that you didn't file a Summary Judgment, I didn't respond to it and the judge denied -- did not issue an order denying it?

MR. LOPEZ: Ms. Elliott, I would ask that I be allowed to --

MR. BROWN: Speak the truth?

MR. LOPEZ: -- to finish -- to finish without Mr. Brown interrupting me.

I didn't say we didn't file a Motion for Summary Judgment. I'm saying that we had -- we had a trial setting, and before that trial setting, Judge Sakai --

MR. BROWN: Ruled on it.

MR. LOPEZ:  -- sent us back here.

MR. BROWN:  No.  That's a misrepresentation.

MR. LOPEZ:  That is not true.

CHAIRPERSON ELLIOTT:  Gentlemen, if you all will address Commission.

Mr. Lopez, if you'll be brief.

MR. LOPEZ:  Certainly.  This case before it came to you was still set for trial.  There was a Motion for Summary Judgment that was filed, but before we had a trial before a judge, he sent it back to you because he found that there was material evidence that you heard that could be a basis for you to change your mind.

And we're asking you that after that evidence and the unfairness of this case that you should change and reward the relief that Ms. Guerrero is entitled to.

MR. BROWN:  If I could respond the truth.  An order deny -- it's in my package.  Order Denying Plaintiff's Motion for Summary Judgment, April 17th, 2014.  He doesn't say I'm not ruling; he absolutely denies the whole thing.  He did not send us back here before that ruling.  He sent us back here after they asked for it following denial of the Motion for Summary Judgment.  He sent us back here on May 17th, 2014.  So that representation is 100 percent false.

MR. LOPEZ:  You need to stop pointing at me.

MR. BROWN:  No, I don't.

CHAIRPERSON ELLIOTT:  Gentlemen --

MR. BROWN:  Absolutely false.

CHAIRPERSON ELLIOTT:  -- at this time we will stop with the closing arguments.

It is now 11:35.  At this time we will go into executive session pursuant to Chapter 551 of the Texas Government Code.

Thank you.  We ask all the parties to exit at this time and we will reconvene when we are done with executive session.

MR. LOPEZ:  Thank you, ma'am.

CHAIRPERSON ELLIOTT:  Thank you.

(Short break).

CHAIRPERSON ELLIOTT:  Okay.  At this time it is now 11:55, and we are returning from executive session.

At this time I'll ask that we call for a motion.

COMMISSIONER GIMBLET:  By unanimous decision, the Civil Service Board has decided to uphold the decision ordered on April 26th, 2012 in connection with Case Number 10-BCCS-022.

CHAIRPERSON ELLIOTT:  Do we have a second?

COMMISSIONER ARRIAGA:  And I second that motion.

CHAIRPERSON ELLIOTT:  And we'll vote.  All

those in favor of this decision vote yes by saying aye.

COMMISSIONER GIMBLET:  Aye.

COMMISSIONER ARRIAGA:  Aye.

CHAIRPERSON ELLIOTT:  Okay.  Time is now 12:57 -- 11:57.  Excuse me.

I appreciate both parties going through this process.

Ms. Guerrero we continue to wish you well.

MS. GUERRERO:  Thank you.

**END OF PROCEEDINGS.**

CAUSE NO. 2012-CI-08758

CARMELLA GUERRERO,              )      IN THE DISTRICT COURT
        Plaintiff              )
                               )
                               )      225th JUDICIAL DISTRICT
vs.                            )
                               )
INFORMATION TECHNOLOGY         )
DEPARTMENT,                    )
BEXAR COUNTY, TEXAS,           )
        Defendant              )      BEXAR COUNTY, TEXAS

* * * * * * * * * * *
NO. 10-BCCS-002

CARMELLA GUERRERO,              )
        Employee              )
                               )      BEXAR COUNTY
                               )      CIVIL SERVICE COMMISSION
vs.                            )
                               )      BEXAR COUNTY, TEXAS
INFORMATION TECHNOLOGY         )
DEPARTMENT,                    )
BEXAR COUNTY, TEXAS,           )
        Department.            )

**REPORTER'S CERTIFICATE**

STATE OF TEXAS      )

COUNTY OF BEXAR     )

I, DAWN FLIPPIN, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the above and foregoing transcript contains a true and correct transcription of an audio recorded Bexar County Civil Service Commission hearing held on August 21, 2014 in Cause Number 2012-CI-08758, which recording was transcribed by me by stenographic means to typewritten form to the best of my ability.

TR-0278

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Sworn to by me this 17th day of September, 2014.

_____
DAWN FLIPPIN, CSR #4045
Expiration Date:  12-31-15

DAWN FLIPPIN, CSR
200 Alcalde Moreno
San Antonio, Texas 78232
210.383.2290
df-fiorino1046@att.net

Affidavit for Adam L. Leos

I, Adam L. Leos, custodian of records for the Bexar County Civil Service Commission, certify that the following attached documentary evidence as part of the official record for the Bexar County Civil Service Case Hearing #10-BCCS-022 Carmella Guerrero vs Bexar County Information Technology which was presented before the Bexar County Civil Service Commission on August 21, 2014. **Please Note:** Item #7 has intentionally been omitted from the document as per the agreement between Bexar County and Mrs. Carmella Guerrero.

Signed: _____

The State of Texas

County of Bexar

Before me, a Notary Public, on this day personally appeared <u>Adam L. Leos</u>, known to me (or proved to me on the oath of ___Adam Leos___ to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of this office this __8th__ day of __December__ A.D. 2014

Notary Public, State of Texas

(SEAL) Belia Anguiano
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Expires 07-30-2018

TR-0280



**LOPEZ | SCOTT**
LAWYERS

# MEMORANDUM

**TO:**    Clark Brown
Bexar County District Attorney
Civil Section

**FROM:**    Orlando R. Lopez

**RE:**    Carmella Guerrero v. Bexar County Civil Service Commission; Before the 225ᵗ Judicial District Court of Bexar County, Texas; Cause No. 2012-CI-08758

In the Matter of Carmella Guerrero Relative Employment in the Bexar County Information Technology Department; Before the Bexar County Civil Service Commission; No. 10-BCCS-022

**DATE:**    12.4.14

---

This memo will confirm, pursuant to Rule 11 of the Texas Rules of Civil Procedure, that the Plaintiff and Defendant have made the following agreement. The Defendant will agree to the admission of the documentary evidence the Plaintiff introduced at the hearing before the Bexar County Civil Service Commission (the "Commission"); provided however, the Commission shall cause Exhibit 7 to be removed and struck from the record. For the convenience of the Commission, Exhibit 7 is the "Henry Reyes Affidavit."

If this memo accurately reflects the agreement, please sign your name where indicated and return it to me for filing with the Court. Thanks.

**AGREED:**


_____
**CLARK BROWN**

**ATTORNEY FOR DEFENDANT**

DATE: _12-4-14_

TR-0281

CAUSE NO. 2012-CI-8758

| | | |
|---|---|---|
| CARMELLA GUERRERO | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| VS. | § | 225ᵀᴴ JUDICIAL DISTRICT |
| | § | |
| | § | |
| BEXAR COUNTY CIVIL SERVICE | § | |
| COMMISSION | § | BEXAR COUNTY, TEXAS |

## <u>TABLE OF CONTENTS</u>

1. Timeline of Events

2. Bexar County Civil Service Commission April 26, 2012 Order

3. Texas Fourth Court of Appeals Opinion in *Carmella Guerrero v. Bexar County Civil Service Commission* No. 04-12-00523-CV

4. Texas Local Government Code Section 158.0122

5. Bexar County Department of Human Resources and Civil Service Commission Rules and Regulations Policy No. 7.6.14

6. Order Granting Plaintiff's Application to Present Additional Evidence

8. Bexar County Information Technology Department FY 2011-2012 Budget

9. Salary & Back Pay Analysis

10. Bexar County Non-Departmental General Fund FY 2011-12 Budget

11. Bexar County FY 2012-2013 Budget Message

12. Bexar County FY 2013-2014 Budget Message

13. Mediated Settlement Agreement



BCIT Demotes
Carmella
Guerrero.
(11.29.10)

BCIT Eliminates
Carmella
Guerrero's E-11
Position. (10.1.11)

Bexar County Civil
Service Commission
Overturns Carmella
Guerrero Demotion.
(4.26.12)

TR-0284

**2**

TR-0285

## NO. 10-BCCS-022

| | |
|---|---|
| IN THE MATTER OF CARMELLA GUERRERO RELATIVE TO EMPLOYMENT IN THE BEXAR COUNTY INFORMATION TECHNOLOGY DEPARTMENT, BEXAR COUNTY, TEXAS | BEXAR COUNTY CIVIL SERVICE COMMISSION, BEXAR COUNTY, TEXAS |

\* \* \*

## ORDER

On the 26th day of April, 2012, came on to be heard the case of Carmella Guerrero vs Bexar County Information Technology Department (10-BCCS-022) before the Bexar County Civil Service Commission. Chairman Gina M. Elliott presided. Commissioner Ruben L. Cortez and Commissioner Joe Gimblet were also in attendance. Carmella Guerrero attended in person and was represented by her attorney Orlando Lopez. The Bexar County Information Technology Department appeared through Catherine Maras, Chief Information Officer, and was represented by Clark Brown, Assistant Criminal District Attorney, Civil Section. Also present were: Tina Singh, Contract Employee, Bexar County Information Technology Department; Gilbert Louis Sanchez, Technical Support Manager, Bexar County Information Technology Department; Robert Hampel, Deputy Chief Information Officer, Bexar County Information Technology Department; David Mandujano, Former Technical Support Manager, Bexar County Information Technology Department; Chauncey Spencer, Former Jail Administrator, Bexar County Sheriff's Office; Andrea San Miguel, Director for the Commission; and Nelda Tanaka, Office Assistant III, Bexar County Civil Service Commission.

After listening to testimony and reviewing the evidence submitted by both parties in this case, and after deliberating, the Commission, by unanimous decision, has determined that the demotion of Carmella Guerrero should be overturned and that Ms. Guerrero should be granted back pay and

TR-0286

**CASE #10-BCCS-022 CARMELLA GUERRERO VS BEXAR COUNTY INFORMATION TECHNOLOGY DEPARTMENT**

benefits for the difference in pay at the rate of pay when she was demoted until the position was eliminated in the budget on October 1, 2011. Ms. Guerrero will remain in her current position of Technology Business Analyst at her current salary.

> **IT IS HEREBY ORDERED** that the demotion of Carmella Guerrero is overturned and that Ms. Guerrero will be granted back pay and benefits for the difference in pay at the rate of pay when she was demoted until the position was eliminated in the budget on October 1, 2011.

**IT IS FURTHER ORDERED** that Ms. Guerrero will remain in her current position of Technology Business Analyst at her current salary.

**IT IS FURTHER ORDERED** that pursuant to Local Government Code, Chapter 158, Subchapter A., County Civil Service System, Section 158.0123 (a) the Commission shall require a party who appeals a final decision to pay one-half of the cost of preparation of the original or a certified copy of the record of the Commission proceeding that is required to be sent to the reviewing court.

**SIGNED AND ENTERED** this the 26th day of April, 2012.

THE BEXAR COUNTY
CIVIL SERVICE COMMISSION

_____
GINA M. ELLIOTT, CHAIRMAN

_____
RUBEN L. CORTEZ, COMMISSIONER

_____
JOE GIMBLET, COMMISSIONER

TR-0287

**3**

TR-0288



## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-12-00523-CV

Carmella GUERRERO,
Appellant

v.

BEXAR COUNTY CIVIL SERVICE COMMISSION,
Appellee

From the 225th Judicial District Court, Bexar County, Texas
Trial Court No. 2012-CI-08758
The Honorable Janet P. Littlejohn, Judge Presiding

Opinion by:    Catherine Stone, Chief Justice

Sitting:    Catherine Stone, Chief Justice
Sandee Bryan Marion, Justice
Steven C. Hilbig, Justice

Delivered and Filed: December 28, 2012

REVERSED AND REMANDED

This is an accelerated appeal of the trial court's order granting the Bexar County Civil Service Commission's plea to the jurisdiction. Carmella Guerrero contends the trial court erred in granting the plea because she is appealing her demotion pursuant to section 158.012 of the Texas Local Government Code ("Code"). We sustain Guerrero's contention and reverse the trial court's order.

TR-0289

## BACKGROUND

In December of 2010, Guerrero was demoted by her supervisor from her position as IT Services Manager to Technology Business Analyst. The IT Services Manager position was classified as an E-11 position with a salary of $80,616.00, while the Technology Business Analyst position is classified as an E-5 position with a salary of $58,140.00. Guerrero filed an appeal of her demotion with the Commission in 2010.

On October 1, 2011, before the Commission reached a decision, a new county budget was adopted that eliminated the IT Services Manager position along with fifteen other positions in the IT department. On April 26, 2012, the Commission issued its ruling. The Commission's order stated that Guerrero's demotion was overturned and granted Guerrero back pay and benefits for the difference in pay at the rate of pay when she was demoted until the IT Services Manager position was eliminated in the budget on October 1, 2011. The Commission's order also stated that Guerrero would remain in her current position as Technology Business Analyst at her current salary.

Pursuant to section 158.012 of the Code, Guerrero appealed the Commission's decision by filing a petition in the trial court. The Commission filed a plea to the jurisdiction, asserting that Guerrero was not entitled to appeal from a victory that overturned her demotion and awarded her all relief available. Guerrero responded that the order keeps the demotion in place by not reinstating her to her former position. The trial court granted the Commission's plea.

## STANDARD OF REVIEW

"Whether a court has subject matter jurisdiction is a question of law." *Tex. Dept. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). "Whether a pleader has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction is a question of law reviewed *de novo*." *Id.* "Likewise, whether undisputed evidence of jurisdictional facts

- 2 -

establishes a trial court's jurisdiction is also a question of law." *Id.* "However, in some cases, disputed evidence of jurisdictional facts that also implicate the merits of the case may require resolution by the finder of fact." *Id.* "[I]f a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do." *Id.* at 227. "If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder." *Id.* at 227-28.

### SECTION 158.012

Guerrero contends the trial court erred in granting the Commission's plea because the trial court had jurisdiction under section 158.012 of the Code. Section 158.012 states:

> A county employee who, on a final decision by the commission, is demoted, suspended, or removed from the employee's position may appeal the decision by filing a petition in a district court in the county within 30 days after the date of the decision.

TEX. LOC. GOV'T CODE ANN. § 158.012(a) (West 2008). Determining whether the trial court has jurisdiction under section 158.012 requires a construction of the language of the statute.

"In construing statutes, we ascertain and give effect to the Legislature's intent as expressed by the statute's language." *Presidio Ind. Sch. Dist. v. Scott*, 309 S.W.3d 927, 930 (Tex. 2010). "Where text is clear, it is determinative of that intent, and we give meaning to the language consistent with other provisions in the statute." *Id.* (internal citations omitted). We construe the text of a statute "according to its plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd results." *Id.* "We also presume that the Legislature intended a just and reasonable result by enacting the

-3-

TR-0291

statute." *Id.* The construction of a statutory provision involves a question of law that we review *de novo. Atmos Energy Corp. v. Cities of Allen*, 353 S.W.3d 156, 160 (Tex. 2011).

Black's Law Dictionary defines "demote" as "[t]o lower (a person) in rank, position, or pay."[1] Black's Law Dictionary 465 (8th ed. 2004); *see also Alba v. Nueces County Sheriff's Dept.*, 89 S.W.3d 132, 134 (Tex. App.—Corpus Christi 2002, pet. denied) (citing Black's Law Dictionary to determine if employee was "suspended" under section 158.012). Under the circumstances of this case, Guerrero is clearly demoted. She previously held an E-11 position and currently holds an E-5 position with a lower pay.

The Commission argues that Guerrero is not entitled to appeal because the Commission's order overturned the demotion. However, section 158.012 does not state that a county employee who is demoted may appeal only if the Commission's decision does not overturn the demotion. Instead, section 158.012 states that a county employee who is demoted on a final decision of the Commission may appeal. Thus, the clear text of the statute permits a county employee to appeal if the employee remains demoted after the Commission's final decision. Therefore, applying the plain and common meaning of the term "demotion" to section 158.012, we hold that the trial court erred in granting the Commission's plea to the jurisdiction.

During oral argument and in their briefing, both parties raised issues with regard to whether the Commission or the trial court could order Guerrero's reinstatement since the county's budget eliminated her former position. *See* TEX. LOC. GOV'T CODE ANN. § 158.012(c) (West 2008) ("If the district court renders judgment for the petitioner, the court may order reinstatement of the employee, payment of back pay, or other appropriate relief."). The nature of

---

[1] This definition is consistent with the definition of demotion set forth in the Commission's policies. Policy 7.2.11 defines demotion as "the movement of an employee from one classification to another classification with a lower pay grade." Policy 7.6.11 defines demotion as "the involuntary reduction of an employee's pay grade and classification by the office or department."

- 4 -

the relief that may be available, however, does not affect the trial court's jurisdiction to consider Guerrero's appeal under section 158.012. The available relief is an issue for the merits of the case, not an issue affecting the trial court's subject matter jurisdiction. Moreover, the intent of the Legislature in enacting section 158.012 was to provide judicial review to a county employee who remains demoted after the Commission's final decision. Allowing a county employee to pursue her right to judicial review unaffected by subsequent budgetary actions is a "just and reasonable result." *Presidio Ind. Sch. Dist.* 309 S.W.3d at 930.

## CONCLUSION

Because, on a final decision of the Commission, Guerrero remained in her demoted position, the trial court erred in granting the Commission's plea to the jurisdiction. The trial court's order is reversed, and the cause is remanded to the trial court for further proceedings.

Catherine Stone, Chief Justice

-5-



4

TR-0294

LOCAL GOVERNMENT CODE

TITLE 5. MATTERS AFFECTING PUBLIC OFFICERS AND EMPLOYEES

SUBTITLE B. COUNTY OFFICERS AND EMPLOYEES

CHAPTER 158. COUNTY CIVIL SERVICE

SUBCHAPTER A. COUNTY CIVIL SERVICE SYSTEM

Sec. 158.0122. PROCEDURES FOR REVIEW UNDER SUBSTANTIAL EVIDENCE RULE. (a) After service of the petition on the commission and within the time permitted for filing an answer or within additional time allowed by the court, the commission shall send to the reviewing court the original or a certified copy of the entire record of the proceeding under review. The record shall be filed with the clerk of the court. The record may be shortened by stipulation of all parties to the review proceedings. The court may assess additional costs against a party who unreasonably refuses to stipulate to limit the record, unless the party pays all costs of record preparation. The court may require or permit later corrections or additions to the record.

(b) A party may apply to the court to present additional evidence. If the court is satisfied that the additional evidence is material and that there were good reasons for the failure to present it in the proceeding before the commission, the court may order that the

TR-0295

additional evidence be taken before the commission on conditions determined by the court. The commission may change its findings and decisions by reason of the additional evidence and shall file the additional evidence and any changes, new findings, or decisions with the reviewing court.

(c) The party seeking judicial review shall offer, and the reviewing court shall admit, the commission record into evidence as an exhibit.

(d) The court shall conduct the review sitting without a jury and is confined to the commission record, except that the court may receive evidence of procedural irregularities alleged to have occurred before the commission that are not reflected in the record.

Added by Acts 1997, 75th Leg., ch. 68, Sec. 2, eff. Sept. 1, 1997.

**5**

TR-0297



# BEXAR COUNTY DEPARTMENT OF HUMAN RESOURCES
## Civil Service Commission Rules and Regulations

### Suspension, Demotion or Termination - Appeal & Hearing

**Policy Number: 7.6.14**
**Effective Date: March 16, 2007**

1. An employee who wishes to appeal a suspension, demotion or termination may appeal to the Commission. A written appeal on the Employee's Appeal Form available from the Commission shall be filed within ten (10) business days after receipt of the Notice of Disciplinary Action. The day of receipt is not counted. An appeal not on the Employee Appeal Form will not be accepted for filing.

   a. An appeal filed after the deadline is null and void and shall not be accepted for filing by the Commission.
   b. The appeal shall be styled "Employee versus the office or department" and not the elected/appointed official or department head.
   c. An employee cannot file an appeal of a disciplinary action occurring during an employee's probationary period.

2. The Civil Service Coordinator will request a response from the office or department. A response by the office or department should be made on the Department Response Form and filed in 10 business days. The day of receipt is not counted.

## Hearing Procedures

### Setting the Matter for Hearing

1. The Commission will set the matter for hearing.

2. The order of priority of appeals before the Commission is terminations, demotions and suspensions.

### Notice of Hearing

1. The employee must keep the Commission informed of their current address.

2. The Commission will notify all parties of the hearing date, time and location. This notice will be given at least two weeks prior to the date of the hearing. A letter sent by certified mail to the last known address of the employee will constitute notice.

### Attendance at the Hearing

1. The employee must be present at the hearing and may represent themselves or be represented by another person. The employee should notify the Commission of the selection of a representative and who the representative will be. Any representative shall act as the spokesperson for the employee during the appeal process.

1

TR-0298

2. If the employee is not present at the time of hearing, the Commission shall dismiss the appeal and enter a written order to that effect.

3. The office or department must be present through the elected official, department head or representative.

## *Hearing*

1. Two Commissioners is a quorum which allows a hearing to proceed.

2. The Commission has the authority to administer oaths to all witnesses. Once sworn, witnesses will be subject to penalties for perjury.

3. At the beginning of the hearing, the disciplinary action shall be read including the date of occurrence and the rule or policy violated from the Department Response Form.

4. The hearing shall be open to the public unless the employee notified the Commission in writing prior to the hearing date that the employee wishes the hearing to be closed.

5. The office or department has the burden of proof and of going forward at the hearing.

6. Either party may invoke "The Rule." Texas Rule of Evidence 613 which means that all witnesses, excluding the office or department representative and the employee, will not be allowed to remain in the hearing and no witness shall discuss their testimony with other witnesses.

7. Each party may make a brief opening statement to the Commission. The office or department will go first, followed by the employee.

8. The office or department will present their witnesses first and has an opportunity to present rebuttal witnesses.

9. The employee will present their witnesses second and be allowed to respond to the office or department.

10. Each side may call witnesses and will be allowed to cross-examine each other's witnesses.

11. The Commission may ask any questions necessary of any party or witness or recall any witness if necessary for clarification.

12. Any witness may be released by the Commission after giving testimony.

13. Five copies of any document must be submitted.

14. Each side shall have an opportunity to make a closing statement to the Commission. The office or department shall make the first closing statement followed by the employee. The office or department may choose to make a short rebuttal after the closing statement of the employee.

15. The Commission may recess to deliberate in executive session.

16. If an executive session is held, the Commission shall reconvene in open session and make a decision. The Commission may choose to deny the appeal and uphold the disciplinary action, impose a lesser penalty than the one taken by the office or department and may include an award

2

TR-0299

of back pay, or overturn the disciplinary action. The Commission is not limited in the length of time a suspension may last.

17. If the employee is to receive back pay by order of the Commission, the employee shall receive full compensation at the rate of pay that was provided for their position at the time of their appeal or the amount of compensation considered fair by the Commission. Should the office or department refuse to reinstate the employee as ordered by the Commission, the employee shall be entitled to their full salary just as though they had been reinstated as ordered.

18. A written order shall be entered which clearly states whether the action will be upheld, dismissed or reduced. Such order shall be signed by the members of the commission who made the decision and sent to all parties.

## Copy of the Record

A tape recording of all hearings will be on file in the Human Resources office. A copy will be provided upon request as permitted by law and payment of all costs in advance.

## Appeal to District Court

Pursuant to chapter 158 of the Texas Local Government Code, an employee who on final decision by the Commission is demoted, suspended or removed from the employee's position may appeal the Commission's decision in district court within 30 days of the date of the decision.

**6**

TR-0301

CAUSE NO. 2012-CI-8758

| CARMELLA GUERRERO | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| VS. | § | 225TH JUDICIAL DISTRICT |
| | § | |
| | § | |
| BEXAR COUNTY CIVIL SERVICE | § | |
| COMMISSION | § | BEXAR COUNTY, TEXAS |

## ORDER GRANTING PLAINTIFF'S APPLICATION TO
## PRESENT ADDITIONAL EVIDENCE

On April 23, 2014, the Court considered the Plaintiff's Application to Present Additional Evidence. After considering the application, the response, the pleadings, the evidence, and argument of counsel, the Court is of the opinion that the motion should in all things be GRANTED.

Accordingly, the Court ORDERS that the Plaintiff, Carmella Guerrero, is entitled to present and take additional evidence before the Bexar County Civil Service Commission (the "Commission") concerning the facts and merits of this matter. The Court ORDERS that the Commission hold and reconvene an evidentiary hearing within one-hundred and twenty (120) days of the entry of this order to consider the additional evidence the Plaintiff presents and offers at the hearing (the "Hearing"). After the Plaintiff presents the additional evidence at the Hearing, the Commission is ORDERED and ADVISED that the Commission may change its findings and decisions it rendered on or about April 26, 2012. The Commission is further ORDERED to file the additional evidence and any changes, new findings, or decisions it renders after the Hearing with the Court within ten (10) business days of the date of the Hearing.

The Court further ORDERS that the parties shall mediate this matter no later

Page 1 of 2

TR-0302

than sixty (60) days from the date of this order. The parties shall select a mediator by mutual agreement; and absent an agreement, either party may file a motion requesting that the Court appoint a mediator. Each party shall bear one-half of the expense of the mediation and each party is ORDERED that a representative from each party attend the mediation with full authority to resolve this matter.

SIGNED this May 7th, 2014.

_____
PRESIDING JUDGE

**AGREED AS TO FORM:**

LOPEZ SCOTT, L.L.C.
719 S. Flores, Suite 100
San Antonio, Texas 78205
Telephone:    210.472.2100
Telecopier:    210.472.2101

_____
ORLANDO R. LOPEZ
STATE BAR NO. 24010196

ATTORNEYS FOR PLAINTIFF

_____
CLARKSON F. BROWN
STATE BAR NO. 00798082
ASSISTANT CRIMINAL DISTRICT ATTORNEY
CIVIL DIVISION
300 Dolorosa, Suite 4049
San Antonio, Texas 78205
Telephone:    210.335.2139
Telecopier:    210.472.2151

ATTORNEYS FOR DEFENDANT



8

TR-0304

**Mission:** An efficient County government supported by an integrated information environment created through strong departmental partnerships and provided by a highly trained and diverse workforce deploying effective technologies.

**Vision:** To support the mission of Bexar County with high quality, innovative, and cost effective information and communication technology solutions.

## Goals and Objectives:

**Goal 1: Customer Relations:** To earn the trust and confidence of customers.

**Objectives:**
- Establish levels of service that can be supported
- Deliver what is promised
- Be accountable for actions
- Establish customer driven standards and keep customers informed
- Involve customers in the prioritization and implementation processes
- Evaluate performance against customer expectations

**Goal 2: Information Management:** To treat information as a critical asset, collecting information once and using it many times.

**Objectives:**
- Expand existing capabilities to make information easily accessible by County employees and citizens
- Facilitate electronic workflow and electronic data management
- Leverage current and future technologies to manage and deliver information

**Goal 3: Technology Infrastructure:** To have a robust, integrated, and sustainable infrastructure which is protected and restricts access where appropriate.

**Objectives:**
- Provide County employees with a technology infrastructure that is capable of transmitting and storing voice, data, and video on demand, protected as necessary
- Sustain the longevity of our infrastructure by thoroughly researching and documenting analysis, development, implementation and assessment efforts
- Maximize systems reliability and information availability

**Goal 4: Systems Interoperability:** To strive to ensure systems and applications meet multiple needs and serve multiple customers.

**Objectives:**
- Ensure customer system requests optimize solutions to maximize customer base
- Identify additional opportunities for systems integration when developing business case

323

TR-0305

analysis for new systems and capabilities

**Goal 5: Business Application Investment Decisions:** To make sound application investment recommendations in cooperation with our partners.

**Objectives:**
- Ensure information technology solutions undergo thorough cost and impact analysis prior to expending fiscal resources
- Institute and use a Countywide process to facilitate application investment decisions
- Advocate innovation and leading-edge technology when cost effective
- Benchmark with best practices

**Goal 6: Legacy Mainframe Systems:** To maintain legacy mainframe systems as long as they remain a cost-effective solution.

**Objectives:**
- Continuously examine the cost effectiveness of operating the legacy systems
- Exploit commercial off-the-shelf applications where prudent

**Goal 7: Our People:** Our people are valued; we will treat them with respect and maintain a professional environment in which to work.

**Objectives:**
- Keep people informed
- Establish priorities and set realistic goals
- Promote professional growth
- Enhance training opportunities
- Maintain a positive working environment

**Goal 8: Security And Privacy:** To ensure the security and privacy of our information resources.

*Objectives:*
- Protect data from unauthorized access and misuse
- Protect the physical integrity of the network
- Implement procedures for properly storing and maintaining copyrighted software

**Goal 9: Training And Support Services:** To provide County employees with effective technology training and support services.

*Objectives:*
- Coordinate the introduction of new technologies including installation, documentation, user training and help desk preparation
- Provide life-cycle support for all County standard products

**Program Description:** Bexar County Information Technology (BCIT) is responsible for the development, implementation, and maintenance of technology and communication systems for the County. BCIT utilizes its resources and technological expertise to develop and operate efficient and secure communications and computer systems throughout the County. This includes

324

coordinating County technology improvement plans that use new or more effective computer systems, as well as evaluating the needs of individual offices and departments and matching them with the optimum available communications, hardware or software systems. In this manner, BCIT assists offices and departments in improving their processes and better utilizing their resources. To facilitate this effort, the Department continually researches new technical developments to determine their usefulness to the County.

## Performance Indicators:

|  | FY 2009-10 Actual | FY 2010-11 Estimate | FY 2011-12 Budget |
|---|---|---|---|
| **Work Load Indicators:** | | | |
| **Applications Development** | | | |
| Legacy Enhancement Projects | N/A | 696 | 700 |
| **Enterprise Data Center** | | | |
| Number of Processed Mainframe Jobs | 237,058 | 238,602 | 234,948 |
| **Geographical Information Systems** | | | |
| Number of GIS Service Visits | 212,282 | 202,678 | 220,000 |
| **Planning and Technical Services** | | | |
| Number of Communication Device Service/Trouble Call Received | 2,103 | 2,000 | 2,000 |
| **Technical Support** | | | |
| Number of Help Calls Received | 16,976 | 20,000 | 19,800 |
| | | | |
| **Efficiency Indicators:** | | | |
| **Applications Development** | | | |
| Legacy Enhancement Projects Completed | N/A | 600 | 600 |
| **Enterprise Data Center** | | | |
| Total Number of Job Failures | 588 | 636 | 346 |
| **Geographical Information Systems** | | | |
| Average Number of Inquires per Visit | 7,361 | 6,127 | 6,136 |
| **Planning and Technical Services** | | | |
| Number of Analyses/Research Projects Completed per FTE | 39 | 30 | 30 |
| **Technical Support** | | | |
| Number of Voice/Data Service Calls Closed per FTE | 453 | 508 | 750 |
| **Effectiveness Indicators:** | | | |
| **Applications Development** | | | |
| Percent of Legacy Enhancement Projects Completed | N/A | 86.2% | 85% |
| **Enterprise Data Center** | | | |
| Percentage of Time Mainframe is Available | 99.87 % | 98.10% | 98.60% |

325

| | FY 2009-10 Actual | FY 2010-11 Estimate | FY 2011-12 Budget |
|---|---|---|---|
| **Geographical Information Systems** | | | |
| Percentage of GIS System Availability | 99.82% | 99.84% | 99.99% |
| **Planning and Technical Services** | | | |
| Amount Saved by Providing In-House Desktop Training | $186,268 | $225,000 | $225,000 |
| **Technical Support** | | | |
| Percentage of Calls Resolved by Help Desk Staff | 72% | 60% | 80% |

## Appropriations:

| | FY 2009-10 Actual | FY 2010-11 Budget | FY 2010-11 Estimate | FY 2011-12 Budget |
|---|---|---|---|---|
| Personnel Services | $7,121,810 | $7,194,583 | $6,552,560 | $7,336,134 |
| Travel and Remunerations | 90,927 | 191,888 | 191,888 | 140,337 |
| Operational Services | 917,359 | 1,189,697 | 1,042,795 | 246,823 |
| Supplies and Materials | 1,544,213 | 446,654 | 436,555 | 997,960 |
| *Total* | *$9,674,309* | *$9,022,822* | *$8,223,798* | *$8,721,254* |

## Program Justification and Analysis:

- The FY 2011-12 Budget increases by 6 percent compared to the FY 2010-11 estimates. This is primarily due to an increase in the Personnel Appropriation as described below.

- The Personnel Services group increases 12 percent compared to the FY 2010-11 estimates. During FY 2010-11, the County Manager's reorganization transferred the County Human Resources Information System (CHRIS) division and the Mailroom to BCIT; and created the position of Deputy Chief Information Officer in the Information Technology Department. The FY 2011-12 Adopted Budget personnel appropriation reflects these changes.

- The Travel and Remunerations group decreases 26.9 percent when compared to FY 2010-11 estimates. This represents the amount requested by the department.

- The Operational Costs group decreases by 76.3 percent compared to FY 2010-11 estimates. This is primarily due to countywide annual hardware maintenance agreements that are now funded in the Non-Departmental Budget. It also reflects the decreases in maintenance contracts as described in the program change below. Funding in this appropriation includes the County's phone contract, postage for the print shop, professional memberships, and other operational services.

- The Supplies and Materials group increased substantially compared to FY 2010-11 estimates. This reflects an increase in the computer software line item. Also included is maintenance of the SAP system that was transferred into this budget with the CHRIS division.

- The FY 2011-12 Adopted Budget program change represents a re-organization within Information Technology for a net savings of $1,205,843 as follows:

**Program Change 1:**

Unfreeze 4 Positions for a total cost of $74,443:

| Position # | Position Title | |
|---|---|---|
| 30003127 | Video Conferencing Systems Mgr - FRO0511 | E-09 |
| 30000109 | Systems Programming Administer- FRO0607 | E-09 |
| 30001233 | Network Architect I - FRO0607 | E-07 |
| 30004708 | Analyst Programmer II - FROZEN | E-08 |

**Program Change 2:**

Salary Adjustments 8% increase totaling $40,754:

| Position | Position Title | |
|---|---|---|
| 30009225 | E-Government Developer | E-07 |
| 30002938 | GIS Senior Analyst | E-07 |
| 30000107 | Applications Development Manager | E-11 |
| 30004328 | Enterprise Data Center Manager | E-11 |
| 30001827 | GIS Manager - X | E-11 |
| 30008067 | Webmaster | E-08 |
| 30007950 | Communications Coordinator | E-08 |

Salary Adjustment 7% increase totaling $7,383:

| Position | Position Title | |
|---|---|---|
| 30005999 | Technical Support Manager | E-12 |

**Program Change 3:**

Deletion of sixteen positions for a total General Fund savings of $559,043:

| Position | Position Title |
|---|---|
| 30006574 | Analyst Programmer I - FRO0511 |
| 30004231 | Analyst Programmer I - FRO0607 |
| 30009507 | Analyst Programmer I - FROATT |
| 30006041 | Analyst Programmer I - FROZEN |
| 30001239 | Chief Network Architect - FRO0511 |
| 30009227 | Communications Specialist - FRO0607 |
| 30007367 | Computer Operator - FRO0511 |
| 30007426 | Computer Operator FROZEN |

| 30008080 | IT Services Manager - FRO0511 |
| 30005930 | Network Architect I - FRO0607 |
| 30006879 | Office Assistant III - FROATT |
| 30006703 | Office Assistant IV - FRO0607 |
| 30004147 | Programmer - FROZEN |
| 30004300 | Programmer - FROZEN |
| 30008302 | Programmer - FROZEN |
| 30009428 | Technology Project Coordinator FROZEN |

**Program Change 4:**

Transfer of one Technology Business Analyst to the JP Tech Fund for a General Fund cost savings of $51,675. Transfer of one Network Architect IV from Capital projects into the General Fund. Funding for this position is included in the Personnel Appropriation because it is reimbursed, therefore there is no cost associated with this action.

**Program Change 5:**

Budget for turnover for a General Fund cost savings of $126,372.

**Program Change 6:**

Decrease BCIT Maintenance contracts for hardware and software for a General Fund cost savings of $591,332.

## Policy Consideration:

During FY 2010-11, the Bexar County Commissioners Court created the Office of the County Manager in order to increase efficiency, decrease expenditures, and streamline operations. As a result, the departments of Public Works, Facilities and Park Management, Budget, Management and Finance, Human Resources, Information Technology, and the Community Resources will report directly to the County Manager instead of Commissioners Court.

An organization review of the GIS function countywide is planned for FY 2011-12 as part of identifying additional efficiencies and cost saving measures. The GIS function is housed in two separate departments in Bexar County. The review will establish if this is the efficient and effective way to conduct GIS in Bexar County, or if it needs to be consolidated into one department. The review is expected to be completed by January 31, 2011.

TR-0310

## Authorized Positions:

| | FY 2009-10 Actual | FY 2010-11 Estimate | FY 2011-12 Budget |
|---|---|---|---|
| **Administration** | | | |
| Chief Information Officer | 1 | 1 | 1 |
| Deputy Chief Information Officer | 0 | 1 | 1 |
| *Total-Administration* | *1* | *2* | *2* |
| | | | |
| **Applications Development** | | | |
| Applications Development Coordinator | 2 | 1 | 0 |
| Applications Development Manager | 1 | 1 | 1 |
| Analyst Programmer I | 12 | 16 | 12 |
| Analyst Programmer II | 14 | 14 | 14 |
| Database Analyst | 3 | 2.5 | 0 |
| Database Administrator | 1 | 1 | 0 |
| Database Coordinator | 1 | 1 | 0 |
| Data Security Analyst | 1 | 1 | 1 |
| E-Government Developer | 1 | 2 | 0 |
| Programmer | 9 | 3 | 0 |
| Senior Technology Business Analyst | 0 | 0 | 1 |
| Technology Business Analyst | 0 | 0 | 2 |
| Web Master | 1 | 1 | 0 |
| *Total - Applications Development* | *46* | *43.5* | *31* |
| | | | |
| **CHRIS** | | | |
| ABAP Programmer | 0 | 1 | 1 |
| BASIS Administrator | 0 | 1 | 1 |
| CHRIS Coordinator | 0 | 1 | 1 |
| CHRIS Support Specialist | 0 | 3 | 3 |
| | *0* | *6* | *6* |
| | | | |
| **Enterprise Data Center** | | | |
| Applications Development Coordinator | 0 | 0 | 1 |
| Asset Control Analyst | 0 | 0 | 1 |
| Computer Operator | 5 | 5 | 3 |
| Data Control Clerk | 1 | 1 | 1 |
| Data Control Supervisor | 1 | 1 | 1 |
| Database Analyst | 0 | 0 | 3 |
| Database Administrator | 0 | 0 | 1 |
| Database Coordinator | 0 | 0 | 1 |
| Enterprise Data Center Coordinator | 1 | 0 | 0 |
| Enterprise Data Center Manager | 1 | 1 | 1 |

|  | FY 2009-10 Actual | FY 2010-11 Estimate | FY 2011-12 Budget |
|---|---|---|---|
| Lead Computer Operator | 3 | 3 | 3 |
| Mail Courier I | 0 | 3 | 3 |
| Mail Courier II | 0 | 1 | 1 |
| Mailroom Supervisor | 0 | 1 | 1 |
| Media Librarian | 1 | 1 | 1 |
| Office/Contracts Supervisor | 0 | 0 | 1 |
| Operations Shift Supervisor | 3 | 3 | 3 |
| Production Control Analyst | 1 | 1 | 1 |
| Systems Programmer | 3 | 3 | 3 |
| System Programming Administrator | 1 | 1 | 1 |
| *Total - Enterprise Data Center* | *21* | *25* | *31* |

**Geographical Information Systems**

| | | | |
|---|---|---|---|
| E-Government Developer | 0 | 0 | 2 |
| GIS Database/Systems Coordinator | 1 | 1 | 1 |
| GIS Manager | 1 | 1 | 1 |
| GIS Senior Analyst | 1 | 1 | 1 |
| Senior Technology Training and Support Specialist | 0 | 0 | 1 |
| Technology Training and Support Specialist | 0 | 0 | 2 |
| Web Master | 0 | 0 | 1 |
| *Total - Geographical Information Systems* | *3* | *3* | *9* |

**Planning and Technical Services**

| | | | |
|---|---|---|---|
| Chief Information Officer | 1 | 0 | 0 |
| Communications Coordinator | 1 | 1 | 0 |
| Communications Specialist | 1 | 1 | 0 |
| Court Technology Support Specialist | 1 | 1 | 0 |
| IT Services Manager | 0 | 1 | 0 |
| Lead Communication Specialist | 1 | 1 | 0 |
| Office Assistant III | 1 | 1 | 0 |
| Office Assistant IV | 1 | 1 | 0 |
| Office/Contracts Supervisor | 1 | 1 | 0 |
| Planning and Technical Services Manager | 1 | 0 | 0 |
| Senior Technology Business Analyst | 1 | 1 | 0 |
| Senior Technology Training and Support Specialist | 1 | 1 | 0 |
| Technology Business Analyst | 3 | 3 | 0 |
| Technical Project Coordinator | 0 | 1 | 0 |
| Technology Training and Support Specialist | 2 | 2 | 0 |
| Video Conferencing Systems Manager | 1 | 1 | 0 |
| *Total - Planning and Technical Services* | *17* | *17* | *0* |

TR-0312

| Technical Support | FY 2009-10 Actual | FY 2010-11 Estimate | FY 2011-12 Budget |
|---|---|---|---|
| Asset Control Analyst | 1 | 1 | 0 |
| Chief Network Architect | 1 | 1 | 0 |
| Communications Coordinator | 0 | 0 | 1 |
| Communications Supervisor | 1 | 1 | 1 |
| Communication Technician | 3 | 3 | 3 |
| Court Technology Support Specialist | 1 | 2 | 3 |
| Lead Communication Specialist | 0 | 0 | 1 |
| Lead Communication Technician | 1 | 1 | 1 |
| Network Architect I | 4 | 5 | 4 |
| Network Architect III | 1 | 1 | 1 |
| Technical Support Coordinator | 1 | 1 | 1 |
| Technical Support Manager | 1 | 1 | 1 |
| Technical Support Specialist II | 3 | 2 | 2 |
| Technical Support Specialist III | 5 | 6 | 6 |
| Technical Support Specialist IV | 1 | 1 | 2 |
| Video Conferencing Systems Manager | 0 | 0 | 1 |
| *Total - Technical Support* | *24* | *26* | *28* |

| Technology Fund | | | |
|---|---|---|---|
| Network Architect I | 1 | 1 | 1 |
| Network Architect II | 1 | 1 | 1 |
| *Total - Technology Fund* | *2* | *2* | *2* |
| *BCIT TOTAL* | **114.0** | **124.5** | **108.5** |

331

TR-0313

**9**

TR-0314

**Salary Analysis**
**For Carmella Guerrero**

### Summary of Salary Differences with Promotion & Demotion

| FY | Date | Action | Starting Salary | Ending Salary | Amount Increase or Decrease |
|---|---|---|---|---|---|
| 2010-11 | 10/1/2010 | Promotion to E-11 | $ 79,224 | $ 80,616 | $ 1,396 |
| 2010-11 | 11/30/2010 | Demotion to E-5 | $ 80,616 | $ 58,140 | $ (22,476) |

### Summary of Raises Received Compared to Raises Due

| FY | Date | Action | Starting Salary | Ending Salary | Dollar Amount Received | Should have received | Difference | New Salary would have been | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 2011-12 | 10/30/2011 | 2% COLA on $58,140 | $ 58,140 | $ 58,140 | $ 1,162 | $ 1,612 | $ 450 | $ 82,228 | All BCIT Managers received 8%. If Ms. Guerrero was not demoted, she would have received 8% on $82,228 which would take her salary to $88,806 |
| 2011-12 | 10/30/2011 | 8% Increase for Managers | $ 58,140 | $ 58,140 | $ - | $ 6,578 | $ 6,578 | $ 88,806 | |
| 2012-13 | 10/30/2012 | 3% Cola on 58,140 | $ 58,140 | $ 58,140 | $ 1,740 | $ 2,664 | $ 924 | $ 91,470 | |
| 2013-14 | 10/30/2013 | 3% Cola on 58,140 | $ 58,140 | $ 58,140 | $ 1,742 | $ 2,744 | $ 1,002 | $ 94,214 | |
| | | Totals | | | $ 4,644 | $ 13,598 | $ 8,954 | $ 94,214 | This would be Ms. Guerrero's current salary |

# Back Pay w/ Managers Raise and COLA

|  | Current Salary | Prior Salary |
|---|---|---|
| Annual | $ 58,140.00 | $ 80,616.00 |
| Monthly | $ 4,845.00 | $ 6,718.00 |

| Month | Actual Salary | Should have been | Difference Owed to Ms. Guerrero | Comments |
|---|---|---|---|---|
| 10/1/2011 | $ 4,845.00 | $ 6,718.00 | $ 1,873.00 | Back pay received from 12/1/10 to 9/30/11 |
| 11/1/2011 | $ 4,845.00 | $ 7,400.00 | $ 2,555.00 | 8% Increase for Managers and 2% COLA |
| 12/1/2011 | $ 4,845.00 | $ 7,400.00 | $ 2,555.00 | |
| 1/1/2012 | $ 4,845.00 | $ 7,400.00 | $ 2,555.00 | |
| 2/1/2012 | $ 4,845.00 | $ 7,400.00 | $ 2,555.00 | |
| 3/1/2012 | $ 4,845.00 | $ 7,400.00 | $ 2,555.00 | |
| 4/1/2012 | $ 4,845.00 | $ 7,400.00 | $ 2,555.00 | |
| 5/1/2012 | $ 4,845.00 | $ 7,400.00 | $ 2,555.00 | |
| 6/1/2012 | $ 4,845.00 | $ 7,400.00 | $ 2,555.00 | |
| 7/1/2012 | $ 4,845.00 | $ 7,400.00 | $ 2,555.00 | |
| 8/1/2012 | $ 4,845.00 | $ 7,400.00 | $ 2,555.00 | |
| 9/1/2012 | $ 4,845.00 | $ 7,400.00 | $ 2,555.00 | |
| 10/1/2012 | $ 4,845.00 | $ 7,400.00 | $ 2,555.00 | |
| 11/1/2012 | $ 4,845.00 | $ 7,622.00 | $ 2,777.00 | 3% COLA |
| 12/1/2012 | $ 4,845.00 | $ 7,622.00 | $ 2,777.00 | |
| 1/1/2013 | $ 4,845.00 | $ 7,622.00 | $ 2,777.00 | |
| 2/1/2013 | $ 4,845.00 | $ 7,622.00 | $ 2,777.00 | |
| 3/1/2013 | $ 4,845.00 | $ 7,622.00 | $ 2,777.00 | |
| 4/1/2013 | $ 4,845.00 | $ 7,622.00 | $ 2,777.00 | |
| 5/1/2013 | $ 4,845.00 | $ 7,622.00 | $ 2,777.00 | |
| 6/1/2013 | $ 4,845.00 | $ 7,622.00 | $ 2,777.00 | |
| 7/1/2013 | $ 4,845.00 | $ 7,622.00 | $ 2,777.00 | |
| 8/1/2013 | $ 4,845.00 | $ 7,622.00 | $ 2,777.00 | |
| 9/1/2013 | $ 4,845.00 | $ 7,622.00 | $ 2,777.00 | |
| 10/1/2013 | $ 4,845.00 | $ 7,622.00 | $ 2,777.00 | |
| 11/1/2013 | $ 4,845.00 | $ 7,851.00 | $ 3,006.00 | 3% COLA |
| 12/1/2013 | $ 4,845.00 | $ 7,851.00 | $ 3,006.00 | |
| 1/1/2014 | $ 4,845.00 | $ 7,851.00 | $ 3,006.00 | |
| 2/1/2014 | $ 4,845.00 | $ 7,851.00 | $ 3,006.00 | |
| 3/1/2014 | $ 4,845.00 | $ 7,851.00 | $ 3,006.00 | |
| 4/1/2014 | $ 4,845.00 | $ 7,851.00 | $ 3,006.00 | |
| 5/1/2014 | $ 4,845.00 | $ 7,851.00 | $ 3,006.00 | |
| 6/1/2014 | $ 4,845.00 | $ 7,851.00 | $ 3,006.00 | |
| 7/1/2014 | $ 4,845.00 | $ 7,851.00 | $ 3,006.00 | |
| 8/1/2014 | $ 4,845.00 | $ 7,851.00 | $ 3,006.00 | |
| | | | $ 95,917.00 | |
| | | | $ 4,644.00 | Minus checks received for COLAs not added to salary |
| | | | $ 91,273.00 | |
| | | | $ 1,925.00 | Parking Reimbursement |
| | | | $ 93,198.00 | Total Due |

TR-0316

## Parking Reimbursement

| Month | Parking Cost | Comments |
|---|---|---|
| 10/15/2011 | $ 55.00 | Parking was reimbursed from 12/1/10 to 9/30/11 |
| 11/15/2011 | $ 55.00 | |
| 12/15/2011 | $ 55.00 | |
| 1/15/2012 | $ 55.00 | |
| 2/15/2012 | $ 55.00 | |
| 3/15/2012 | $ 55.00 | |
| 4/15/2012 | $ 55.00 | |
| 5/15/2012 | $ 55.00 | |
| 6/15/2012 | $ 55.00 | |
| 7/15/2012 | $ 55.00 | |
| 8/15/2012 | $ 55.00 | |
| 9/15/2012 | $ 55.00 | |
| 10/15/2012 | $ 55.00 | |
| 11/15/2012 | $ 55.00 | |
| 12/15/2012 | $ 55.00 | |
| 1/15/2013 | $ 55.00 | |
| 2/15/2013 | $ 55.00 | |
| 3/15/2013 | $ 55.00 | |
| 4/15/2013 | $ 55.00 | |
| 5/15/2013 | $ 55.00 | |
| 6/15/2013 | $ 55.00 | |
| 7/15/2013 | $ 55.00 | |
| 8/15/2013 | $ 55.00 | |
| 9/15/2013 | $ 55.00 | |
| 10/15/2013 | $ 55.00 | |
| 11/15/2013 | $ 55.00 | |
| 12/15/2013 | $ 55.00 | |
| 1/15/2014 | $ 55.00 | |
| 2/15/2014 | $ 55.00 | |
| 3/15/2014 | $ 55.00 | |
| 4/15/2014 | $ 55.00 | |
| 5/15/2014 | $ 55.00 | |
| 6/15/2014 | $ 55.00 | |
| 7/15/2014 | $ 55.00 | |
| 8/15/2014 | $ 55.00 | |
| Total | $ 1,925.00 | |
| | | |
| | | |

10

TR-0318

# NON-DEPARTMENTAL –
# GENERAL FUND

COMPANY: 100
ACCOUNT UNIT: 9999

**Program Description:** The expenses in the Non-departmental budget all share a basic similarity-- they represent expenses that benefit multiple offices and departments throughout the County. This budgetary approach also serves to streamline the budget and financial accounting processes. Each of the groups of expenditures shown in this budget is described in more detail below.

## Appropriations:

| General Government | FY 2009-10 Actual | FY 2010-11 Budget | FY 2010-11 Estimate | FY 2011-12 Budget |
|---|---|---|---|---|
| Personnel Services | $0 | $1,778,842 | $1,778,842 | $0 |
| Travel and Remunerations | 61,135 | 30,000 | 30,000 | 30,000 |
| Operational Costs | 18,965,661 | 20,073,319 | 18,477,854 | 17,174,188 |
| Supplies and Materials | 2,750 | 0 | 0 | 1,563,201 |
| Interfund Transfer | 77,527 | 340,463 | 340,463 | 325,675 |
| *Subtotal* | **$19,107,074** | **$22,222,624** | **$20,627,159** | **$19,093,064** |

**Health and Safety**

| | | | | |
|---|---|---|---|---|
| Operational Costs | $222,746 | $290,964 | $295,000 | $295,000 |
| *Subtotal* | **$222,746** | **$290,964** | **$295,000** | **$295,000** |

**Services By Other Agencies**

| | | | | |
|---|---|---|---|---|
| Operational Costs | $5,559,835 | $5,929,101 | $5,929,101 | $6,213,971 |
| Capital Expenditures | 0 | 35,000 | 35,000 | 0 |
| *Subtotal* | **$5,559,835** | **$5,964,101** | **$5,964,101** | **$6,213,971** |

**Contingencies**

| | | | | |
|---|---|---|---|---|
| Contingencies | $0 | $6,007,211 | $0 | $11,954,782 |
| *Subtotal* | **$0** | **$6,007,211** | **$0** | **$11,954,782** |

**Other Financing Uses**

| | | | | |
|---|---|---|---|---|
| Interfund Transactions | $4,840,938 | $5,158,207 | $5,390,348 | $13,496,744 |
| *Subtotal* | **$4,840,938** | **$5,158,207** | **$5,390,348** | **$13,496,744** |

| *Total Non-Departmental* | *$29,730,593* | *$39,643,107* | *$32,276,608* | *$51,053,561* |
|---|---|---|---|---|

TR-0319

## Program Justification and Analysis:

### General Government

General Government expenses include various expenditure items that benefit multiple functions within the County's organization and/or the County as a whole. Items here include advertising expenses, the County-wide outside audit, legal services, legislative services, interpreter services, the County's contribution to other agencies, and fees and dues for associations.

The Non-Departmental - General Government FY 2011-12 Budget shows a 7.4 percent decrease compared to the FY 2010-11 estimate. This is primarily due to decreased funding in the personnel appropriation. FY 2010-11 all non-uniformed County employees received a one-time bonus of $500. The total cost of this program was $1,778,842. This is not adopted for FY 2011-12.

Other funding in General Government is allocated for contractual services, Information Technology maintenance contracts, travel, and other agencies as described below.

Funding in the amount of $30,000 is allocated for travel expenses. This represents required travel for elected officials to enhance economic development initiatives for the County.

Funding in the Operational Costs group for the following items:

Funding in the amount of $109,532 is for telephone usage which is allocated for the phones services at Central Magistration. Funding in the amount of $82,850 is allocated for pre-sorting services for the County's outgoing mail. Funding in the amount of $678,888 is for security services in the County-owned facilities that do not house courtrooms. Funding in the amount of $25,000 is for interpreter services for the deaf and the blind who require assistance in Courtrooms and Auctions.

The FY 2011-12 Budget includes $100,000 for consultant services. Countywide initiatives requiring the services of outside consultants are funded from this group. Also, funding for the annual Countywide outside audit is budgeted in the amount of $165,800. The County Manager is responsible for hiring an outside auditor for the annual audit of the County's financial and accounting processes and the production of the Comprehensive Annual Financial Report. Also included in this amount is funding for an outside audit of the County's registry accounts as required by the Texas Legislature.

Funding for Legal Services is budgeted in the amount of $420,222. This represents a significant decrease when compared to FY 2010-11 estimate primarily due to a one time payout of a lawsuit in FY 2010-11 in the amount of $1,000,000. Included in this is funding for the County's Federal lobbyist in the amount of $180,000 and the law firm contracted for the Collective Bargaining negotiations and agreement with Bexar County Sherriff Deputies. Funding for Legislative Services line item remains funded $120,000 which is allocated between two contracts for State lobbyists.

Funding in the amount of $136,000 is budgeted in the financial services line item for the total expense associated with the County's financial advisor's services. Funding for Banking Services is also funded at $112,685 to pay fees associated with the County's Bank Depository contract and lockbox services. The General Government group also provides $189,000 in funding for the Employee Education Incentive Program which represents a 10 percent decrease from FY 2010-11. Funded is $65,000 for the Employee Assistance Program. Funding in the amount of $205,782 is budgeted for transportation initiatives for the VIA Bus "Big Pass" Program that offers free bus rides to County employees by simply showing a County ID card, a one-day Bus Pass for Jurors and vanpool subsidies. Funding in the amount of $60,000 is budgeted for County-wide training for the County's Leadership Program. Funding in the amount of

401

TR-0320

$45,000 is budgeted to hire an outside consultant to assist with the Sheriff's promotional testing program. Also, funding in the amount of $15,000 is budgeted to fund the ECivis licenses used to search grants and other countywide contracts.

Funding in the amount of $259,183 is budgeted for various association fees in the General Government group, and includes the Alamo Area Council of Governments, LoneStar Commuter Rail District, County Judges & Commissioners Association of Texas, Conference of Urban Counties, National Association of Counties, San Antonio Mobility Coalition, South Texas County Judges & Commissioners Association, Texas Associations of Counties, and Austin San Antonio Corridor.

The Non-Departmental Budget provides funding in the amount of $798,781 for outside agencies. The FY 2011-12 Adopted Budget recommends contributions to 26 outside agencies that provide important social and environmental services, educational programs, economic development initiatives, and other services for Bexar County citizens.

| Outside Agencies | Adopted |
|---|---|
| Bexar County Detention Ministries | $45,086 |
| Catholic Charities | 183,059 |
| Christian Senior Services | 62,526 |
| City/County Seniors | 6,500 |
| Gardendale Community Center | 6,000 |
| Haven for Hope | 50,000 |
| Health Collaborative | 20,000 |
| Home Comforts Inc | 10,000 |
| Jefferson Outreach for Older People | 8,000 |
| Magik Theatre | 20,000 |
| MLK March | 25,000 |
| Northeast Senior Assistance | 8,000 |
| Our Lady of Mt St Carmel | 5,000 |
| Peace Initiative | 25,610 |
| Project Mend | 10,000 |
| Project Quest | 85,000 |
| San Antonio College GED Scholarship Program | 10,000 |
| San Antonio Education Partnership | 40,000 |
| San Antonio Food Bank | 40,000 |
| Seton Home | 25,000 |
| Southeast Community Outreach for Older People | 8,000 |
| The Fund | 25,000 |
| The San Antonio Opera | 20,000 |
| The San Antonio Symphony | 20,000 |
| UTSA Restorative Justice | 3.000 |
| Walzem Road Area Revitalization | 10,000 |

402

TR-0321

| | |
|---|---|
| Well Med Sr. Transportation | 8,000 |
| YWCA of San Antonio | 20,000 |
| **Total** | **$798,781** |

In addition to this list there is a $86,904 contribution to Park Centre which is 381 Grants that were previously approved by Commissioners Court for multiple year funding.

The FY 2011-12 Adopted Budget includes $7,000 for the Historical Commission, $1,200 for the Texas State Guard, $75,000 for Public Notices, $13,500 for the County Arbitrage Expense, $35,000 for elected official bonds, and $52,800 for the Flexible Spending Account Administration Fees.

The FY 2011-12 Adopted Budget also includes funding in the amount of $25,460 for special services that include an end of the year report on the County finances and special events that the County hosts such as groundbreakings. Budgeted for copier rental is $27,860 and for professional fees, dues and subscriptions is $6,958 to fund countywide dues.

Also included in the Non-Departmental budget is funding in the amount of $1,366,322 million for the County's liability insurance and $1,591,537 for costs associated with the appraisal of property in Bexar County. Also included is funding in the amount of $3,679,219 for the City/County Joint Radio Project, Video Conferencing, and maintenance for countywide computer software, hardware, and other equipment. This amount is significantly higher than FY 2010-11. In FY 2011-12 some of these maintenance contracts were budgeted in the Innovation Fund. These contracts have now been moved back to the General Fund as planned in the Computer Software line item. Also included in this funding is the annual maintenance of the new financial management system.

In FY 2008-09 the County negotiated a contract with the GEO Group that increases the amount per day per inmate paid to the County for housing select federal inmates and also negotiated a contract with the Federal Government to increase the revenue received for housing these inmates. Based on information from the Western US Marshal, the Average Daily Population of US Marshal prisoners the first half of the year was 521. The GEO group is currently forecasting a population of 492 for FY 2010-11, therefore, funding in the amount of $8,162,121 is budgeted for this expense.

The FY 2011-12 Adopted Budget for the General Government allocates an interfund transfer to Grants-In-Aid in the amount of $325,675 for the purchase of bullet proof vests for various participating Bexar County Law Enforcement Agencies and for a cash match for the U.S. Department of Justice FY 2011 Bexar County Re-Entry Supplemental Grant.

### Health and Public Welfare
The Health and Safety group remains flat compared to FY 2010-11 estimates. The Burial Services line item provides funding for the cost incurred to provide burial services for indigent Bexar County residents. The FY 2011-2 Budget recommends $295,000 for these burial services. Because of the current economy this service has been being utilized more than in recent years.

### Services by Other Agencies
Services by Other Agencies increases 4.8 percent compared to FY 2010-11 estimates. This is primarily due to contract increases to the City of San Antonio. Services offered through the City of San Antonio include use of library facilities, environmental and food service vendor inspections, and animal control. These reimbursement amounts are set by contracts between the County and the City to help with their cost to provide the services to citizens residing in the areas of the County outside the City of San Antonio.

403

The library contract provides that the County pays a proportionate share of the total library costs based on the amount that the library budget grows each year, up to a 5 percent increase. The total cost may not include Capital Improvements. For FY 2011-12, the County's estimated annual cost of library services is $3,882,274 which represents a 5 percent increase. The City's Adopted budget for library grows 2 percent grew; therefore, this expenditure will decrease by 3 percent of the actual budgeted amount.

The City of San Antonio provides Environmental Health Services for the residents of unincorporated Bexar County on a fee for services basis. These services include environmental health inspections, food establishment permits, and food inspections. For FY 2011-12, a total amount of $131,301 is adopted.

The City of San Antonio provides animal control services in the unincorporated areas of Bexar County. The County pays for these services in two ways. First, the County fully funds four Animal Control Officers, including vehicles. These four officers pick up animals only in the unincorporated areas. In addition, the County pays for kenneling, rabies observation, euthanasia, and dangerous dog pick-up. For FY 2011-12, $950,000 is adopted for animal control in the unincorporated areas of Bexar County. This contract is due for renegotiation after this fiscal year.

Funding in the amount of $1,250,396 is budgeted for the Center for Health Care Services. The center provides a variety of services to the mentally ill in Bexar County. Specifically, the Restoration Center is a group of programs to combat the effects of homelessness, substance abuse and mental illness by providing a public safety focused treatment alternative to incarceration. The programs include a Public Safety Unit that provides injured prisoner screening and urgent medical care for persons under arrest and sobering services for arrestees in lieu of incarceration. Persons are brought in custody of police and are medically evaluated before entering a sobering program. As they begin to sober, motivation interviewing is used to encourage individuals to begin receiving treatment for their addictions. The Restoration Center also includes a licensed 27-bed Detoxification service and a licensed 250 person Intensive Outpatient service. This Fiscal Year it is adopted that the amount that funds the detoxification unit will be reprogrammed to competency restoration. Also, funding is budgeted for local competency restoration, involuntary outpatient procedures, medication and transportation.

---

**Contingencies**

Contingencies increase significantly over FY 2010-11 Budget. Items adopted under Contingencies vary widely in scope and purpose and change from year to year. These expenditures include salary increases for the collective bargaining agreement, funds for operating offices and departments set aside pending completion of new initiatives, a 2 percent Cost of Living Adjustment for all all active, regular full-time and part-time employees not covered by a collective bargaining agreement, and undesignated funds.

---

The FY 2011-12 Adopted Budget includes $5,000,000 in undesignated funds and $1,000,000 in operating reserve, which represents 2 percent of the total General Fund Budget to address unanticipated expenses during the fiscal year. Also, funding is budgeted in the amount of $1,166,775 representing one-half of full funding for CMAG operations. In FY 2011-12 a Performance Review will be conducted to evaluate the efficiency and cost effectiveness of the current Central Magistration process. Pending the completion of this report, 6 months of funding for CMAG Courts will be placed in Non-Departmental.

Total funding of $1,700,000 is budgeted to address Sheriff's Office staffing tools and issues. Also, funding is budgeted in the amount $166,027 for Appellate Public Defenders. This involves a formal evaluation of the alternative staffing models for providing appellate defense services. A solicitation of services will be made from the legal community with the release of Request for Proposals (RFP) in December 2011, and final determination will be made by March 2012 on whether to provide appellate defense through contract services or to continue to provide with County employees. Six months of

404

**11**



Office of the County Manager
Paul Elizondo Tower, Suite 1021
101 West Nueva
San Antonio, Texas 78205

To the Honorable Commissioners Court

Bexar County, Texas

# BUDGET MESSAGE

## INTRODUCTION

In the pages that follow, you will find the Bexar County FY 2012-13 Adopted Budget. I believe we are beginning to see early indications of an improved financial environment for the first time since the global financial crisis of FY 2008-09. The General Fund experienced a one percent decrease in property taxes collected after FY 2010; that equated to $2.2 million in lost revenue. However, FY 2011 property tax revenues are expected to remain flat and in FY 2012-13 property tax revenues are projected to increase by approximately 1.5 percent. All of this increase in property tax revenue, however, is coming from new construction property market values, which increased by $1.8 billion, not from increases in existing values. In fact, in the aggregate, existing property values in the Bexar County area have decreased. Foreclosures remain a leading concern in the Bexar County area. At the time of this writing it is reported that 4.72 percent of residential loans in the San Antonio area were delinquent by at least 90 days. HB 1038, which went into effect January 1, 2010, mandated that chief appraisers of a county must take into consideration surrounding properties including foreclosures. This means that properties surrounding foreclosures may lose value depending on the sale price of that foreclosed property. Unless sustained growth can be achieved by new market values, it is very possible that the County could return to decreases in property tax revenues.

The Adopted Budget totals $1.49 billion for all funds, including $514 million in Operating Appropriations, $463 million in Capital Projects, $99 million for Debt Service, and $413 million for reserves, most of which are carry forward funding for multi-year capital projects. The FY 2012-13 Adopted General Fund operating budget totals $340 million compared to last year's operating budget of $331.6 million, or an increase of $8.4 million.

## BUDGET STRATEGIES

During the early planning stages for the FY 2011-12 Budget, we assessed our challenges. We had to follow a course of action that would balance the budget through the forecast period and maintain County capacity for delivering services to a continually expanding County population, as well as address employee compensation and benefits. Given last year's revenue projections and recognizing that property tax revenue constitutes about 75 of the County's General Fund revenue Commissioners Court directed implementation of several cost reduction strategies:

TR-0325

- $2 M (annualized) mid-year savings from a Hiring Freeze in May 2011
- $5 M from Attrition/Vacancy Program
- $5 M from targeted cuts in FY 2011-12 Budget
- $5 M for Return on Investment (ROI) from use of Technology to be identified in FY 2012-13 Budget

The first strategy was to freeze hiring of all positions that had been vacant over four months to realize a projected savings of $2M annually. Second, an attrition strategy for FY 2011-12 was established. This plan called for the reduction of authorized positions by using the annual employee attrition rate to serve as a baseline for reducing positions. Conversely, Offices and Departments were given the opportunity to forego the attrition plan by submitting their own cost reduction plan. If they did submit a voluntary reduction plan, half of any savings achieved beyond their target was returned to their budgets to address the redistribution of workload. Several Offices and Departments took advantage of these options and together the County was able to save $5.7 million.

Another $5 million in annual savings was realized through implementation of targeted process improvements and operational efficiencies. This included reductions in jail staffing, reduction of Court Appointed Attorney Fees in the County and Civil Courts, reductions in Juvenile Detention costs, and the identification of additional recurring revenues by the Auditor's Office.

The final strategy involved the setting of another $5 million savings goal by identifying opportunities to streamline operations and improve processes through investments in technology. The County's Chief Information Officer has worked diligently to identify and implement cost saving measures. These initiatives include negotiated reductions to phone and internet contracts, automation of many duties in the Offices of the District Clerk and County Clerk, implementation of software systems to automate County-wide operational processes such as of American Cadastre, LLC (AMCAD) and E-citations, and the on-going implementation of the Lawson financial/procurement system.

Enacting these strategies has contributed to balancing our current and forecasted expenditures. Bexar County is now forecast to have sufficient funds to provide services to our growing population. However, the one issue that is concerning to the County is the escalating cost of health insurance.

### HEALTH INSURANCE

Bexar County, like all entities around the nation, is confronted with the escalating cost of health care. The County has averaged a nine percent increase in annual health care costs. This rate is unsustainable. Currently the County's health plan pays over $37 million in claims annually. At this rate of growth, the County would pay approximately $53 million for healthcare cost by FY 2015-16.

TR-0326



**Health Insurance Costs**

$60,000,000
$55,000,000
$50,000,000
$45,000,000
$40,000,000
$35,000,000
$30,000,000
$25,000,000
$20,000,000

$30.6   $34.3   $37.8   $37.5   $40.1   $44.1   $48.5   $53.4

FY2008-09  FY2009-10  FY2010-11  FY2011-12  FY2012-13  FY2013-14  FY2014-15  FY2015-16

The County currently offers three plan options to County Employees. An Exclusive Provider Organization (EPO) where an employee may select any physician within the EPO directory without a referral. The advantages to the employee of choosing this plan include no deductibles or co-payments when accessing services, however there is no coverage for services acquired outside of the established directory.

There is also a Preferred Provider Organization (PPO) plan with two options: a premium PPO and a base PPO. In the PPO options the employee may select any provider for services and when a covered person reaches the required deductible, co-insurance covers the remainder of the expenses up to a maximum amount. The difference in the two options is that the Premium PPO offers lower deductibles and higher co-insurance, while the Base PPO offers higher deductibles and lower co-insurance. In Bexar County, the majority of participants have selected the EPO option, which is also the most expensive option.

Our staff surveyed other public agencies in the community to compare the features and costs of their healthcare programs. Looking at programs offered by the City of San Antonio, San Antonio Water System, Northside Independent School District and VIA Metropolitan Transit Authority, we discovered that overall Bexar County offered "richer" plans-- lower family premiums, better deductibles, and higher coinsurance rates for County employees. None of the other entities offered an EPO-type plan.

This year we recommended to Commissioners Court changes to our healthcare plan designs that are more in line with our financial forecast and are more comparable with the plans provided to employees of the other local governmental entities. Adopted recommendations include increases to employee premiums, which is the amount deducted from each employee's paycheck, for those employees who select the Exclusive Provider Organization (EPO) to generate additional revenue in the amount of $1.3 million to pay for health care costs. The second recommendation includes increasing deductibles, co-pays, and coinsurance associated with the PPO plans to save an additional $3.75 million. Employee premiums for the PPO plans will remain unchanged.

Plan changes are just part of the strategy the County is pursuing to curtail the increased cost of health care. Employee wellness is also a key component of a long term strategy. Taking positive

11

steps to get and keep employees healthy will allay future costs. The County will meet these goals by initiating several early risk detection programs such as the Mandatory Health Risk Assessment (HRA) and Biometric Screenings beginning in the 2013 plan year. This will help to identify long term health care issues within our employee population.

Another initiative is to increase focus on disease and case management. These programs are aimed at providing intensive counseling, education, information and referral to employees that are already dealing with challenging health situations such as cancer, diabetes, asthma. etc. Disease and case management provides the right care at the right time to mitigate chronic situations and preempt or prevent complications.

## EMPLOYEE COMPENSATION AND BENEFITS

Even with the employee premiums proposed to remain unchanged, or in some cases decrease. out of pocket expenses may increase based on an employee's utilization of services. One of the goals of our five-year budget plan is to provide for cost of living adjustments for our employees to help defray these costs even while our tax revenues may be growing more slowly. Therefore, a 3 percent Cost of Living Adjustment for all active, regular full-time and part-time employees not covered by a collective bargaining agreement with an employment date on or before October 1, 2012 is adopted.

## JAIL POPULATION AND JAIL STAFFING



Jail Population Trends and Projections*

\* Total Population - includes Housed out of Facility and Sheriff's Department Electronic Leg Monitor (ELM) Work Release Inmates

The County has continued to see a reduction in the overall jail population. I believe the County has been successful in controlling the jail population because of the continued. active participation by key County criminal justice stakeholders and the leadership of the Commissioners Court in focusing on jail population mitigation strategies such as the specialty courts, jail diversion programs, inmate re-entry programs, using the Quarterly Judicial Management Report to track key court metrics and improve court processes. ongoing reviews of

12

**12**



**Office of the County Manager**
Paul Elizondo Tower, Suite 1021
101 West Nueva
San Antonio, Texas 78205

**To the Honorable Commissioners Court**

**Bexar County, Texas**

## BUDGET MESSAGE

### INTRODUCTION

I am pleased to submit the Bexar County FY 2013-14 Adopted Budget. For the past several years, the County experienced minimal growth in revenues and expenditures as we, along with the rest of the nation, continued to face fiscal challenges as a result of the global financial crisis that began in 2008. This year the County's economic environment appears to be moving in a positive direction. Property values have increased by nearly 5.5 percent, or $5.5 billion in 2013. This is a significant improvement considering last year's values increased by only 1.5 percent (generated only by the value of new property) and property values were flat in 2011. This increase is made up of two components. Property values on existing properties increased by $3.2 billion and new property generated $2.3 billion in additional value. Another sign that the local economy is improving is the decrease in foreclosures. Last year, I reported that foreclosures were a leading concern in the Bexar County area with 4.72 percent of residential loans delinquent by at least 90 days. This year that number has decreased to 3.65 percent.

Commissioners Court adopted the current tax rate of $0.326866 per $100 valuation, which is above the effective tax rate of $0.317028 per $100 valuation. The Adopted Budget totals $1.69 billion for all funds, including $495 million in Operating Appropriations, $821 million in Capital Projects, $124 million for Debt Service, $31 million in contingencies, and $218 million in reserves.

Since the FY 2012-13 Adopted Budget, the General Fund has increased by $26.5 million. Of this, $4 million was the result of FY 2012-13 beginning balance being higher than budgeted. An additional $10 million is the result of actual revenues being higher than projected. For FY 2013-14, the County Auditor is projecting an increase of $12.5 million in Total Available Funds mostly due to increased projected ad valorem revenue of over $12 million.

Priorities funded with these additional revenues include enhancements to employee compensation and benefits, a continued focus on flood control, additional investment in public safety, plans to address transportation issues, and, most importantly, improved services and service delivery to Bexar County citizens.

9

TR-0330

## PUBLIC SAFETY

Additional funding in the amount of $9 million is budgeted to address public safety. The Adopted Budget provides an additional $2.9 million for the second year of the Collective Bargaining Agreement with the Deputy Sheriff's Association of Bexar County. All uniformed officers will receive a 3 percent pay adjustment and will continue to receive annual increases as they move through the Sheriff's Step Pay Plan. Training funds for uniformed officers will increase by 53 percent, or about $175,000. The Sheriff's Office will enhance training opportunities for Officers on topics such as investigations, court security management, prisoner control, emergency response and weapons certification.

The FY 2013-14 Adopted Budget includes funding for a Court Services Emergency Response Team (ERT). The purpose of the ERT will be to respond to immediate threats and attacks within the three principal buildings of the County, the Bexar County Courthouse, the Justice Center, and the Paul Elizondo Tower. Funding in the amount of $235,361 is provided for additional ammunition as well as tactical equipment, including plate carriers, velocity plates, ballistic helmets and shields, breaching kits, and other tactical gear, as well as funding for weapons.

Funding in the amount of $5.7 million is provided for various capital items related to public safety. This year the Sheriff's Office will implement a new enterprise-wide records management system that will allow for storage, retrieval, retention, manipulation, archiving, and viewing of information, records, documents, or files pertaining to law enforcement operations. Funding is also provided for digital recording equipment in police vehicles in the amount of $300,000. Finally, nearly $500,000 is provided for safety equipment, such as Tasers, tactical equipment and body armor.

In FY 2012-13, the Sheriff's Office worked with the Office of the County Manager to develop a comprehensive study on jail staffing needs, which included post-by-post analysis, reallocation of Officers from administrative duties, and attendance and vacancy issues. This study followed the National Institute of Corrections Staffing Analysis, as well as the Texas Commission on Jail Standards. At the full capacity of 4,563 inmates, it was determined the jail would need 621 FTEs (full-time equivalents) for the living units and corridors, 237 FTEs for secondary jail operations, and 24 FTEs for support staffing, for a total of 882 FTEs. This established staffing level for a full jail, which is 4,563 inmates. This year's budget authorizes 830 uniformed staff, which will meet the staffing needs of the jail at the current and projected jail population over the next 12 months. As this budget was being prepared, the jail population stood at about 3,750, with over 800 empty beds. I look forward to working with the Sheriff and her team on the second phase of the agreed on staffing study, which will be an audit of civilian positions to be conducted jointly by our staffs.

## FLOOD CONTROL

Over the last year the County and the San Antonio River Authority (SARA) have overseen the preliminary engineering study of the historic San Pedro Creek. The study was commissioned to analyze the feasibility, cost and conceptual renderings to transform the concrete-laden creek into a vibrant linear urban park.

The outcome of the study shows that this restoration project will provide flood control, as well as enhance quality of life, honor our culture and respect the environment. While conducting this study, it was found that previous Federal Emergency Management Agency (FEMA) flood plain maps along the Creek had been miscalculated, thus placing 41.8 acres of downtown within the 100-year flood plain.

The San Pedro Creek project limits would be segmented into six unique sections, each showcasing the cultural and historical significance of the creek. Along with increasing flood control capacity in the heart of downtown, this restoration project will enhance quality of life for our residents by adding 22 acres of park land and other recreational amenities. Finally, as seen along the Museum Reach of the San Antonio

10

TR-0331

River, we are projecting property values along the Creek to increase two to five times the pre-project value.

The study also concluded that by extending the project limits another one-half mile, from South Alamo Street to the confluence with Alazan/Apache Creek, the County will achieve its goal to contain the flood plain within the channel banks. Based on concept design estimates, the total project costs could range from $131.5 million to $174.6 million. A finance plan was approved on May 21st to fund $125 Million for the San Pedro Creek Project. I am also working with City leadership and SARA to identify the necessary public and private partnerships to develop the funding plan needed to complete this historic waterway.

## TRANSPORTATION

Last year, Commissioners Court directed staff to work with the Alamo Regional Mobility Authority (ARMA) to further understand the issues associated with the development and delivery of ARMA projects and continue to identify opportunities for delivering projects in a more cost-effective manager. On April 11, 2013, Governor Rick Perry appointed Mr. John Clamp as Chairman to the Board of Directors of the Alamo RMA. Subsequently, on May 9th the operations of the Alamo RMA were transferred to Bexar County and I was appointed Interim Executive Director.

The State of Texas 83rd Legislature passed a piece of important legislation on behalf of the Alamo RMA this year. Effective September 1, 2013, HB 1573 gives authority, by order of Commissioners Court, for an additional vehicle registration fee of up to $10 to be collected for the Alamo RMA. The FY 2013-14 Adopted Budget includes a recommendation to authorize this additional fee. Collected revenue will be sent to the Alamo RMA to fund long-term transportation projects in Bexar County. The estimated collections for the first year would be about $9 million and $12 million in subsequent years.

The FY 2013-14 Adopted Budget includes new funding for roads in the amount of $21,425,000 as follows: Shaenfield Place Subdivision ($3,500,000), Steubing Road ($3,000,000), Old F.M. 471 & Talley Road ($1,500,000), Talley Road Phase 1 ($1,875,000), Marshall Road ($1,000,000), Bulverde Phase IV ($1,000,000), Glen Mont ($1,500,000), Candlewood Phase 1 ($3,250,000), Palm Park ($600,000), Roft Road ($2,100,000) and Bulverde Pedestrian Amenities ($2,100,000).

## EMPLOYEE COMPENSATION AND BENEFITS

This year, I asked our Human Resources staff to develop a comprehensive roadmap that will get us back on course to achieving pay equity in the local market. Refreshing the County's pay tables and addressing employee compensation will be a multiyear focus for my staff.

### Non-Exempt Pay Table Market Study

A market-based compensation study was completed on the Non-Exempt pay table, which includes most of the trade and clerical classifications. The purpose of the study was to review pay levels and determine if adjustments in pay grades were needed to maintain market comparability. Local public entities were surveyed to compare salaries for similar job groups and positions. These public entities included the City of San Antonio, Alamo Colleges, University Health System, School Districts, SAWS, and VIA. The results of this study show that the County is below the market for Non-Exempt employee wages. Based on the survey, average salary increase for an employee on the Non-Exempt Pay Table will be 7.47 percent. Of the 2,551 employees who hold jobs on the Non-Exempt Pay Table, 1,794 will receive anywhere from 3 to 11.5 percent wage increases.

---
**Cost of Living Adjustment**
The FY 2013-14 Adopted Budget includes a 3 percent Cost of Living Adjustment (COLA) for all active, regular full-time, and part-time employees on the Exempt Pay Table not covered by a collective

---

bargaining agreement with an employment date on or before October 1. 2013. Employees on the Non-Exempt Pay Table who did not receive at least 3 percent as a result of the Non-Exempt Pay Table study will receive a COLA that would bring their wage increase to 3 percent.

My current plan is to conduct a similar market study during FY 2013-14 for those employees on the Exempt Pay Table for implementation in FY 2014-15.

### Health Insurance

Last year I alerted Commissioners Court to the potential for an unsustainable County Health Insurance program unless positive management steps were taken to control projected employee healthcare costs. Our projections were showing 10 percent annual increases for the foreseeable future unless we took action. With adoption of the FY 2012-13 Budget the Court approved a number of revisions to the healthcare plan to bring costs back in line. The healthcare plan we implemented this year increased premiums for those employees on the Exclusive Provider Organization (EPO) plan and changed co-pays, co-insurance and out-of-pocket maximums for those employees on one of the Preferred Provider Organization (PPO) plans.

The Adopted Budget projects a 7 percent increase in health care claims in FY 2013-14. This equates to about $2.2 million in additional claims costs. The Adopted Budget includes funding so that the County absorbs this increase, which results in no impact to the out-of-pocket expenses of Bexar County employees. The following tables show the ratio of contributions between Bexar County and employees:

Non-Uniformed Employees:

| Health Plan | Bexar County | Employees |
|---|---|---|
| Exclusive Provider Organization (EPO) | 54% | 46% |
| Premium Preferred Provider Organization (PPPO) | 75% | 25% |
| Base Preferred Provider Organization (BPPO) | 81% | 19% |

Uniformed Employees:

| Health Plan | Bexar County | Employees |
|---|---|---|
| Exclusive Provider Organization (EPO) | 67% | 33% |
| Premium Preferred Provider Organization (PPPO) | 83% | 17% |
| Base Preferred Provider Organization (BPPO) | 89% | 11% |

## SERVICE ENHANCEMENTS

### BiblioTech

Bexar County pays a little under $4 million per year to the San Antonio Public Library for unincorporated residents to use the City's libraries. But the City cannot build new libraries in the unincorporated areas. where we are seeing the most population growth. Last year County Judge Nelson Wolff tasked me with researching the feasibility of providing library services in an entirely digital format. After several months of planning and research, in January 2013 the County announced plans for the Nation's first all-digital public library, named the "BiblioTech". Located at the Precinct 1 Satellite Office on Pleasanton Road, BiblioTech brings the changing landscape of technology and literacy together in an area of the county where an estimated 75 percent of households do not have internet access at home. Furthermore. the 10,000-title collection is available through a "cloud" library to any Bexar County resident with a

12

TR-0333



**13**

TR-0334

## NO. 2012-CI-08758

| | | |
|---|---|---|
| CARMELLA GUERRERO | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | 225th JUDICIAL DISTRICT |
| | § | |
| BEXAR COUNTY CIVIL SERVICE COMM. | § | BEXAR COUNTY, TEXAS |

## MEDIATION SETTLEMENT AGREEMENT **

The following agreement has been reached by the parties hereto: (** expressly subject to Bexar County Commissioners Court approval)

1. The parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and damages and the amount thereof, if any, and by reason of such disputes and controversies they desire to compromise and settle all claims and causes of action of any kind whatsoever which the parties have or may have arising out of the transaction or occurrence which is the subject of this litigation. It is understood and agreed that this is a compromise of a disputed claim, and nothing contained herein shall be construed as an admission of liability by any party, all such liability being expressly denied.

2. **Subject to express approval by Bexar County Commissioners Court**, each signatory hereto hereby warrants and represents that:

   a. such person has authority to settle for the party or parties for whom such person acts.
   b. the claims, suits, rights, and/or interests which are the subject matter hereto are owned by the party asserting same, have not been assigned, transferred or sold, and are free of any encumbrance.

3. Consideration for settlement: Plaintiff will be reinstated to a category E-9 with an annual salary of $81,500. Plaintiff shall be paid a total amount of $66,000 to be paid as follows: Plaintiff shall be paid $36,000 for back pay and an additional $26,400 for attorney's fees, plus $3,600 for expenses.

Plaintiff agrees to indemnify Defendant for tax liability (except for taxes to be paid by Employer), if any, as a result of this settlement allocation of monies to her from this settlement. Each party shall bear its own court costs and attorneys' fees.

TR-0335

4.  Claims to be released: Any and all claims asserted or which could be asserted by Plaintiff in this cause of action and/or as a result of her employment with Defendant.

5.  Parties to be released: Defendant, its elected officials, its related entities, affiliates, officers, directors, shareholders, representatives, agents, employees, defense attorneys and their respective agents.

6.  Party granting the release: Plaintiff.

7.  All of Plaintiff's claims shall be dismissed with prejudice.

8.  Counsel for Defendant shall deliver drafts of releases and any further documents to be executed in connection with this settlement to counsel for the Plaintiff within seven (7) days after Bexar County Commissioners Court approval. Defendant's counsel shall tender settlement checks to Plaintiff's counsel within thirty (30) days after Bexar County Commissioners Court approval and receipt of signed release agreement. The parties and their counsel agree to cooperate with each other in the drafting and execution of such additional documents as are reasonably requested or required to implement the provisions and spirit of this Mediation Settlement Agreement, but notwithstanding such additional documents the parties confirm that this is a written settlement agreement as contemplated by Section 154.071 of the Texas Civil Practice and Remedies Code.

9.  This Mediation Settlement Agreement is not subject to revocation and is made and performable in Bexar County, Texas, and shall be construed in accordance with the laws of the State of Texas.

11. Although the mediator has provided a basic outline of this Mediation Settlement Agreement to the parties' counsel as a courtesy to facilitate the final resolution of this dispute, the parties and their counsel have thoroughly reviewed such outline and have, where necessary, modified it to conform to the requirements of their agreement. All signatories to this Mediation Settlement Agreement hereby release the mediator from any and all responsibility arising from the drafting of this Mediation Settlement Agreement, and by signing this Mediation Settlement Agreement acknowledge that they, or their attorneys, have been advised by the mediator in writing that this Mediation Settlement Agreement should be independently reviewed by counsel before executing the Agreement.

- 2 -

TR-0336

12. The parties represent that they have carefully read or had read to them the Mediated Settlement Agreement, understand the contents thereof, and sign the Mediated Settlement Agreement voluntarily as their own free act, without any coercion by any person or party.

SIGNED and AGREED * (expressly subject to Bexar County Commissioners Court approval) to this 29th day of July, 2014.

_____
Carmella Guerrero, Plaintiff

_____
Attorney for Plaintiff
2401019

_____
Representative for Defendant
Bexar County Civil Service Commission

_____
Attorney for Defendant
Clark Brown
00799082

- 3 -

TR-0337

| CARMELLA GUERRERO, | § | |
|---|---|---|
| | § | |
| VS. | § | BEXAR COUNTY CIVIL |
| | § | SERVICE COMMISSION |
| | § | |
| INFORMATION TECHNOLOGY | § | |
| DEPARTMENT | § | |

## Brief in Support of upholding this Commission's Original Order

### I.
### Statement of the Facts

On April 26, 2012 the Bexar County Civil Service Commission (commission) heard the appeal of Carmella Guerrero. Ms. Guerrero is an employee of Bexar County who works in the Information Technology Department. Ms. Guerrero had been demoted in December of 2010 by Bexar County. The Commission found in favor of Ms. Guerrero and overturned her demotion. The position Ms. Guerrero had been demoted from, IT Services Manager, was eliminated in the 2011-2012 Bexar County budget along with fifteen other positions in the department. Therefore, although the demotion was overturned, this commission was not able to return Ms. Guerrero to her previous position since it does not have the authority to create positions in the county. This commission instead provided Ms. Guerrero all of the relief it could. You overturned her demotion and awarded her back pay up to the date that her previous position was eliminated, October 1, 2011.

### II.
### Procedural History

a.  **Order of the Commission**

This commission issued its Order April 26, 2012 and explicitly overturned the demotion

of Mrs. Guerrero, granted her back pay until her position was eliminated by the county commissioners.

**b.      Appeal of Commission's Order**

On May 29, 2102 Mrs. Guerrero appealed this commission's decision to the district court in Bexar County, Texas.

**c.      Plea to the Jurisdiction**

On July 24, 2012 the county filed a motion with the court asking the court to dismiss Mrs. Guerrero's appeal because the court lacked jurisdiction to hear the appeal. The trial agreed with county and dismissed the appeal. Mrs. Guerrero appealed this decision to the Fourth Court of Appeals.

**d.      Fourth Court of Appeals Holding**

The holding by the Fourth Court of Appeals in *Guerrero v. Bexar County Civ. Serv. Comm'n*, 2012 Tex. App. LEXIS 10701 (Tex. App. San Antonio 2012) was very narrow. The Court held that since Ms. Guerrero remained in the same position after the commissions hearing as before, she fit within the definition of an employee who had been demoted and could appeal her demotion to the district court. The only decision made by the court of appeals was that the trial court had jurisdiction to hear the appeal. The court of appeals made absolutely no ruling on the merits of the case or the authority of the commission to order the commissioners to create a position eliminated by the commissioners.

**e.      Mrs. Guerrero's Motion for Summary Judgment**

On January 27, 2014 Mrs. Guerrero file a motion with the trial court asking that the court order her returned to her E-11 position she was demoted from in 2010. On April 17, 2014 Judge

2

Peter Sakai <u>denied</u> this motion and granted <u>no</u> relief to Mrs. Guerrero.[1]

**f.    § 158.0122.  Procedures for Review under Substantial Evidence Rule**

On April 16, 2014 Mrs. Guerrero filed an Application to Present Additional Evidence to the commission.  On March 7, 2014 Judge Peter Sakai granted Mrs. Guerrero's Application to Present Additional Evidence to the commission.[2]  The authority to do this is found in the Tex. Local Gov't Code § 158.0122(b).  Under this section of the code, "The commission may change its findings and decisions by reason of the additional evidence and shall file the additional evidence and any changes, new findings, or decisions with the reviewing court."  Likewise, the commission may stand by its original decision.

## III.
### The Commission granted all of the relief it could

The Commission granted the Mrs. Guerrero all of the relief it was able to when it overturned her demotion and granted her back-pay up and until the position she held was eliminated by the commissioners court.  The Commission had no authority to order Bexar County to create a position that had previously been eliminated in the 2011-2012 adopted budget.

The county commissioners court is a creature of the Texas Constitution; thus, its powers are limited and controlled by the Constitution and the laws as passed by the Legislature. Tex. Const. *art. V, § 18(b)*; *See also Commissioners' Court of Madison County v. Wallace*, 118 Tex. 279, 15 S.W.2d 535, 537 (1929).

Along with constitutionally-derived jurisdiction over "county business," the

---

[1] The Order of the Judge is attached.
[2] The Order of the Judge is attached.

3

TR-0340

commissioners court specifically has the statutory authority to oversee the fiscal operation of the county by approving and authorizing a budget. *Tex. Loc. Gov't Code Ann.* §§ 111.031-111.043 (Vernon 2012). Generally, the allocation of county funds is a policymaking determination left to the sound discretion of the commissioners court. *Weber v. Sachse,* 591 S.W.2d 563 (Tex.Civ.App.--Dallas 1979, writ dism'd).

"The budget process is *political.* It combines inextricably the two legislative powers of 'taxation' and 'appropriation,' the latter being a distribution and setting aside of parts of the total available revenue among the various government functions, operations, and programs." *Commissioners Court of Caldwell County v. Criminal Dist. Attorney, Caldwell County,* 690 S.W.2d 932, 934 (Tex.App.--Austin 1985, writ ref'd n.r.e.). "The correlation of total revenue and expenditure, and apportionment of the former among the various county functions, operations, and programs, *in the overall public interest,* is the essence of the decision making entrusted to the judgment of the Commissioners Court. There could be no clearer grant of discretionary power." *Id.* at 934-35 (emphasis original).

In establishing the county budget, the commissioners court, as a matter of course, receives input from various departments that operate within the established structure of county government. *Hooten v. Enriquez,* 863 S.W.2d 522, 529 (Tex. App. El Paso 1993). Absent an abuse of discretion, the commissioners court establishes manning tables for each of the respective departments and sets the rate of compensation for its employees. *Id.; Tex. Loc. Gov't Code Ann. § 152.001* (Vernon 2012). In that regard, County officials may employ deputies and assistants only as authorized by the commissioners court. *Id.; Tex. Loc. Gov't Code Ann. §§ 151.001-.004* (Vernon 2012). The commissioners court may either grant or deny the authority to appoint such deputies or assistants in the exercise of its discretion regarding their need. The

4

commissioners court may limit the number of deputies or assistants authorized to any department. *Id.*; *Tarrant County v. Smith,* 81 S.W.2d 537, 538 (Tex.Civ.App.--Fort Worth 1935, writ ref'd).

No court looking at Mrs. Guerrero's appeal of your initial decision has ever found that this commission could order the reinstatement of Mrs. Guerrero to an eliminated position and force the county to create the position. Judge Sakai, in fact, denied the Motion for Summary Judgment asking him to do just that.

## Conclusion

For these reasons, Bexar County asks that the commission uphold its original ruling and not grant Mrs. Guerrero any additional relief.

Respectfully submitted,

/s/Clarkson F. Brown
Attorney for Bexar County

5



CAUSE NO. 2012-CI-8758

| | | |
|---|---|---|
| CARMELLA GUERRERO | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| VS. | § | 225TH JUDICIAL DISTRICT |
| | § | |
| | § | |
| BEXAR COUNTY CIVIL SERVICE | § | |
| COMMISSION | § | BEXAR COUNTY, TEXAS |

## ORDER GRANTING PLAINTIFF'S APPLICATION TO PRESENT ADDITIONAL EVIDENCE

On April 23, 2014, the Court considered the Plaintiff's Application to Present Additional Evidence. After considering the application, the response, the pleadings, the evidence, and argument of counsel, the Court is of the opinion that the motion should in all things be GRANTED.

Accordingly, the Court ORDERS that the Plaintiff, Carmella Guerrero, is entitled to present and take additional evidence before the Bexar County Civil Service Commission (the "Commission") concerning the facts and merits of this matter. The Court ORDERS that the Commission hold and reconvene an evidentiary hearing within one-hundred and twenty (120) days of the entry of this order to consider the additional evidence the Plaintiff presents and offers at the hearing (the "Hearing"). After the Plaintiff presents the additional evidence at the Hearing, the Commission is ORDERED and ADVISED that the Commission may change its findings and decisions it rendered on or about April 26, 2012. The Commission is further ORDERED to file the additional evidence and any changes, new findings, or decisions it renders after the Hearing with the Court within ten (10) business days of the date of the Hearing.

The Court further ORDERS that the parties shall/mediate this matter no later

TR-0343

 

than sixty (60) days from the date of this order. The parties shall select a mediator by mutual agreement; and absent an agreement, either party may file a motion requesting that the Court appoint a mediator. Each party shall bear one-half of the expense of the mediation and each party is ORDERED that a representative from each party attend the mediation with full authority to resolve this matter.

SIGNED this May 7ᵗʰ, 2014.

PRESIDING JUDGE

**AGREED AS TO FORM:**

LOPEZ SCOTT, L.L.C.
719 S. Flores, Suite 100
San Antonio, Texas 78205
Telephone:   210.472.2100
Telecopier:   210.472.2101

ORLANDO R. LOPEZ
STATE BAR NO. 24010196

ATTORNEYS FOR PLAINTIFF

CLARKSON F. BROWN
STATE BAR NO. 00798082
ASSISTANT CRIMINAL DISTRICT ATTORNEY
CIVIL DIVISION
300 Dolorosa, Suite 4049
San Antonio, Texas 78205
Telephone:   210.335.2139
Telecopier:   210.472.2151

ATTORNEYS FOR DEFENDANT

Page 2 of 2

TR-0344

## CAUSE NO. 2012-CI-08758

| | | |
|---|---|---|
| CARMELLA GUERRERO, | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| VS. | § | 225TH JUDICIAL DISTRICT |
| | § | |
| BEXAR COUNTY CIVIL SERVICE | § | |
| COMMISSION, | § | |
| Defendant. | § | OF BEXAR COUNTY, TEXAS |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

On the 26th day of February, 2014, came on to be heard the Plaintiff's Motion for Summary Judgment. The court has reviewed the pleadings and papers in this action, heard argument of counsel and finds that under the law and facts the Motion should be, in all things, denied.

It is therefore, ORDERED that the Plaintiff's Motion for Summary Judgment is denied.

APR 1 7 2014
SIGNED this ____ day of April, 2014.

Peter Sakai
Presiding Judge
225th District Court
Bexar County, Texas

_____
The Honorable Peter Sakai
District Court Judge
225th Judicial District Court

Agreed as to form:

_____
Orlando R. Lopez
State Bar No. 24010196
Attorney for Plaintiff

Agreed:

_____
Clarkson F Brown
State Bar No. 00798082
Attorney for Defendants

TR-0345

2012CI08758

## CAUSE NO. ~~2012-CI-8758~~

| | | |
|---|---|---|
| CARMELLA GUERRERO,<br>    **Plaintiff,** | §<br>§<br>§ | **IN THE DISTRICT COURT** |
| **VS.** | §<br>§<br>§ | **225TH JUDICIAL DISTRICT** |
| **BEXAR COUNTY CIVIL SERVICE<br>COMMISSION,**<br>    **Defendant.** | §<br>§<br>§ | **OF BEXAR COUNTY, TEXAS** |

### NOTICE OF FILING OF BEXAR COUNTY CIVIL SERVICE COMMISSION ORDER

Defendant, Bexar County Civil Service Commission files the attached Order of the Commission per the Order issued May 7, 2014 by the Honorable Peter Sakai.

Respectfully submitted,

/s/Clarkson F. Brown
Clarkson F. Brown
State Bar No. 00798082
Assistant Criminal District Attorney
 - Civil Division
300 Dolorosa, Suite 5049
San Antonio, Texas 78205-3030
Telephone:  (210) 335-3918
Telecopier:  (210) 335-2151
cbrown@bexar.org
ATTORNEY FOR DEFENDANT

TR-0346

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been filed electronically on September 2, 2014 and service on the following will be made by the filing system via email:

Orlando R. Lopez
The Lopez Law Firm
719 S. Flores, Suite 100
San Antonio, TX 78215
210-472-2100
210-472-2101 fax
olopez@lopezscott.com
*Attorney for Plaintiff*

/s/Clarkson F. Brown
Clarkson F. Brown

2

TR-0347

NO. 10-BCCS-022
EVIDENTIARY HEARING

| IN THE MATTER OF CARMELLA | | BEXAR COUNTY CIVIL SERVICE |
|---|---|---|
| GUERRERO RELATIVE TO | | COMMISSION, BEXAR COUNTY, TEXAS |
| EMPLOYMENT IN THE BEXAR COUNTY | | |
| INFORMATION TECHNOLOGY | | |
| DEPARTMENT, BEXAR COUNTY, TEXAS | | |

\* \* \*

## ORDER

On the 21st day of August, 2014, came on to be heard the case of Carmella Guerrero vs Bexar County Information Technology Department (10-BCCS-022) before the Bexar County Civil Service Commission as an Evidentiary Hearing pursuant to 225th Judicial District Court of Bexar County, Texas; Cause No. 2012-CI-08758. Chairman Gina M. Elliott presided. Commissioner Gloria C. Arriaga and Commissioner Joe Gimblet were also in attendance. Carmella Guerrero attended in person and was represented by her attorney Orlando Lopez. The Bexar County Information Technology Department appeared through Robert Hampel, Deputy Chief Information Officer, and was represented by Clark Brown, Assistant Criminal District Attorney, Civil Section. Also present were: Henry "Hank" Reyes, Former Budget Director, County Manager's Office, Bexar County; Elva Abundis-Esparza, Former Criminal Assignments Clerk I, District Clerk's Office, Bexar County; Andrea San Miguel, Former Civil Service Director, Civil Service Commission, Bexar County; Adam Leos, Human Resources Analyst for the Commission, Bexar County; Alex Fabela, Human Resources Analyst, Bexar County.

After listening to testimony and reviewing the evidence submitted by both parties in this case, and after deliberating, the Commission, by unanimous decision, has determined that the decision

TR-0348

CASE #10-BCCS-022 CARMELLA GUERRERO VS BEXAR COUNTY INFORMATION TECHNOLOGY DEPARTMENT

ordered by the Commission on April 26, 2012 (10-BCCS-022) should be upheld.

IT IS HEREBY ORDERED that the decision ordered by the Commission on April 26, 2012 (10-BCCS-022) should be upheld.

IT IS FURTHER ORDERED that Ms. Guerrero will remain in her current position of Technology Business Analyst at her current salary.

IT IS FURTHER ORDERED that pursuant to Local Government Code, Chapter 158, Subchapter A., County Civil Service System, Section 158.0123 (a) the Commission shall require a party who appeals a final decision to pay one-half of the cost of preparation of the original or a certified copy of the record of the Commission proceeding that is required to be sent to the reviewing court.

SIGNED AND ENTERED this the 21st day of August, 2014.

THE BEXAR COUNTY
CIVIL SERVICE COMMISSION

GINA M. ELLIOTT, CHAIRMAN

GLORIA C. ARRIAGA, COMMISSIONER

JOE GIMBLET, COMMISSIONER

TR-0349

| | | |
|---|---|---|
| CARMELLA GUERRERO | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| VS. | § | 225TH JUDICIAL DISTRICT |
| | § | |
| | § | |
| | § | |
| BEXAR COUNTY CIVIL SERVICE | § | |
| COMMISSION | § | BEXAR COUNTY, TEXAS |

## BUSINESS RECORDS AFFIDAVIT

Before me, the undersigned notary public, Janet Guadarrama, in person and, after taking her oath as required by law, deposed and stated the following:

1. My name is Janet Guadarrama. I am over the age of eighteen and otherwise competent and capable of making this affidavit. The facts stated in this affidavit are true and within my personal knowledge.

2. I am the custodian of the records for Bexar County, the Bexar County Human Resources Department, and the Bexar County Information Technology Department (collectively "Bexar County"). I attach to this affidavit Exhibit "C-1," which are 129 pages of records that constitute the complete Bexar County Human Resources Policies. The records attached as Exhibit "C-1" are kept by Bexar County in the regular course of business, and it was in the regular course of business of Bexar County for an employee or representative of Bexar County, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached as Exhibit "C-1" are the originals or exact duplicates of the originals.

3. The records attached as Exhibit "C-1" are the only written human resources rules and policies of Bexar County that are applicable to the Plaintiff's claims in this lawsuit; and no other written human resources rules or policies exist for Bexar County relating to employee layoffs, dismissals, or disciplinary actions.

Further Affiant Sayeth Not.

_____
JANET GUADARRAMA

Subscribed to and Sworn before me on December 5th, 2014.

Belia Anguiano
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Expires 07-30-2018

_____
Notary Public in and for the State of Texas

TR-0351



# Human Resources Policies
## Table of Contents

**7.0**    **Introduction**

**7.1**    **Employment**

| | |
|---|---|
| 7.1.01 | Equal Employment Opportunity |
| 7.1.02 | Pre-employment Screening |
| 7.1.03 | In-Processing New Employees |
| 7.1.04 | County Identification Cards |
| 7.1.05 | Nepotism |
| 7.1.06 | Out-Processing Exiting Employees |
| 7.1.07 | Americans with Disabilities Act (ADA) |

**7.2**    **Compensation**

| | |
|---|---|
| 7.2.01 | Paydays |
| 7.2.02 | FLSA, Compensatory and Discretionary Time |
| 7.2.03 | Creating Positions |
| 7.2.04 | Position Descriptions |
| 7.2.05 | Filling Vacancies |
| 7.2.06 | Promotions and Temporary Promotions |
| 7.2.07 | Position Classifications and Requests for Changes |
| 7.2.08 | Transfers |
| 7.2.09 | Personnel Status Change Request (Status Form) |
| 7.2.10 | Longevity Pay |
| 7.2.11 | Demotion |

## 7.3    Benefits Policies

7.3.01          Benefits Programs

7.3.02          Retirement

7.3.03          Family and Medical Leave Act

7.3.04          Worker's Compensation

7.3.05          Modified Duty

7.3.06          Voluntary Reduced Time Schedules

7.3.07          Employee Assistance Program

7.3.08          Flexible Spending Accounts

7.3.09          VIA Transport Program

## 7.4    Employment Leave Benefits

7.4.01          Administering Leave

7.4.02          Vacation or Annual Leave

7.4.03          Sick Leave

7.4.04          Administrative Leave

7.4.05          Bereavement (Funeral Leave)

7.4.06          Military Leave

7.4.07          Jury and Witness Duty Leave

7.4.08          Unauthorized Absence

7.4.09          County Holidays

7.4.10          Sick Leave Pool

## 7.5    Employee Conduct

7.5.01          General Conduct

7.5.02          Sexual Harassment

7.5.03          Drug and Alcohol-Free Workplace

7.5.04          Confidentiality

7.5.05          Political Activity

7.5.06          Use of Government Property

## 7.6 Civil Service Commission Rules and Regulations

| | | |
|---|---|---|
| 7.6.01 | Introduction |
| 7.6.02 | Application of Civil Service Rules |
| 7.6.03 | Office and Department Policies |
| 7.6.04 | Sensitive and Excluded Positions |
| 7.6.05 | Change in Civil Service Status |
| 7.6.06 | Probation Periods |
| 7.6.07 | Posting Requirements for Vacancies |
| 7.6.08 | Certification of Position Descriptions |
| 7.6.09 | Reasons for Discipline |
| 7.6.10 | Progressive Discipline |
| 7.6.11 | Disciplinary Actions |
| 7.6.12 | Investigative Administrative Leave |
| 7.6.13 | Personal Grievances |
| 7.6.14 | Suspension, Demotion, Termination – Appeal and Hearing |
| 7.6.15 | Fitness for Duty Evaluation |

## 7.7 Workforce Development

| | | |
|---|---|---|
| 7.7.01 | Performance Appraisal |
| 7.7.02 | Training and Development Program |
| 7.7.03 | Tuition Reimbursement |

# Introduction

**Policy Number: 7.0.0**
**Effective Date: January 1, 2007**

The Human Resources Policies and Procedures contained herein summarize the personnel policies and procedures for all employees of Bexar County.

Nothing in these Policies and Procedures is intended to create a contract, either expressed or implied, between Bexar County and its employees for either employment or any benefit. All of the Policies and Procedures herein are subject to the continuing approval of Bexar County Commissioners Court. If any ambiguity arises as to the meaning or interpretation of these Policies and Procedures, the ambiguity is resolved in favor of the County.

The Policies and Procedures shall apply to all pertinent situations from the time of its adoption. Commissioners Court may alter, eliminate, or add to any of the provisions of the Policies and Procedures at any time and for any reason, and such alterations, eliminations, or additions shall apply to all pertinent situations from the time of their inception.

For those offices and departments that may be governed by a separate board or appointed authority, these Policies and Procedures will serve as a guideline unless the appropriate authority elects to bind its employees to these policies.

The Policies and Procedures will be available to all employees on the Bexar County Intranet, and a printed copy of the Policies and Procedures will be maintained by the Human Resources Division.

TR-0355

# BEXAR COUNTY DEPARTMENT OF HUMAN RESOURCES

## Employment Policies

7.6.01          **Equal Employment Opportunities**

7.6.02          **Pre-Employment Screening**

7.6.03          **In-Processing New Employees**

7.6.04          **County Identification Cards**

7.6.05          **Nepotism**

7.6.06          **Out-Processing Exiting Employees**

7.6.07          **Americans with Disabilities Act (ADA)**

# Policy No. 7.1.01

## Equal Employment Opportunities

**Effective Date: September 1, 2009**

Bexar County provides equal employment opportunities (EEO) to all employees and applicants for employment without regard to race, color, ethnicity, national origin, citizenship, gender, age, religion, political affiliation or beliefs, physical or mental disability, pregnancy status, veteran status, or any non-merit factor (except where such is a bona fide occupational qualification) in accordance with applicable federal, state, and local laws governing non-discrimination in employment.

This policy applies to all terms and conditions of employment, including, but not limited to, recruitment, hiring, selection, placement, promotion, demotion, termination, layoff, rehire, benefits, transfer, leaves of absences, compensation, and training.

Bexar County expressly prohibits any form of unlawful employee harassment based on race, color, religion, gender, national origin, age, disability, pregnancy status, or veteran status. Improper interference with the ability of County employees to perform their expected job duties is absolutely not tolerated.

The County's designated person for issues concerning Equal Employment Opportunity is the HR Manager. The HR Manager can be contacted at 211 S. Flores Street San Antonio, TX. 78204, (210) 335-2545.

A Workforce Report and an Equal Employment Opportunity Plan and Policy are completed by the Human Resource Department staff biannually. A copy of the report is issued to offices and departments along with appropriate guidelines to assist hiring authorities in reaffirming the County's commitment to providing equal opportunity to all employees and applicants.

# Policy No. 7.1.02

# Pre-Employment Screening

## Effective Date: January 1, 2007

In order to create a safe and secure workplace and to ensure that Bexar County employees are qualified to perform the jobs for which the County hires them, the County will conduct pre-employment screening for all employees.

## Verification of Eligibility to Work in the United States
## (Immigration Reform & Control Act of 1986)

The County requires the verification of eligibility for all employees to work in the United States. All new employees must complete an I-9 Form and provide proof of employment eligibility. Human Resources will ensure that all new employees complete an I-9 Form and provide proof of employment eligibility as required by the I-9 Form. Acceptable forms of proof of employment eligibility are provided on the I-9 Form and include birth certificate, social security card, driver's license or student identification card.

## Failure to Provide Proof of Employment Eligibility

If an employee cannot present proof of eligibility to Human Resources on the employee's first day of employment or within three (3) days of employment, then proof of application for the documents must be presented to Human Resources within three (3) working days. If an employee submits proof of application, the grace period will be extended to 90 days. At the end of 90 days, proof of eligibility must be presented. If not, failure to provide the documentation as required under the Immigration Reform & Control Act of 1986 will result in immediate dismissal. Any material misrepresentation of facts or failure to report pertinent data on the application form will also result in immediate dismissal.

## Pre-Employment Physical

Prior to beginning employment, all employees must be scheduled for a pre-employment physical. Offices and departments must contact the Human Resources Division to schedule pre-employment physicals for all employees.

Pre-employment physicals are conducted through an external agency. An employee who does not successfully complete the pre-employment physical may not continue with in-processing procedures.

TR-0358

## Professional License and Educational Checks

When a position requires an employee to have a professional license or certification in order to perform the job, Human Resources is available to assist in verifying such license or certification at the request of the hiring office or department.

## Mandatory Drug Screening for Safety-Sensitive Positions

Employees filling safety-sensitive positions are required to submit to a controlled substance test and alcohol test prior to filling the position. Safety-sensitive positions are identified as such on the applicable position description for each office and department. The hiring office or department must inform applicants and employees if they are being considered for a safety-sensitive position. Any applicant for a safety-sensitive position who refuses to submit to a drug screening is disqualified from employment with Bexar County.

## Other Pre-Screening Checks

Any other pre-screening checks, such as a criminal background check or a motor vehicle record check, will be conducted at the discretion of the hiring office or department.

# Policy No. 7.1.03

## In-Processing New Employees

**Effective Date: January 1, 2007**

Bexar County wants to ensure that all newly hired and re-employed individuals are promptly informed about the County's benefits program and human resources policies and procedures. To avoid any unnecessary delay in signing up for benefits and providing all required payroll information, the hiring office or department must ensure that all new employees report to Human Resources on their first day of work. The hiring office or department must ensure that the employee presents the original status form to Human Resources on their first day of work.

During in-processing, Human Resources will provide the employee with information relating to the County's benefits programs and insurance enrollment forms, as well as payroll information regarding retirement, social security, withholding taxes and other related information. The employee's photograph will be taken at that time to be placed in the employee's file maintained by Human Resources and used for a County Identification Card, unless the hiring office or department produces a separate Identification Card.

The hiring office or department should inform the employee if there are additional in-processing procedures that will take place within the office or department.

## Employee Orientation

The County expects that all offices and departments will encourage new employees to attend Employee Orientation provided by Human Resources. At Orientation, employees will learn about the history of Bexar County, County personnel policies and procedures, applicable state and federal laws, safety and security awareness, computer security policies, and other employee programs offered by the County. Enrollment for insurance coverage will also take place during employee orientation to ensure that new employees do not lose their opportunity to enroll in insurance programs.

An orientation date will be provided to the employee at the time of in-processing. Offices and departments must contact Human Resources to schedule employees for orientation.

# Policy No. 7.1.04

## County Identification Cards

**Effective Date: January 1, 2007**

In order to create a safe and secure workplace, Bexar County provides photo identification cards for all employees. Each employee is required to carry their County Identification Card ("ID card") and have it readily available during working hours for presentation at security check points or when asked to produce identification.

> ➢ Employees shall not give or lend this card to another individual.

> ➢ It is a violation of policy to use this ID card to allow another person entry or exit from County buildings or other County property.

ID cards are furnished by Human Resources. Human Resources will photograph all new employees and prepare the ID cards. A copy of the photograph will be kept in their personnel file maintained by Human Resources.

Office and departments which provide their own identification cards shall notify Human Resources to prevent duplicate cards from being made and issued.

## Replacing Lost/Damages Cards

A new ID card will be issued at no cost when the original card is damaged and returned. A fee will be charged to replace lost or stolen ID cards. If a new ID card is issued and the old card is recovered, the old card must be surrendered to the Human Resources Division.

# Policy No. 7.1.05

## Nepotism

**Effective Date: January 1, 2007**

No person may work in an office or department where he or she would be related to the department head, elected/appointed official or supervisor within the second degree of affinity (marriage) or within the third degree of consanguinity (blood relation) who will be directly or indirectly under his/her supervision. This paragraph is consistent with the standards set out by Texas State law (V.T.C.A. Government Code Chapter 573 "Degrees of Relationship: Nepotism Prohibitions").

An employee's relative in the first degree includes parents and children. An employee's relative within the second degree includes brothers, sisters, grandparents and grandchildren. An employee's relative within the third degree includes great-grandparents, great-grandchild, an aunt who is a sister of a parent of the employee, an uncle who is a brother of a parent of the employee, a nephew who is a child of a brother or sister of the employee, or a niece who is a child of a brother or sister of the employee Each individual office and department will be responsible for addressing violations of nepotism and preventing occurrences.

# Policy No. 7.1.06

## Out-Processing Exiting Employees

**Effective Date: January 1, 2007**

Upon separation from employment with Bexar County under any circumstance, offices and departments shall ensure that employees turn in all County property and equipment (e.g., keys, car, cellular phone, computer, pager, radio, identification cards, etc.) that they have in their custody before receiving their final pay. If applicable, the property and equipment collected shall be returned to the office or department from which it was issued. The County will take all necessary steps to collect any money owed by the employee and to obtain the return of County property and equipment.

## Exit Survey

Upon separating from employment with Bexar County, offices and departments may direct their employees to the Human Resources Division to conduct an exit survey. Information obtained from the exit survey is used to improve working conditions and retain employees.

TR-0363

## Americans with Disabilities Act (ADA)

**Effective Date: September 1, 2009**

It is the policy of Bexar County to abide by all provisions of the Americans with Disabilities Act. Bexar County will not discriminate against any individual who satisfies the skill, experience, education, and other job-related requirements of the position sought or held, and can perform the primary job tasks of the position, with or without reasonable accommodation.

No mental or physical disability will be considered as a factor in satisfactorily performing a job/task except for those which are critical to the performance of such task.

The County Human Resource Manager acts as the ADA Coordinator for all employment related (Title I) ADA issues. The ADA Coordinator can be contacted at 211 S. Flores Street, San Antonio, Texas 78204, (210)335-2545.

ADA issues related to public access (Title II) are addressed in Bexar County Administrative Policy 2.7.01, ADA Notice and Complaint Procedure.

# BEXAR COUNTY DEPARTMENT OF HUMAN RESOURCES

## Compensation Policies

| | |
|---|---|
| 7.2.01 | **Paydays** |
| 7.2.02 | **FLSA, Compensatory and Discretionary Time** |
| 7.2.03 | **Creating Positions** |
| 7.2.04 | **Position Descriptions** |
| 7.2.05 | **Filling Vacancies** |
| 7.2.06 | **Promotion and Temporary Promotion** |
| 7.2.07 | **Position Classifications and Requests for Changes** |
| 7.2.08 | **Transfers** |
| 7.2.09 | **Personnel Status Change Request (Status Forms)** |
| 7.2.10 | **Longevity Pay** |
| 7.2.11 | **Demotion** |

TR-0365

## Policy No. 7.2.01

## Paydays

**Effective Date: January 1, 2007**

Pay checks or Notifications of Deposit (for those with direct bank deposit) for employees are distributed to the offices and departments on the 15th and the last day of each month. If the 15th or the last day of the month falls in a Saturday, Sunday or County holiday, pay checks or notifications of deposit will be distributed on the last workday prior to that day. For example, if the 15th falls on a Saturday, them the payday will be on Friday, the 14th. If the last day of the month falls on a Monday which is a County holiday, then the payday is the previous Friday.

**Changes to Pay, Withholding Exemptions, Direct Deposit**

Employees are required to immediately report any error of underpayment or overpayment in their pay to the County Auditor's Office.

Any changes in federal withholding exemptions or direct deposit information should be made with the County Auditor's Office.

TR-0366

**Policy No. 7.2.02**

**FLSA, Compensation & Discretionary Time**

**Effective Date: January 1, 2007**
                         **(Revised July 10, 2007)**

The Fair Labor Standards Act (FLSA) is administered by the Department of Labor to prescribe standards for the basic minimum wage and overtime pay.

## Definitions

*Non-Exempt Positions*- Positions that do not meet the criteria under the FLSA standard exemption test to be determined an exempt position.

*Exempt Positions* – Positions determined to be a bona fide Executive, Professional, Administrative or Computer position as determined by the FLSA exemption tests.

*FLSA time*- For employees in non-exempt positions, overtime hours for each period of time actually worked in excess of forty (40) hours in a workweek.

*Compensatory time* – For employees in non-exempt positions, overtime hours in a workweek that do not exceed forty (40) hours actually worked for that week.

*Discretionary time* – For employees in exempt positions, overtime hours worked in excess of the scheduled number of hours for that workweek.

## Non-Exempt Positions-FLSA and Compensatory Time

All full-time regular employees are required to work no more than 40 hours a week except in cases of emergency as determined by each office and department. The FLSA considers all positions non-exempt unless the position is exempted by an FLSA exemption test.  The Planning and Resource Management Department (PRM) determines the FLSA status following the FLSA standard exemption tests for each position.

Overtime hours are calculated according to the exemption status. For employees in non-exempt positions, time shall be calculated as follows.

➢ Time and one half (1 ½) for each period of time actually worked in excess of forty (40) hours in a workweek. This time is accrued as FLSA time.

   **Example:** An employee in a non-exempt position works 42 hours in a 40 hour workweek. The two additional hours will be adjusted by 1 ½ for a total of three hours, or, three hours FLSA time.

➢ Any overtime hours worked in a workweek that do not exceed 40 hours actually worked will be calculated on an hour-for-hour basis and is accrued as Compensatory time.

16
TR-0367

**Example:** An employee in a non-exempt position works an additional hour on Monday for a total of nine hours that day. The employee works eight hour days on Tuesday, Wednesday and Thursday for a total of 33 hours Monday through Thursday. The employee utilizes available accrued leave on Friday. The overtime worked on Monday is credited as one hour compensatory time. It does not qualify as FLSA time since actual hours worked in the week was less than 40 hours.

## Maximum Accrual

The maximum accrual of FLSA time for employees in non-exempt positions is 240 hours (160 overtime hours worked). Employees in non-exempt public safety positions may accrue up to 480 hours of FLSA time (320 overtime hours worked). Employees with FLSA time over the maximum accrual are eligible for payment of the excess amount.

## Reporting FLSA Accruals

In order to assess the number of non-exempt employees approaching the maximum FLSA accrual limit, each month an FLSA report will be submitted to Commissioners Court identifying non-exempt employees with accrued FLSA balances between 199 and 240 hours for non-public safety positions and balances between 439 and 480 hours for public safety positions. Offices and departments with employees approaching the maximum FLSA limits are encouraged to take appropriate action to reduce such balances.

## Separation- Employees in Non-Exempt Positions

Employees in non-exempt positions who retire, resign or otherwise separate employment with Bexar County are eligible to be paid for their FLSA and Compensatory time at the time of separation. Employees in non-exempt positions may request to use their FLSA time and compensatory time balances, upon notice of separation, immediately prior to their last day of employment if approved by the office or department , but in no event will more than 240 hours of accrued FLSA and compensatory time be permitted to be used at separation.

## Exempt Position and Discretionary Time

The Human Resource department determines the FLSA status following the FLSA standard exemption tests for each position. Employees in exempt positions are not eligible to earn compensatory or FLSA time. Time actually worked in excess of the scheduled number of hours per workweek by an employee in an exempt position is called discretionary time and is earned on an hour-for-hour basis.

For employees in exempt positions, time shall be calculated as follows:

> ➢ Any overtime hours worked in excess of the scheduled number of hours for that workweek will be calculated on an hour-for-hour basis and accrued as Discretionary time.

## Maximum Accrual

The maximum annual accrual of discretionary time for employees in exempt positions is 240 hours.  Any discretionary time earned in excess of 240 hours will be forfeited on June 1st of every year.

## Balances in Excess of Maximum Accrual

The maximum annual accrual for employees in exempt positions with a discretionary time balance in excess of 240 hours on the effective date of this policy is that higher amount. Any discretionary time earned in excess of that higher maximum will be forfeited on June 1st of every year, beginning June 1, 2007. These individual maximums will be reduced if a lower discretionary time balance exists on June 1st of every year until the remaining balance is at or below 240 hours, at which time the 240-maximum shall apply.

**Example:** Jim is in an exempt position with a discretionary time balance of 400 hours on the effective date of this policy. He is permitted to have a maximum annual accrual of 400 hours on the following June 1st. Jim may continue to accrue discretionary time during the year, but on June 1, 2007 his balance will be reduced to 400 hours. If, on June 1, 2008 Jim's discretionary time balance is 300 hours, this becomes his new maximum annual accrual amount. Continuing with the example, if Jim subsequently earns over 300 hours of discretionary time, on June 1, 2009 his discretionary time balance will continue to be reduced to 300 hours. This process of reducing the maximum annual accrual amount will continue for every employee in an exempt position with current accruals over 240 hours until all employees in exempt positions have a discretionary time balance at or below 240 hours.

## Separation-Employees in Exempt Positions

Employees in exempt positions who retire, resign or otherwise separate employment with Bexar County are not eligible to be paid for discretionary time at time of separation. However, employees in exempt positions may request to use their discretionary time balances, upon notice of separation, immediately prior to their last day of employment if approved by the office or department, but in no event will more than 240 hours of accrued discretionary time be permitted to be used at separation.

## Compensable Time (Work Time)

1. *Work Week*
   The County work week is normally seven consecutive days beginning at 12:00 a.m. on Saturday and ending at 11:59 p.m. on Friday. The typical schedule for regular full-time employees consists of eight-hour shifts from 8:00 a.m. to 5:00 p.m. on Monday through

Friday. Any exceptions to this policy must be approved by the individual office or department and must remain in accordance with the Fair Labor Standards Act.

2. *Lunch and Breaks*
The County provides full-time employees with a one-hour unpaid lunch. Two paid 15 minute breaks daily may be scheduled at the discretion of the office or department based on business necessity. Lunch and breaks for part-time employees is determined by the office or department.

3. *Training Time*
When an office or department requires or permits an employee to attend training during the employee's regular work hours, the time is compensable time.

If the training is outside of regular working hours, voluntary, and not directly related to the employee's job, then the time is not considered compensable time.

4. *Travel Time*
   ➢ *Travel during the work day*. The employee commute to and from the work site is not considered compensable under travel time.

   ➢ *Out of County travel - single day*. Travel time for an out-of-County trip for a single day is considered hours worked (except for meal periods or time spent traveling from home to mode of public transportation, if applicable).

   ➢ *Overnight travel*. For travel time which involves an overnight stay, employees will only be compensated for their regular work hours, and not for overnight hours. Travel time on an airplane, train, bus or automobile outside of regular working hours is not counted as work hours.

   ➢ *Overnight out-of-town travel* is compensable time when it cuts across the employee's workday. This is true for hours worked on regular working days during normal working hours and during the corresponding hours on nonworking days. For example, an employee regularly works from 8 a.m. to 5 p.m. from Monday through Friday. The employee travels on business to a location that requires two hours of travel time. The employee leaves Friday at 8 a.m., works the remainder of Friday and Saturday morning, and returns on Saturday at 2 p.m. The two hours of travel time on Friday and the two hours of travel time on Saturday are compensable time.

5. *On-Call*
Any time spent responding to calls while on-call is hours worked.

Hours spent by employees "engaged to wait" is considered compensable time. "Engaged

to wait" means that the employee is required to stay on County premises or in close proximity so that the employee is not free to pursue their own interests.

Hours spent by employees "waiting to be engaged" is not considered compensable time. "Waiting to be engaged" means that the employee is on-call and may use time for their own purposes but is accessible by phone or pager.

# Procedures

## *Employee Responsibility*

1. Employees must request and receive approval from their office or department to work hours over 40 hours per week or to earn compensatory or discretionary time.

2. Employees must request and receive approval from their office or department in order to use FLSA, compensatory or discretionary time. Requests must be in one hour increments.

## *Office or Department Responsibility*

1. Offices and departments must ensure that employees get pre-approval to work more than 40 hours per week.

2. Offices and departments must ensure that all compensatory or discretionary work time is approved.

3. Offices and departments must ensure that employees are being compensated according to FLSA provisions.

4. Offices and departments shall grant all employees the opportunity to use accrued FLSA, compensatory or discretionary time within a reasonable period of time provided it does not unduly disrupt the operation of work within the office or department.

5. Offices and departments must ensure that proper time records for all employees are being maintained. Time-keeping records are subject to audit by the County Auditor and the U.S. Department of Labor.

## Accrual Chart

| Status | Type | Accrual Rate | Paid | Maximum Annual Accrual |
|---|---|---|---|---|
| Non-Exempt | FLSA (more than 40 hours per week) | 1:1.5 | Yes, at separation or if max is exceeded | 240 |
| | Comp (more than normal workday) | 1:1 | Yes, at separation | none |
| Non-Exempt - Public Safety | FLSA (more than 40 hours per week) | 1:1.5 | Yes, at separation or if max is exceeded | 480 |
| | Comp (more than normal workday) | 1:1 | Yes, at separation | none |
| Exempt | Discretionary | 1:1 | No | 240 |

## FLSA and Compensatory Payments

The Fair Labor Standards Act (FLSA) allows public employers to elect to make overtime payments at any time and not affect the subsequent granting of compensatory time off in future workweeks.

*This section is not applicable to members of the collective bargaining unit.*

### Buy Out – Change in Employment Exemption Status

Employees moving from a non-exempt position to an exempt position will be paid for all accrued FLSA and compensatory hours upon the effective date of the status change. If the move involves a change in office or department, the exiting office or department will be charged for the amount of the payment of overtime accruals.

**Buy Out – Movement to a New Office or Department**

Employees moving to a new office or department will be paid for all accrued FLSA and compensatory hours upon the effective date of the status change. The exiting office or department will be charged for the amount of the payment of overtime accruals.

**Buy Down – Exempt Employees**

For offices and departments with exempt employees with FLSA and compensatory balances, the offices and departments shall, during the month of June each year, submit a status form to the Auditor's Office requesting payment to buy down the FLSA and compensatory balances. The offices and departments shall submit requests sufficient to bring balances to their lowest point but not to exceed 200 hours per eligible employee. The Auditor's Office will pay the combined FLSA and compensatory time balances up to 200 hours per exempt employee per fiscal year. Once the payment has been made, the Auditor's Office will inform Human Resources so that corresponding adjustments to the employee's FLSA and compensatory time balances are made.

## Procedures for FLSA and Compensatory Payments

### *Office or Department Responsibility*

1. To reduce FLSA and compensatory balances, offices and departments may schedule employees to use or take accrued FLSA or compensatory time at specified times as directed to reduce account balances.

2. Offices and departments may require that FLSA time will be utilized *first*, compensatory time *second* and discretionary time *third* prior to utilizing any vacation leave.

3. Offices and departments must notify employees that their FLSA time earned as a non-exempt employee will be utilized *first* and compensatory time *second* prior to utilizing any discretionary time earned as an exempt employee.

4. Offices and departments with an employee moving from a non-exempt position to an exempt position must submit a status form to the Auditor's Office listing all FLSA and compensatory time balances for payment, effective the date of change. Payment will be deducted from the existing office or department's budget.

5. Offices and departments with an employee moving to a new office or department must submit a status form to the Auditor's Office listing all FLSA and compensatory time balances for payment, effective the date of the change. Payment will be deducted from the exiting office or department's budget.

# Policy No. 7.2.03
# Creating Positions

**Effective Date: January 1, 2007**

A request from an office or department to create a position that does not currently exist in the County may be made during the annual budget process and by exception during the year. Commissioners Court must approve all positions authorized in the Bexar County Budget documents, or amendments to that document, including grant-funded positions.

## Types of Positions

*Regular* - A position authorized by Commissioners Court as either full-time or part-time. Full-time positions are scheduled to work at least 32 hours per week and Part-time positions are schedules to work less than 32 hours per week.

*Temporary* – A position paid for from temporary funds authorized by Commissioners Court during the annual budget process and not generally listed individually in the budget document. Temporary positions may either be full-time or part-time. Full-time positions are schedules to work at least 32 hours per week and part-time positions are schedules to work less than 32 hours per week. Individuals who occupy temporary positions may not work more than 900 hours per calendar year. Individuals filling temporary positions may not occupy the position for more than a twelve-month period.

*Job Share* - A single position filled by two employees who each work half the scheduled hours per month of a regular full-time position. Commissioners Court must authorize the conversion of a regular full-time position into a job share position and must authorize the conversion of the job share position back into a regular part-time position.

## Procedures

### During the Annual Budget Process

Offices and departments shall complete budget forms, Schedule D and Schedule E. These forms are available on the intranet site or by contacting Human resources. Completed Schedules must be submitted to Human Resources for review and analysis. The Human Resouse staff will classify the position, provide a cost estimate and draft a position description that will be forwarded to the office or department for review and approval.

If Schedule D and Schedule E are submitted during the annual budget process, no further action is required and the request will proceed under the budget process.

See Budget Manual for more details.

TR-0374

New positions approved during the budget process will be created in the County's Human Resources Information System (CHRIS system) as soon as possible.

## Outside the Annual Budget Process

If Schedule D and Schedule E are submitted outside of the annual budget process, Budget staff will notify the office or department of the recommendations and an agenda item must be prepared by the office or department for separate consideration by Commissioners Court.

Grant positions must be presented to the Grant Review Committee after analysis and prior to Commissioners Court approval.

Upon Commissioners Court approval, staff will have five (5) business days to create the position in the CHRIS system.

## Civil Service Designation

Any newly created position in an office or department that is covered by Civil Service will have Civil Service status unless the office or department requests that Commissioners Court designate the position as sensitive.

If Commissioners Court designates a position as sensitive, the office or department must submit a request to the Civil Service Commission that the position be exempted from Civil Service.

# Policy No. 7.2.04

## Position Description

**Effective Date: January 1, 2007**

New Position descriptions or changes to existing positions descriptions for positions authorized by Commissioners Court require approval by Human resources.Position description for positions covered by civil service also require certification by the Civil Service Commission.

**Proposed Position Descriptions**

Each office or department must prepare a proposed written description of the duties and responsibilities for each position that is established or changed within their office or department. The proposed position description should be forwarded to the Compensation Section of Human Resources who will prepare the final Positions Descriptions.

**Contents of a Position Description**

A position Description consists of the following:

- ➤ Primary duties of the position ranked in order of the most important and most frequently performed to the least important and the least frequently performed.

- ➤ Responsibilities of the position which will affect the qualifications required to perform the work.

- ➤ Qualification requirements which will in part be determined by the responsibilities and duties; and

- ➤ The level of discretion and independent judgment with respect to matter of significance required to perform the duties of the position.

While offices and departments may provide recommendations in these categories, final determination will be made by the Compensation Section of Human Resources.

## Maintenance or Accurate Descriptions

Offices and departments are requires to maintain and review all position descriptions periodically to help ensure that the proper classification of positions is maintained. If the duties of positions or the mission of an office or department change, position descriptions should be changed to reflect current operations. All proposed changes must be reviews and approved by the Compensation section. Positions covered by Civil Service will also require approval by the Civil Service Commission.

# Policy No. 7.2.05
# Filling Vacancies

**Effective Date: January 1, 2007**

Bexar County encourages all offices and departments to fill vacancies through competitive procedures. Regardless of civil service status, an office or department has the authority to determine the manner in which a vacancy will be filled. The office or department may rehire a qualified person with rehire eligibility based on civil service status, may promote a qualified employee, choose to demote an employee; select from a certified list of eligible persons provided by the Civil Service Commission or fill the position by reassignment or transfer of a qualified County employee.

The office or department may recruit internally within the office or department or choose to recruit outside the office or department. Posting requirements and procedures for civil service positions are listed in Policy Number 7.6.07. Any office or department that is filling a vacancy, regardless of civil service status, may request to use the same posting procedures and screening process used by Civil Service.

# Policy No. 7.2.06

## Promotions and Temporary Promotions

**Effective Date: January 1, 2007**

## Promotion

A promotion is defined as the movement of an employee from one classification to another classification with a higher pay grade. If movement is from one pay table to another pay table and the midpoint of the new grade is at least 8% higher, the movement is also considered a promotion.

## Determining Basic Eligibility

All candidates who meet the minimum qualifications may be eligible for promotion. Qualifications for a position may not be modified after the promotion process has begun unless an inappropriate standard has been used through error or a revised standard of the position description requirements has been approved by the appropriate authority.

## Increase in Pay

Promoted employees are eligible to receive an increase in base pay. The increase would affect the employee's pay in one of the following ways to be determined by the hiring authority:

1. Promoting to Minimum New Pay Grade or 8% Increase

   Increase employee's base pay to minimum of the new pay grade or increase base pay by an amount of 8% of their current salary, whichever is greater;

2. Promoting Above Minimum

   The employee exceeds the minimum requirements for the position if the candidate selected for promotion has additional education, experience or certification/skills to warrant a higher starting salary. "Hiring/Promoting above the Minimum" Forms must be completed with a copy submitted to the Compensation Section.

   a. **Minimum to discretion Point**. An office or department has the authority to set the salary for the candidate selected for promotion at any point between the minimum of the pay grade and the "discretion point," without prior approval by Human Resources.

   b. **Midpoint**. With Human Resources approval, the office or department may set the salary for the candidate selected for promotion as high as the midpoint of the pay grade.

TR-0378

c.  **Available funds**. The office or department must have funds available to set a salary above the minimum of the pay range.

## Temporary Promotions

An office or department may make a temporary promotion. Temporary promotions are generally the most appropriate means of meeting a situation requiring the temporary service of an employee in a higher-grade position and typically used when a position is in a long-term vacancy status such as unpaid leave of absence or extended military leave. Temporary promotions are not appropriate, however, primarily for training or evaluating an employee in a higher-grade position.

### *Duration*

A temporary promotion may end at any time at the discretion of the office or department. A temporary promotion that is expected to last more than 120 days must follow policy 7.2.05 Filling Vacancies, and thereafter may be extended to one year with a two year maximum, if circumstances require; if policy 7.2.05 Filling Vacancies is not used, a temporary promotion is limited to 120 days or less. If additional time is needed for a temporary promotion, a request may be submitted to Commissioners Court or the Civil Service Commission, as appropriate, for approval.

### *Notice and Documentation*

The office or department must notify the employee in advance and in writing that the promotion is a temporary promotion, the reasons that make it a temporary promotion and that the employee will be returned to their regular position one the temporary probation period had expired.

## Status Form

The office or department must complete and submit an original status form reflecting any promotion to the Auditor's Office with copy to be provided to the Human Resource Division,

# Policy No. 7.2.07

## Position Classification and Request for Changes

**Effective Date: January 1, 2007**

Bexar County has a classification system for sorting positions according to similarities and differences in duties, responsibilities and qualification requirement. Under this classification system, positions are first sorted into occupational groups and each of these groups is divided into series of classes. Each series is then divided into classes and each class placed in it appropriate grade.

- ➢ Classification is defined as the process of comparing the duties and qualifications of a position

  And assigning the position to the appropriate category (job), title (position) and pay grade (level).

- ➢ Grade is defined as all classes of positions which are sufficiently equivalent in level of difficulty and responsibility, and level of qualification requirements of work.

Human Resources are responsible for maintaining the classification system and for recommending any changes to the classification or grade of a position.

## Request for Changes

A change in the grade of a position is called a Re-Grade and a change in a position due to new and fundamentally changed duties being performed is called a Reclassification. All Re-Grades and Reclassifications must be approved by Commissioners Court.

### *Re-Grades*

Positions may be re-graded on a County-wide basis based on the results of market studies conducted by Human Resources. While re-grade request may be submitted at any time, they are generally considered only during the budget process unless an immediate business necessity exists.

Offices or departments must submit a request to Human Resources to re-grade a position. Such as the uniqueness of the position and the current market conditions. Human Resources will coordinate and notify offices and departments regarding analysis and recommendations of proposed re-grades to a position.

## *Reclassifications*

Positions reclassifications may occur when fundamental changes in the position duties have occurred over time and are the result of planned business changes, organizational restructuring or changes in a program mission. Reclassifications will only occur when a position's job responsibilities have changed significantly in level and/or scope over an extended period of time compared to the duties listed on the position description.

Offices and departments may submit reclassification requests at any time during the year but will be considered for approval during the annual budget process. The reclassification request should be made by completing a Schedule F (available through Human Resources) and submit the completed schedule along with any supporting documentation to the Compensation Section of Human Resources.

The Compensation Section may Contact the office or department to conduct a position audit with the incumbent employee.

If the Compensation Section determines that a reclassification is merited, they will calculate the employee's new salary based on the current method of range penetration and perform a cost analysis and determine funding for the recommended action.

## Status Form

The office or department must complete and submit an original status form reflecting any changes in grade or classification of an employee's position to the Auditor's Office with a copy to be provided to the Human Resources.

# Policy No. 7.2.08
# Transfers

**Effective Date: January 1, 2007**

A transfer is defined as the lateral movement of an employee from one classification to another classification with the same pay grade, or when the difference between the current midpoint and the midpoint of the new position is less than*%. The employee selected for the vacancy must meet the minimum qualifications of the position.

> ➤ Transfers between offices and departments require adherence to Policy 7.2.05 Filling Vacancies.

> ➤ Transfers within an office or department do not require adherence to Policy 7.2.05 Filling Vacancies.

Transfers are not disciplinary actions and are to be done at the discretion of the office or department according to their business needs.

## Status Form

The office or department must complete an original status form reflecting any transfer to the Auditor's Office with a copy provided to the Human Resource Division.

TR-0382

# Policy No. 7.2.09

## Personnel Status Change Request

### Effective Date: January 1, 2007

A personnel status change refers to any change that affects the title, table, grade, salary, or fund of a position and an employee. All personnel status changes must be submitted to the Auditor's Office on a Status Form. All original Status Forms are submitted to the Auditor's Office for processing, with a copy provided to Human Resources.

### Future Changes Only

Status changes are effective on the first day of the pay period in which the Status Form is submitted to the Auditor's Office or for a future pay period. Status Forms may not be effective retroactively for prior pay periods.

### Employee Movement between Offices and Departments

*Any Employee* who moves from their current office or department to a new office or department in the County must notify the existing office and the incoming office or department of the employee's current position and the future position. Either offices or departments should coordinate regarding a transfer date.

*Existing office or department* is responsible for notating on a Status Form that the employee is transferring to another County office or department and that the employee must be removed from their payroll.

*Incoming office or department* is responsible for submitting a Status Form placing the employee into their new position with the correct position information and salary.

### Failure to Complete a Status Form

Failure to timely submit a Status Form may result in an employee's loss of benefits for 60 days, the premature payment of leave balances which then zeroes out those balances, and the loss of seniority benefits accrual.

# Policy No. 7.2.10

# Longevity Pay

## Effective Date: January 1, 2007

Bexar County has established Longevity Pay to recognize employees for their continued service with the County. Longevity Pay is awarded monthly to all regular, full-time employees, excluding Elected Officials, in the amount of $60 per year, for each full year of continuous employment as of September 30th up to a
maximum of 25 years. Increases are effective on the first payday in November. Temporary employment with the County will be credited if there is no break in service prior to becoming a regular, full-time employee.

## Forfeiting Longevity Time

Employees who voluntarily terminate their employment with the County but return at a later date forfeit all longevity time previously credited and will commence as a new employee except as described below.

## Reinstating Longevity Time

### Involuntary Termination
Longevity time will be reinstated when the break in service is within five (5) years and the result of involuntary termination was caused by a change in administration or loss of funding for a program, department or office.

### Voluntary Termination
Longevity time will be reinstated when the break in service was voluntary and the employee returns within sixty (60) days, provided that the employee resigned in good standing.

# Policy No. 7.2.11

## Demotion

**Effective Date: January 1, 2007**

A demotion is defined as the movement of an employee from one classification to another classification with a lower pay grade. If movement is from one pay table to another pay table and the midpoint of the new grade is at least 8% lower, the movement is also considered a demotion. A demotion may be voluntary, involuntary, or the result of disciplinary action.

## Decrease in Pay

Demoted employees will receive a decrease in base pay. The decrease will be determined by the hiring authority, and the employee's new base pay will be either 8% less than their current salary or the maximum of the new grade, whichever is lower.

## Notice of Demotion

The office or department must notify the employee of the demotion in writing prior to the effective date. The letter should include the employee's new position description, notification that their base salary will be decreasing and the date it will be decreasing.

## Involuntary Demotion

An involuntary demotion is not initiated by the employee and may be the result of changes to the organizational structure. Employees demoted as a result of an organization restructure will maintain their current pay at the time of the demotion for one year. After one year, the new base pay will be reduced by either 8% less than their current salary or the maximum of the new grade, whichever is lower. If an employee is involuntarily demoted as a result of a disciplinary action, refer to Policy 7.6.11 Disciplinary Actions.

The Auditor's Office should contact Human Resource for the calculation of the new salary. Human Resources will notify the office or department regarding the new salary, and the office or department must notify the employee of the new salary.

## Voluntary Demotion

A voluntary demotion is initiated by an employee who applies for or requests to fill a position in a lower grade and is selected. Employees who are selected for a position in a lower grade will have their base salary reduced to either 8% less than their current salary or the maximum of the new grade, whichever is lower.

## Status Form

The office or department must complete and submit an original status form reflecting any demotion to the Auditor's Office with a copy to be provided to the Human Resources Division.

# BEXAR COUNTY DEPARTMENT OF HUMAN RESOURCES
## Benefits Policies

7.3.01          **Benefits Programs**

7.3.02          **Retirement**

7.3.03          **Family and Medical Leave Act**

7.3.04          **Worker's Compensation**

7.3.05          **Modified Duty**

7.3.06          **Voluntary Reduced Time Schedules**

7.3.07          **Employee Assistance Program**

7.3.08          **Flexible Spending Accounts**

7.3.09          **VIA Transport Program**

TR-0386

## Policy No. 7.3.01

# Benefits Programs

**Effective Date: January 1, 2007**

The County offers Group Insurance Programs on a voluntary basis to eligible employees, retirees, and their dependents. While it is expected that benefits will continue, Commissioners Court reserves the right to change the insurance programs or discontinue them at any time.

Determination of eligibility and details of the Group Insurance Programs may be obtained by contacting Human Resources at 335-2545. Group insurance programs offered include:

- ➢ Health insurance
- ➢ Dental insurance
- ➢ Vision care insurance

## Enrollment

Offices and departments shall ensure that all newly hired or rehired regular employees attend New Employee Orientation at their first opportunity following their first day of employment. An overview of the insurance programs offered to employees is discussed at that time. New Employee Orientation is held at the Bexar County Training Center, located at 232 Iowa Street. Offices and departments must contact Human Resources to schedule employees for orientation.

All regular full-time employees working a minimum of 32 hours per week are eligible to enroll in the group insurance program of their choice. Eligible employees must enroll in the group insurance programs of their choice within 31days of hire.

Employees in a job-share program are also eligible to enroll in the group insurance program of their choice but must contact Human Resources to determine cost for each person in the job share. Enrollment in group insurance programs of their choice must be made within 31 days of hire.

- ➢ Employees with 30 days of continuous service in a part-time or temporary position immediately prior to becoming a full-time regular employee are eligible to enroll in the group insurance program of their choice on the date of the status change.

The effective date for group insurance coverage for newly hired, rehired and newly eligible regular employees, including elected and appointed officials, will be the first day of the calendar month following 30 days of employment, provided that enrollment materials have been properly completed and submitted to Human Resources.

TR-0387

> If an elected or appointed official was insured by the County as an active employee or retiree on the day prior to the first day of the official's term or the official's first day in office, coverage will begin on the first day in office.

The effective date for dependents is as follows:

> The date the employee or retiree is eligible for coverage, if he or she has dependents who are also eligible for coverage on that date; or

> The date of the employee's marriage for any dependent acquired on that date; or

> The date of birth of the employee's natural-born child; or

> The date a child is placed for adoption under the employee's legal guardianship, or the date which the employee incurs a legal obligation for total or partial support in anticipation of adoption; or

> The date a covered employee's child is determined to be eligible as an alternate recipient under the terms of a medical child support order.

The coverage selected will remain in force until the next open enrollment period. Employees may not change their coverage before that time, unless their family situations change by means of marriage, divorce, death of a spouse or child, birth, adoption or change in dependent status of a child, or a change in spousal employment. Consequently, employees may not add or delete dependents or change insurance coverage, except during open enrollment or as outlined above.

## Coordination of Benefits

Employees and eligible dependents who are insured with any Bexar County Medical Plan must complete and submit a Coordination of Benefits Form to the insurance carrier or contact their customer service department with information regarding any other medical coverage information. This will prevent duplication of coverage, which may result in cost increases for medical coverage. Coordination of Benefits is coordinated with benefits provided by other plans under which you or your dependent are also covered and does not apply to any individual policies. Additional information can be obtained in Human Resources or in your Summary Plan Description for your medical plan.

## Double Coverage Prohibited

No individual may be simultaneously covered as both an employee or a retiree and a dependent. If both parents are eligible for coverage, only one may enroll for dependent coverage.

## Benefits Continuation

The Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) provides for continuation of medical, vision and dental coverage for covered participants should a qualifying employee or dependents covered under the plan become ineligible for coverage as a result of the employee's termination or death, a divorce or legal separation of employee and spouse, or the employee's dependent child ceases to be a dependent child under the applicable requirements of the plan.

Regular full-time employees may continue their participation in group insurance programs during an approved leave of absence, providing arrangements are made in advance with Human Resources. Employees in an unpaid status are responsible for paying the County's portion as well as the employee portion in order to continue coverage. If the employee is in an FMLA status or receiving Worker's Compensation benefits, only the employee premium is required to continue coverage. Employees who retire in accordance with the provisions of the Texas County & District Retirement System and who were covered as active employees under a group insurance program in effect at the time of retirement are eligible to retain certain insurance coverage.

## Additional Benefits

Employees may enroll in supplemental insurance plans such as Cancer, Critical Illness, Personal Accident, Short and Long Term Disability Insurance and additional Life Insurance.

## Life Insurance

Bexar County offers life insurance to regular full-time and part-time employees at 1 times the employee's salary up to $200,000. IRS regulation requires the County to include the cost of life insurance coverage above $50,000 as taxable income to the employee. Employees can also purchase additional life insurance policies through the County.

## Procedures

*Employee Responsibility*

1. Employees are responsible for paying required premium contributions for themselves and dependents.

2. Employees who are on approved periods of unpaid leave are responsible for making all premium payments directly to the County. Unless the employee is out on workers compensation or Family and Medical Leave (FLMA), the employee is responsible for paying both the employee premium and the County's contribution. If unpaid, coverage will end on the first of the month following 30 days of no payment.

3. Employees are responsible for making coverage changes during annual enrollment periods.

4. Employees must submit a Benefits Change Form along with the appropriate documentation to Human Resources within 31 days of the qualifying change in family status event.

*Retiree Responsibility*

1. Retirees are responsible for paying required premium contributions for themselves and dependents directly to the County. If unpaid, coverage will end on the first of the month following 30 days of no payment.

2. Retirees may only maintain coverage in the insurance plan in which they were enrolled at the time of retirement. Once removed from an insurance program, a retiree may not re-enroll.

3. Retirees may drop dependents at any time.

4. During an open enrollment period, retirees may only change benefit plan selections.

*Office and Department Responsibility*

1. Offices and departments should be familiar with and be able to refer employees to current Summary Plan Documents for details regarding all benefits plan offered to employees. Summary Plan Documents are available from Human Resources and the County's Intranet website.

2. Offices and departments are required to ensure that newly hired or re-hired regular employees attend New Employee Orientation. An overview of the County and the benefits offered to employees are discussed at that time.

## Fraud or Misrepresentation

Employees, retirees, and dependents who commit fraud or misrepresentation with regard to the use of group insurance plans could lose coverage as outlined in the respective benefit plan documents. In addition, the County will report all suspected cases of fraud to the District Attorney and seek appropriate action.

# Policy No. 7.3.02

# Retirement

**Effective Date: January 1, 2007**

The Texas County and District Retirement System (TCDRS) provides pension benefits for regular full-time and part-time County employees. Effective upon employment, County employees are automatically enrolled in TCDRS and contribute a mandatory seven percent (7%) of their annual salary to TCDRS. The County provides matching contributions at a 2 to1 ratio.

Retirement eligibility can occur when one of the following requirements are met:

- ➢ Age of 60 with 8 years of service
- ➢ Rule of 75 (age plus years of service equals 75)
- ➢ Any age with 20 years of service

Other benefits of the Bexar County Retirement Plan include a Survivor Annuity Death Benefit, a Military Service Benefit, and a Partial Lump Sum Payment Benefit. Information regarding retirement benefits can be obtained by contacting the Human Resources Division or attending a retirement seminar offered by the County Auditor's Office.

## Deferred Compensation Retirement Programs

Employees may register for additional 457 deferred compensation retirement programs any time during the year. Information regarding 457 deferred compensation retirement programs and providers is available from Human Resources.

TR-0391

# Family and Medical Leave Act

**Effective Date: January 1, 2007**
**(Revised January 26, 2010)**

**All FMLA Forms (PDF)**
**Listing of Individual Forms**

Bexar County (the County) is committed to providing Family and Medical Leave to eligible employees in accordance with the Family and Medical Leave Act (FMLA) of 1993 (as amended).

The FMLA prohibits any Bexar County employee, office, or department from: (a) interfering with, restraining, or denying the exercise of any right provided under the FMLA; and (b) discharging or discriminating against any person for opposing any practice made unlawful by FMLA or for involvement in any proceeding under or relating to FMLA.

This policy is intended to explain benefits available to eligible employees under the FMLA. It is not intended to create any rights to leave beyond those created by the FMLA. If an employee would like additional information on the FMLA, please contact your office/department's HR representative or HR Central.

Under federal law, this policy applies to all County offices and departments. If this policy deviates from federal law, the law supersedes this policy.

This policy is intended to serve as a general guide for the employee, supervisor, and office/department's HR representative. Definitions and supplemental documents begin on page 7. This policy and all forms are available on the internet at http://www.bexar.org

## I. FMLA Job Protections

The use of Family and Medical Leave shall not be considered negatively or held against the employee as it relates to performance appraisals, promotional considerations, or any other employment facts. Offices/departments shall not interfere with, restrain, or deny employees their rights under this policy; nor shall an employee be discharged or discriminated against based on the employee's use of FMLA or the filing of a grievance or charge related to this policy and the Family and Medical Leave Act. Offices/departments shall apply this policy equally to all employees and shall not grant greater leave benefits to one employee over another.

## II. Eligibility

An employee is eligible for Family and Medical Leave if they have been employed by the County for at least 12 months and have worked at least 1,250 service hours at the County over the previous 12 month period preceding the commencement of the leave.

## III. Qualifying Reasons

Under the FMLA, eligible employees may take up to 12 weeks of unpaid leave (paid leave must be taken concurrently when paid leave balances are available) within the designated 12 month period (see anniversary date/year definition) for any of the following:

1. For incapacity due to pregnancy, prenatal medical care, or child birth;

2. To care for the employee's child after birth or placement (for adoption or foster care);

3. To care for the employee's spouse, child, or parent, who has a serious health condition;

4. For a serious health condition that makes the employee unable to perform his or her job; or

5. For a qualifying exigency.

Eligible employees may take up to 26 weeks of unpaid leave (paid leave must be taken concurrently when paid leave balances are available) in the designated 12 month period (see anniversary date/year definition) for the following:

6. To care for a covered service member with a serious injury or illness (if the employee is the spouse, child, parent, or next of kin of the service member) and/or

7. To care for a veteran who is undergoing medical treatment, recuperation, or therapy for a serious injury or illness, who was a member of the Armed Forces (including members of the National Guard and Reserves) at any time during the 5 years preceding the date of treatment, recuperation, or therapy, and who is a the employee's spouse, child, parent, or the service member's next of kin.

## IV. Procedures

### Request for Leave

Requests for Family and Medical Leave must be made to the employee's immediate supervisor, providing as much notice as practicable. A Request for Family and Medical Leave form (Form A; attached) must be completed for each request for FMLA leave. Whenever leave is foreseeable or planned, an employee must notify his/her office/department and submit a Request for Family and Medical Leave form (Form A) 30 calendar days in advance of the effective date of the leave. For exigencies, unforeseeable, and/or emergency situations, an employee must comply with their office/department's normal call-in procedures and the Family and Medical Leave Request form (Form A) should be submitted as soon as practicable.

The employee and the office/department shall communicate and coordinate all matters involving an FMLA occurrence with each other.

**Designating FMLA Leave** It is the responsibility of the supervisor to preliminarily designate an employee's leave as FMLA qualifying and to give verbal notice of this preliminary designation to the employee. The supervisor may confer with HR Central, if necessary, in making this determination.

The Request for Family and Medical Leave form (Form A) and a Certification of Health Care Provider (Form B or Form C; attached) may be sent to the employee to help provide sufficient information when designating FMLA leave.

Preliminary FMLA designation must be based on information provided on the Request for Family and Medical Leave form (Form A), from information provided by the employee (written or verbal), or the employee's spokesperson if the employee is incapacitated (such as his/her spouse, adult relative, or doctor).

Offices/departments have the right to designate an eligible employee's Family and Medical Leave qualifying absences as part of an employee's 12 week entitlement of FMLA in the absence of direct employee communication. The employee must be notified by the office/department that he/she has been placed on FMLA by the office/department.

In certain circumstances, the supervisor may require additional information to make the determination that a leave qualifies as FMLA. Supervisors should not contact medical staff directly, but should coordinate through the office/department's HR contact or HR Central. HR Central may be contacted for additional assistance/information as needed.

It is also the responsibility of the supervisor to verbally notify the employee or the employee's spokesperson within five business days of the employee's request for leave that paid leave will be provisionally designated as FMLA leave.

The supervisor should notify the office/department's timekeeper once this verbal notice has been provided. The office/department will mail written notification to the employee's address of record. This written notification should be sent to the employee within 7 calendar days of the employee's request for leave.

The employee's supervisor may require the employee to contact him/her on a periodic basis regarding the employee's status and intention to return to work. The employee must be notified of such requirement in writing when the employee provides notice of the need for FMLA leave or when the employee is placed on FMLA by the County for a known FMLA qualifying reason.

**Emergency Situations**

Employees who have the sudden onset of a serious health condition for themselves, spouse, child, or parent and are not available to complete the necessary paperwork will have the absence automatically designated as FMLA leave. A notification letter and a Certification of Health Care Provider (Form B or Form C) will be mailed to employee's address of record within seven (7) calendar days of the FMLA leave designation. The Certification of Health Care Provider (Form B or Form C) must be completed by the employee's or family member's physician and

returned to the office/department's HR contact within 15 calendar days. Supervisors are responsible for notifying the office/department's HR contact of these emergency situations.

If an employee receives an "invitational travel order" (ITO) or "invitational travel authorization" (ITA) because of the immediate need for the employee to be at a covered service member's bedside, the submission of the ITO or ITA, in lieu of the Certification of Health Care Provider is sufficient certification for FMLA leave during the time period designated in the ITO or ITA. If the covered service member's need for care extends beyond the expiration date specified in the ITO or ITA, the employee must provide a Certification of Health Care Provider (Form C) for the remainder of the leave period.

**Medical Certification**

Employees shall be required to provide medical certification to their office/department designated representative as soon as practicable to support a request for FMLA leave. A Certification of Health Care Provider (Form B or Form C) may be used. Certification must support the need for the leave and set forth the beginning and expected ending dates of the leave. The certification must include:

1. a summary of medical facts pertaining to the qualifying family or medical event,

2. an estimate of the amount of leave time necessary to provide care or the anticipated schedule for medical treatments, and

3. an identification of the essential functions the employee is unable to perform due to the qualifying family or medical event.

A Certification of Health Care Provider (Form B or Form C) is not required when the serious health condition is due to a work-related injury.

Employees have up to 15 calendar days from the date of the initial request to submit the medical certification. Employees may request additional time to provide the medical certification due to special circumstances with proper and timely notice to the office/department. If an employee fails to provide any required certification within 15 calendar days, the County may deny leave until the certification is provided. If certification is submitted, but it is incomplete, the employee will be given seven calendar days to correct.

If additional information is needed, the office/department's designated representative (not the supervisor) may contact a health care provider to authenticate a medical certification. If requested, the employee must give permission for HR Central to contact the health care provider for clarification or to authenticate the certification, or the employee will forfeit their FMLA rights.

The County may require the employee to obtain a second opinion for medical certification except for certifications for covered service members. If a second opinion is requested, the County will cover the costs. Pending receipt of the second opinion, the employee will be provisionally entitled

to FMLA leave. In addition, the second opinion must be provided by a health care provider not employed on a regular basis by Bexar County.

If the initial and second opinions conflict, the County may request a third and final opinion. This opinion is final and binding and at the County's expense. The third opinion must be provided by a health care provider approved jointly by HR Central and the employee.

An employee may be required to submit subsequent certifications no more frequently than every 30 calendar days unless an extension or modification of leave is requested, changed circumstances occur regarding the serious health condition or information arises that questions the validity of the earlier certification. A new certification must be submitted every designation year.

If an employee requests to take FMLA leave in order to care for a family member, the employee may be required to provide reasonable documentation confirming a qualifying family relationship.

If the employee does not provide the requested medical certification within the identified timelines, FMLA job protections may be invalidated in accordance with the FMLA rules and this policy.

**Duration of Leave**

Eligible employees are entitled for up to a maximum of 12 work weeks (26 weeks for the care of a covered service member) during the 12 month period for a FMLA qualifying event. The 12 month period is defined by the anniversary date/year. Multiple reasons for FMLA leave within the same 12 month period are not eligible for additional 12 week entitlement.

An eligible employee who is the spouse, son, daughter, parent, or next of kin of a covered service member shall be entitled to a total of 26 weeks of leave during a 12 month period to care for the service member. The employee shall only be entitled to a total of 26 weeks for all FMLA qualifying events in any one 12 month period (see anniversary date/year).

Eligible employees scheduled to work 40 hour work weeks will be eligible for 480 hours (1040 hours for the care of a covered service member) of FMLA leave each 12 month period. Eligible part-time employees will receive the 12 week entitlement calculated on a proportional basis. For example, if an employee normally works 24 hours per week, the employee is entitled to 24 hours per week for 12 weeks (288 hours) of FMLA leave each 12 month period.

When both spouses are employed by Bexar County, they are entitled to a combined maximum total of 12 work weeks of leave for the birth and/or care of a newborn child of the employee or placement with the employee of a son or daughter for adoption or foster care, which requires an absence from work. Leave for birth or placement for adoption or foster care must conclude within 12 months of the birth or placement. When both spouses are employed by Bexar County, they are entitled to a combined total of 26 weeks of leave, if the leave is to care for a covered service member with a serious injury or illness.

**Use of Accrued Paid Leave Hours**

Bexar County requires the concurrent use of accrued and available paid leaves in conjunction with FMLA leave. This concurrent use of available leave must be taken in the following order: sick, vacation, holiday, FLSA time, compensatory time, and discretionary time. When and if the employee's accrued paid leaves are exhausted, the employee may take the remainder of their FMLA entitlement on an unpaid status.

**Benefits during Leave**

The employee's use of FMLA leave will not result in the loss of any privilege or benefit provided by the County or office/department policy or established practice that occurred or accrued prior to the start of the employee's leave. However, benefit accruals such as vacation, holiday, and sick leave will be suspended during any unpaid leave.

Bexar County will continue to pay its portion of any group health insurance benefits during FMLA leave on the same terms as if the employee had continued to work. Insurance coverage is subject to the specific provisions of each insurance policy/plan. The employee will be responsible for payment of employee's portion of premiums, if applicable. Non-payment of premiums will result in cancellation of any health and insurance plans.

If the employee has accrued leave balances to cover his/her FMLA leave, the employee will continue to accrue paid leave benefits including sick, vacation, and holiday leave.

If the employee does not have the necessary accrued leave balances, the employee will be placed in an unpaid leave status. During an unpaid leave of absence, employee payroll deductions and employer contributions for the deferred compensation plans and the Texas County and District Retirement System (TCDRS) will stop. Employee contributions to TCDRS made on the basis of temporary income benefits received through Workers' Compensation will still be deducted.

**Return to Work**

Offices/departments shall reinstate an employee who returns to work on or before the expiration of FMLA leave to their position or a comparable position at a pay rate not less than the former pay rate.

In cases of the employee's own serious health condition, the employee may be required on or before the date he/she returns to work to provide a certification from a health care provider confirming the employee is able to return to work and perform the essential functions of his/her position.

If an employee is unable to perform the essential functions of his/her job or work, he/she may be placed in a modified or light duty capacity as defined in Modified Duty Program Policy 7.3.05.

**Intermittent or Reduced Leave Schedule**

FMLA leave may be taken intermittently or on a reduced leave schedule only if medically necessary, to address qualifying exigencies, to care for a covered service member, or for other reasons with County approval.

There must be a medical need for intermittent/reduced leave and the need must be such that it can best be accommodated through an intermittent/reduced leave schedule. If leave is requested on an intermittent or reduced basis for planned medical treatment, the County may require the employee to transfer temporarily to an available alternate or part-time position (with equivalent pay and benefits that better accommodates the employee's intermittent/reduced leave schedule) or a schedule which better accommodates intermittent or reduced periods of absence. Employees on an intermittent leave schedule must follow regular leave procedures found in Employee Leave Benefits policies and the standard leave requirements of the office/department.

In the case of a request for intermittent or reduced leave schedule which is medically necessary, an employee shall advise his/her supervisor of the reasons for the request and of the schedule for treatment if applicable.

Employees requesting intermittent leave or reduced leave schedule must make a reasonable effort to schedule medical treatments and appointments to cause the least disruption to the office/department's work schedule.

FLSA exempt employees who work intermittent or reduced schedules under this policy, and use unpaid leave hours to cover the balance of their FMLA leave period, will not be paid for hours not worked. Under these circumstances, the exempt employee's regular salary will be reduced when partial days are taken off or for working on an intermittent schedule without affecting their exempt status. Exempt employees do not lose their exempt status under the Fair Labor Standards Act by using any unpaid FMLA leave.

**Repayment of Insurance Premiums**

If an employee does not return from FMLA leave, the County can require reimbursement of health premiums paid by the County for employee coverage when an employee is on an unpaid leave status. However, if an employee is unable to return to work due to the continuation, recurrence, or onset of a serious health condition, or a situation beyond the employee's control, reimbursement will not be required. Medical certification is required under such circumstances.

# V.    Recordkeeping

**Forms**

The following forms are available to assist in obtaining Family and Medical Leave. These forms are attached and may also be obtained from HR Central.

    A.  Requests for Family and Medical Leave

B. Certification of Health Care Provider (WH-380-E) for Employee's Serious Health Condition

C. Certification of Health Care Provider (WH-380-F) for Family Member's Serious Health Condition

D. Certification of Qualifying Exigency for Military Family Leave (WH-384)

E. Permission to Contact Health Care Provider and Authorization for Release of Medical Information form

**Procedures**

Offices/departments are responsible for maintaining any documents pertaining to Family and Medical Leave, *separate from an employee's personnel file*, for at least three years, to include, but not limited to:

A. Requests for Family and Medical Leave

B. Certification of Health Care Provider (WH-380-E) for Employee's Serious Health Condition

C. Certification of Health Care Provider (WH-380-F) for Family Member's Serious Health Condition

D. Certification of Qualifying Exigency for Military Family Leave (WH-384)

E. Permission to Contact Health Care Provider and Authorization for Release of Medical Information form

F. FMLA Designated Hours

## VI.  Additional Information

When an employee gives notice of FMLA leave, the employee will be given additional information as to his/her rights and responsibilities under the FMLA. In addition, employees may contact HR Central and/or the nearest office of the U.S. Department of Labor's Wage & Hour Division for more information.

## VII.  Definitions

**Active Duty** – military duty under a call or order to active duty under a provision of law referred to in section 101(a)(13)(B) of Title 10, United States Code.

**Anniversary Date/Year** – the 12 month period following the first calendar day of the first FMLA absence. This date is used to determine leave balances.

**Child, Son, or Daughter** – a biological, adopted, or foster child, a stepchild, a legal ward, or a child of a person standing "in loco parentis," who is under age 18 or age 18 or older and incapable of self-care because of a mental or physical disability. An employee's child is one for whom the employee has actual day-to-day responsibilities for care.

**Contingency Operation** – from section 101(a) (13) of Title 10, United States Code "The contingency operation means a military operation that:

**(A)** is designated by the Secretary of Defense as an operation in which members of the armed forces are or may become involved in military actions, operations, or hostilities against an enemy of the United States or against an opposing military force; or

**(B)** Results in the call or order to, or retention on, active duty of members of the uniformed services under section 688, 12301(a), 12302, 12304, 12305, or 12406 of this title, chapter 15 of this title, or any other provision of law during a war or during a national emergency declared by the President or Congress."

**Continuing Treatment** – includes two or more visits to a health care provider, two or more treatments by a health care practitioner on referral from, or under the direction of a health care provider, a single visit to a health care provider that results in a regimen of continuing treatment, or, in the case of a serious, long-term or chronic condition or disability that cannot be cured, being under the continuing supervision of, but not necessarily being actively treated by, a health care provider.

**Covered Service member** – a member of the Armed Forces, including a member of the National Guard or Reserves, who is undergoing medical treatment, recuperation, or therapy, is otherwise in outpatient status, or is otherwise on the temporary disability retired list, for a serious injury or illness incurred in the line of duty while on active duty.

**Designation year** - the 12 month period following the first calendar day of the FMLA designation. This date is used to determine when recertification is needed.

**Exigency** – see Qualifying Exigency

**FMLA (Family Medical Leave Act) Leave** – family and medical leave as defined in this policy, which is unpaid except when other paid leave balances are available and used concurrently as outlined in this policy.

**FLSA** – the Fair Labor Standards Act (29 U.S.C. 201 et seq.)

**FMLA Designated Hours** – actual hours not worked where leave hours are taken for Family and Medical Leave

**Health Care Provider** – a doctor of medicine or osteopathy who is authorized to practice medicine or surgery by the State in which the doctor practices as well as podiatrists, dentists, clinical psychologists, optometrists, chiropractors, nurse practitioners, nurse mid-wives, and clinical social workers.

**HR Central** – HR Central is a division of Planning and Resource Management.
> HR Central may be contacted at:
> Human Resources
> 211 Flores Street
> San Antonio, TX 78204
> (210) 335-2545

**Immediate Family Member** – includes spouse, child, or parent. Step relationships are included; in-laws and unmarried domestic partners are not included.

**Incapacity** – Inability to work, attend school, or perform other regular daily activities due to a serious health condition, treatment thereof, or recovery there from.

**Intermittent Leave** – leave taken in separate blocks of time due to a single qualifying reason.

**Invitational Travel Authorizations/Orders (ITAs)/ (ITOs)** - government orders that can authorize up to three family members of a soldier to travel to the medical facility providing care.

**Leave Year** - Bexar County uses an anniversary date/year for purposes of calculating leave availability.

"**Needed to Care for**"–medical condition provision which encompasses both physical and psychological care.

**Next of Kin** – the nearest blood relative other than the covered service member's spouse, parent, son, or daughter, unless the covered service member has specifically designated an individual as "next of kin" for military caregiver leave purposes.

**Outpatient Status** – the status of a member of the Armed Forces assigned to either a military medical treatment facility as an outpatient or a unit established for the purpose of providing command and control of members of the Armed Forces receiving medical care as outpatients.

**Parent** – a biological, adoptive, step, or foster parent or an individual who stands or stood "in loco parentis" to an employee when the employee was a child. This term does not include parents-in-law. Persons who are "in loco parentis" include those with day-to-day responsibilities to care for and financially support a child, or in the case of an employee, who had such

responsibility for the employee when the employee was a child. A biological or legal relationship is not necessary.

**Qualifying Exigency** – when an employee's spouse, son, daughter, or parent is called to active military services and the employee is needed to assist service members' families in managing their affairs while the covered service member is on active duty. This provision only applies to a federal, not a state, call to active military duty unless the state call is ordered by the President.

The following circumstances qualify as an exigency:

1. Short-term deployment (seven or less calendar days prior to the date of deployment);

2. .Military events and related activities in advance of and during deployment, including family support or assistance programs and informational briefings that are related to the active duty or call to active duty of a covered military member;

3. Childcare and school activities arising from the active duty or call to active duty status of a covered service member such as arranging for alternative childcare, providing childcare on a non-routine, urgent, immediate-need basis or to attending meetings at a school or daycare facility if they are necessary due to circumstances arising from the active duty or call to active duty of the covered military member;

4. Financial and legal arrangements to address a covered service member's absence;

5. Counseling provided by someone other than a health care provider for oneself, the covered military member, or the child of the covered military member, the need for which arises from the active duty or call to active duty status of the covered service member.;

6. Taking up to five business days of leave to spend time with a covered service member who is on short-term temporary, rest, and recuperation leave during deployment; and

7. Post-deployment activities including attending arrival ceremonies, reintegration briefings and events, and other official ceremonies or programs sponsored by the military for a period of ninety (90) calendar days following the termination of the covered service member's active duty status, and addressing issues arising from the death of a covered service member.

**Reduced Leave Schedule** – leave schedule that reduces an employee's usual number of working hours per work week or per workday.

**Serious Health Condition** – an illness, injury (including work related injuries), impairment, or physical or mental condition that involves in-patient care or continuing treatment by a health care provider.

The following conditions are generally not considered to be serious health conditions unless complications arise: the common cold, the flu, earaches, upset stomachs, minor ulcers, headaches other than migraines, routine dental or orthodontia problems, and periodontal disease. In addition to these conditions, an absence caused by an employee's abuse of a substance, rather than for treatment for the problem, does not qualify for FMLA leave, and is not considered a serious illness.

**Serious Injury or Illness** – an illness, injury impairment, or a physical or mental condition that involves:

1. Inpatient care; or

2. Any period of incapacity requiring absence from work for more than three consecutive, full calendar days and that involves continuing treatment by a health care provider; or

3. Continuing treatment by a health care provider for a chronic or long-term health condition that is incurable or which, if left untreated, would likely result in a period of incapacity of more than three consecutive calendar days; or

4. Prenatal care by a health care provider; or

5. An injury or illness incurred by a covered service member in the line of duty on active duty that may render the service member medically unfit to perform the duties of the member's office, grade, rank, or rating.

   a. Covered family members (employee's spouse, child, or parent) are eligible for 26 weeks of leave to care for veterans who are undergoing medical treatment, recuperation, or therapy for a serious injury or illness and who were members of the Armed Forces (including members of the National Guard or Reserves) at any time during the 5 years preceding the date of treatment, recuperation, or therapy.

**Service Hours** – actual hours worked not to include paid time-off such as vacation leave, sick leave, or bereavement/funeral leave.

**Spouse** – a husband or wife as defined or recognized under Texas law for purposes of marriage, including common law marriages. Former spouses and in-laws do not qualify as spouses or parents for the purposes of Family and Medical Leave.

**Twelve (12) Month Period** – see Leave Year.

**"Unable to Perform the Essential Functions of the Position"** – situation where a health care provider finds that the employee is unable to work at all or is unable to perform the essential functions of the employee's position within the meaning of the American with Disabilities Act (ADA).

## FMLA Forms
### PDF Format

- All FMLA Forms


- FMLA Request Form
- FMLA Release Form
- Certification of Qualifying Exigency for Military Family Leave
- Certification for Serious Injury/Illness of Covered Servicemember for Military Family Leave
- Designation Notice (FMLA)
- Certification of Health Care Provider for Employee's Serious Health Condition
- Certification of Health Care Provider for Family Member's Serious Health Condition
- Notice of Eligibility and Rights & Responsibilities

**Policy No. 7.3.04**

# Worker's Compensation

**Effective Date: January 1, 2007**

Bexar County provides self-insured Workers' Compensation benefit coverage for accidents; illnesses or injuries employees sustain in the course and scope of employment in accordance with Texas Worker's Compensation laws.

## Reporting Procedures

Employees should report any on-the-job injury to their office or department within 24 hours of the incident but no later than thirty (30) days after the date of injury. Employees should submit an Incident Report (Form 75) along with a signed Authorization for Medical Records to their office or department. Failure to do so may result in the lack of coverage.

Offices and departments should have an Incident Report (Form 75) readily available and should report all on-the job injuries to Human Resources within 24 hours of the incident. The completed Form 75 should be signed by the employee and forwarded to Human Resources with the Authorization for Medical Records within three days of the incident.

## Medical Treatment

If required, employees can seek medical treatment from a County authorized medical facility or a doctor of their choice.

The office or department should have available the list of medical facilities that are available through Bexar County and provide the injured employee with the list of available medical facilities. The list can be requested from Human Resources.

## Texas Workers Compensation Commission Form
## (TWCC 73)

In order to be released to full duty with no restrictions, the employee must obtain Texas Workers' Compensation Commission Form (TWCC 73) and have it signed by their treating doctor and submit it to their office or department.

> ➢ Texas Workers' Compensation Commission Form (TWCC 73) is available from Human Resources.

A copy of the completed Texas Workers' Compensation Commission Form (TWCC 73), signed by the doctor, shall be forwarded by the office or department to Human Resources when the employee is released to full duty with no restrictions.

> ➢ All offices and departments should have current Workers' Compensation laws available in their department. A copy can be requested from Human Resources.

## Status Forms

The office or department is responsible for submitting any required status forms to ensure that no employee is underpaid or overpaid following an on-the-job injury.

## Payment under Worker's Compensation

Employees covered under Workers' Compensation will begin receiving payment after the employee has been out of work for seven (7) days due to illness or injury sustained in the course and scope of employment. Payment begins on the eighth day.

The office or department can apply the employee's sick leave, vacation leave, FLSA, compensatory, or discretionary time for pay during the first seven (7) days of lost time from a compensable injury at the request of the employee.

After leave time is exhausted, the office or department should place the employee on leave without pay status, and the injured employee should receive weekly compensation benefits in accordance with Workers' Compensation Law. In no event may an employee receive more than 100% of their base pay.

# Policy No. 7.3.05

# Modified Duty Program

**Effective Date: January 1, 2007**

Bexar County offers eligible employees, where practicable, the opportunity to work under a Modified Duty Program after an illness or injury of three or more days, thereby promoting a more speedy recovery and enabling employees to maintain continuous pay without interruption.

## Participation

Each office or department has the discretion whether to offer modified duty assignments. Modified duty assignments are not automatic nor are they a right of employment. Participation is based on available positions within the office or department, the regular job duties of the employee and the limitations or restrictions imposed by the treating physician.

The denial or discontinuance of a modified duty assignment does not in any way interfere with the ability of the office or department to proceed with the normal termination process if an employee has exhausted all leave benefits and is unable to return to work.

## Eligible Employees

Eligible employees for modified duty are those employees who have sustained an on-the-job injury. Other employees who are recuperating from an off-the-job injury or illness may participate in the Modified Duty Program depending on the injury and the available positions that can accommodate the restrictions imposed by the doctor. First priority by the office or department should be given to employees injured on the job.

Employees are eligible for modified duty if that employee has been released to modified or light duty by their attending physician. Modified duty assignments are for a limited period of six weeks for on-the-job injuries. Modified duty assignments are limited to thirty (30) days, or the expected duration of the temporary restriction or limitation, whichever is shorter, for off-the-job injuries and thirty days for off-the-job injuries. Employees must have a re-evaluation every three weeks after initial participation in the program and submit a medical certification to the office or department. Failure to submit a re-evaluation may result in removal from the program.

An employee who requests to work a modified duty assignment must certify to the office or department that no outside employment is being worked during the period of modified duty.

## Criteria for Modified Duty Assignment

Offices or departments should use the following criteria in evaluating whether to provide modified duty assignment authorization to an eligible employee:

1. Are the employee's medical restrictions or physical limitations conducive to a modified duty assignment?

2. Will the modified duty assignment permit the employee to perform many of the employee's regular position tasks while keeping within the restrictions or limitations ordered by the physician?

3. Does a vacant position exist in the office or department which meets the employee's limitations and qualifications?

4. Can a modified duty assignment be structured to allow the employee to perform tasks generally associated with other positions in order to alleviate work backlog situations?

## Extension of Modified Duty Period

Extension of a modified duty assignment may only be granted by the office or department when there is a continuing business need. An employee may request an extension of the modified duty assignment by timely submitting a request to the office or department along with medical certification from their treating physician which supports the continued medical need for a modified duty assignment.

## Benefits While on Modified Duty

Employees in a modified duty assignment shall receive their regular rate of pay and accrue seniority, sick leave and vacation time according to applicable Bexar County policies and procedures. Employees in a modified duty assignment are still eligible to compete for other County employment opportunities for which they are qualified through the competitive process with proper notice to their office or department.

## Completion of Modified Duty

Modified duty eligibility under the Bexar County Modified Duty Program will end when one of the following actions occur:

1. The employee receives a medical release to resume the essential functions of their regularly assigned position without restriction.

2. Completion of six weeks in an on-the-job injury

3. Completion of 30 days in an off-the-job injury modified duty assignment.

4. Withdrawal of authorization for the modified duty assignment by the office or department based on bona fide business necessity or the employee's failure to comply with the program.

## Procedures

*Employee Responsibility*

1. An employee must request a modified duty assignment from their office or department and provide a medical certification completed by their attending physician which authorizes a release to modified or light duty.

2. Once a modified duty assignment is approved, an employee must have a reevaluation every three weeks after initial participation in the program and submit a medical certification indicating a continuance of modified duty or a release to full duty.

3. Any employee who encounters difficulties performing up to the standards imposed by their physician may request to be removed from the program or may request an assignment change. Any request for changes must be supported by a report from the treating physician who initially approved a return to duty in a modified duty status.

*Office or Department Responsibility*

1. The office or department is responsible for reviewing and authorizing each modified duty request using the certification submitted by the treating physician, the restrictions and limitations placed on the employee, the regular position tasks of the employee and the business needs of the office or department.

2. The office or department shall provide the employee with a written decision approving or denying the request for modified duty assignment as soon as possible.

3. If approved for a modified duty assignment, a bona fide job offer must be made describing the terms and duties of the modified assignment and accepted by the employee.

4. The office or department shall ensure upon reaching the three week period for re-evaluation, that the employee submits a new medical certificate from their treating physician indicating a continuance of the modified duty or a release to full duty.

5. The office or department may adjust the daily assignments on modified duty to reflect the organization's business needs and/or the employee's improved conditions and expanded

medical capabilities based on re-certification information received.

6. If the modified duty assignment is to be discontinued, the office or department should notify the employee as soon as possible.

7. When an extension of the modified duty assignment is requested by the employee and treating physician supports a release for continued modified duty, the office or department should review the criteria and shall provide the employee with a written decision approving or denying the request for extension of the modified duty assignment as soon as possible.

# Voluntary Reduced Time Schedule

**Policy Number: 7.3.06**
**Effective Date: January 1, 2007**

## Voluntary Reduced Time Schedule

Bexar County allows a Voluntary Reduced Time Schedule as a flexible time schedule that may be offered at the discretion of the office or department to provide employees with an opportunity to maintain their full-time status while working a reduced time schedule due to personal needs, operational needs or to meet an office or departmental budget need.

## Eligibility

All regular full-time employees are eligible to participate in a Voluntary Reduced Time Schedule subject to the approval of the office or department and subject to operational or budgetary needs.

## Maximum Reductions Allowed

In order to maintain full-time status, the agreed reductions allowed are a 10 % reduction to a 36-hour work week or a 20% reduction to a 32-hour work week. The salary received would be based on the actual number of hours worked.

## Voluntary Reduced Time Schedule Agreement

A Voluntary Reduced Time Schedule Agreement must be completed and signed by the office or department and the employee. The Agreement should describe the hours, pay, benefits and length of the Agreement. The initial Agreement will generally be for a period of six months to one year and may be renewable if approved by the office or department. When the Agreement expires, the employee will return to a 40-hour work week.

Any change in operational or budgetary needs may allow the Agreement to be withdrawn. The Agreement may also be withdrawn based upon the employee's performance.

## Employee Responsibilities

When the need for a reduced time schedule arises, the employee must assist the office or department in completing a Voluntary Reduced Time Schedule Agreement. A signature of the employee is required on the Agreement.

## *Office or Department Responsibilities*

The office or department is responsible for developing a Voluntary Reduced Time Schedule Agreement with the employee. The Agreement must describe the hours, pay and benefits, an effective and expiration date, and both the employee's and the office or department authorized representative signature. The office or department must contact the Human Resources Department to insure the proper calculation of pay and benefits. An Agreement Form may be obtained from Human Resources.

The office or department is required to submit a copy of the Agreement and a completed status form to both the Auditor's Office and the applicable Budget Analyst in the Human Resources Department within ten (10) days.

## *Participating Employee Termination*

If a participating employee terminates employment, the office or department may elect to fill the vacant position with another employee under a Voluntary Reduced Time Schedule Agreement, or the office or department may elect to fill the vacancy with a full-time employee, provided there are sufficient dollars available in the authorized budget for that fiscal year.

> ➢ Before filling the reduced-time vacancy with a full-time employee, the office or department should determine whether that action will lead to a negative budgetary impact. Additional funding is not automatically allocated in the approved budgets of offices or departments to support increasing the hours of a reduced position to a full-time position. The office/department should consult with their Budget Analyst in the Human Resources Department to verify and determine budgetary compliance. A noncompliant office or department may face a budget reduction in the following year.

## Policy No. 7.3.07

## Employee Assistance Program

**Effective Date: January 1, 2007**

Bexar County has established the Employee Assistance Program to provide free, voluntary, confidential and professional counseling assistance to all regular employees and their dependents regardless of their location or choice of medical insurance plan. Both male and female counselors are available. Appointments may be made during work hours, after work, or on Saturdays. Employees must utilize their leave accounts for appointments made during work hours.

EAP services may address a variety of issues including:

> ➢ Marital Conflict

> ➢ Family Problems

> ➢ Alcohol/Drug Problems

> ➢ Legal/Financial Problems

More information regarding the EAP program is available from Human Resources.

TR-0413

# Flexible Spending Accounts

**Effective Date: January 1, 2007**

Bexar County offers pre-tax benefit programs to help employees save for certain out-of-pocket costs while increasing spendable income. The Health Care Flexible Spending Account, the Dependent Care Flexible Spending Account, and the Parking and Mass Transit Pre-Tax Benefits allow employees to contribute pre-tax dollars to an account from which employees can be reimbursed for eligible expenses up to the amount of the elected annual contribution.

All regular full-time employees working at least 32 hours per week are eligible to participate. Participation in a flexible spending account does not automatically continue from one year to the next. Participation must be renewed every year in order to continue enrollment. A previous year's election does not automatically carry forward.

Employees choose the amount of annual contribution which is deducted from their paychecks and seek reimbursement from the account.

## Health Care FSA

In order to participate, employees must enroll during the annual Open Enrollment period. No exceptions will be made unless the employee has a qualified status change. The Health Care FSA allows the employee to be reimbursed for eligible expenses up to the amount elected for annual contribution. If the employee submits an eligible expense for health care received during the year that is greater than the year-to-date contributions at that time, they will be reimbursed for the entire amount, as long as the total expense submitted is not greater than the annual elected contribution amount. Semi-monthly deductions from the employee's paycheck will continue to be made for the remainder of the calendar year.

## Dependent Care FSA

In order to participate, employees must enroll during the annual Open Enrollment period. No exceptions will be made unless the employee has a qualified status change. With the Dependent Care FSA, employees are reimbursed for monthly eligible day care expenses up to the monthly contribution amount only. Semi-monthly deductions are taken from the employee's paycheck in the amount elected during Open Enrollment.

TR-0414

## Pre-Tax Parking and Mass Transit

Bexar County offers employees the opportunity to set aside a portion of their salary, on a pre-tax basis, to pay for certain transportation expenses. Employees will not be taxed on the amounts that are set aside and used for qualified expenses. All regular County employees who are currently receiving benefits are eligible to use this program.

Employees can set aside up to $195 per month in pre-tax dollars to be used to pay eligible parking expenses and up to $105 per month to be used to pay mass transit expenses.

Parking expenses, daily or monthly, which are paid or reimbursed by the county, are not eligible.

## Contract Garage Parking

Employees that have a contract with Bexar County to park in the County Garage must enroll each year to authorize a pre-taxed parking fee payroll deduction. The deduction can then be taken on a pre-tax basis. Because this is a pre-tax payroll deduction, employees are not reimbursed for this expense but the pre-tax savings are still realized. Contact the Human Resources Division for additional information regarding Flexible spending accounts and eligible expenses.

# Policy No. 7.3.09

# VIA Transportation Program

## Effective Date: January 1, 2007

To help employees save money on transportation expenses and to decrease the number of private vehicle trips resulting in a demand for parking at or near County facilities, Bexar County has coordinated with VIA to offer Bexar County employees free bus rides and a monthly subsidy for utilizing VIA's Vanpool Service.

**Bus Ride**

Employees must present their Bexar County identification card to the bus operator in order to ride for free. The free bus pass includes the use of all VIA Metropolitan Park and Ride facilities and the downtown Trolley. Exclusions include Special Events, VIA trans or Starlight Services.

**Vanpool**

Employees are eligible to receive a $25 monthly subsidy for participating in VIA's Vanpool Service. Vanpool requires the rental of a van through VIA, fuel cost and at least six people to share their ride to work. One member of the group must drive and maintain the van in return for riding free.

For additional information, contact Human Resources at 210-335-2545.

TR-0416

# BEXAR COUNTY DEPARTMENT OF HUMAN RESOURCES

## Employee Leave Benefits Policies

| | |
|---|---|
| **7.4.01** | **Administering Leave** |
| **7.4.02** | **Vacation or Annual Leave** |
| **7.4.03** | **Sick Leave** |
| **7.4.04** | **Administrative Leave** |
| **7.4.05** | **Bereavement (Funeral Leave)** |
| **7.4.06** | **Military Leave** |
| **7.4.07** | **Jury and Witness Duty Leave** |
| **7.4.08** | **Unauthorized Absence** |
| **7.4.09** | **County Holidays** |
| **7.4.10** | **Sick Leave Pool** |

TR-0417

## Policy No. 7.4.01

# Administering Leave

**Effective Date: January 1, 2007**

Bexar County provides leave for all of its employees as outlined in these Employee Leave Benefits Policies. It is the responsibility of offices and departments to administer leave benefits in accordance with these policies. Authority to approve leave requests is accompanied by the responsibility for verifying that leave granted is available, legal and justifiable.

## Responding to Leave Requests

Each office and department should establish reasonable rules for employees to request and schedule leave. Each employee should receive a copy of all leave rules in writing with a signed copy of acknowledgment maintained in the employee's personnel file within their office or department. The office or department should respond to each request for leave within a reasonable time not to exceed seven business days. Leave requests shall be charged a minimum of one hour.

Each office and department should designate a timekeeper to accurately record leave requests, authorizations and designations. Leave balances can be requested from the timekeeper in the office or department so that employees and supervisors can affirmatively verify the accuracy of the current leave information and take appropriate action to update the system.

TR-0418

## Policy No. 7.4.02

## Vacation or Annual Leave

**Effective Date: January 1, 2007**

Bexar County provides annual vacation leave to regular full time and part time employees for rest and recreation and to provide periods of time off for personal and emergency purposes. Vacation or annual leave accrues automatically except for any period when an employee is on leave without pay or workers' compensation. Vacation leave cannot be taken during the first six months of initial employment with the County. Sheriff's Office employees may not take vacation during the first year of initial employment.

Vacation or annual leave requests shall be approved according to the needs of the office or department. However, all reasonable accommodation should be given to the employee in determining when vacation leave may be taken.

### Earning Rates

All regular employees accrue annual vacation leave on a semi-monthly basis. Regular employees who work less than 40 hours per week earn vacation leave on a pro-rata basis, provided they work at least one day each week. A regular employee who worked as a temporary employee immediately prior with no break in service will be credited for service for their time with the County and their earning rate set accordingly.

The annual accrual and semi-monthly accrual rates for regular full-time employees are as follows:

| Tenure | Annual Accrual | Semi-monthly Accrual |
|--------|----------------|----------------------|
| 1-4 years | 10 days | 3 hours, 20 minutes |
| 5-9 years | 12 days | 4 hours |
| 10-14 years | 15 days | 5 hours |
| 15+ years | 18 days | 6 hours |

TR-0419

## Maximum Accrual

Employees may not carry more than 30 days (240 hours) of annual leave from one fiscal year to the next. Any vacation time accrued in excess of 30 days (240 hours) will be lost on October 1 of each year.

All offices and departments should insure that, whenever possible, annual or vacation leave will be scheduled for use by an employee to prevent any loss of accrued annual leave at the end of the fiscal year. Offices and departments should provide each employee with an accounting of the employee's leave balances by August 31 of each year.

## Payments of Unused Leave at Separation

Upon separation from employment, any employee who has completed at least six months of employment with the County will be paid for annual vacation leave hours accrued but not taken up to a maximum of 30 days (240 hours). Any amount above this maximum will be lost at time of separation or may be donated to the Sick Leave Pool.

## Break in Service

Vacation accrual rates may change for employees who separate from the County and return at a later date.

## Forfeiting Vacation Accrual Rates

Employees who voluntarily terminate their employment with the County but return at a later date forfeit their vacation accrual rate at the time of separation and accrue as a new employee except as described below

## Reinstating Vacation Accrual Rates

*Involuntary Termination*

Annual vacation accrual rates will be reinstated when the break in service is within five years and was the result of involuntary termination caused by a change in administration or loss of funding for a program, department or office.

*Voluntary Termination*

Annual vacation accrual rates will be reinstated within sixty (60) days when the break in service was voluntary and the employee resigned in good standing.

## Sick Leave

**Effective Date: January 1, 2007**

Bexar County provides employees with sick leave to be granted when they are unable to perform their duties for health-related reasons or it may be used for a medical or dental appointment. Sick leave may be granted for health related reasons of an employee or for the care of an employee's immediate family members.

## Sick Leave – Employee Illness or Injury

Eligible employees may be granted sick leave when they are unable to perform duties because of 1) illness, injury, pregnancy, childbirth, or related medical conditions or 2) when absent for the purpose of obtaining health-related services not available outside of regular working hours, such as medical or dental appointments. Offices and departments may request employees to apply in advance for sick leave for prearranged doctor's appointments, whenever possible.

## Sick Leave – Employee's Immediate Family

An eligible employee may be granted sick leave when a member of the employee's immediate family is ill or for other health-related reasons, such as a medical or dental appointment, and the employee's presence is required.

## Immediate Family

Immediate family includes the employee's spouse, children, stepchildren, foster children legally placed by a State agency, an adult who raised the employee in the absence or death of the employee's parents, father, stepfather, mother, stepmother, brother, stepbrother, sister, stepsister, grandparent, grandchild, parents of the employee's spouse, spouses of the employee's children, brother of the employee's spouse, sister of the employee's spouse, and grandparent of the employee's spouse.

## Earning Rates for Regular Employees

All regular employees accrue sick leave on a semi-monthly basis at the rate of four hours each pay period. Sick leave is earned from the first full pay period of employment. There is no qualifying period for the earning of sick leave and it may be used as it is accrued. The maximum accrual amount for sick leave is 90 days (720 hours). Regular employees who are scheduled to work less than 40 hours per week will earn sick leave on a pro-rata basis.

## Payment of Unused Sick Leave at Separation

Upon separation from employment with the County, an employee who has completed at least five consecutive years of employment is eligible to be paid for one-half of their available sick leave hours. The maximum amount that will be paid is 30 days (240 hours).

## Sick Leave – Family and Medical Leave (FMLA) (see Policy No. 7.3.03)

During any period of Family and Medical Leave, eligible employees must use accrued sick leave and other available leave in accordance with Policy 7.3.03, FMLA.

## Request for Physician's Statement

An employee who is absent on or requests Sick Leave for three or more consecutive workdays or 24 consecutive work hours must provide the office or department with a physician's statement indicating the onset and duration of the illness before the office or department may post the third day or 17th hour as Sick Leave. Employees who do not submit physician's statements in a timely manner may not be granted sick leave for that period. For absences less than three days, if a pattern of sick leave abuse is established, the office or department may require the employee to provide proof of illness, medical or dental appointment.

## Inappropriate Use of Sick Leave

In the event that a legitimate need for the use of sick leave cannot be established to the satisfaction of the office or department, any unauthorized leave time taken shall be deducted from another available leave account or the employee's salary should be adjusted for the time taken if no other leave is available.

## Sick Leave Designated as Personal Leave

Employees will earn 40 hours of Personal leave at the beginning of each fiscal year and are eligible to use up to 40 hours of Sick Leave as Personal Leave every fiscal year. *Personal Leave is taken from the employee's available sick leave account and is not considered additional accrued leave*.

Personal Leave may be granted to any employee for any reason in accordance with the established policy by the Elected/Appointed Official or Department Head. Any unused Personal Leave may be carried over into the next fiscal year but may not exceed a total of 120 hours. Because Sick Leave must be available in order to utilize any available Personal Leave, it is not considered additional leave. As such, any unused Personal Leave balances remaining at time of separation will not be paid to the employee.

TR-0422

## Policy No. 7.4.04

## Administrative Leave

**Effective Date: January 1, 2007**
**Revised: May 1, 2009**

In accordance with Texas Local Government Code (LGC) 157.021, in a county with a population of 355,000 or more, the Commissioners Court may adopt and enforce uniform rules on the hours of work of department heads, assistants, deputies, and other employees whose compensation is set or approved by the Court. The intent of this policy is to administer time off, with pay, for purposes approved by Commissioners Court as listed below.

All regular employees may be granted administrative leave in accordance with this policy. Each office and department is responsible for developing policies that are consistent with and do not interfere with County policies and Commissioners' Court orders.

Examples of Administrative Leave include the following:

1. Situations which require the office/department to immediately remove an employee from a work location and before any adverse action has been initiated (this includes situations where there is an immediate threat to County property or the well-being of the employee, a co-worker, or the public);

2. During investigations into employee wrongdoing when it is in the best interest of the County to have the employee off the job;

3. Blood donation during a County-wide blood drive;

4. Brief absences (less than one hour);

5. Examinations relating to the employee's job;

6. Work related conferences, training and development, and for conventions;

7. Registration to vote and for voting;

8. Participation in activities which are encouraged by the County;

9. An official funeral.

TR-0423

Work time designated as Administrative Leave should not be included as hours worked for the purposes of overtime calculations. Administrative Leave is not intended to extend an employee's unearned (not accrued) leave. Administrative Leave may not be used by an office or department to designate a holiday leave or extend holiday leave. Administrative Leave is to provide for suspension of normal operations of an office or department of the County no longer than four hours in duration. Any deviation from this policy must be approved by Commissioners Court.

## Termination

Administrative leave may not be used as severance pay nor used as a means to extend an effective date in cases of employee termination.

## Emergency Situations

There may be occasions for employees to be granted leave for reasons directly resulting from severe weather conditions, emergencies involving facilities, or other unexpected reasons. In cases where notification has been issued Countywide for employees to arrive at a specified later time or not to report to work, administrative leave will be used to designate such absences. In cases where notification has not been issued and employees miss work without supervisor approval, the employee will have their salary adjusted for the lost time if no paid time is available.

TR-0424

# Bereavement (Funeral Leave)

**Effective Date: January 1, 2007**

Bexar County provides employees with bereavement leave or funeral leave to be granted in the occurrence of the death of an employee's immediate family member. An employee may be granted Funeral Leave for a period not to exceed three days (24 hours) consecutively scheduled per occurrence.

➢ An employee who is on an unpaid status is not eligible for Funeral Leave and will remain in an unpaid status.

➢ An employee who is on annual leave may be granted Funeral Leave if a death occurs during the employee's scheduled vacation.

➢ The office or department may grant additional time off to employees if other appropriate leave time is available.

At the discretion of the office or department, an employee may be required to provide proof of death and/or family relationship.

## Immediate Family

Immediate family includes the employee's spouse, children, stepchildren, foster children legally placed by a State agency, an adult who raised the employee in the absence or death of the employee's parents, father, stepfather, mother, stepmother, brother, stepbrother, sister, stepsister, grandparent, grandchild, parents of the employee's spouse, spouses of the employee's children, brother of the employee's spouse, sister of the employee's spouse, and grandparent of the employee's spouse.

# Policy No. 7.4.06

# Military Leave

**Effective Date: January 1, 2007**

Bexar County is committed to providing Military Leave in accordance with the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA).

## Reservists

Every employee who is an actively participating reservist of the U.S. Armed Forces or member of the National Guard is entitled to a leave of absence from duties, without loss of pay, time or efficiency rating for not more than fifteen (15) working days in any fiscal year, for active duty service or for training. This does not include activities such as:

1. Summer training as members of a Reserve Officers' Corps organization.
2. Duty with the Temporary Coast Guard Reserve.
3. Participation in parades organized by a State National Guard.
4. Training with a State guard or other state military organization
5. Service with the Civil Air Patrol.

Military leave will be charged only to regular work days. Non-work days, during a period of military leave do not count against the total allowable military leave.

## Extended Active Duty Military Leave

Employees who are placed on extended active duty with the U.S. Armed Forces or the National Guard shall be placed on a leave without pay status in a manner consistent with USERRA. The office or department can apply the employee's vacation leave, FLSA, compensatory, or discretionary time for pay during this time at the request of the employee. Employees shall present active duty orders with any request for such leave. An employee on Extended Active Duty Military Leave shall not accrue sick or vacation leave or other benefits, but the period of active duty shall represent continuous service so long as the military service conforms to provisions as specified by the Veterans' Reemployment Act.

## Return to Employment

An employee who has Veterans' reemployment rights shall be returned to the former position held or a comparable position at a comparable rate of pay, contingent upon the availability of funds, unless circumstances make it impossible or unreasonable to do so. An office or department so affected will be able to hire temporary employees or move a current employee into the position for a temporary time period to fill those positions during the absence.

TR-0426

# Jury and Witness Duty Leave

**Effective Date: January 1, 2007**

Offices and departments shall grant an employee's request for leave for jury duty and witness duty under the following circumstances:

1. The employee is appointed to serve on a grand jury or required by court order to appear as a prospective juror in a federal, state, county, or municipal court on a day and during the hours that the employee is normally scheduled to work; or
2. The employee is required by subpoena or court order to appear as a prospective witness in a federal, state, county, or municipal court on a day and during the hours that the employee is normally scheduled to work.

Offices and departments shall verify and obtain a copy of the employee's summons to appear as a potential juror or a copy of the employee's subpoena to appear as a potential witness. An employee serving for Jury or Witness Duty will only be compensated for up to eight hours per day.

## Return to Work

An employee released early from jury duty or witness duty must return to work for the remainder of the day. The time the employee spends driving from the courthouse or other location directly to their worksite is compensated as Jury or Witness Duty. Any employee who does not return to work as required shall have their leave accounts or pay adjusted for the amount of time absent from work.

## Witness Regarding Official Acts

Employees of the County who provide testimony in connection with the performance of an official act shall count the time spent as Hours Actually Worked and may not receive any form of compensation from any source other than the County for their services. Funds received from outside sources for those services shall be turned in to the office or department for appropriate deposit with the County. Refusal to do so may result in adverse disciplinary action.

TR-0427

# Policy No. 7.4.08

# Unauthorized Absence

**Effective Date: January 1, 2007**

An unauthorized absence from work is an absence that is not approved. An employee will receive no pay nor will the employee's leave account be credited during any period of unauthorized absence. The office or department may excuse an absence with appropriate adjustments to pay and credits of leave time upon receiving adequate documentation of the circumstances surrounding the employee's unauthorized absence.

An employee who takes unauthorized leave will be subject to disciplinary action, which may include termination.

Any unauthorized leave that continues for three consecutive work days will be considered an automatic resignation. When that occurs, the office or department shall send written notice of automatic resignation to the last known address of the employee on file.

TR-0428

## Policy No. 7.4.09

# County Holidays

**Effective Date: January 1, 2007**

Bexar County Commissioners Court grants time off from work with pay for each holiday. Designated holidays which fall on a Saturday will normally be observed on Friday and designated holidays which fall on a Sunday will normally be observed on Monday. The annual Holiday Calendar is approved as part of the Budget process and can found in the Budget Manual each year and on the County Intranet site.

Twelve (12) holidays are normally designated each year and typically include:

| | |
|---|---|
| New Year's Day | Independence Day |
| Martin Luther King Day | Labor Day |
| President's Day | Veteran's Day |
| Good Friday | Thanksgiving and following Friday |
| Battle of Flowers | Christmas Day |
| Memorial Day | |

Employees in positions required to maintain a 24-hour operation (shift work) will be credited for eight hours of holiday time regardless of whether or not they are actually scheduled to work on the holiday.

Employees shall not be paid for holidays occurring during a leave of absence without pay. Employees paid on an hourly basis are not entitled to holiday pay. Holidays occurring during paid absences shall not be charged against any leave account.

TR-0429

# Policy No. 7.4.10

# Sick Leave Pool

**Effective Date: January 1, 2007**

Bexar County has established a Sick Leave Pool pursuant to Texas Local Government Code, Chapter 157. The Sick Leave Pool program provides a source of additional paid leave to an employee if a catastrophic illness or injury forces an employee to exhaust all earned leave time and go into a non-pay status.

## Catastrophic Illness or Injury

A catastrophic illness or injury is defined as a severe condition or combination of conditions affecting the mental or physical health of the employee which has resulted in a life threatening condition and/or has had a major impact on life functions. Such life-functions shall include, but are not limited to, the loss of physical senses, the loss of physiological processes, or the loss of limb.

Types of catastrophic illnesses or injuries may include surgery to remove kidney/lung, emergency cardiac surgery, amputation of a limb, transplant surgery and cancer.

## Eligibility for Leave Request

Requests for leave will be considered on a first-come, first-served basis. In order for an employee to be considered eligible to receive leave from the Pool, a request for leave must be made by a regular employee with a qualifying illness or injury who meets all of the following criteria:

 ➢ The requesting employee must have donated a minimum of eight hours to the pool within 12 months preceding the date of the request;

 ➢ The employee must be out of work for thirty days due to a catastrophic illness or injury;

 ➢ The employee may not have any accrued paid leave available, including time accrued while participating in the Sick Leave Pool;

 ➢ The employee must be continuously employed with Bexar County for at least 12 months;

 ➢ The employee's catastrophic illness or injury may not be as a result of activity that is in the course of employment with Bexar County or from any other employment; and

 ➢ The employee must not be receiving Worker's Compensation benefits.

## Procedures for Leave Requests

### *Employee Responsibility*

1. To request leave from the Pool, an employee (or their representative) must complete the County Sick Leave Pool Leave form and turn it in to Human Resources.

2. An employee must obtain a Medical Certification of Catastrophic Illness or Injury from a medical care provider. The forms are available from Human Resources. If a current medical certification has been submitted for purposes of Family and Medical Leave and it covers the period of requested Pool leave, a copy of that certification may be used.

### *Supervisor Responsibility*

1. Offices and departments must verify eligibility by signing a Bexar County Sick Leave Pool Contribution form that has been completed and signed by the employee.

### *Sick Leave Pool Administrator*

1. The Sick Leave Pool Administrator will notify the employee in writing if the request for Pool leave has been approved or denied, and a copy will be sent to the office or department.

2. The Sick Leave Pool Administrator will process all requests for leave within five days from the time they are received.

3. If a request is denied, the reason(s) for denying the request will be included in the notification sent to the employee with a copy sent to the office or department.

## Disbursements

Any annual and sick leave contributed to the County Sick Leave Pool becomes the property of the County and can only be withdrawn by eligible employees as defined by this policy.

The maximum amount of Pool leave that can be disbursed to and used by an employee in one fiscal year shall not exceed 720 hours. However, at no time may an employee be granted more than one-third of the balance of hours in the Pool at the time of the request. An employee may request to use the Pool for each catastrophic illness until the employee uses the maximum amount of 720 for the fiscal year.

Any unused Pool leave disbursed to the employee will revert to the Pool under any of the following conditions:

➢ The employee returns to work in a full-duty, light-duty or modified duty status;

➢ The employee is no longer disabled;

➢ The employee resigns or otherwise terminates employment, including retirement; or

➢ The employee is deceased.

Under no circumstances will disbursed sick leave be eligible for monetary pay out if an employee who has been awarded leave from the Pool is unable to use the disbursed sick leave. The estate of a deceased employee is not entitled to payment for unused sick leave acquired by that employee from the sick leave pool.

## Contributions to the Pool

Any regular employee is eligible to donate leave to the Sick Leave Pool. Donations can only be made to the Pool and cannot be made to a specific employee.

> ➢ Donations can be made by filling out and turning in to Human Resources the County Sick Leave Pool Leave form for contributions.

> ➢ An employee may contribute up to five business days or forty (40) hours of accrued annual or sick leave to the Pool each fiscal year, in increments of eight hours.

> ➢ Contributions must be submitted to the Sick Leave Pool Administrator in Human Resources within ten business days from the date of the employee's signature.

> ➢ A separating employee may donate sick and vacation leave to the Pool in any amount as long as the contribution does not exceed the forty hour maximum for the fiscal year and the contribution is received by the Sick Leave Pool Administrator within ten business days from the date the employee signed their contribution form.

> ➢ Once a contribution is approved, the Sick Leave Pool Administrator will notify the office or department to ensure that the employee's appropriate account is deducted for the amount of the contribution and will ensure that the Sick Leave Pool is credited with the contribution.

> ➢ Contributions placed in the system by the Sick Leave Pool Administrator may not be rescinded.

TR-0432

# BEXAR COUNTY DEPARTMENT OF HUMAN RESOURCES

## Employee Conduct Policies

| | |
|---|---|
| **7.5.01** | **General Conduct** |
| **7.5.02** | **Sexual Harassment** |
| **7.5.03** | **Drug and Alcohol-Free Workplace** |
| **7.5.04** | **Confidentiality** |
| **7.5.05** | **Political Activity** |
| **7.5.06** | **Use of Government Property** |

TR-0433

# General Conduct

**Effective Date: January 1, 2007**

In order to maintain the confidence and respect of its citizens, Bexar County offices and departments should develop, maintain and communicate clear standards of conduct for their own office or department. Office and department specific standards for conduct must at least include information from this Chapter and any Government legal statutes that may relate to their operation.

## Ready, Willing, and Able to Work

Bexar County expects all employees to be ready, willing, and able to work. If an office or department determines that an employee is not ready, willing, and able to work, the employee may be asked to leave work for up to the remainder of the workday and the appropriate leave will be charged, excluding Administrative Leave. If leave is not available, the employee will be placed on leave without pay status. This type of action is not a disciplinary action. However, disciplinary action may be taken against an employee who repeatedly fails to appear ready, willing, and able to work.

## Dress Code

Employees shall dress with emphasis on professionalism, neatness and safety. An appropriate image shall include good grooming and hygiene with attire properly reflecting the type of work in which the employee regularly engages. Each office and department should adopt a standard for dress code. The dress code shall be distributed and communicated to each employee.

## Gifts, Entertainment, Financial Interests and Favors

Employees are prohibited from soliciting or accepting, directly or indirectly, any gift, favor, entertainment, loan or any type of monetary value from a person who has, or is seeking to obtain, contractual or other business or financial relations with the County or where official duties of the County will affect that person's business. Each office and department is responsible for developing a system for disclosing conflicts or apparent conflicts of interest. An employee may not receive any salary or anything of monetary value from a private source as pay for their services to the County.

TR-0434

## Office Donations

Managers may not force employees or make them feel obligated to contribute or make donations to any fund or collection. The Elected Official or Department Head must first be notified and approve any office collection.

## Outside Employment Policy

County employees are permitted to hold secondary non-County employment; however, managers must obtain the duties and details of the outside job, including the name and address of the employer from the employee. Offices and departments shall evaluate the duties of the outside employment and determine if
there is a conflict that would prevent the employee from holding both positions. All outside employment, including self-employment, must be approved by an office or department manager in writing. It is the responsibility of each office and to maintain all records regarding outside employment.

## Gambling, Betting and Lotteries

Employees are prohibited from participating while on County-owned or leased property or while on duty for the County, in any gambling activity including the operation of a gambling device, in conducting a lottery or pool, in a game for money or property, or in selling or purchasing a numbers slip or ticket.

TR-0435

# Sexual Harassment

**Effective Date: January 1, 2007**

It is the policy of the County and the responsibility of every manager and supervisor to provide and maintain a work environment that is free of sexual harassment, sexual exploitation, intimidation and retaliation from reports of sexual harassment. This harassment-free protection applies to all persons employed by the County or working as a volunteer in the County. Sexual harassment is a form of sex discrimination and is a violation of Federal Law Section 703 of Title VII of the Civil Rights Act of 1964 (as amended). "Sexual Harassment" is defined as unwelcome sexual advances, requests for sexual favors or other physical or verbal conduct of a sexual nature,

1. that creates a hostile, intimidating or offensive working environment;

2. the submission to which is made either implicitly or explicitly a term or condition of a person's employment; or

3. The submission to, or rejection of which is used as a basis for an employment decision affecting the harassed employee.

It is illegal and against County policy for any employee to sexually harass another employee or to create a hostile working environment by either committing or encouraging:

1. physical assaults on another employee; or

2. intentional physical contact that is sexual in nature, including but not limited to, touching, pinching, patting or brushing up against another employee's body; or

3. unwanted sexual advances, propositions or sexual comments, including gestures, jokes or comments made in the presence of any employee who has indicated in any way that such conduct in his or her presence is unwelcome; or

4. posting or displaying pictures, posters, calendars, graffiti, objects or other materials that are sexual in nature or pornographic.

Actions that arise out of a personal or social relationship and that are not intended to have a discriminatory employment effect might not be viewed as sexual harassment.

## Procedures for Reporting an Incident

Employees filing a sexual harassment claim are required by federal law to report the incident no later than 180 days after the alleged incident occurred. Bexar County highly encourages employees to report any claim of sexual harassment immediately.

1. If an employee is either subjected to or witnesses sexual harassment, the employee should notify their immediate supervisor or the Human Resources Division as soon as

TR-0436

possible. Supervisors will not disregard any complaint of sexual harassment. All claims of harassment shall remain confidential in compliance with State and Federal laws.

2. If the employee's immediate supervisor is the source of the alleged harassment, the employee should report the claim directly to the next level of supervision or may report it to the Human Resources Division.

The supervisor receiving the claim is responsible for immediately reporting it to the next level of supervision and may also report it to the Human Resources Division. The Human Resources Division is available at any stage of the process to receive complaints of sexual harassment. The incident must be reported even if the employee does not want action taken

## Investigation and Findings Procedures

The Human Resources staff will investigate all claims and reports of sexual harassment immediately and present their findings to the office or department from which the complaint was made and to the District Attorney's Office. The Elected Official or Department Head, with consultation from the District Attorney's Office will determine the appropriate action, including disciplinary action. The parties directly involved in the sexual harassment claim must be notified of the final outcome.

While the County cannot control the actions of outside parties, such as County vendors or patrons, employees who believe they have witnessed or been the subject of discrimination by an outside party, including sexual harassment or retaliation, must report the alleged act(s) as required by this policy.

*All sexual harassment cases are taken very seriously. An employee who knowingly files a false sexual harassment complaint is subject to discipline, up to and including termination*.

TR-0437

# Policy No. 7.5.03

# Drug and Alcohol-Free Workplace

**Effective Date: January 1, 2007**

Bexar County is committed to ensuring the health, safety, well-being and satisfactory work performance of all employees. The use, exchange or presence of alcohol, illegal drugs, and the misuse of legal drugs by County employees in any County facility, work site or County vehicle is prohibited.

Employees are required to refrain from:

> ➢ the unlawful use, manufacture, procurement, distribution, sale, and dispensing of illegal or legal drugs

> ➢ the misuse of legal drugs while on duty and for a sufficient time prior to the performance of duty so that none of the effects of the misuse of legal drugs remain during job performance

> ➢ the use of alcohol while on duty and for a sufficient time prior to the performance of duty so that none of the effects of the use of alcohol remain during job performance

> ➢ the misuse of substances and materials available in the workplace that may result in physical or mental impairment

## Mandatory Drug Testing for Safety-Sensitive Positions

Mandatory drug testing is required for all employees in safety-sensitive positions, as identified on the position description, as follows:

1. **Random Testing.** All employees in safety-sensitive positions are subject to controlled substance and alcohol testing on a random basis. The office/department is responsible for scheduling random tests so that safety sensitive employees will have an equal chance of being selected each time a random selection is made.

2. **Post-Accident Testing.** A controlled substance test and an alcohol concentration test are required after an accident. An "accident" is defined as a County employee operating a County motor vehicle which involves any one of the 7.5.03 Drug 2 Free Workplace following:

   a) A fatality.

   b) Injury requiring medical treatment within two hours.

c) Property damage to a vehicle requiring it to be towed.

d) Property damage estimated to be equal or greater than $500.

e) A violation of federal or state law, city ordinance or County rule.

Employees who are seriously injured and unable to provide a specimen at the time of the accident, or who are otherwise unable to comply with controlled substance and alcohol concentration testing, shall provide the necessary authorization for the office/department to obtain medical records, law enforcement reports and other documents that may indicate the presence of controlled substances or alcohol concentration.

## Removal from Duty

Employees shall be placed on administrative leave and not allowed to remain on duty in a safety-sensitive position if that employee found to use, manufacture, distribute, procure, sell, dispense or possess illegal drugs or is found to use alcohol when its effects will remain during job performance.

## Return to Duty

If an employee's test results are found to be negative, the employee shall return to duty in a sensitive position if it is determined that this action would not pose a danger to public health or safety. Following the return to work, the employee will be subject to at least six unannounced tests over the next 12 months and unannounced tests may continue for not more than 60 months following the return to work.

## Testing Based on Reasonable Cause

A controlled substance test and an alcohol concentration test are required if there is reasonable cause to believe an employee is under the influence of drugs or alcohol. "Reasonable cause" exists when an employee exhibits behavior which suggests impairment from drug or alcohol use or when job performance or safety is affected.

➤ Offices and departments shall place in writing their observations and any other supporting documentation for their reasonable cause.

➤ Offices and departments shall refer such an employee to an authorized testing facility.

## Refusal to Test

Employees who refuse to submit to drug and alcohol testing will be subject to disciplinary action up to and including termination. Employees who refuse to Free Workplace submit to post-accident drug and alcohol testing after being involved in a fatal accident will be disqualified from driving a County vehicle for one year and subject to disciplinary action up to and including termination.

A "refusal" by an employee to submit to a controlled substance and alcohol test includes any of the following:

1. Refusal to take the test.

2. Inability to provide sufficient quantities of breath or urine to be tested without a valid medical explanation.

3. Tampering with or attempting to adulterate the specimen or collection procedure.

4. Not reporting to the collection site in the time allotted.

5. Leaving the scene of an accident without a valid reason before the tests has been conducted.

## Testing Facilities

If an employee is required to submit to drug and alcohol testing, testing will occur at facilities authorized by Commissioners Court. Offices/departments should contact Human Resources for a list of current testing facilities authorized by Commissioners Court.

Whenever available, Bexar County will accept the results from drug and alcohol tests conducted by law enforcement officers pursuant to the Texas Penal Code and Texas Code of Criminal Procedure.

## Notification to Supervisor of Conviction

An employee convicted of a violation of a criminal statute relating to illegal drugs or alcohol shall notify their office/department no later than five days after the conviction.

## Reporting Requirements to Outside Agencies

Positive drug and alcohol testing may be reported to outside agencies and licensing authorities as required by law.

TR-0440

## Policy No. 7.5.04

# Confidentiality

**Effective Date: January 1, 2007**

All information concerning County business must be held in strict confidence and must not be discussed with others on or off the job except for purposes of necessary County business. An employee is prohibited from directly or indirectly using or allowing the use of official information obtained through or in connection with their position in the County for the purpose of furthering a private interest.

TR-0441

# Policy No. 7.5.05

# Political Activity

**Effective Date: January 1, 2007**

Bexar County employees are encouraged to vote during elections for the person or party of their choice. No employee shall be required to support, work for, make financial contribution to, or otherwise do campaign work for any candidate for political office.

Employees may voluntarily participate in political activities provided that it is a voluntary action on their part and they do not engage in such activities while on duty, in uniform, or while using County property.

No employee may be discharged, demoted, denied promotion, transferred or subjected to any type of personnel action because they did or did not participate in political activities.

TR-0442

## Policy No. 7.5.06

# Use of Government Property

**Effective Date: January 1, 2007**

County property of any kind, including property leased to the County, is prohibited for use for unofficial County business. All employees have the duty to protect and conserve government property, including equipment, supplies and other property entrusted or issued to them. Policies regarding the use of technology equipment such as desktop computers, laptops and cellular phones can be requested through the Bexar County Information Services Department or Administrative Policy 5.4.

Employees shall not participate in the bidding of County equipment sales, unless required by the employee's position.

TR-0443

# BEXAR COUNTY DEPARTMENT OF HUMAN RESOURCES

## Civil Service Commission Rules and Regulations

| | |
|---|---|
| 7.6.01 | **Introduction** |
| 7.6.02 | **Application of Civil Services Rules** |
| 7.6.03 | **Office and Department Policies** |
| 7.6.04 | **Criteria for Declaring a Position Sensitive and Exempt** |
| 7.6.05 | **Changes in Civil Service Status** |
| 7.6.06 | **Probation Periods** |
| 7.6.07 | **Posting Requirements for Vacancies** |
| 7.6.08 | **Certification of Position Descriptions** |
| 7.6.09 | **Reasons for Discipline** |
| 7.6.10 | **Progressive Discipline** |
| 7.6.11 | **Disciplinary Actions** |
| 7.6.12 | **Investigative Administrative Leave** |
| 7.6.13 | **Personal Grievances** |
| 7.6.14 | **Suspension, Demotion, Termination - Appeal and Hearing** |
| 7.6.15 | **Fitness for Duty Evaluation** |

**Adopted March 15, 2007; Effective March 16, 2007**
**Revised: Adopted May 24, 2012; Effective June 8, 2012**

TR-0444

# Introduction

**Effective Date: March 16, 2007**
**Revised: Adopted May 24, 2012**
**Effective June 8, 2012**

## Civil Service Commission

Chapter 7.6 contains the Rules and Regulations of the Bexar County Civil Service Commission ("the Civil Service Rules and Regulations"). The Bexar County Civil Service Commission ("the Commission") was established September 15, 1971 pursuant to chapter 158 of the Texas Local Government Code for the purpose of developing and enforcing rules regarding the selection and employment of Bexar County employees.

The Civil Service Rules and Regulations apply to employees of all Bexar County offices and departments that are not specifically excluded by statute or by the Commission. The Civil Service Rules and Regulations shall apply from the time of its adoption in all instances in which the Commission has jurisdiction. Any changes, deletions or additions to the Civil Service Rules and Regulations may be made by the Commission in accordance with its rule-changing provisions. The Commission is responsible for interpreting its rules consistent with applicable law.

The Civil Service Rules and Regulations will be available to all employees on the Bexar County Intranet and Internet, and a printed copy of the Rules and Regulations will be maintained by Human Resources.

## Change of Rules

These rules may be amended, repealed or supplemented by the Commission at any time and new rules may be adopted. Notice of such action shall be issued ten (10) business days prior to any action by the Commission to amend, repeal, or supplement any of these rules or to adopt new rules. The notice will include the time and place for the public hearing on the proposed actions. Copies of the notice and of the proposed changes or new rules shall be posted in Human Resources, and elsewhere as the Commission deems advisable. Copies of the notice and proposed actions shall be forwarded to County offices or departments, associations/unions upon request, and made available to the public for inspection upon request.

The Commission, after public hearing, may take action on the proposed changes or new rules and such changes or new rules may be adopted by a majority vote. The Commission has the discretion to adopt new rules and proposed amendments, postpone adoption until further review and/or changes, or decline to add or amend rules.

All rules and amendments adopted shall become effective the next business day following approval by the Commission.

# Application of Civil Service Rules and Regulations

**Effective Date: March 16, 2007**
**Revised: Adopted May 24, 2012**
            **Effective June 8, 2012**

The rules and regulations in this Chapter are established pursuant to Chapter 158 of the Texas Local Government Code and apply to all County employees who are designated by state law with civil service status.

While the Civil Service Rules and Regulations do not apply to employees in positions that are not covered by state law or positions specifically excluded by the Commission, these rules may serve as guidelines in developing individual discipline and conduct policies and procedures.

*Coverage for Deputy Constables*. Deputy Constables are covered under these Rules and Regulations.
*Temporary positions*. Employees filling temporary positions within the County do not obtain civil service status.

## Positions Not Covered By Law

The following employees are not covered under the Civil Service Commission, pursuant to Chapter 158 of the Texas Local Government Code:

**Employees of the Criminal District Attorney's Office**
**The Official Shorthand Reporter of a court**
**Elected or appointed officer under the constitution**
**Employees of the Bexar County Auditor's Office**
**Employees of the Juvenile Probation Department**

The following employees are also not covered by law under the Civil Service Commission

**Employees of the Central Jury Office**
**Employees of the Civil District Court Administration**
**Employees of the Criminal District Court Administration**
**Employees of the Juvenile District Court Administration**
**Employees of the County Courts-at-Law District Court Administration**

TR-0446

## Positions Excluded by Civil Service

A number of positions have been declared sensitive by Commissioners Court and thereafter excluded from Civil Service coverage by the Commission. Complete listings of these positions will be maintained by the Civil Service Director and are available at Human Resources.

TR-0447

# Policy No. 7.6.03

# Office and Department Policies

**Effective March 16, 2007**

The Commission recognizes that offices and departments may need to supplement the Civil Service Rules and Regulations with more specific policies and procedures for each individual office or department. The office or department covered by civil service must prepare and submit the proposed department policies and procedures to the Commission for review and approval to assure that they do not conflict with any established rules or regulations of the Commission. The office or department policies and procedures are effective only after approval by the Commission during open session in accordance with the Texas Open Meeting Act.

After Commission approval, each office or department shall furnish each employee a copy of the appropriate approved policies and procedures. The appropriate approved policies and procedures shall also be provided to each new employee.

The Commission requires that office or department policies and procedures include notice that a violation of the policies and procedures by an employee may be cause for appropriate disciplinary action, and that any disciplinary action taken may be in addition to any penalties prescribed by law.

TR-0448

# Policy No. 7.6.04

# Sensitive and Excluded Positions

**Effective Date: March 16, 2007**
**Revised: Adopted May 24, 2012;**
**Effective June 8, 2012**

An office or department may seek to declare a position sensitive and then have the position excluded from civil service coverage. This requires the following two-step process:

1. Commissioners Court and the County Manager may declare a position sensitive. Therefore, the office or department must first provide to Commissioners Court or to the County Manager a request to designate a position sensitive along with supporting written justification based on the applicable criteria as outlined below.

2. If approved by Commissioners Court or the County Manager, the office or department must then present their request to the Commission for approval to exclude the sensitive position from civil service coverage, citing the applicable criteria as outlined below.

## *Criteria for Declaring a Position Sensitive*

Commissioners Court[1] has adopted the following criteria for considering whether a position should be declared sensitive:

1. The position reports directly to a board, elected or appointed official, or department head.
2. The position acts autonomously and operates on a regular basis with a minimum of supervision, based on direction from a board, elected or appointed official, or department head.
3.  The position is responsible for a division within a department or a department within an office.
4. Discretion in decision-making is vital on a regular and constant basis.

5. The board, elected/appointed official or department head holds this position to a higher level of trust and confidentiality because of the involvement in various aspects of their administration, including but not limited to: policy development and implementation, delivery of service to the citizens of Bexar County or long range vision and planning.

---

[1] The Criteria for Declaring a Position sensitive and excluded from Civil Service was adopted by the Bexar County Civil Service Commission on April 30, 2001 and by Commissioners Court on January 29, 2002.

TR-0449

## Positions Typically Qualified To Be Excluded From Civil Service

The Commission has typically identified Executive and Manager Positions with the following job duties to be excluded:

### *Executive*

➢ Reports directly to elected or appointed official(s) or a board.
➢ May lead an office or department with multiple divisions.
➢ Develops strategies and long range plans.
➢ Sets policies and administers resources.
➢ Executives in Bexar County who assist elected or appointed officials in shaping the County's vision and mission.
➢ Executives who are responsible to the elected or appointed official for carrying out the office or department's overall strategic vision and mission.

### *Manager*

➢ Reports to an Executive, not in an administrative capacity.
➢ Responsible for a division or a department within an office.
➢ Discretion in decision making.
➢ High level of resources responsibility.
➢ Managers in Bexar County reporting directly to the executive and responsible for developing and implementing specific programs consistent with County and departmental strategies.
➢ Managers whose responsibility is to ensure that operations are consistent with the strategic direction of the County and the office or department.

TR-0450

# Change in Civil Service Status

**Effective Date: March 16, 2007**
**Revised: Adopted May 24, 2012**
          **Effective June 8, 2012**

## Retaining Civil Service Status

If a current employee with civil service status voluntarily remains in a position that has been changed from covered under civil service to exclude from civil service, pursuant to Policy No. 7.6.04, Sensitive and Excluded Positions, the employee retains civil service status in the excluded position.

## Accepting a Non-Covered or Excluded Position

If an employee with civil service status voluntarily changes positions and accepts a non-covered or excluded position, the employee does not retain civil service coverage in the non-covered or excluded position. For example, when an employee with civil service status accepts a position in the Auditor's office, an office not covered by civil service, the employee does not retain civil service status.

For a complete listing of non-covered offices and departments, and non-covered or excluded positions, please refer to Policy No. 7.06.02, Application of Civil Service Rules or contact Human Resources.

# Policy No. 7.6.06

# Probation Periods

**Effective Date: March 16, 2007**

All new and re-employed regular employees are placed on probationary status for six (6) months, except law enforcement employees who serve a one year probationary period. Time spent as a temporary employee does not fulfill the probation requirements. During the probation period, the office or department has a right to terminate employment at any time for any reason that does not violate public policy. There is no right to appeal.

An employee who is promoted during the probation period is continued on probation for the remainder of probation period. No new probation period is required if one is completed before the promotion.

## Voluntary Transfer

An employee who voluntarily transfers from one office or department to another serves an initial six months' probation in the new office or department. Involuntarily transfers or transfers for business needs are not subject to additional probation periods.

TR-0452

# Policy No. 7.6.07

# Posting Requirements for Vacancies

**Effective Date: March 16, 2007**
**Revised: Adopted May 24, 2012**
           **Effective June 8, 2012**

The office or department may recruit internally within the office or department or choose to recruit outside the office or department. If the position is filled through an internal transfer, no posting is required. For all other manners of filling a vacancy, posting is requires either internally or externally.

## Internal Posting Procedures

Internal postings are done by the office or department for a minimum of three (3) business days. The posting should include the position description, any special requirements or preferred qualifications and where applications are being received. Applicants must meet the minimum job requirements of the posted position.

## External Posting Procedures

A vacancy that the office or department chooses to recruit for externally must be posted for a minimum of five (5) business days by the Commission. All position postings should include the position description as well as special requirements or preferred qualifications.

The office or department should complete and submit the Job Announcement Request Form to Human Resources for posting. Posting requests will be processed three (3) business days.

The vacancy will be posted on the Bexar County website for a minimum of five (5) business days unless the office or department requests an additional period.

A position may be posted "Open until Filled" at the request of the office or department. The office or department should notify Human Resources as soon as possible when the posting should be removed from the web site.

Once the posting has closed all applications for applicants who have passed all the required screening test will be forwarded to the hiring office or department. Once a list of candidates has been selected for further review and/or for interviews, the hiring office or department will forward that list to the Civil Service Director. The Civil Service Director will certify that the final candidates meet the minimum qualifications for the position being filled and inform the hiring office/department in five (5) business days.

TR-0453

Upon receipt of certification of eligible candidates, the hiring office or department should proceed through a competitive process to select a candidate who is best- suited for the position.

## Testing

Any required testing identified on the position description such as typing tests and logic tests will be administered through the Commission or through the Texas Workforce Commission.

### *Logic Test*

Only those applicants that meet the qualifying score of 70 on the Bexar County logic test will be sent to the office or department. The logic tests are valid for one (1) year from the date of the test for external applicants.

### *Typing Test*

Only those applicants that meet the required typing test score for the position will be sent to the office or department. The typing test scores for external candidates are valid for one (1) year from the test and for three (3) years for internal candidates.

# Policy No. 7.6.08

# Certification of Position Descriptions

**Effective Date: March 16, 2007**
**Revised: Adopted May 24, 2012**
**Effective June 8, 2012**

New position descriptions or changes to existing position descriptions require approval by the Office of the County Manager and certification by the Commission. See guidelines set out in Human Resources Policy 7.2.04 Position Descriptions.

TR-0455

# Policy No. 7.6.09

# Reasons for Discipline

**Effective Date: March 16, 2007**

In addition to violation of office or department policies and procedures, an office or department many take disciplinary action against an employee if it is determined that the employee has committed any of the following violations, to include but not be limited to:

a. Poor attendance - excessive absences and/or tardiness.
b. Insubordination – unwilling to follow orders of a supervisor or higher level of authority.
c. Dishonesty – characterized by a lack of trust, honesty, or truthfulness.
d. Failure to provide notice of absence.
e. Misuse of leave.
f. Unauthorized absence – absence from duty which is not authorized or for which a request for leave has been denied.
g. Fighting or otherwise disrupting relations between employees during normal duty hours.
h. Failure to accept a transfer, either lateral or to an uncovered position, failure to report to a different duty location or failure to report to a different position for rotation of job duties. Failing to report to or choosing not to accept a new assignment may result in termination.
i. Failure to perform the job requirements.
j. Being in possession and/or under the influence of intoxicating beverages or substances or illegal controlled substances while on duty.
k. Sexual harassment.
l. Poor job performance.
m. Physical or verbal abuse of fellow employees, supervisors or the public.
n. Fraud or misrepresentation in the selection process, discovered within five years. If the employee is not qualified or not suitable for the position, the Commission may direct the removal of the employee on the basis of intentional fraud misrepresentation.
o. Perjury.
p. Violation of any statute, Civil Service Rule or Regulation, or any duty authorized office department rule or policy.
q. Knowingly creating and submitting false and/or slanderous reports and/or gossip regarding fellow employees, supervisors or subordinates.
r. Conduct or actions that seriously impair the employee's job effectiveness.
s. Conduct which is detrimental to or has an adverse effect on the office or department.

TR-0456

t.  Failure to obtain and maintain any position qualifications, licenses or certifications required by the employee's position description.

u.  Exhaustion of leave in excess of the allowable maximum period authorized by federal, state, county or local laws and rules.

v.  Conviction of a felony offense, class B or above misdemeanor, or any crime involving moral turpitude which relate to job functions.

w.  Failure to satisfactorily complete, obtain or maintain the required physical and/or psychological fitness for duty test.

x.  Solicitation or acceptance, directly or indirectly, of any gift, favor, entertainment loan or other thing which has monetary value in exchange for some action of the employee in the employee's official duties for the County. This includes solicitation between employees for gifts for superiors.

y.  Accepting gifts from contractors, vendors or other persons who are employed by persons/entities who are dealing with or attempting to deal with the County. These rules do not apply to calendars and similar articles that bear the donor's advertising.

z.  Outside employment that conflicts with an employee's duties for the County. An employee shall not receive additional compensation from a source other than the County for work performed for the County. An employee may not conduct outside employment on County time. Further, an employee shall not utilize sick leave in order to appear for outside employment. All outside employment will be approved according to each office or department's rules.

aa. Financial interests that conflict with an employee's employment with the County.

bb. Misuse or allowing the misuse of County property, directly or indirectly.

cc. Release of confidential information or misuse of information obtained through employment with the County.

dd. Gambling or betting while on County time.

ee. Failure to maintain current address and/or telephone number with the office or department.

ff.  Forcing co-workers to donate to an office fund or collection.

gg. Conduct that occurs off duty that negates the effectiveness of the employee or the office or department.

hh. Bidding on County equipment sales, unless required by the employee's position.

# Policy No. 7.6.10

# Progressive Discipline

**Effective Date: March 16, 2007**
**Revised: Adopted May 24, 2012**
**Effective June 8, 2012**

Bexar County subscribes to a policy of systematic progressive discipline, when possible, to permit an employee who violates policies or exhibits unsatisfactory job performance an opportunity to comply with office or department requirements and correct his or her actions.

Bexar County employees are expected to conduct themselves responsibly and with propriety in their work and are expected to abide by all policies and regulations of the County. To enable them to do this, each office or department should develop clear and reasonable policies and performance expectations, investigate the circumstances of apparent policy or rule violations or unsatisfactory performance before taking disciplinary action, and ensure that prompt, consistent disciplinary action is administered.

No disciplinary action may be taken against an employee based on race, color, sex, national origin, age, disability, religion, political affiliation/association or for any other discriminatory reason.

## Levels of Disciplinary Action

Each office or department has the authority and responsibility to take disciplinary actions against an employee for cause misconduct or for poor work performance. The levels of disciplinary action include:

1. Oral Counseling

2. Written Reprimand

3. Suspension

4. Demotion

5. Termination

In determining the level of discipline to impose, the office or department should consider factors that it deems relevant on a case-by-case basis, including but not limited to the following:

1. The seriousness of the employee's offense;

2. The position the employee holds;

TR-0458

3.  The employees' employment history, including any previously imposed disciplinary actions which occurred within the pervious twenty-four (24) months, shall be considered; instances of suspensions or demotions which occurred within the previous thirty-six (36) months shall also be considered;

4.  Other similar disciplinary actions within the office or department; and

5.  The progressiveness of the discipline, where practicable.

## Resignation in Lieu of Discipline

An employee who faces disciplinary action may voluntarily resign prior to the issuance of a disciplinary action. Resignation shall not be forced upon the employee by the office or department. If an employee chooses to resign, they may submit their resignation in writing to their office or department.

# Disciplinary Actions

**Effective Date: March 16, 2007**

## *Oral Counseling:*

An oral counseling is the most common method for assisting the employee to improve work performance or comply with rules and policies.

## *Written Reprimand:*

A written reprimand should state that it is a "written reprimand" and shall state that further disciplinary action will occur if the employee fails to achieve a satisfactory level of performance. A copy of the written reprimand should be provided to the employee.

## *Suspension:*

A suspension is the temporary release from duty of an employee for up to thirty calendar days without pay. A suspension is applicable when a prior reprimand does not produce satisfactory results in correcting behavior, or when the office or department determines that a violation of a rule or policy is serious enough to warrant a suspension without prior use of less severe discipline.

## Forfeit of Leave in Lieu of Release from Duty.

In lieu of release from duty, employees may request from their office or department to forfeit time from their available vacation leave, personal leave, FLSA, compensatory, or discretionary time up to a total of five days in one fiscal year. An employee allowed to do so will agree to report to work on those days of the forfeited leave and waive their right to appeal the suspension. The employee must sign an agreement which will be attached to the suspension in the employee's personnel file.

## *Demotion:*

A demotion is the involuntary reduction of an employee's pay grade and classification by the office or department. Demotion is applicable when a prior reprimand or suspension does not produce satisfactory results in correcting behavior, or when the office or department determines that a violation of a rule or policy is serious enough to warrant a demotion without prior use of less severe discipline.

TR-0460

## *Termination:*

A termination is the involuntary discharge of an employee by the office or department. Discharge is applicable when a prior reprimand, suspension, or demotion does not produce satisfactory results in correcting behavior, or when the office or department determines that a violation of a rule or policy is serious enough to warrant a termination without prior use of less severe discipline.

## Disciplinary Action within 120 Days

A disciplinary action cannot be filed against an employee for a non-criminal violation that occurred over 120 days prior to the service of the Notice of Proposed Disciplinary Action or written reprimand, unless it can be shown that the conduct was actively concealed. A disciplinary action for criminal activity can be brought at any time.

## Notice of Proposed Disciplinary Action and Reply

Prior to suspending, demoting or terminating an employee, the office or department shall provide the employee with a notice of proposed disciplinary action and provide a reasonable opportunity for the employee to respond orally or in writing to the charges. The office or department should review and inspect any and all evidence which supports the employee's position before the proposed disciplinary action takes place.

## *Notice of Proposed Disciplinary Action*

The office or department shall prepare a Notice of Proposed Disciplinary Action and include the following information.

1. The specific policies or rules violation.
2. The specific details of the violation(s), including names of witnesses, dates and times.
3. Inform the employee that the action is proposed and not a final decision.
4. Inform the employee that they have a right to reply and that the reply will be considered.
5. Inform the employee to whom the reply should be directed.

## *Service of the Notice of Proposed Disciplinary Action*

The Notice of Proposed Disciplinary Action, if practicable, should be made in person with a written receipt obtained. If personal service is not available, service is deemed complete if the Notice is sent by certified mail to the employee's last known address.

## *Employee Reply*

An employee shall have ten (10) business days from the day of receipt of the Notice of Proposed Disciplinary Action to reply as directed to the office or department. An employee shall have five business days to reply if there is reasonable cause to believe that the employee is

guilty of a crime for which a prison or jail sentence can be imposed. The day of receipt is not counted. If mailed, the reply must be postmarked by the reply date.

## Notice of Disciplinary Action

The office or department has ten (10) business days from the receipt of the employee's reply to send the employee a written Notice of Disciplinary Action. The day of receipt is not counted. The deadline may be extended by written agreement of the parties.

### *Notice of Disciplinary Action*

The Notice of Disciplinary Action shall include the following:

1. Inform the employee of the office or department's decision.
2. The effective date of the disciplinary action, which if not specified in the Notice, is deemed to be one day later than the date of receipt of the Notice by the employee.
3. Identify the reasons for the disciplinary action.
4. Inform the employee of the right to appeal the decision to the Commission.
5. Identify the individual(s) to whom such appeal should be addressed.
6. Identify the person or office from which the employee may obtain any additional information about the employee's rights.

### *Service of the Notice if Disciplinary Action*

The Notice of Disciplinary Action, if practicable, should be made in person with a written receipt obtained. If personal service is not available, service is deemed complete if the Notice is sent by certified mail to the employee's last known address.

## Copies of Disciplinary Actions

A copy of the Notice of Disciplinary Action and Proposed Notice of Disciplinary Action shall be placed in the employee's personnel file after ten (10) business days if no appeal of the Disciplinary Action has been filed with the Commission. If an appeal of the Disciplinary Action has been filed with the Commission, a copy of the Notice of Disciplinary and Proposed Notice of Disciplinary Action should not be placed in the employee's personnel file until the appeal is resolved by the Commission or the appeal is withdrawn by the employee.

TR-0462

## Policy No. 7.6.12

## Investigative Administrative Leave

**Effective Date: March 16, 2007**

Investigative Administrative Leave is the temporary release from duty or job transfer for up to ten (10) days with pay to permit the investigation of a serious violation of office, department or civil service rules and regulations.

The office or department shall place an employee on Administrative Leave when the disciplinary action arises from an incident which constitutes a crime against the County.

The office or department may place an employee on Administrative Leave if it is in the best interest of the County and there is no lateral position to which the employee may be reassigned.

The period of leave may be extended in increments of 10 business days. Upon completion of the investigation, the employee may be returned to work without penalty or disciplinary action may be taken.

TR-0463

## Policy No. 7.6.13

## Personal Grievances

**Effective Date: March 16, 2007**

A personal grievance is a written complaint made by an employee concerning a condition of employment and includes grieving a written reprimand.

### Filing a Grievance within an Office or Department

1.  An employee must file a written personal grievance with the elected/appointed official, department head or their immediate supervisor within ten (10) business days from the first date of occurrence or the first date the employee became aware of the occurrence of the incident or condition which is the subject of the grievance. The day of occurrence is not counted.

    a. Failure to meet the time limit for initial filing acts as a forfeit of the matter grieved.
    b. The grievance should clearly state "Personal Grievance."
    c. An employee cannot grieve an occurrence of incident or conduct that occurred during an employee's probationary period.
    d. An employee cannot grieve an oral counseling.

2.  The office or department has ten (10) business days to respond in writing to the employee's personal grievance. The day of receipt is not counted. Failure to meet the time limit does not act as a default or forfeit of the matter grieved.

3.  The parties may, by written agreement, extend the deadline to respond.

### Filing an Appeal with the Commission

1.  If the employee is not satisfied with the final written determination from the office or department or if no determination is issued, the employee may appeal to the Commission. The appeal shall be written on the Employee's Appeal Form available from the Commission and shall be filed within 10 business days of receipt of the final determination or the date the determination was due. The day of receipt or determination due date is not counted. An appeal not on the Employee Appeal Form will not be accepted for filing.

2.  Any appeal filed after the deadline is null and void and shall not be accepted for filing by the Commission. Commission staff shall inform the Commission of any appeal that was not accepted.

TR-0464

3.  The Commission has no jurisdiction to hear an appeal regarding budgetary matters, reorganizations, and other matters not specified in Texas Local Government Code, sections 158.001 et. seq., as amended.

## Hearing Procedures

### *Requesting a Department Response Form*

The Civil Service Director will request a response from the office or department. A response by the office or department should be made on the Department Response Form and filed in ten (10) business days. The day of receipt is not counted.

### *Setting the Matter for Hearing*

The Commission will set the matter for hearing. Appeals from personal grievances are the last in the order of priority for hearing settings.

### *Notice of Hearing*

1.  The employee must keep the Commission informed of their current address.

2.  The Commission will notify all parties of the hearing date, time and location. This notice will be provided with at least two weeks prior to the hearing date. A letter mailed to the last known address of the employee will constitute notice.

### *Request for Continuance*

Any request to re-set a hearing must be made in writing seven (7) days prior to the scheduled hearing, unless an emergency arises. By agreement of the parties, the Commission will cancel and re-set the hearing date. However, the Commission will not re-set a hearing more than twice unless the parties agree.

### *Attendance at the Hearing*

1.  The employee must be present at the hearing and may represent themselves or be represented by another person. The employee should notify the Commission of the selection of a representative and who the representative will be. Any representative shall act as the spokesperson for the employee during the appeal process.

2.  The Commission has the authority to administer oaths to all witnesses. Once sworn, witnesses will be subject to penalties for perjury.

3.  At the beginning of the hearing, the reason for the appeal from the personal grievance shall be read including the date of occurrence and the remedy requested by the employee from the Employee's Appeal Form.

TR-0465

4. The hearing shall be open to the public unless the employee notified the Commission in writing five (5) days prior to the hearing date that the employee wishes the hearing to be closed.

5. Either party may invoke "The Rule," Texas Rule of Evidence 613, which means that all witnesses, excluding the office or department representative and the employee, will not be allowed to remain in the hearing, or no witness shall discuss their testimony with other witnesses.

6. The employee will present their appeal to the Commission first and the employee carries the burden of proof.

7. The office or department will have an opportunity to respond.

8. The employee will then be allowed to respond to the office or department.

9. Each side may call witnesses and will be allowed to cross-examine each other's witnesses.

10. The Commission may ask any questions necessary of any party or witness or recall any witness if necessary for clarification.

11. Any witness may be released by the Commission after giving testimony.

12. Five copies of any documents must be submitted.

13. Each side shall have an opportunity to make a closing statement to the Commission. The employee shall make the first closing statement followed by office or department. The employee may choose to make a short rebuttal after the closing statement of the office or department.

14. The Commission may recess to deliberate in executive session.

15. If an executive session is held, the Commission shall reconvene in open session and make a decision. The Commission may choose to deny the appeal or grant the relief requested, which may include an award of back pay if authorized by statute.

16. If the employee is to receive back pay by order of the Commission, the employee shall receive full compensation at the rate of pay that was provided for their position at the time of their appeal or the amount of compensation considered fair by the Commission. Should the office or department refuse to reinstate the employee as ordered by the Commission, the employee shall be entitled to their full salary just as though they had been reinstated as ordered.

17. A written order shall be entered which states the Commission's ruling. Such order shall be signed by the members of the Commission who made the decision and sent to all parties.

## *Copy of the Record*

A tape recording of all hearings will be on file in the Human Resources Office. A copy will be provided upon request as permitted by law and payment of all costs in advance.

# Policy No. 7.6.14

# Suspension, Demotion or Termination - Appeal & Hearing

## Effective Date: March 16, 2007

1. An employee who wishes to appeal a suspension, demotion or termination may appeal to the Commission. A written appeal on the Employee's Appeal Form available from the Commission shall be filed within ten (10) business days after receipt of the Notice of Disciplinary Action. The day of receipt is not counted. An appeal not on the Employee Appeal Form will not be accepted for filing.

   a. An appeal filed after the deadline is null and void and shall not be accepted for filing by the Commission.
   b. The appeal shall be styled "Employee versus the office or department" and not the elected/appointed official or department head.
   c. An employee cannot file an appeal of a disciplinary action occurring during an employee's probationary period.

2. The Civil Service Coordinator will request a response from the office or department. A response by the office or department should be made on the Department Response Form and filed in 10 business days. The day of receipt is not counted.

## Hearing Procedures

### Setting the Matter for Hearing

1. The Commission will set the matter for hearing.

2. The order of priority of appeals before the Commission is terminations, demotions and suspensions.

### Notice of Hearing

1. The employee must keep the Commission informed of their current address.

2. The Commission will notify all parties of the hearing date, time and location. This notice will be given at least two weeks prior to the date of the hearing. A letter sent by certified mail to the last known address of the employee will constitute notice.

### Attendance at the Hearing

1. The employee must be present at the hearing and may represent themselves or be represented by another person. The employee should notify the Commission of the

TR-0468

selection of a representative and who the representative will be. Any representative shall act as the spokesperson for the employee during the appeal process.

2. If the employee is not present at the time of hearing, the Commission shall dismiss the appeal and enter a written order to that effect.

3. The office or department must be present through the elected official, department head or representative.

## *Hearing*

1. Two Commissioners is a quorum which allows a hearing to proceed.

2. The Commission has the authority to administer oaths to all witnesses. Once sworn, witnesses will be subject to penalties for perjury.

3. At the beginning of the hearing, the disciplinary action shall be read including the date of occurrence and the rule or policy violated from the Department Response Form.

4. The hearing shall be open to the public unless the employee notified the Commission in writing prior to the hearing date that the employee wishes the hearing to be closed.

5. The office or department has the burden of proof and of going forward at the hearing.

6. Either party may invoke "The Rule." Texas Rule of Evidence 613 which means that all witnesses, excluding the office or department representative and the employee, will not be allowed to remain in the hearing and no witness shall discuss their testimony with other witnesses.

7. Each party may make a brief opening statement to the Commission. The office or department will go first, followed by the employee.

8. The office or department will present their witnesses first and has an opportunity to present rebuttal witnesses.

9. The employee will present their witnesses second and be allowed to respond to the office or department.

10. Each side may call witnesses and will be allowed to cross-examine each other's witnesses.

11. The Commission may ask any questions necessary of any party or witness or recall any witness if necessary for clarification.

12. Any witness may be released by the Commission after giving testimony.

13. Five copies of any document must be submitted.

14. Each side shall have an opportunity to make a closing statement to the Commission. The office or department shall make the first closing statement followed by the

TR-0469

employee. The office or department may choose to make a short rebuttal after the closing statement of the employee.

15. The Commission may recess to deliberate in executive session.

16. If an executive session is held, the Commission shall reconvene in open session and make a decision. The Commission may choose to deny the appeal and uphold the disciplinary action, impose a lesser penalty than the one taken by the office or department and may include an award of back pay, or overturn the disciplinary action. The Commission is not limited in the length of time a suspension may last.

17. If the employee is to receive back pay by order of the Commission, the employee shall receive full compensation at the rate of pay that was provided for their position at the time of their appeal or the amount of compensation considered fair by the Commission. Should the office or department refuse to reinstate the employee as ordered by the Commission, the employee shall be entitled to their full salary just as though they had been reinstated as ordered.

18. A written order shall be entered which clearly states whether the action will be upheld, dismissed or reduced. Such order shall be signed by the members of the commission who made the decision and sent to all parties.

## *Copy of the Record*

A tape recording of all hearings will be on file in the Human Resources office. A copy will be provided upon request as permitted by law and payment of all costs in advance.

## *Appeal to District Court*

Pursuant to chapter 158 of the Texas Local Government Code, an employee who on final decision by the Commission is demoted, suspended or removed from the employee's position may appeal the Commission's decision in district court within 30 days of the date of the decision.

# Policy No. 7.6.15

# Fitness for Duty Evaluation

**Effective Date: March 16, 2007**
**Revised: Adopted May 24, 2012**
**Effective June 8, 2012**

Offices or departments have authority to direct an employee to take a fitness for duty medical examination when a specific injury, incident, action, or behavior indicates that such an evaluation may be warranted.

## Written Order and Administrative Leave

The office or department shall provide the employee with a written Order for Fitness for Duty Evaluation which provides the reason(s) the evaluation is being ordered. The Order should also include whether the employee will be placed on Administrative Leave, with pay, or retained on duty until a final determination is made.

## Medical Evaluation

The employee should be referred for medical examination with a statement of the particular demands of the position and a statement of how the employee's performance fails to meet these demands. Evaluations will be conducted either by a physician, psychiatrist or psychologist under contract or employed by the County, as appropriate, at no expense to the employee. A list of doctors may be obtained from Human Resources.

## Failure to Complete the Evaluation

Failure by the employee to complete the evaluation process may result in disciplinary action, including termination.

## Removal from Duty

In the event that the medical evaluation finds the employee not fit for duty, the employee will be removed from their position pursuant to Bexar County Civil Service Rules and Regulations.

If the employee has a permanent disability protected under the Americans with Disabilities Act, the employee may be considered for an open position within that office or department. The employee must perform the essential functions of the job in question, with or without reasonable accommodation, and must meet the minimum job requirements. The employee's salary will depend on the pay range for the open position and will be in accordance with County policy. If there are no open positions or the employee refuses the offer, the office or department will proceed with the termination.

TR-0471

# Appeal Procedures - Fitness for Duty Actions

An employee who is suspended, demoted or terminated under this policy may file an appeal under the appeal procedures outlines under Bexar County Civil Service Rules and Regulations.

## *Three Doctor Panel*

1. If the aggrieved employee files a timely appeal with the Commission, the Commission will select a panel of three (3) physicians or psychiatrists (depending on the nature of the fitness requirement) and submit the names and addresses of the panel of three (3) doctors to the appealing employee. The list of doctors should be sent by certified mail to the employee's last known address.

2. The appealing employee has the option of being examined by at least two (2) of the three (3) doctors on the panel to determine the employee's fitness for duty. All expenses and fees for these medical evaluations by the panel shall be paid for by the County if the employee is found fit for duty by two of the three doctors. If the appealing employee is not found fit for duty by two of the three doctors, all expenses and fees for the medical evaluations shall be paid for by the appealing employee.

3. The evaluations must be conducted and the doctors' reports submitted to the Commission within thirty (30) business days after receipt of the notification by the Commission. Failure by the appealing employee to schedule the evaluation or have the reports submitted timely will act to forfeit the appeal.

4. In order to aid in the evaluation of the employee, the Commission shall require the office or department, or the physician, psychiatrist or psychologist under contract or employed by the County, to submit the results of the fitness for duty evaluation and any attending medical records or reports to the doctors on the panel selected by the employee. The appealing employee must sign a medical release and will be responsible for any cost for obtaining these records if found not fit for duty by two (2) of the three (3) doctors. Furthermore, the Commission shall require the appealing employee to submit any medical records or reports concerning their condition prepared by their personal physicians or hospitals to the doctors on the panel selected by the employee.

5. The selection of the panel of doctors by the Commission shall be made from a list of eligible physicians or psychiatrists maintained by the Commission for this purpose. Eligibility for any doctor to be appointed to the list shall be determined by the Commission based upon the recommendations of the Bexar County Medical Association. Additionally, none of the appointed doctors on the panel may be employed by the County or under contract to the County or under contract to the County.

6. If two (2) out of three (3) doctors on the panel find that the appellant is fit for duty, the Commission will order the reinstatement of the appealing employee.

TR-0472

## *Hearing before the Commission*

The Commission will not hold an evidentiary hearing concerning Fitness for Duty Evaluation appeals and will not analyze or debate medical findings or evidence. The Commission's decision will be solely based on the recommendations of the panel.

The Commission recognizes that there may be instances where an appealing employee may have been disciplined for conduct or acts which are unlawful or rule infractions which led to their fitness for duty re-evaluation, as well as being demoted, suspended or dismissed for the required fitness for duty. In those cases, the Commission shall resolve the issue of fitness for duty through the above procedures *before* determining the issue of the conduct or rule or violation If the appealing employee is reinstated on the issue of fitness for duty, the office or department is *not* prohibited from bringing or maintaining disciplinary action against the employee for any conduct or rule violations which led to the fitness for duty evaluation. Any disciplinary action for such conduct or action shall be severed from the fitness for duty issue and dealt with at a separate evidentiary hearing.

# BEXAR COUNTY DEPARTMENT OF HUMAN RESOURCES

## Workforce Development Policies

**7.7.01**          **Performance Appraisals**

**7.7.02**          **Training and Development Program**

**7.7.03**          **Tuition Assistance Program**

TR-0474

# Performance Appraisals

**Effective Date: January 1, 2007**

Bexar County has adopted a Performance Appraisal process to provide information and feedback about employee job performance to the employee, supervisor and management. Performance Appraisals provide the supervisor and the employee with a means of discussing the employee's job duties and responsibilities along with work circumstances and work environment. Performance Appraisals should be conducted on the employee's anniversary date in the office/department.

## Performance Appraisal Forms

Employee Performance Appraisal forms and Employee Self-Evaluation forms, as well as an explanation of performance dimensions, can be obtained by contacting the Human Resources Department.

## Employee Responsibilities

Employees can voluntarily complete an Employee Self-Evaluation form which will assist supervisors in completing the Employee Performance Appraisal.

## Office and Department Responsibilities

The office or department should personally inform an employee that a performance appraisal is upcoming and ask the employee to voluntarily complete and submit their Employee Self-Evaluation by a certain date. If submitted, the office/department should meet with the employee and discuss the information from the Employee Self-Evaluation. The office or department should then complete the Employee Performance Appraisal form with any recommended action. The office or department should furnish the completed Employee Performance Appraisal form to the employee and meet again with the employee to review the final appraisal and to obtain the employee's signature.

If there are any changes to the final recommendation, the changes should be reviewed with employee as soon as possible and a final copy of the Employee Performance Appraisal should be provided to the employee and maintained in the employee's personnel file.

TR-0475

## Policy No. 7.7.02

## Training and Development Program

**Effective Date: January 1, 2007**

Bexar County has established a Training and Development program which is designed to encourage employees in the development of skills, knowledge and abilities that will assist employees in becoming fully qualified for their current position and enhance their opportunity for advancement. Through this program, quality training is provided at no cost to employees and is available for all County employees. Offices and departments are strongly encouraged to allow employees to participate in the various training events offered throughout the year and to designate an office or department training liaison to work with the Training and Development Specialist in Human Resources.

Employees must notify their supervisor for classes they are interested in attending and request approval from the office or department to attend any of these classes. The office or department training liaison will notify the Training and Development Specialist to register interested employees for each class.

TR-0476

# Policy No. 7.7.03

# Tuition Assistance Program

**Effective Date: January 1, 2007**

**Tuition Assistance Request Form (PDF)**

Bexar County provides a Tuition Assistance Program to encourage eligible employees to continue their education. This program provides tuition assistance for academic and technical courses taken at an accredited college/university or a recognized technical training school. Courses must be related to the employee's present position or to a position that the employee could reasonably progress to within the County. Courses taken must not interfere with the business needs of the County.

## Eligibility

All full-time, regular employees in positions authorized by Commissioners Court are eligible to participate after they have completed their first six months of employment.

The following are **ineligible** for tuition reimbursement:

1. Part-time employees (those employees who work less than thirty-two (32) hours per week);
2. Contract employees;
3. Employees who have not completed their probationary period;
4. State employees (e.g., employees from Community Supervision and Correction);
5. Temporary employees, including interns;
6. Employees on disability or an approved leave of absence;
7. Programs leading to a doctoral degree (any post-graduate doctoral-level degree, including, but not limited to: Ph.D., Psy.D., MD, JD, Ed.D);
8. Courses for which reimbursement has already been paid; or
9. Courses involving sports, games, or hobbies (unless required as part of a degree program/plan).

TR-0477

## Retention Agreement

By participating in this program, the employee agrees to a one-year retention commitment to the County. The employee must remain employed with the County for a minimum of one year from the date on the most recent issued reimbursement check.

If the employee terminates his or her employment with the County or if the employee is terminated for cause, the Auditor's Office will deduct a prorated amount from the employee's final paycheck to refund the County. If the total amount owed back to the County cannot be recovered in full from the employee's final paycheck, a balance letter will be mailed to the employee for the remaining balance due.

## Program Guidelines

This program allows an employee to receive a partial reimbursement for tuition and mandatory fee costs (as identified below) at a maximum of two courses per school term as identified below, with a maximum of six courses per fiscal year.

A school term is defined as a:

    a)  Fall semester or quarter between August and December;

    b)  Spring semester or quarter between January and May; or

    c)  Summer semester or quarter between May and August.

Funding is based on the fiscal year, and reimbursements are paid out on a first-come first-serve basis.

### Availability of reimbursement is subject to budget limitations.

Reimbursement costs include tuition and mandatory fees such as lab fees, library fees, student center fees, automated services and records processing, registration, student services, and identification cards fees.

Reimbursement costs do not include internships or supplementary costs, such as books, course supplies, parking, late fees, penalties and orientation fees, applications for graduation, installment fees, or copies of official transcripts or certificates.

Prior approval of tuition reimbursement is not a guarantee that the employee will be reimbursed. Reimbursement is contingent upon budget constraints and which employee is first in line to receive reimbursement. Obtaining prior approval to participate in the program serves only to put the department, Human Resources, and the Auditor on notice that reimbursement is requested.

## Amount of Reimbursement

The maximum amount of reimbursement for college courses is based upon the prevailing tuition rate set by the University of Texas-San Antonio (UTSA). Non-college courses, pass-fail courses, certificate courses, or professional development courses are paid at the prevailing UTSA rates or the rate the employee paid, whichever is lower.

The amount reimbursed is contingent upon the employee's successful completion of courses as follows:

| Undergraduate Graded Courses | Graduate Graded Courses | Non-Graded Courses | Pass-Fail Courses |
|---|---|---|---|
| 90% - a grade of A | 90% - a grade of A | 50% - Satisfactory | 50% - Pass |
| 80% - a grade of B | 80% - a grade of B | 0% - non-satisfactory | 0% - Fail |
| 50% - a grade of C | 50% - a grade of C or below | | |
| 0% - a grade of D or below | 0% - a grade of D or below | | |

If the employee received scholarships, grants, or gifts, participate in education assistance, or GI Bill programs to cover all or part of the cost of tuition, that amount will be used to calculate the employee's tuition reimbursement. Employees are not eligible to receive two types of tuition reimbursement. Student loans are not calculated against tuition reimbursement.

## Procedures

*Employee Responsibilities*

1. **The employee must obtain the approval of their office or department prior to seeking reimbursement for each school term. Courses taken must not interfere with the employee's duties, responsibilities, or attendance.**

2. The employee must be eligible (as outlined above). The employee must be pursuing an associate, undergraduate, master's degree program or an approved certificate or training program.

3. The employee must fill out and submit the Employee Tuition Assistance Application form to Human Resources within thirty (30) days after the date of registration. A new application form must be submitted for each school term.

4. Human Resources will audit all tuition assistance applications. Human Resources will make the final determination for tuition assistance eligibility and make the final approval of all tuition assistance applications.

TR-0479

5. **Incomplete applications will not be processed.** It is the employee's responsibility to ensure a complete application is submitted to Human Resources within the 30-day application period.

    a) Human Resources may contact an employee regarding incomplete applications. If an incomplete application is submitted and not completed within the 30-day application period, the application will automatically be denied without further notice to the employee.

    b) Human Resources may contact an employee regarding denied or rejected applications. It is the responsibility of the employee to check the status of his or her tuition reimbursement application and tuition assistance checks.

6. Within 30 days of the final day of classes (excluding the posted final exam schedule), the employee **must** submit a verifiable copy of the course grade or certificate of completion to Human Resources. An internet printout of the unofficial transcript with the grades displayed is acceptable.

7. Once the course(s) is complete, the employee **must** submit to Human Resources a copy of the grade the employee received for the course(s) and the itemized tuition invoice showing tuition, fees, credits, and charges. An internet printout of both documents is acceptable.

8. The employee's signature on the receipt of the tuition assistance check confirms a one-year retention commitment. A copy of the receipt form will be given to the employee and a copy will be included with the employee's personnel file.

9. Once the reimbursement check is issued, the Auditor's Office will notify Human Resources. The employee must pick up the reimbursement check from the Auditor's Office and must present a valid form of photo identification.

*Office or Department Responsibilities*

1. Offices and departments should refer all employees to Human Resources or to the County intranet to obtain the Employee Tuition Assistance Application form.

2.  Only signed Employee Tuition Assistance Application forms should be submitted to Human Resources.

## Grandfather Clause

A completed application on file for the current school term at the time a policy update is adopted will be fulfilled, so long as there is money in the budget to reimburse the employee.

A completed application on file for a school term that begins after a policy update is adopted will be subject to any new eligibility and program guidelines set forth in the policy update.

TR-0480